Trey A. Monsour
State Bar No. 14277200
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tmonsour@polsinelli.com

Jeremy R. Johnson (*Pro Hac Vice* Pending)
Polsinelli PC
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| Senior Care Centers, LLC, *et al.*,[1] | § § | Case No. 18-18-33967 (BJH) |
| Debtors. | § § § | (Joint Administration Requested) |

**DECLARATION OF KEVIN O'HALLORAN, CHIEF RESTRUCTURING
OFFICER OF SENIOR CARE CENTERS, LLC, IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Kevin O'Halloran, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of Senior Care Centers, LLC and its subsidiaries (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"). I have served as CRO of the Debtors since November 18, 2018.

2.      In addition to my role with the Debtors, I am also a principal of Newbridge Management, LLC ("**Newbridge**"). At Newbridge, I provide broad restructuring, crisis

---

[1]   A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as Exhibit A. The Debtors' mailing address is 600 North Pearl Street, Suite 1100, Dallas, Texas 75201.

management, and financial advisory services across a wide spectrum of distressed situations. Newbridge and I specialize in corporate restructurings, acquisitions/sales and due diligence, implementation and/or monitoring of bankruptcy plans and settlements, and have worked with a number of companies across a range of real estate, finance, service and manufacturing industries, both public and private, through reorganization and liquidation programs. I have been appointed as a Receiver in the Federal District Courts, as well as by State Courts, in Alabama, Colorado, Georgia, Missouri, North Carolina, Pennsylvania, and Tennessee, and as a Liquidator by the Grand Court of the Cayman Islands. In addition, I have been appointed as Chapter 11 Trustee, Examiner, as well as Plan Trustee and Liquidating Agent for a number of Chapter 11 cases by the Federal Bankruptcy Courts in Alabama, Arizona, Florida, Georgia, Tennessee and Virginia. I have been retained in numerous cases by boards of directors, with Court approval, as chief restructuring officer. In these cases I have been responsible for the management of corporations, significant asset sales, as well as complex litigation including professional malpractice, securities and investor rights issues.

3.      In my capacity as CRO of the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors. Additionally, I have worked with certain interim management and other personnel (the "**BDO Personnel**") provided by BDO USA, LLP (together with its affiliates, "**BDO**").

4.      As CRO, I am authorized to make this declaration (the "**Declaration**") on behalf of the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees, agents,

attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

5.      I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases and in support of: (a) the Debtors' voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Court**"); and (b) the relief that the Debtors have requested from the Court pursuant to the motions and pleadings (collectively, the "**First Day Pleadings**").

6.      Contemporaneously herewith, the Debtors have filed the following First Day Pleadings:

a.      Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Their Chapter 11 Cases, and (II) Granting Related Relief (the "**Joint Administration Motion**");

b.      Motion of Debtors for Entry of an Order (I) Authorizing the Filing of a Consolidated Mailing Matrix and Consolidated List of Forty Largest Unsecured Creditors, and (II) Approving the Form and Manner of Notice of Commencement of These Chapter 11 Cases (the "**Consolidated Creditor Motion**");

c.      Motion of the Debtors for Entry of an Order Pursuant to Bankruptcy Rule 1007 Extending the Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "**Schedules Extension Motion**");

d.      Application of Debtors for Entry of an Order Authorizing Employment and Retention of Omni Management Group, Inc. as Claims, Noticing, and Administrative Agent, *Nunc Pro Tunc* to the Petition Date (the "**Claims Agent Application**");

e.      Motion of Debtors for Entry of An Order Authorizing Procedures to Maintain and Protect Confidential Patient Information (the "**Patient Confidentiality Motion**");

3

f.     Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (I) Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on a Postpetition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, (V) Workers' Compensation Obligations, and (VI) Prepetition Claims Owing to Administrators and Third-Party Providers (the "**Wages Motion**");

g.     Motion of Debtors for an Order Authorizing Payment of Prepetition Taxes and Fees (the "**Taxes Motion**");

h.     Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (II) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "**Utilities Motion**");

i.     Motion of Debtors for Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies From Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief From the Automatic Stay, (IV) Authorizing the Debtors to Continue to Honor Premium Financing Obligations, and (V) Authorizing the Debtors to Continue Surety Bond Program (the "**Insurance Motion**");

j.     Motion of Debtors for Entry of an Order Authorizing the Debtors to (I) Maintain, Administer, and Modify Patient Refund Programs and Practice, and (II) Honor Obligated Related Thereto (the "**Patient Refund Motion**");

k.     Motion of Debtors for Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices (the "**Cash Management Motion**"); and

l.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II), Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief (the "**Cash Collateral Motion**").

7.      The Debtors seek the relief set forth in the First Day Pleadings to minimize the disruption to and adverse effects of the commencement of the Chapter 11 Cases on business operations and to maximize the value of their assets. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me by the Debtors' advisors, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

8.      References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience in other healthcare restructurings. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

9.      To familiarize the Court with the Debtors and the relief the Debtors seek early in these Chapter 11 Cases, this Declaration is organized into four sections. Section I provides an introduction to the Debtors and detailed information on the Debtors' corporate history and business operations. Section II provides an overview of the Debtors' prepetition capital structure and lease obligations. Section III describes the circumstances leading to the commencement of these Chapter 11 Cases, the Debtors' efforts to negotiate agreements with key constituents and the objectives of these Chapter 11 Cases. Section IV sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with these Chapter 11 Cases, which the

Debtors believe are critical to administering these Chapter 11 Cases and preserving and maximizing the value of the Debtors' estates.

## PRELIMINARY STATEMENT

10.     The Debtors are one of the largest providers of skilled nursing services in the country, providing care on a daily basis to approximately 9,000 patients. The Debtors are licensed operators of ninety-seven (97) skilled nursing facilities, nine (9) assisted living facilities, and six (6) hospice facilities (collectively, the "**Facilities**" and each, a "**Facility**"). In addition, the Debtors provide rehabilitation, therapy, and other services. The Facilities are located throughout Texas and Louisiana. As of the Petition Date, the Company employs approximately 11,300 employees (collectively, the "**Employees**") in full- and part-time positions across the Facilities.

11.     Like much of the healthcare sector, the operators of skilled nursing facilities ("**SNFs**") are and have been experiencing significant challenges and financial distress in recent years. The challenges faced by the Debtors are similar to those experienced by other SNF operators and widespread within the skilled nursing industry. The Debtors faced increasing financial pressure in 2017 and 2018 cause by, among other things, declining reimbursement rates, difficulties in collecting accounts receivable, declining census, and occupancy rates, increasing lease obligations, tightening terms with various trade creditors, and a significantly reduced working capital loan facility. All of these factors have combined to negatively impact the Debtors' operations.

12.     In response to increasing financial pressure, in June 2018, the Debtors engaged BDO to provide interim management and advisory services as the Company explored strategic alternatives. The Debtors also formed a special committee of the Board of Directors in order to

6

review and evaluate strategic alternatives and the Debtors engaged Kaufman Hall as financial advisor and S-4 Consulting as consultant to assist the Company in reviewing and evaluating its strategic alternatives. From July 2018 to November 2018, the Debtors explored strategic alternatives including but not limited to negotiations with key landlords to restructure, reduce or defer ongoing rent payments, a sale of some or all of the equity in the Debtors, additional debt or equity capital investment in the Debtors, a sale of some or all of the Debtors' assets, a spin-off of some of the assets of Debtors, and a refinancing of the Company's existing accounts receivable debt facility to provide additional liquidity. In connection with this process, BDO and the Debtors held lengthy negotiations with lenders, landlords, potential investors, and potential sale bidders in an effort to sell, recapitalize or restructure the Debtor and its assets and resolve the increasing financial challenges faced by the Debtors. Unfortunately, this effort of the Debtors to negotiate a global resolution to its financial challenges outside of court was not successful.

13. Despite the Debtors' persistent efforts to resolve its financial issues outside of court, the Debtors' finances have continued to decline over the past several months. Hampered by declining census and revenue and reduced liquidity due to a significant reduction to the Debtors' availability under its working capital loan facility by its lender, the Debtors were unable to stay current with their lease obligations to certain landlords. As a result, certain landlords declared defaults on underlying leases and one key landlord publicly declared in early November on an earnings call with investors that it had purportedly terminated its leases with Debtor. After this November earnings call, the Debtors began experiencing additional financial pressure from trade creditors and other landlords. This additional pressure began to overwhelm the Debtors' ability to operate and the Debtors were forced to seek relief in this Court.

14.     The Debtors sought chapter 11 relief to accomplish several goals: (a) to ensure that the patients in the Facilities continue to receive high-quality medical care while the Debtors implemented their restructuring strategy; (b) to use the automatic stay to provide the Debtors with a "breathing spell" to permit them to pursue the orderly restructuring of business operations; (c) to enable the Debtors to transition certain of its underperforming Facilities to new operators with the cooperation of certain of the Debtors' landlords; and (d) to maximize the value of Debtors' assets particularly those related to profitable facilities and subsidiaries, which efforts may include a sale pursuant to Bankruptcy Code section 363(f).

## I.     OVERVIEW OF THE DEBTORS' STRUCTURE AND BUSINESS OPERATIONS

### A.     Corporate History and Organizational Structure.

15.     Senior Care Centers, LLC ("**SCC Parent**") was formed on November 20, 2008 by Silver Star Investments, LLC ("**Silver Star**"). Silver Star raised $12.5 million in equity capital on behalf of SCC Parent. The Company formally commenced operations on May 1, 2009 as a licensed operator of fourteen (14) Facilities in Texas.

16.     In 2016, Silver Star sponsored an additional equity offering of almost $20 million to provide additional working capital and to assist the Company in its continued growth. As of the Petition Date, Silver Star owns approximately 68.3% of the equity of SCC Parent.

17.     Granite Investment Group, LLC (together with its affiliates, "**Granite**") owns approximately 73.5% of Silver Star. In addition to its position as majority equity holder of SCC Parent, Granite is a controlling equity sponsor of the landlord for approximately thirty-four (34) of the Debtors' Facilities.[2]

18.     Organizational charts reflecting the Company's organizational structure and detailing the Debtors' operations are attached hereto as Exhibit B. Pursuant to the Senior Care

---

[2]  Three Facilities are assisted living facilities ("**ALFs**") located on the same property as SNFs.

Centers, LLC Operating Agreement (the "**Operating Agreement**"), the Company is generally managed by existing management and a board of directors (the "**Board**") at the holding company, SCC Parent.

19.     SCC Parent owns, directly or indirectly, 100% of each of the other Debtors (together, the "**Wholly-Owned Subsidiaries**"). In addition to the Wholly-Owned Subsidiaries the Debtors own a 38% non-controlling interest in Pharmacy Partners, LLC. The Debtors also own Senior Care Cares Foundation, a non-profit foundation formed to provide assistance to Employees facing financial or other difficulties (together with Pharmacy Partners, LLC, the "**Non-Debtor Affiliates**").

20.     Under the Operating Agreement, and at the direction of the Company's management, unit holders of Senior Care Centers, LLC ("**Unit Holders**") are eligible to receive quarterly pro rata distributions of the Company's net profits from operations to assist in paying income tax liabilities along with dividends from time to time. The last distribution made for taxes was in 2015. The last dividend distribution was made in March 2018.

21.     The Board consists of four Board members (the "**Board Members**"). Historically, three of the Board Members were affiliated with Granite and the remaining Board Member was an officer of the Company. Beginning in November 2017, an independent Board Member was added. In response to the Debtors' financial difficulties, the Debtors' exploration of strategic alternatives, the Board formed a special committee of the independent director (the "**Independent Committee**") to help review and evaluate its strategic alternatives including notably a potential sale of some or all of the equity of the Debtors. On or about November 10, 2018, two additional independent observers were added to the Board meetings and, as of the Petition Date, the three members appointed by Granite resigned from the Board and the

independent observers were appointed as additional independent board members. In addition, one additional independent member was added as of the Petition Date. As of the Petition Date, the Board currently consists of five (5) independent members.

B. **Accommodations and Services**

22. The Company provides post-acute skilled nursing services, assisted living, and hospice care in their Facilities. As of the Petition Date, the Facilities have a capacity of approximately 13,000 beds.

23. To become a patient, the prospective patient must enter into an admission agreement with the Company ("**Admission Agreement**"). The Admission Agreement establishes the terms and conditions under which a resident will reside in a Facility and receive services. In exchanges for the services, the Company is reimbursed by a third party payor and/or the patient.

24. The services provided by the Company to patients include, among other things,: transportation, meals, housekeeping, 24-hour monitoring, laundry, daily living assistance, and 24-hour nursing care.

C. **Business Operations**

25. As of the Petition Date, the Debtors are Medicare- and Medicaid-licensed operators ninety-seven (97) SNFs, nine (9) ALFs, and six (6) hospice Facilities. The Debtors employ approximately 11,300 Employees including, but not limited to, nurses, nursing assistants, social workers, regional directors, and supervisors.

26. In order to provide management for day-to-day operations, the Debtors are parties to numerous management agreements (each, a "**Management Agreement**"). Generally, there is one Management Agreement in place at each Facility as of the Petition Date. Under the Management Agreements, Debtor Senior Care Center Management ("**SCC Management**") provides certain other Debtors with the following services: (a) provision of care to residents; (b)

the general maintenance, repair, and supply, of the Facilitates; (c) day-to-day direct supervision of service providers at the Facilities; (d) preparation of annual budgets; (e) preparation and implementation of marketing programs; (f) establishment and maintenance of books and records; (g) preparation of financial reports; (h) preparation of Medicaid, Medicare, and other reimbursement programs; (i) preparation and filing of tax return; (j) purchasing, utilities, and service contract management, (k) maintaining licensing; (l) insurance procurement; and miscellaneous other services. Generally, the Management Agreements provide that the Company's various business segments remit a management fee for such services equal to five percent of gross revenue. For the period of January 1, 2018 to October 31, 2018, SCC Management collected or booked approximately $38.741 million in management fees from the subsidiaries and $0.744 million in miscellaneous revenue. As of the Petition Date, SCC Management is owed approximately $14.6 million. The Debtors intend to pay their postpetition obligations to SCC Management under the Management Agreements in the ordinary course of business, including postpetition amounts accrued on a pro rata basis for December 2018, but do not seek approval to pay outstanding amounts owing to SCC Management as of the Petition Date.

27. The Company is also party to an agreement (the "**Forum Membership Agreement**") with Forum Purchasing, LLC ("**Forum**") and an agreement (the "**Premier Membership Agreement**", together with the Forum Membership Agreement, the "**GPO Agreements**") with Premier Healthcare Alliance, L.P. ("**Premier**", together with Forum, the "**GPOs**"). The GPOs are group purchasing organizations which negotiate and enter into contracts with providers of certain products to achieve more favorable pricing. The Premier Membership Agreement is for the Company's corporate office. Forum is member-owned limited

liability company comprised of the approximately top thirty long-term care companies. The Forum Membership Agreement provides the Company with access to medical supplies, food, and equipment purchases and rentals. No amounts are outstanding under the GPO Agreements.

28. The Debtors receive revenue from various sources primarily: (a) Medicare reimbursements; (b) Medicaid reimbursements; and (c) other third party and private payors. The Debtors use the revenue generated by the receipt of daily basic rates and fees to fund their daily operations, make rent payments, and make capital improvements to the Facilities.

29. For the twelve month period between January 1, 2017 and December 31, 2017, the Company generated approximately $910.420[3] million in revenue and reported a loss of approximately $94.254 million. Through the period between January 1, 2018 and October 31, 2018 the Company generated approximately $697.056 million in revenue. Of the $697.056 million[4] generated in 2018, $655.499 million was generated by the SNFs and ALFs, $29.073 million[5] by the rehabilitation companies, $7.256 million by the hospice division, and $.0792 million was generated by SCC Management. [6]

D. **Regulatory Agencies**

30. Operators of SNFs, such as the Facilities, are heavily regulated by various state and federal agencies. In particular, nearly every aspect of the operation of the Facilities, including patient services and financial operations are subject to rules and regulations promulgated by: (a) the United States Depart of Health and Human Services' Centers for Medicare & Medicaid Services; (b) the Department of Aging, Office of Health Assurance and

---

[3] This amount excludes intercompany balances of approximately $174.301 million.
[4] The Company also generated approximately $4.437 million from Harden Pharmacy, LLC, but as discussed below, this entity was sold in 2018.
[5] This amount excludes intercompany balances of approximately $75.827 million.
[6] This amount excludes intercompany amounts of approximately $38.693 million

Licensing, Bureau of Long Term Care, Bureau of Regulatory Enforcement; and (c) the applicable departments of health in Texas and Louisiana.

## II. PREPETITION CAPITAL STRUCTURE AND LEASE OBLIGATIONS

### A. Prepetition Capital Structure

#### (i) The Credit Facility

31. Certain Debtors[7] (the "**Non-HUD Borrowers**") are parties to the certain Amended and Restated Credit and Security Agreement dated January 12, 2017 (as amended, restated, modified, or supplemented from time to time, the "**Non-HUD Credit Agreement**") with CIBC Bank USA as Lead Arranger, Administrative Agent, and Lender (the "**Administrative Agent**"),[8] and CIT Finance LLC, Wells Fargo Bank, N.A., MB Financial Bank, N.A., Bankers Trust Company, and Compass Bank as lenders (together with Administrative Agent, the "**Lenders**"). The Non-HUD Credit Agreement provided the Non-HUD Borrowers with access to a term loan up to an aggregate principal amount of $7,395,448.99 (the "**Non-HUD Term Loan**") and a revolving credit loan in the aggregate principal amount of $67,500,000 (the "**Non-HUD Revolver**", and together with the Non-HUD Term Loan, the "**Non-HUD Credit Facility**").

32. Certain Debtors (the "**HUD Borrowers**") are parties to that certain Amended and Restated Credit and Security Agreement dated June 21, 2017 (as amended, restated, modified, or supplemented from time to time, the "**HUD Credit Agreement**", with the Non-HUD Credit Agreement, the "**Credit Facility Documents**") with the Administrative Agent and Lenders. The HUD Credit Agreement provided the HUD Borrowers with a revolving credit loan in the

---

[7]  A chart detailing the respective parties under the various Credit Facility Documents is attached hereto as <u>Exhibit C</u>. Additionally, a detailed accounting of the Credit Facility Documents is attached to the Cash Collateral Motion as <u>Exhibit B-1</u>.

[8]  The Credit Facility Documents were original executed by The PrivateBank and Trust Company, who is now known as CIBC Bank USA.

aggregate principal amount of $12,500,000 (the "**HUD Revolver**" or the "**HUD Credit Facility**", together with the Non-HUD Credit Facility, the "**Credit Facility**"). As is common in these types of financings, borrowings under the Credit Facility are limited by a borrowing base calculation (the "**Borrowing Base**"). The Credit Facility has a maturity date of April 1, 2020.

33.     In early 2018, the Debtors paid off the balance of the Non-HUD Term Loan. As of the Petition Date, approximately $33.06 million is due and outstanding under the Non-HUD Revolver, and approximately $9.53 million is due and outstanding under the HUD Revolver. Additionally, the Debtors and the Administrative Agent are also parties to two unsecured letters of credit in aggregate principal amount of $2.78 million (the "**LOC**").

34.     Thus, as of the Petition Date, there is approximately $45,564,254.58 in principal and interest outstanding under the Credit Facility (the "**Prepetition Obligations**"). Pursuant to the Credit Facility Documents, the Administrative Agent has first priority security interest in and liens on all of the Prepetition Collateral (as defined below), including the Cash Collateral (as defined below) and all proceeds of the Prepetition Collateral, to secure payment of the Prepetition Obligations.

35.     In April 2018, the Administrative Agent sent correspondence to the Company, informing it that events of default under the Credit Facility Documents had occurred and the Administrative Agent was reserving its rights with respect to those defaults. Beginning in July 2018, the Administrative Agent began to establish Borrowing Base reserves, reducing the availability under the Credit Facility and requiring significant paydowns. In October 2018, Administrative Agent sent additional correspondence to the Company alleging that continued events of default occurred and further reducing the Borrowing Base.

(ii)     **CCP Loan**

36.     In connection with the acquisition of certain Facilities, on September 1, 2015, certain Debtors[9] entered into that certain Loan Agreement (the "**CCP Loan Agreement**") and Promissory Note (the "**CCP Note**") with CCP Finance I LLC (together, with its affiliates, including Care Capital Partners Inc., "**CCP**"). SCC Parent executed that certain Guaranty of Payment on September 1, 2015 (the "**CCP Guaranty**", and together with the CCP Notes and CCP Loan Agreement, the "**CCP Loan Documents**"). The CCP Loan Agreement provided the Gamble Affiliates with access of up to $20 million (the "**CCP Loan**").

37.     As detailed further below, the CCP Loan is secured by an asserted second priority security position on substantially all of the Company's current and future assets, all fixtures, equipment, letter of credit rights, letters of credit, commercial tort claims, deposit accounts, instruments, chattel paper, investment property, general intangibles, documents, account, money, inventory, goods, and all other personal property, and the proceeds from any of the foregoing, subject to certain exceptions and permitted liens. The CCP Loan has a maturity date of September 1, 2020.

38.     In August 2017, CCP and Sabra Healthcare REIT, Inc. (together with its affiliates, "**Sabra**") completed a merger. As a result, certain leases were assigned from CCP to Sabra. CCP Finance I, LLC is now a Sabra subsidiary.

39.     In December 2017, the Company sold its subsidiary (the "**Pharmacy Sale**") Harden Pharmacy, LLC ("**Harden**") to certain purchasers (the "**Pharmacy Purchasers**"). In connection with the Pharmacy Sale, an indemnification escrow agreement was executed, which

---

[9] The Debtors were: Senior Rehab Solutions North Louisiana LLC and SCC Hospice Holdco LLC. Additionally, the following Debtors are wholly-owned subsidiaries of the parties to the CCP Loan Agreement and CCP Note: Gamble Hospice Care Northwest, LLC, Gamble Hospice Care of Cenla, LLC, Gamble Hospice Care Central, LLC, and Gamble Hospice Care Northeast LLC (collectively, the "**Gamble Affiliates**").

established an escrow account of approximately $7,600,000 (the "**Escrowed Amount**"). The Escrowed Amount is scheduled to be released to the Company one year after the close of the Pharmacy sale, *i.e.*, February 1, 2019. Upon information and belief, no party has a perfected security interest in the Escrowed Amount.

40.     As of the Petition Date, approximately $4,333,333.44 is outstanding under the CCP Loan.

### (iii)     Intercreditor Agreements

41.     Given the complexity of the Company's operations, a number of intercreditor and subordination agreements are in place governing relationships among the parties, including the Administrative Agent, HUD, and various landlords. Generally speaking and as detailed further in the respective agreements, the Administrative Agent has a perfected first priority lien on substantially all of the Debtors' current and future assets in connection with the Credit Facility.

42.     Sabra, through its subsidiary CCP, and pursuant to that certain Second Amended and Restated Intercreditor Agreement dated April 28, 2017 (the "**CCP Intercreditor**") has an asserted second priority lien on substantially all of the Debtors' current and future assets related to the Sabra Leases (as defined below) in connection with the CCP Loan.

43.     The majority of landlords have first priority liens in certain landlord collateral (the "**Landlord Liens**").

### (iv)     General Unsecured Debt

44.     As of the Petition Date, the Debtors estimate they owe an aggregate of approximately $36.7 million in unsecured trade debt.

### B.     <u>Leasehold Obligations</u>

45.     The Company does not own its real estate, but instead operates the Facilities through a number of leases and master leases (collectively, the "**Leases**") among numerous

16

landlords (together, the "**Landlords**"). The Debtors' three (3) largest Landlords are Sabra, Granite, and TXMS Real Estate Investments, Inc. ("**LTC**"). SCC Parent, or an affiliate, is the tenant under the Leases and subleases majority of the Facilities to its subsidiaries. A chart detailing the Facilities by Landlord is attached hereto as <u>Exhibit D</u>.

       (i)      **Sabra Leases**

46.      Sabra and the Debtors are parties to a number of leases some of which are grouped in master leases, one stand-alone lease, and (the "**Sabra Leases**") which cover approximately forty (40) Facilities (the "**Sabra Facilities**"). Certain leases were originally executed between the Debtors and other parties including CCP, but were subsequently assigned to Sabra.

47.      Sabra and the Debtors are also parties to that certain Second Amended and Restated Amendment of Leases and Loan Documents (the "**Sabra Omnibus Amendment**") and Second Amendment to Amended and Restated Guaranty of Leases, each dated April 28, 2017. The Sabra Omnibus Amendment provides certain cross default and cross collateralization related to the Sabra Leases and CCP Loan (as defined above). The Sabra Omnibus Amendment also contains certain financial covenants to which the Debtors are subject.

48.      Pursuant to the Sabra Leases, Sabra was paid approximately $58.5 million annually in rent in the aggregated under the Sabra Leases and the Sabra Omnibus Amendment. Each Sabra landlord held security deposits in the aggregate amount of approximately $5.76 million (the "**Sabra Security Deposit**") and each of the Sabra Leases has a capital reserve in the aggregate amount of approximately $3.02 million the "**CapEx Reserve**").

49.      On August 9, 2018, Sabra sent a number of notices of default for failure to pay rent since May 2018. On August 23, 2018, Sabra sent notices of termination to the Company,

which were subsequently withdrawn by Sabra. Sabra now takes the position that these notices of termination were not withdrawn and the Debtors dispute this attempted recharacterization.

50.     As of the Petition Date, certain of the Debtors are in arrears on their rent obligations to certain Sabra entities. In the aggregate, Sabra entities are owed approximately $31.78 million in unpaid rent, common area maintenance charges, and taxes.

**(ii)     LTC Leases**

51.     LTC and the Debtors are parties to one master lease and multiple subleases (the "**LTC Leases**") which cover approximately eleven (11) facilities (the "**LTC Facilities**"). Pursuant to the LTC Leases, LTC is owed approximately $14 million per year in rent. LTC holds a security deposit in the amount of approximately $2.03 million.

52.     Upon information and belief, the LTC Leases are potentially valuable estate assets.

53.     On November 8, 2018, LTC sent the Company notices of potential default for failure to make repairs and provide new inspection reports. LTC demanded to draw down a letter of credit. As of the Petition Date, the LTC have not been terminated.

54.     As of the Petition Date, the Debtors owe zero rent under the LTC Leases.

**(iii)     Granite Leases**

55.     Granite and the Debtors are parties to seven (7) master leases grouping a number of leases with each other (the "**Granite Leases**") covering approximately thirty-four (34) Facilities (the "**Granite Facilities**").

56.     Pursuant to the Granite Leases, Granite is owed approximately $46.6 million per year. Granite holds a security deposit in the amount of approximately $1.26 million.

57.     On October 4, 2018, the Company, Granite, and a potential purchaser of the Sabra Facilities (the "**Sabra Buyer Group**") executed that certain Tripartite Non-Binding Letter of

Intent Regarding Sabra and Granite Portfolio Leases (the "**Tripartite Agreement**"). Under the Tripartite Agreement, Granite and the Sabra Buyer Group agreed to reduce the base rent under the Granite Leases and Sabra Leases, respectively. After execution, the Debtors began paying the reduced rent under the Granite Leases.[10] Among other things, the Tripartite Agreement allowed for the replenishment of certain security deposits, and distributed insurance proceeds from hurricane damage.

58. On November 11, 2018, Granite sent the Company notices of default and lease terminations for failure to pay rent.

59. As of the Petition Date, Granite is owed approximately $4.49 million in unpaid rent.

### (iv) Other Leases

60. The Debtors are also party to leases with approximately fifteen (15) additional Landlords ("**Additional Landlords**"), representing twenty-six (26) Facilities (the "**Additional Leases**"). Upon information and belief, certain of these Additional Leases are potentially valuable estate assets.

61. As of the Petition Date, only one default or termination notice had been sent under the Additional Leases and the Debtors are current in their rent obligations.

### (v) Conclusion

62. As of October 30, 2018, the Company had approximately $310.117 million in total assets and approximately $267.893 million in total liabilities on a consolidated basis at book value, although the Company's market value is likely less than its book value.[11]

---

[10] Notably, the Sabra Buyer Group was a signatory to the agreement, but Sabra was not. Sabra never agreed to accept reduced rents.
[11] These amounts exclude intercompany balances of approximately $283 million.

**III.**        **EVENTS LEADING TO THE CHAPTER 11 FILINGS**

63.        Since 2017, the Company experienced significant liquidity constraints caused by, among other things: (a) increasing rent and "above-market" leases with various Landlords; (b) declining performance within the current portfolio for a variety of industry-wide developments; (c) tightening terms with various trade creditors; and (d) declining census. The Company has struggled to respond to liquidity issues for several months. In July of 2018, Administrative Agent began establishing Borrowing Base reserves, resulting in reduced availability under the Credit Facility.

64.        The immediate cause for the filing of these Chapter 11 Cases was due to liquidity issues resulting from reduced Borrowing Base availability. This problem was compounded when certain of the Debtors' landlords issued termination and/or default notices (the "**Landlord Notices**").

65.        Certain vendors demanded modification to payment terms, which restricted or eliminated the Company's trade credit. Moreover, relationships with current and prospective Employees and Patients have been affected by the uncertainty. For example, several recent candidates have rescinded their offers to join the Company and expressed concern regarding the Company's financial stability. As described in the Wages Motion, the Company utilizes a number of external recruiting sources and firms to fill key roles, from management to clinical care. The landlord's announcements have severely impacted the Company's relationships with these external parties and candidates.

66.        The Debtors have filed these Chapter 11 Cases to obtain a breathing spell from the Debtors' issues with landlords and trade creditors. The Debtors intend to use the Chapter 11 process to facilitate the orderly transition of certain Facilities to certain Landlords and to permit the Debtors to maximize the value of their existing assets by exploring the sale of their leasehold

interests and operations to a third party. To that end, before the Petition Date, the Debtors began negotiations with a potential purchaser. These negotiations remain ongoing. The Debtors also intend to retain an investment banker or broker to explore selling the portion of Company which will not be transitioned to Landlords. The assets which the Company intends to sell during these Chapter 11 Cases include the remaining Leases and potential claims related to prepetition investigations.

## IV.    FIRST DAY PLEADINGS

67.    Contemporaneously with the filing of their chapter 11 petitions, the Debtors seek approval of the First Day Pleadings and related orders (the "**Proposed Orders**"). The Debtors respectfully request that the Court enter each of the Proposed Orders as they are critical to the Debtors' successful reorganization in these Chapter 11 Cases.

68.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

### A.    The Joint Administration Motion

69.    Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their Chapter 11 Cases, one hundred and twenty-one (121) in total, for procedural purposes only. Many of the motions, hearings and other matters involved in the Chapter 11 Cases will affect all of the Debtors. Therefore, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications

21

and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. Accordingly, I believe the Court should approve the joint administration of these Chapter 11 Cases.

### B. The Consolidated Creditor Motion

70.     Pursuant to the Consolidated Creditor Motion, the Debtors request entry of an order authorizing the Debtors to file one consolidated list of their forty (40) largest unsecured creditor for all Debtors.

71.     The Debtors are comprised of 121 affiliated companies that maintain their books and records on a consolidated basis with one accounts payable system. There are thousands of creditors and other parties in interest in these Chapter 11 Cases, and there may be potential for confusion and/or overlap regarding creditor obligations. Given the circumstances, the Debtors submit that it is appropriate for them to file one consolidated mailing matrix and one consolidated list of their forty largest unsecured creditors. If the Debtors were not granted the relief requested herein, the Debtors would have to manually build each accounts payable subledger for each entity. This process would be burdensome and time-consuming with no meaningful benefit. The consolidated list of creditors will provide good and sufficient notice to all creditors and parties in interest in an efficient manner.

72.     Accordingly, on behalf of the Debtors, I respectfully submit that the Consolidated Credit Motion should be approved.

### C. The Schedules Extension Motion

73.     Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order extending the deadline to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") by an additional thirty (30) days, from the date such Schedules and

66098845.15

Statements are otherwise required to be filed, for a total of forty-four (44) days from the Petition Date.

74.     I believe cause exists to extend the deadline for filing the Schedules and Statements for the following reasons: (a) the size and complexity of the Debtors' business; (b) the number of creditors; (c) the number of Debtors; and (d) the burden which would be imposed on the Debtors to file schedules and statements within the allotted next 14 days. To completely and accurately file the Schedules and Statements, the Debtors must collect, review, and analyze a substantial amount of information.

75.     Prior to the Petition Date, the Debtors, their advisors, counsel, and other parties in interest focused extensively on preparing for the filing and transitioning the business into the chapter 11 process. This included extensive negotiations among the multiple tranches of creditors, landlords, other creditor constituencies. The Debtors are working expeditiously to prepare and file their Schedules and Statements, and I believe, considering the expedited sale procedures being sought, that Schedules and Statements will be filed as soon as possible. Notwithstanding, in an abundance of caution, it is in the best interests of the Debtors to respectfully request an extension of thirty (30) days.

**D.     The Claims Agent Application**

76.     Pursuant to the Claims Agent Application, the Debtors request entry of an order authorizing the appointment of Omni Management Group, Inc. ("**Omni**") as the claims, noticing, and administrative agent for the Debtors in these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases.

77.     The Debtors' selection of Omni to act as the Claims, Noticing and Administrative Agent is appropriate under the circumstances and in the best interests of their estates. Moreover,

23

the Debtors submit that, based on the five (5) engagement proposals obtained and reviewed Omni's rates are competitive and reasonable given Omni's quality of services and expertise. By appointing Omni as the Claims, Noticing and Administrative Agent in these Chapter 11 Cases, the distribution of notices will be expedited and the Clerk will be relieved of the administrative burden of noticing.

78.     Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Application should be approved.

### E.     The Patient Confidentiality Motion

79.     Pursuant to the Patient Confidentiality Motion, the Debtors seek entry of an order authorizing the implementation of procedures to protect confidential information of the Debtors' Patients (as defined below), as required by the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**").

80.     As detailed herein, the Debtors are in the business of operating skilled nursing facilities that provide nursing and rehabilitation services to individuals (the "**Patients**"). In the ordinary course of their business, the Debtors have access to and receive "protected health information" and data relating to Patients, which the Debtors are required to confidentially maintain pursuant to HIPAA. Notwithstanding, some of these Patients could potentially hold actual or contingent claims against the Debtors' estates, and as such, under the Bankruptcy Code, the Debtors have a duty to list all such creditors on the Debtors' mailing matrices and bankruptcy schedules.

81.     In an effort to comply with both federal statutes, the Debtors propose certain procedures to maintain Patient confidentiality during the pendency of these Chapter 11 Cases (the "**Privacy Procedures**").

82.     I believe that Privacy Procedures and the relief requested in the Patient Confidentiality Motion appropriately balance the need to maintain confidential patient information under HIPAA with the need for adequate disclosure under the Bankruptcy Code.

**F.     The Wages Motion**

83.     Pursuant to the Wages Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay accrued prepetition wages, salaries, and other compensation to their Workforce; (ii) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off policies, severance practices, and employee benefit plans and programs; (iii) reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis; (iv) pay all related prepetition payroll taxes and other deductions, including union benefits; (v) honor worker's compensation obligations and related obligations; and (vi) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider, all in accordance with prepetition practices, and as described in further detail in the Wages Motion.

84.     In connection with the operation of their businesses, the Debtors currently employ approximately: 780 full-time salaried employees; 7,046 full-time hourly employees; and 3,478 hourly part-time employees (the "**Employees**"). The Employees are employed at the Debtors' 109 facilities located throughout the United States (each a "**Facility**" and collectively the "**Facilities**").

85.     The Employees are critical to the Debtors' business, and their value cannot be overstated. To a significant extent, the long-term prognosis of the Debtors' patients depends on

25

the Debtors' ability to attract and retain qualified personnel. The loss of certain Employees will impede the Debtors' business and seriously harm the ability to successfully implement their bankruptcy strategy. Further, replacing Employees can be difficult for the Debtors given the limited number of individuals in their industry with the breadth of skills and experience required to successfully navigate the senior care space, where experienced employees are at a premium.

86.     If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations, certain Employees will likely seek employment elsewhere. The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through these Chapter 11 Cases.

87.     The Debtors also regularly utilize the services of contract workers ("**Contractors**" and, together with the Employees, the "**Workforce**") to provide a variety of services. The Contractors are (a) either employed directly by, and have contracts directly with, the various individual Debtors (the "**Direct Contractors**"), or (b) employed by third party staffing agencies and outsourced to the Debtors (the "**Third Party Contractors**"). There are approximately 13 Direct Contractors. There are approximately 16 Third Party Contractors who provide the Debtors with a range of functions, both operational and administrative, from high end clinicians and nurses to back office support.

88.     The Contractors fill certain critical and immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner. The Contractors are a reliable and cost-efficient component of the Debtors' operations. Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their

prepetition compensation obligations to the Contractors, it is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations.

89.     In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Workforce. The Debtors also provide other benefits to their Employees for the performance of services. Workforce Compensation Obligations. The Debtors utilize one payroll cycle where Employees are paid on a biweekly basis. All employees are paid two weeks in arrears on the 10th and 25 of each month. Payroll is funded the Friday before payroll is disbursed. The Debtors average payroll obligation per cycle is approximately $16.6 million. The last payroll date before the Petition Date was November 25, 2018. The Debtors estimate that as of the Petition Date, approximately $16,443,000 has accrued and remains unpaid (the "**Employee Compensation Obligations**"). To the best of the Debtors' understanding, none of the Employees are owed more than $12,850 in accrued and unpaid general prepetition wages or salaries.

90.     The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations. In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

91.     The Debtors regularly utilize the Contractors in the ordinary course of business. As of the Petition Date, the Debtors estimate that the aggregate amount owing on account of the Contractors for services performed prior to the Petition Date is approximately $482,705 (the "**Contractor Obligations**" and together, with the Employee Compensation Obligations, the "**Compensation Obligations**"). The Debtors would be irreparably harmed without the services

27

of the Contractors because such parties play a critical role in the Debtors' day-to-day operations, and, as such, the Debtors request authorization, but not direction, to honor and pay any unpaid Contractor Obligations.

92.     The Debtors request authorization to maintain all Employee Benefit Obligations except for those in connection with the 401(k) Plan and the Nonqualified Deferred Compensation Plan. Pursuant to the Wages Motion the Debtors request authority to terminate the 401(k) Plan *nunc pro tunc* to the Petition Date. The Debtors request that the Court approve the termination of the Nonqualified Deferred Compensation Plan, and to approve the distribution of the assets of the Nonqualified Deferred Compensation Plan held under the Rabbi Trust as determined by the Debtors in their sole and absolute discretion.

93.     Together, the Debtors request authority that they be authorized, but not directed to (a) pay prepetition claims and honor obligations incurred or related to the Compensation Obligations, the Withholding Obligations, the Incentive Programs, PTO, Sick Leave, Holiday Pay, the Reimbursable Expense Obligations, the Employee Benefits Obligations, Workers' Compensation Claims, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (including the Administrative Fee Obligations) (collectively, the "**Employee Obligations**"), and (b) maintain, continue, and honor, in the ordinary course of business, the Incentive Programs, PTO, Sick Leave, and Holiday Pay policies, postpetition Reimbursable Expense Obligations, the Employee Benefits Plans, and the Workers' Compensation Claims (collectively, the "**Employee Plans and Programs**").

94.     To enable the Debtors to implement the relief requested, the Debtors also request that the Court authorize all applicable banks and financial institutions (collectively, the "**Banks**"), ADP (together with the Banks, the "**Processors**"), to receive, process, honor, and pay

all checks presented for payment and all electronic payment requests made by the Debtors relating to the Employee Obligations and the Employee Plans and Programs, whether such checks were presented or electronic-payment requests were submitted prior to or after the Petition Date.

95. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

### G. **Taxes Motion**

96. Pursuant to the Taxes Motion, the Debtors seek entry of an order authorizing them to pay, in their sole discretion any prepetition tax and fee obligations including, without limitation, income and franchise taxes, property taxes, sales and use taxes, business license fees, annual report taxes, and other taxes and fees (collectively, the "**Taxes and Fees**") owing to those federal, state, provincial, and local governmental entities in the United States, including as listed on Exhibit B attached to the Taxes Motion (the "**Taxing Authorities**"). The Debtors propose to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees under the Taxes Motion to $4.6 million unless further authorization is obtained from this Court.

97. The Debtors, in the ordinary course of business, incur various tax liabilities.. Although, as of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may not yet have become due. Certain prepetition Taxes and Fees may not be due until the applicable monthly, quarterly, or annual payment dates—in some cases immediately and in others not until next year.

98. The Debtors are subject to the following Taxes:

| Category | Description | Prepetition Amount Outstanding | Due Date |
|---|---|---|---|
| Use Taxes | Taxes related to the sale of goods or services. | $1,000.00 | 12/31/2018 |
| Franchise Taxes | Taxes required to conduct business in the ordinary course. | $1,000,000.00 | 5/15/2019 |
| Property Taxes | Taxes related to real and personal property holdings. | $2,449,239.00 | 1/31/2019 |
| Licensing Fees | Fees related to acquiring licenses, permits, and inspections | $31,605.00 | 12/18/2018 |
| Annual Report Fees | Fees related to annual reporting requirements by certain states. | N/A | N/A |
| Provider Fees | Fees related to the number of patients treated per day. | $1,026,000.00 | 12/20/2018 |

99.     I believe the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process. If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (i) the obligations are priority, secured, or unsecured in nature, (ii) the obligations are proratable or fully prepetition or postpetition, and (iii) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

100.     Moreover, certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment. In such events, collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

101.     I believe that failure to pay the Taxes and Fees to the Taxing Authorities in full and on time, thereby risking the cessation of normal relations between the Taxing Authorities and the Debtors, will make these estates worse off than they will be having paid the Taxes and Fees. I believe it is in the best interests of the Debtors' estates that the Taxes and Fees be paid on time so as to avoid administrative difficulties. Failure to timely pay, or a precautionary withholding by the Debtors of payment of, the Taxes and Fees may cause the Taxing Authorities to take precipitous action, including an increase in audits, a flurry of lien filings, and significant administrative maneuvering at the expense of the Debtors' time and resources. Prompt and regular payment of the Taxes and Fees will avoid this unnecessary governmental action.

102.     The Chapter 11 Cases are complicated due to the nature of the Debtors' business, and the Debtors' focus should be on addressing their operational and financial issues in a manner that will maximize recoveries. In this context, the payment of the Taxes and Fees is insignificant and will have no meaningful effect on the recoveries of creditors in the Chapter 11 Cases, particularly in view of the priority or secured status of a significant portion of such obligations. Moreover, the payment amount will likely be offset in no small part by the amount of postpetition resources that the Debtors will conserve by obviating the need to spend time and money to address disputes with the Taxing Authorities that are unnecessary and wasteful of the resources of the Debtors and this Court.

### H.     The Utilities Motion

103.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (i) prohibiting Utility Providers (as defined below) from (a) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition, or (b) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (ii) determining that adequate

assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors; and (iii) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

104. In conjunction with its day-to-day operations, the Debtors receive traditional utility services from approximately 183 utility providers (each, a "**Utility Provider**" and collectively, the "**Utility Providers**") for, among other things, cable television, electricity, garbage disposal, internet, natural gas, telephone landline, telephone wireless, and water & wastewater, and similar utility products and services (collectively, the "**Utility Services**"). The Utility Providers include, without limitation, the entities set forth on the list annexed hereto as Exhibit D (the "**Utility Providers List**").

105. The Debtors paid an average of approximately $1,888,129.70 per month on account of all Utility Services during 2018. As "adequate assurance," the Debtors propose to segregate on their books and records, within 20 days of the Petition Date, an amount equal to the estimated cost for two weeks of Utility Services (*i.e.,* approximately $791,000.00), calculated based on the historical data for 2018 (the "**Adequate Assurance Deposit**") into one segregated bank account designated for the Adequate Assurance Deposit (the "**Adequate Assurance Deposit Account**") for the benefit of all Utility Providers.

106. I believe that uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases. Should any Utility Provider alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' ability to consummate a sale through chapter 11. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Providers without hindering the Debtors' ability to maintain

operations. I am informed and believe that the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11 cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

## I.    The Insurance Motion

107.    Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to (i) continue and renew their Insurance Policies (defined below), or obtain new insurance policies, as needed in the ordinary course of business, and (ii) honor all of their prepetition and postpetition obligations, including payment of all outstanding prepetition Insurance Obligations (defined below), under and in connection with the Insurance Policies on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date, including premiums arising under the Insurance Policies and the Broker Fees (defined below). Additionally, pursuant to the Insurance Motion, the Debtors also seek entry of an order (i) authorizing the Banks (defined below) to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay the foregoing and to rely on the representations of the Debtors as to which checks are issued and authorized to be paid in accordance with this Motion, and (ii) preventing the Insurers (defined below) from giving any notice of termination or otherwise modifying or cancelling any Insurance Policies without obtaining relief form the automatic stay.

108.    In the ordinary course of their business, the Debtors maintain approximately 64 insurance policies with various insurance providers (collectively, the "**Insurers**") that provide coverage for, among other things, the Debtors' general liability, director and officer liability,

fiduciary liability, employment practices liability, workers compensation liability, automobile liability, professional liability, cyber liability, and property liability (each, an "**Insurance Policy**" and collectively, the "**Insurance Policies**"), as summarized in <u>Exhibit C</u> annexed to the Insurance Motion.

109.    The Debtors incur a total of approximately $7 million in premiums on an annual basis under the terms of their existing Insurance Policies as well as other obligations, including the Broker Fees (as defined below) and other related fees and costs (collectively, the "**Insurance Obligations**"). In addition, the Debtors may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable.

110.    The Debtors seek authority to pay premiums under the Insurance Policies based on a fixed amount established and billed by each Insurance Provider. Depending on the particular Insurance Policy, premiums are primarily (a) prepaid in full at a policy's inception or renewal; (b) financed through a premium financing company; or (c) paid in installments to a broker over the term of the policy.

111.    Generally, these Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period. In the ordinary course of business, the Debtors renew annual coverages under many of their policies, including those related to general professional liability, flood coverage, and key man life coverage, and the Debtors pay the full amount of the premiums owed for such policies due at renewal. Accordingly, as of the Petition Date, the Debtors do not owe unpaid premium amounts on account of policies that require payment in full at the inception of the applicable policy period.

112.    Generally, the Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period. However, it is not always economically

advantageous for the Debtors to pay the premiums on all of the Insurance Policies on a lump-sum basis. Accordingly, in the ordinary course of business, the Debtors finance the premiums on certain policies pursuant to two premium financing agreements (each, a "**PFA**" and collectively, the "**PFAs**") with Imperial PFS Corporation ("**Imperial**"). The Debtors entered into the PFAs with Imperial in order to finance insurance premiums for certain policies as detailed in <u>Exhibit C</u>, including property liability, general and professional liability, executive risk liability, directors and officers, employment practices liability, commercial auto, and fiduciary liability. The Debtors have fully paid all installments on one of the PFAs, which expired on November 19, 2018. The other PFA expires on May 1, 2019 and has four remaining installments in the amount of $409,348.19, the last of which is due on March 15, 2019. The Debtors have paid any down payments prior to the Petition Date, and have continued to pay the monthly installments as they become due.

113.    If the Debtors are unable to continue making payments on the remaining PFA, Imperial may be permitted to terminate the PFA. The Debtors would then be required to obtain replacement insurance on an expedited basis and at significant cost to the estates. If the Debtors are required to obtain replacement insurance and to pay a lump-sum premium for such Insurance Policy in advance, this payment would likely be greater than what the Debtors currently pay. Even if Imperial were not permitted to terminate the PFA, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

114.    In light of the importance of maintaining insurance coverage with respect to their business activities and preserving liquidity by financing their insurance premiums, the Debtors believe it is in the best interest of their estates to receive Court approval to honor their obligations under the PFA and, as necessary, renew or enter into new such agreements.

115.    The Debtors use Alliance Insurance Group (the "**Broker**") to assist them with the procurement and negotiation of certain Insurance Policies. The Broker assists the Debtors in obtaining comprehensive insurance coverage for their operations, analyzing the market for available coverage and negotiating policy terms, provisions, and premiums. The Broker also provides ongoing support through the policy periods. The Debtors pay the Broker any fees and commissions that are owed under the PFAs (the "**Broker Fees**"). As of the Petition Date, the Debtors do not believe that they owe any amounts to the Broker on account of fees, commissions, or any other prepetition obligations beyond the commission amounts already contained in the next PFA installment that will come due in the ordinary course of the Debtors' business. Out of an abundance of caution, however, the Debtors seek authority to honor any amounts owed to the Broker to ensure uninterrupted coverage under their Insurance Policies.

116.    In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies (the "**Surety Bond Program**"). Often, statutes or ordinances require the Debtors to post surety bonds to secure such obligations. As such, the failure to provide, maintain, or timely replace their surety bonds may prevent the Debtors from undertaking essential functions related to their operations.

117.    The premiums for the surety bonds are generally determined on an annual basis and paid by the Debtors when the bonds are issued and annually upon each renewal. The Debtors have approximately ninety-seven (97) outstanding surety bonds issued by CNA Surety Group Western Surety Company (collectively, the "**Sureties**"). Annual premiums for the Debtors' surety bonds total approximately $100,000.00, which were paid in full prior to the effective date

of the bonds. As such, the Debtors estimate that no prepetition amounts remain outstanding on account of the Surety Bond Program.

118. To continue their business operations during the reorganization or sale process, the Debtors must be able to provide financial assurances to state governments, regulatory agencies, and other third parties. Indeed, without the relief requested, the Debtors' ability to conduct operations in many locations could come to a halt, thereby destroying value for all stakeholders. To maintain the existing Surety Bond Program, the Debtors request the authority, but not direction, to pay all obligations under the Surety Bond Program as they come due, including the bond premiums, and any bond commissions as needed. In addition, the Debtors seek authority to renew or potentially acquire additional bonding capacity as needed in the ordinary course of their business, and execute other agreements in connection with the Surety Bond Program.

119. The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations. If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided. Such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks, including but not limited to: (i) direct liability for the payment of claims that otherwise would have been payable by the Insurers; (ii) material costs and other losses that otherwise would have been reimbursed by the Insurers under the Insurance Policies; (iii) the loss of good standing certification in jurisdictions that require the Debtors to maintain certain levels of insurance coverage; (iv) the inability to obtain similar types of insurance coverage; and (v) higher costs for re-establishing lapsed policies or obtaining new insurance coverage. I believe that any or all of

these consequences could cause serious harm to the Debtors' business. Granting the relief requested in the Insurance Motion will enhance the likelihood of the Debtors' successful rehabilitation or sale process.

### J. Patient Refund Motion

120. Pursuant to the Patient Refund Motion, the Debtors seek entry of an order, (a) authorizing the Debtors (i) to maintain, administer, and modify their Refund Program (defined below) and make payments to Patients (defined below) and Third-Party Payors (defined below) or to otherwise honor accrued obligations owed under their Refund Program, regardless of whether the obligations occurred prepetition or postpetition, and (ii) to continue, replace, modify, or terminate any Refund Program in the ordinary course of business; and (b) granting certain related relief.

121. In the ordinary course of the Debtors' business, the Debtors routinely receive overpayments from patients (the "**Patients**") and third-party payors due to billing procedures, patient overpayments and cancellations, patient medical insurance reconciliations, and/or third-party payments. The third-party payors described herein include, but are not limited to, healthcare insurers, private pay sources, and governmental agencies (collectively, the "**Third-Party Payors**"). To address the overpayments, the Debtors routinely issue refunds (the "**Refunds**") to Patients and Third-Party Payors through a refund program (the "**Refund Program**").

122. Additionally, in the normal course of business, the Debtors are often responsible for incurred medical expenses ("**IME**"). The Debtors often receive funding from Medicaid for IME services utilized by Patients. The Medicaid funding is then used to pay IME providers on behalf of the Patients. The Debtors have historically included these services as part of the Refund Program.

38

123.     As part of the Refund Program, the Debtors maintain a balance account for each Patient and track the accounts in the Debtors' patient ledger, including any refunds due back to such Patient upon discharge, after all charges and payments have been reconciled. Amounts due to Patients are recorded as a refund liability in the Debtors' general ledger.

124.     Refunds to Patients may arise in a number of situations. For example, a Patient whose insurance policy has both co-pay and deductible components might be presented with a bill containing an estimate of the portion of the bill that is the Patient's responsibility. That estimate may include, among other things, an over- or underestimation of the remaining deductible or copay. If the estimated copay turns out to be lower than the actual copay after the Patient paid for the services, the Patient is entitled to a credit. Similarly, Refunds may also arise when services are improperly coded or billed against Patient accounts. Additionally, Refunds arise when Patients prepay for services to be rendered based on a projected length and course for treatment, but the there is a change in treatment. In the ordinary course of business, the Debtors regularly remit Refunds to Patients and Third-Party Payors to address these overpayments.

125.     The case-by-case nature of the Debtors' services provided to Patients makes the process of determining each Patient's payment obligations from the outset particularly complex. As a result, Patient accounts—once fully processed and reconciled—may contain credit balances.

126.     Upon a Patient discharging from a facility, an audit of the Patient's account is completed. The Debtors will complete a review of the account to determine that all debit or credit balances by all payor sources are valid or if an adjustment to the account is necessary. Historically, there has been a lag between when the Patient is treated, when the overpayment is recognized or determined, and when the overpayment is entered into the Debtors' billing system.

After the overpayment amount is entered into the billing system, the Debtors issue a check or other form of payment to the Patient or Third-Party Payor in the amount of the overpayment. The refund department is responsible for reviewing refund requests and will work with Medicaid, Medicare, and insurance specialists to ensure accuracy, finalize outstanding issues, and complete refund processing. Refunds are then sent to the accounts payable department for payments to Patients. The accounts payable department distributes refund checks to the facility, which will then deliver the refund checks to the Patient.

127.    At any given time, it is difficult to determine the amount of outstanding overpayments that have been made and identified, but for which a refund check has not yet been issued. Moreover, some refund checks issued to Patients or Third-Party Payors prepetition may not have been presented for payment or may not have cleared the Debtors' banking system and, accordingly, have not been honored and paid as of the Petition Date. As of the Petition Date, the Debtors estimate that approximately $500,000 is immediately due and owing on account of the Refund Program. Furthermore, due to the processing time within the billing department, the Debtors estimate that approximately $2,000,000 will become due within thirty (30) days of the Petition Date on account of the Refund Program.

128.    Under the laws of various states and the federal government, the Debtors are required in certain circumstances to timely reimburse Patients and Third-Party Payors as overpayments are identified, or risk possible penalties and damages. In addition to the risk of penalties and damages if Refunds are not timely made, the failure to honor the Refunds will erode loyalty from Patients and prospective patients and severely and adversely impact the Debtors' reputation in this highly competitive industry. As such, the Debtors request authority to continue to issue and pay the Refunds to Patients and Third-Party Payors, including refunds for

overpayments made prepetition or resulting from prepetition services in the ordinary course of business, on a postpetition basis.

129.    I believe it is critical to the Debtors' operations to continue their practice of providing Refunds without regard to whether the Refund obligation arose prepetition or postpetition. The ability of the Debtors to provide the Refunds is essential to the Debtors' continued positive relationships with their Patients and Third-Party Payors. I believe that if Patients do not receive Refunds to which they are entitled in the ordinary course of business during the Debtors' Chapter 11 Cases, it would damage the Debtors' reputation, shake prospective Patient trust in the Debtors as service providers, causing loss of enterprise value. Because of these risks, I believe that any delay in returning the Refunds should be reduced to the extent possible. Therefore, it is in the best interest of the Debtors' estates, and a sound business decision, to honor the Refunds.

130.    Furthermore, I believe that nonpayment of the Refunds would threaten the Debtors' ability to operate successfully during bankruptcy, undermining their chances at a successful sale process. Moreover, the transactional costs of dealing with a disrupted insurance collections system could be significant. The Patients and the Third-Party Payors with whom the Debtors regularly interact depend on the timely disbursement of Refunds as they are due as part of the ongoing healthcare system. If for any reason Patients or Third-Party Payors do not believe they will be reimbursed for the amounts they are due, Patients will stop seeking care at the Debtors' facilities, and insurance providers may be reluctant to do business with the Debtors. Continued payment of the Refunds is critical to the Debtors' success.

131.    I believe that the necessity of the Refund Program in this type of a service industry cannot be overstated. In addition to the possible incurrence of penalties and damages,

41

failure to continue the Refund Program would likely cause the Debtors to lose a significant number of Patients (who may choose to form relationships with the Debtors' competitors), which would damage their reputation for reliability, thereby resulting in a long-term decline in business. Thus, I believe that the ability to continue administering the Refund Program without interruption is absolutely critical to the Debtors' valuable patient relationships and goodwill, and will inure to the benefit of all of the Debtors' stakeholders.

132.     The Refund Program is also an essential marketing tool for attracting new Patients. Failure to continue the Refund Program will place the Debtors at a significant—and potentially insurmountable—competitive disadvantage in the marketplace, amplifying the negative effect of Patient uncertainty that may arise from these Chapter 11 Cases. Such uncertainty might erode the Debtors' reputation and loyalty, which, in turn, could adversely impact their ability to successfully administer these Chapter 11 Cases and maximize recoveries to their creditors. Thus, I believe that the Refund Program is necessary for the Debtors to remain competitive and maintain their Patients at this critical juncture.

**K.     The Cash Management Motion**

133.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing Cash Management System (defined below), including maintenance of the Debtor Bank Accounts (defined below) and existing checks and business forms, (ii) granting the Debtors a temporary suspension of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under their Cash Management System or other actions described herein, (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices, and (iv) authorizing and directing all banks with which the Debtors maintain accounts to continue to maintain, service,

and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

134. In the ordinary course of business, the Debtors maintain approximately 328 bank accounts (the "**Debtors Bank Accounts**") and a cash management system that utilizes different mechanics across (a) facility-level bank accounts, (b) corporate-level bank accounts, and (c) management-entity level bank accounts (the "**Cash Management System**"). The Cash Management System is integral to the operation and administration of the Debtors' businesses. The Cash Management System allows the Debtors to monitor and control all of the Debtors' cash receipts and disbursements, identify the cash requirements of the Debtors, and transfer cash as needed to respond to the cash requirements of the Debtors.

135. A diagram reflecting the flow of funds through the Debtor Bank Accounts in the Cash Management System is annexed to the Cash Management Motion as Attachment 2. The amount of funds that flow through the Cash Management System on a monthly basis fluctuates greatly depending on, among other things, new client deposits, census level, and depositing of checks in transit.

136. There are 318 facility-level bank accounts across 106 facilities. Each facility maintains three banks accounts, all at CIBC, for (a) government receivables ("**Facility Government Receivables**"), (b) private pay and insurance receivables ("**Facility Non-Government Receivables**"), and (c) facility payables ("**Facility Disbursements**").

137. Receivables are deposited directly into the facility bank account either by check or Automated Clearing House ("**ACH**") transfers. Government receivables and insurance receivables are primarily paid by ACH. All private pay checks received at the facility are deposited into the Facility Non-Government Receivable account. If the private pay check is sent

to the corporate office, then corporate personnel deposit the checks received into the Facility Non- Government Receivable account.

138.    Vendor check runs occur on a daily basis and are initiated at the corporate office. The checks are issued at the facility level and the bank account is funded once the check clears the bank. The Facility Disbursement accounts get funded daily to pay for all cleared checks. Wire payments are made from the corporate office to large vendors on a discretionary basis and costs are allocated to the facilities through journal entries on a monthly basis. No cash is transferred from the facilities to corporate for the large vendor wires.

139.    The facilities do not maintain any cash balances including petty cash, as all accounts are swept on a daily basis. All facility employee expenses are submitted to the corporate office and paid through expense checks out of the Facility Disbursement accounts. Mileage expense reports are paid through direct deposit into the employees bank accounts out of the Facility Disbursement accounts. Certain employees are issued purchase cards ("**P-cards**") with pre-set limits to pay for expenses. The P-cards are issued by Elan Financial Services, and the approximate monthly spend on account of the P-cards is $220,000. The P-cards are paid in full by the Corporate Disbursement account (defined below) on a monthly basis.

140.    There are four (4) corporate level bank accounts, all with CIBC, for (a) HUD facility receivables Concentration ("**HUD Facility Concentration**"), (b) Non-HUD facility receivable account ("**Non-HUD Concentration Account**"), (c) Gamble Hospice Concentration Account ("**Hospice Concentration Account**"), and (d) corporate disbursements ("**Corporate Disbursement Account**").

141.    Cash is swept for both government receivable concentration accounts and non-government receivable concentration accounts, on a daily basis, to the applicable concentration

account. The three (3) corporate receivable accounts are used to fund the Corporate Disbursement Account on a daily basis as checks clear. The Corporate Disbursement Account is only funded when checks clear the bank and otherwise maintains a zero balance on a daily basis. All checks are cut and sent on a daily basis, for all bank accounts including Facility Disbursement accounts, from the corporate office.

142.     Payroll is funded from the Corporate Disbursement Account to each facility's account, which then pays ADP. ADP then issues the check directly to the employees. Payroll funding occurs on the 9th and 24th of every month to ADP, the payroll provider. Payroll is funded to employees twice a month on the 10th and 25th either through direct deposit or check from ADP. The 401(k) employee contribution withholding is funded twice a month from the Corporate Disbursement Account. Employee medical and dental benefits are self-insured and claims are paid on a daily basis to the insurance providers from the Health Benefits Trust Disbursement Account. Elective benefits are paid on a monthly basis to ADP insurance agency.

143.     The primary vendor with automatic funding access is CIBC Bank USA ("**CIBC**") for bank debt interest payments. These amounts are automatically drawn from the Corporate Disbursement Account. Most other vendor payments are manually issued through checks, ACH, and wire transfers on a daily basis.

144.     There are an additional four (4) bank accounts, all with CIBC, two for Senior Case Center Management LLC and two for Senior Rehab Solutions LLC (the "**Management Entities**"). Each Management Entity maintains a receivable account and a disbursement account. These accounts collect receivables and are used to pay account payables. The accounts are swept on a daily basis to the Non-HUD Concentration Account and do not maintain a balance.

145. As the foregoing overview reflects, I believe the Cash Management System is specifically designed for administering the Debtors' businesses, and cannot be altered without significant disruption to the Debtors' business operations and material distraction to the Debtors' management. Therefore, I believe it is in the best interests of the Debtors to request that the Court authorize them to continue using the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System using the Ordinary Transfer Methods in accordance with the agreements governing the Debtor Bank Accounts, including, without limitation, any prepetition cash management agreements, bank account terms and conditions, or treasury services agreements (collectively, the "**Bank Account Agreements**").

146. The Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest. I believe that requiring the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the majority of the Debtor Bank Accounts are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**"). For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and

continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts.

**L.**     **The Cash Collateral Motion**

147.     As set forth in the First Day Declaration, as of the Petition Date, there is approximately $45,565,254.58 in principal and interest outstanding under the Credit Facility (the "**Prepetition Obligations**"). Pursuant to the Credit Facility Documents, the Administrative Agent has first priority security interest in and liens on all of the Prepetition Collateral (, including the Cash Collateral and all proceeds of the Prepetition Collateral, to secure payment of the Prepetition Obligations.

148.     The Debtors have determined that absent the use of Cash Collateral, the Debtors will be unable to operate their businesses during the Chapter 11 Cases, irreparably harming the Debtors' estates and creditors. This would directly result in the interruption of patient care, potentially leaving many without food, medical supplies, proper medical care, and other services they require. Further, the Debtors' business operations would likely suffer the loss of key employees and vendors because the Debtors would be unable to demonstrate financial stability. Therefore, the Debtors' immediate access to Cash Collateral is necessary to preserve and maximize the value for the benefit of all parties in interest, including patients.

149.     In exchange for the consensual use of Cash Collateral, the Debtors have agreed, and the Interim Order Provides, adequate protection in the form of, among other things, adequate protection liens, superpriority claims, and adequate protection payments to protect the Lender against any diminution in the value of their interests in the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral, the subordination of the Lenders' liens to the Carve-Out (as defined in the Interim Order), and the imposition of the automatic stay.

150. At this time, the Debtors are not contemplating the need for postpetition financing. Instead, the Debtors intend to operate their businesses solely on the use of the existing Cash Collateral. Access to existing Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to operate their businesses, maintain patient care, and thus preserve and maintain the value of the Debtors' estates. Without access to such liquidity, the Debtors will face irreparable harm.

151. The Administrative Agent has consented to the Debtors' use of Cash Collateral on the terms set forth in the Interim Order. The proposed adequate protection included in the Interim Order provides adequate protection in the form of, among other things, the Replacement Liens, the Superpriority Administrative Claim, adequate protect payments, including fees and expenses, and reporting requirements. The Debtors submit that the proposed adequate protection is appropriate and sufficient to protect the Administrative Agent and Lenders from any diminution in value of the Prepetition Collateral.

152. The Cash Collateral will be used for funding business operations and allowing the Debtors to transition into the Chapter 11 Cases. Immediate access to this liquidity will permit the Debtors to fund payroll, pay vendors, provide patient care, and otherwise continue business in the ordinary course. As detailed in the First Day Declaration, one reason underlying the filing of these Chapter 11 Cases is to stabilize operations, transition certain Facilities to their respective Landlords, and sell their remaining assets pursuant to Bankruptcy Code section 363. If Cash Collateral is not available, the Debtors will dissipate value to the detriment of the Lenders and other stakeholders, including Employees and patients. Thus, the use of Cash Collateral will protect the Lenders' security interests by preserving the value of the Prepetition Collateral.

153.    Accordingly, on behalf of the Debtors, I respectfully submit that the Cash

Collateral Motion should be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of December, 2018.
Dallas, Texas                               **Senior Care Centers, LLC**
                                            Debtors and Debtors in Possession

                                            */s/ Kevin O'Halloran*
                                            Kevin O'Halloran
                                            Chief Restructuring Officer

49

**Exhibit A**

(Sorted Alphabetically)

| # | Debtor Name | Case No. | EIN |
|---|---|---|---|
| 1. | Alief SCC LLC | 18-33987 | 0523 |
| 2. | Bandera SCC LLC | 18-33989 | 0617 |
| 3. | Baytown SCC LLC | 18-33992 | 0778 |
| 4. | Beltline SCC LLC | 18-33996 | 7264 |
| 5. | Booker SCC LLC | 18-33999 | 0967 |
| 6. | Bossier SCC LLC | 18-34003 | 2017 |
| 7. | Bradford SCC LLC | 18-34004 | 9535 |
| 8. | Brinker  SCC LLC | 18-34005 | 7304 |
| 9. | Brownwood SCC LLC | 18-33968 | 0677 |
| 10. | Capitol SCC LLC | 18-34006 | 1750 |
| 11. | CapWest-Texas LLC | 18-34008 | 4897 |
| 12. | Cedar Bayou SCC LLC | 18-34010 | 8889 |
| 13. | Clear Brook SCC LLC | 18-34012 | 1877 |
| 14. | Colonial SCC LLC | 18-34014 | 4385 |
| 15. | Community SCC LLC | 18-33969 | 7951 |
| 16. | Corpus Christi SCC LLC | 18-34016 | 9807 |
| 17. | Crestwood SCC LLC | 18-34017 | 7349 |
| 18. | Crowley SCC LLC | 18-33970 | 6697 |
| 19. | CTLTC Real Estate, LLC | 18-34018 | 0202 |
| 20. | Fairpark SCC LLC | 18-34020 | 7381 |
| 21. | Gamble Hospice Care Central LLC | 18-34022 | 6688 |
| 22. | Gamble Hospice Care Northeast LLC | 18-34025 | 6661 |
| 23. | Gamble Hospice Care Northwest LLC | 18-34027 | 2044 |
| 24. | Gamble Hospice Care of Cenla LLC | 18-34029 | 4510 |
| 25. | Green Oaks SCC LLC | 18-33971 | 7218 |
| 26. | Harbor Lakes SCC LLC | 18-33972 | 7299 |
| 27. | Harden HUD Holdco LLC | 18-34032 | 1502 |
| 28. | Harden Non-HUD Holdco LLC | 18-34035 | 3391 |
| 29. | Harden Pharmacy LLC | 18-34036 | 1995 |
| 30. | Hearthstone SCC LLC | 18-34037 | 9154 |
| 31. | Hewitt SCC LLC | 18-33973 | 7237 |
| 32. | HG SCC LLC | 18-34040 | 7415 |
| 33. | Hill Country SCC LLC | 18-34043 | 4199 |
| 34. | Holland SCC LLC | 18-33974 | 1427 |
| 35. | Hunters Pond SCC LLC | 18-34045 | 2886 |
| 36. | Jacksonville SCC LLC | 18-34046 | 4216 |
| 37. | La Hacienda SCC LLC | 18-34049 | 1074 |
| 38. | Lakepointe SCC LLC | 18-34050 | 7457 |
| 39. | Major Timbers LLC | 18-34052 | 7477 |
| 40. | Marlandwood East SCC LLC | 18-34054 | 1871 |

| # | Debtor Name | Case No. | EIN |
|---|---|---|---|
| 41. | Marlandwood West SCC LLC | 18-34058 | 2192 |
| 42. | Meadow Creek SCC LLC | 18-34064 | 9278 |
| 43. | Midland SCC LLC | 18-34065 | 4231 |
| 44. | Mill Forest Road SCC LLC | 18-34066 | 5137 |
| 45. | Mission SCC LLC | 18-33975 | 8086 |
| 46. | Mullican SCC LLC | 18-34067 | 7499 |
| 47. | Mystic Park SCC LLC | 18-34068 | 1898 |
| 48. | Normandie SCC LLC | 18-34069 | 1542 |
| 49. | Onion Creek SCC LLC | 18-34070 | 7425 |
| 50. | Park Bend SCC LLC | 18-34071 | 9410 |
| 51. | Pasadena SCC LLC | 18-34072 | 1694 |
| 52. | Pecan Tree SCC LLC | 18-34073 | 4241 |
| 53. | Pecan Valley SCC LLC | 18-34074 | 9585 |
| 54. | Pleasantmanor SCC LLC | 18-34075 | 7536 |
| 55. | PM Management - Allen NC LLC | 18-34076 | 4961 |
| 56. | PM Management - Babcock NC LLC | 18-34077 | 7829 |
| 57. | PM Management - Cedar Park NC LLC | 18-34078 | 1050 |
| 58. | PM Management - Corpus Christi NC II LLC | 18-34079 | 5231 |
| 59. | PM Management - Corpus Christi NC III LLC | 18-34080 | 5129 |
| 60. | PM Management - Corsicana NC II LLC | 18-34081 | 9281 |
| 61. | PM Management - Corsicana NC III LLC | 18-34082 | 9353 |
| 62. | PM Management - Corsicana NC LLC | 18-34083 | 1333 |
| 63. | PM Management - Denison NC LLC | 18-34084 | 5022 |
| 64. | PM Management - El Paso I NC LLC | 18-34085 | 2965 |
| 65. | PM Management - Fredericksburg NC LLC | 18-34086 | 0599 |
| 66. | PM Management - Frisco NC LLC | 18-34087 | 5082 |
| 67. | PM Management - Garland NC LLC | 18-33979 | 5137 |
| 68. | PM Management - Golden Triangle NC I LLC | 18-33980 | 9478 |
| 69. | PM Management - Golden Triangle NC II LLC | 18-33981 | 9536 |
| 70. | PM Management - Golden Triangle NC III LLC | 18-33982 | 9597 |
| 71. | PM Management - Golden Triangle NC IV LLC | 18-33983 | 9654 |
| 72. | PM Management - Killeen I NC LLC | 18-33984 | 3105 |
| 73. | PM Management - Killeen II NC LLC | 18-33985 | 3179 |
| 74. | PM Management - Killeen III NC LLC | 18-33986 | 3245 |
| 75. | PM Management - Lewisville NC LLC | 18-33988 | 5296 |
| 76. | PM Management - New Braunfels NC LLC | 18-33990 | 6293 |
| 77. | PM Management - Park Valley NC LLC | 18-33991 | 7186 |
| 78. | PM Management - Pflugerville AL LLC | 18-33993 | 4007 |
| 79. | PM Management - Portland AL LLC | 18-33994 | 5018 |
| 80. | PM Management - Portland NC LLC | 18-33995 | 4928 |
| 81. | PM Management - Round Rock AL LLC | 18-33997 | 5304 |
| 82. | PM Management - San Antonio NC LLC | 18-33998 | 1216 |
| 83. | Presidential SCC LLC | 18-34000 | 1913 |
| 84. | Redoak SCC LLC | 18-33976 | 7569 |

2

| # | Debtor Name | Case No. | EIN |
|---|---|---|---|
| 85. | Riverside SCC LLC | 18-34001 | 1889 |
| 86. | Round Rock SCC LLC | 18-34002 | 8936 |
| 87. | Rowlett SCC LLC | 18-34007 | 7606 |
| 88. | Ruston SCC LLC | 18-34009 | 0242 |
| 89. | RW SCC LLC | 18-34011 | 7631 |
| 90. | Sagebrook SCC LLC | 18-34013 | 9571 |
| 91. | San Angelo SCC LLC | 18-34015 | 4254 |
| 92. | SCC Edinburg LLC | 18-34019 | 1195 |
| 93. | SCC Hospice Holdco LLC | 18-34021 | 3166 |
| 94. | SCC Senior Care Investments LLC | 18-34023 | 4123 |
| 95. | SCC Socorro LLC | 18-34024 | 5459 |
| 96. | Senior Care Center Management II LLC | 18-34026 | 1280 |
| 97. | Senior Care Center Management LLC | 18-34028 | 7811 |
| 98. | Senior Care Centers Home Health, LLC | 18-34030 | 1931 |
| 99. | Senior Care Centers LLC | 18-33967 | 8550 |
| 100. | Senior Rehab Solutions LLC | 18-34031 | 4829 |
| 101. | Senior Rehab Solutions North Louisiana LLC | 18-34033 | 1690 |
| 102. | Shreveport SCC LLC | 18-34034 | 1659 |
| 103. | Solutions 2 Wellness LLC | 18-34038 | 4065 |
| 104. | South Oaks SCC LLC | 18-34039 | 8002 |
| 105. | Springlake ALF SCC LLC | 18-34041 | 2436 |
| 106. | Springlake SCC LLC | 18-34042 | 9102 |
| 107. | Stallings Court SCC LLC | 18-33977 | 7393 |
| 108. | Stonebridge SCC LLC | 18-34044 | 9234 |
| 109. | Stonegate SCC LLC | 18-33978 | 3005 |
| 110. | Summer Regency SCC LLC | 18-34047 | 7782 |
| 111. | TRISUN Healthcare LLC | 18-34048 | 2497 |
| 112. | Valley Grande SCC LLC | 18-34051 | 1341 |
| 113. | Vintage  SCC LLC | 18-34053 | 7710 |
| 114. | West Oaks SCC LLC | 18-34055 | 9535 |
| 115. | Western Hills SCC LLC | 18-34056 | 1922 |
| 116. | Weston Inn SCC LLC | 18-34057 | 7871 |
| 117. | Westover Hills SCC LLC | 18-34059 | 3303 |
| 118. | Whitesboro SCC LLC | 18-34060 | 7745 |
| 119. | Windcrest SCC LLC | 18-34061 | 9541 |
| 120. | Windmill SCC LLC | 18-34062 | 8067 |
| 121. | Wurzbach SCC LLC | 18-34063 | 9920 |

## **Exhibit B**

Organizational Charts



Senior Care Centers, LLC
Senior Care Center Management II LLC
SCC Senior Care Investments LLC
Senior Care Center Management LLC
SCC Facilities (See SCC Fac. Sht.)
CTLTC Real Estate, LLC
Senior Care Consultants at Home, Ltd. SCC 1% Home Health 99%
Senior Care Centers Home Health LLC
Solutions 2 Wellness LLC
Partners Pharmacy, LLC SCC 37.037%
Harden Pharmacy, LLC dba MBS Pharmacy
MAJOR TIMBERS, LLC
TRISUN Healthcare, LLC
Harden HUD Holdco, LLC
Harden Non-HUD Holdco, LLC
CapWest – Texas, LLC
Senior Rehab Solutions, LLC SCC 85.09% CTLTC 14.91%
CTLTC HUD Facilities (See CTLTC Fac. Sht.)
CTLTC Facilities (See CTLTC Fac. Sht.)
HHC Portland AL, LP (CapWest is GP)
Canopy Medical Staffing LLC
SCC Hospice Holdco LLC
Senior Rehab Solutions North Louisiana LLC
Gamble Hospice Care Cenla LLC
Gamble Hospice Care Northwest LLC
Gamble Hospice Care Northeast LLC
Agape Hospice Care of Ruston LLC (SHELL)
Gamble Hospice Care Central LLC

**SCC Facilities**

| |
|---|
| Brinker SCC LLC |
| Beltline SCC LLC |
| Fairpark SCC LLC |
| HG SCC LLC |
| Lakepointe SCC LLC |
| Mullican SCC LLC |
| Pleasantmanor SCC LLC |
| Rowlett SCC LLC |
| RW SCC LLC |
| Vintage SCC LLC |
| Whitesboro SCC LLC |
| Crestwood SCC LLC |
| PARK BEND SCC LLC |
| STONEBRIDGE SCC LLC |
| HEARTHSTONE SCC LLC |
| SAGEBROOK SCC LLC |
| HILL COUNTRY SCC LLC |
| JACKSONVILLE SCC LLC |
| MIDLAND SCC LLC |
| PECAN TREE SCC LLC |
| SAN ANGELO SCC LLC |
| Onion Creek SCC LLC |

| |
|---|
| Brownwood SCC LLC |
| Redoak SCC LLC |
| SCC Edinburg LLC |
| Mission SCC LLC |
| Community SCC LLC |
| Green Oaks SCC LLC |
| Hewitt SCC LLC |
| Crowley SCC LLC |
| Stallings Court SCC LLC |
| Harbor Lakes SCC LLC |
| Corpus Christi SCC LLC |
| Marlandwood East SCC LLC |
| Marlandwood West SCC LLC |
| Meadow Creek SCC LLC |
| Round Rock SCC LLC |
| Summer Regency SCC LLC |
| Western Hills SCC LLC |
| Weston Inn SCC LLC |
| Windcrest SCC LLC |
| Wurzbach SCC LLC |
| Alief SCC LLC |
| Bandera SCC LLC |
| Baytown SCC LLC |

| |
|---|
| Capitol SCC LLC |
| Cedar Bayou SCC LLC |
| La Hacienda SCC LLC |
| Mill Forest Road SCC LLC |
| Mystic Park SCC LLC |
| Pasadena SCC LLC |
| Presidential SCC LLC |
| Riverside SCC LLC |
| South Oaks SCC LLC |
| West Oaks SCC LLC |
| Windmill SCC LLC |
| Hunters Pond SCC LLC |
| Pecan Valley SCC LLC |
| Westover Hills SCC LLC |
| Clear Brook SCC LLC |
| Valley Grande SCC LLC |
| Normandie SCC LLC |
| Bradford SCC LLC |
| Shreveport SCC LLC |
| Booker SCC LLC |
| Springlake SCC LLC |
| Colonial SCC LLC |
| Bossier SCC LLC |

| |
|---|
| Ruston SCC LLC |
| Springlake ALF SCC LLC |
| SCC Socorro LLC |
| Stonegate SCC LLC |
| Holland Lake SCC LLC |
| San Antonio SCC LLC |
| SCC Socorro LLC |

| **Shell Subsidiaries:** |
|---|
| West Monroe Hospice SCC LLC |
| Minden Hospice SCC LLC |
| Greenhill LLC |
| Kemp SCC LLC |
| Whispering Pines SCC LLC |

**CTLTC Facilities**

| Harden Non-HUD Holdco, LLC |
| --- |
| PM Management – Allen NC, LLC |
| PM Management – Babcock NC, LLC |
| PM Management – Cedar Park NC, LLC |
| PM Management–Corpus Christi NC II, LLC |
| PM Management–Corpus Christi NC III, LLC |
| PM Management – Corsicana NC II, LLC |
| PM Management – Corsicana NC III, LLC |
| PM Management – Corsicana NC, LLC |
| PM Management – Denison NC, LLC |
| PM Management – El Paso I NC, LLC |
| PM Management – Fredericksburg NC, LLC |
| PM Management – Frisco NC, LLC |
| PM Management – Garland AL, LLC |
| PM Management – Garland NC, LLC |
| PM Management – Golden Triangle NC I, LLC |
| PM Management – Golden Triangle NC II, LLC |
| PM Management – Golden Triangle NC III, LLC |
| PM Management – Golden Triangle NC IV, LLC |
| PM Management – Lewisville, NC LLC |
| PM Management – Pflugerville AL, LLC |
| PM Management–Portland AL, LLC |

| |
|---|
| PM Management–Portland NC, LLC |
| PM Management – Round Rock AL, LLC |
| PM Management – San Antonio NC, LLC |
| PM Management – San Antonio AL, LLC |
| PM Management–Sinton NC, LLC |
| PM Management – Portfolio V NC, LLC |
| PM Management – Portfolio VI NC, LLC |
| PM Management – Portfolio VII NC, LLC |

| |
|---|
| **Shell Subsidiaries:** |
| PM Management – Austin NC, LLC |
| PM Management – Austin NC II, LLC |
| PM Management – Corpus Christi NC, LLC |
| PM Management – Georgetown NC, LLC |
| PM Management – Georgetown AL, LLC |
| PM Management – Hewitt NC, LLC |
| PM Management – Killeen IV NC, LLC |
| PM Management – Pflugerville NC, LLC |
| PM Management – San Angelo NC I, LLC |
| PM Management – San Angelo NC II, LLC |
| PM Management – Temple NC I, LLC |
| PM Management – Temple NC II, LLC |
| PM Management – Temple NC III, LLC |
| PM Management – Temple NC IV, LLC |

| PM Management – Trinity NC, LLC |
| --- |
| PM Management - Windcrest NC, LLC |
| PM Management – Wurzbach NC, LLC |
| PM Management – Temple NC II, LLC |

| **Harden HUD Holdco, LLC** |
| --- |
| PM Management – Killeen I NC, LLC |
| PM Management – Killeen II NC, LLC |
| PM Management – Killeen III NC, LLC |
| PM Management – New Braunfels NC, LLC |
| PM Management – Park Valley NC, LLC |
| PM Management – Portfolio VIII NC, LLC |
| PM Management – Portfolio IX NC, LLC |

## Exhibit C

Schedule of Credit Facility

A comprehensive list of all Credit Facility Documents, including specific Debtors to each agreement, is attached to the Cash Collateral Order as Exhibit B-1.

Non-HUD Facility. The non-HUD Borrowers as of December 4, 2018 consist of HILL COUNTRY SCC LLC, JACKSONVILLE SCC LLC, MIDLAND SCC LLC, PECAN TREE SCC LLC, SAN ANGELO SCC LLC, Riverside SCC LLC, South Oaks SCC LLC, Capitol SCC LLC, Bandera SCC LLC, Cedar Bayou SCC LLC, Baytown SCC LLC, La Hacienda SCC LLC, West Oaks SCC LLC, Alief SCC LLC, Windmill SCC LLC, Pasadena SCC LLC, Mystic Park SCC LLC, Presidential SCC LLC, Mill Forest Road SCC LLC, Rowlett SCC LLC, Onion Creek SCC LLC, Brownwood SCC LLC, SCC Edinburg LLC, Redoak SCC LLC, Mission SCC LLC, Community SCC LLC, Green Oaks SCC LLC, Hewitt SCC LLC, Crowley SCC LLC, Stallings Court SCC LLC, Harbor Lakes SCC LLC, Marlandwood East SCC LLC, Meadow Creek SCC LLC, Western Hills SCC LLC, Weston Inn SCC LLC, Hunters Pond SCC LLC, Pecan Valley SCC LLC, Westover Hills SCC LLC, Clear Brook SCC LLC, Valley Grande SCC LLC, Normandie SCC LLC, Bradford SCC LLC, Shreveport SCC LLC, Booker SCC LLC, Springlake SCC LLC, Colonial SCC LLC, Bossier SCC LLC, Ruston SCC LLC, Springlake ALF SCC LLC, Stonegate SCC LLC, Holland Lake SCC LLC, SCC Socorro LLC, Senior Care Center Management LLC, SCC Senior Care Investments LLC, Solutions 2 Wellness LLC, Senior Care Centers Home Health LLC, Canopy Medical Staffing LLC, CTLTC Real Estate, LLC, Harden Non-HUD Holdco, LLC, TRISUN Healthcare, LLC, CapWest – Texas, LLC, MAJOR TIMBERS, LLC, PM Management – Babcock NC, LLC, PM Management – Cedar Park NC, LLC, PM Management–Corpus Christi NC II, LLC, PM Management–Corpus Christi NC III, LLC, PM Management – Corsicana NC, LLC, PM Management – Corsicana NC II, LLC, PM Management – Corsicana NC III, LLC, PM Management – El Paso I NC, LLC, PM Management – Garland AL, LLC, PM Management – Georgetown AL, LLC, PM Management – Georgetown NC, LLC, PM Management – Golden Triangle NC I, LLC, PM Management – Golden Triangle NC II, LLC, PM Management – Golden Triangle NC III, LLC, PM Management – Golden Triangle NC IV, LLC, PM Management – Pflugerville AL, LLC, PM Management – Portfolio V NC, LLC, PM Management – Portfolio VII NC, LLC, PM Management–Portland AL, LLC, PM Management–Portland NC, LLC, PM Management – Round Rock AL, LLC, PM Management – San Antonio AL, LLC, PM Management – San Antonio NC, LLC, PM Management–Sinton NC, LLC, each a Texas limited liability company, HHC Portland AL, LP, a Texas limited partnership, and Senior Rehab Solutions LLC, a Delaware limited liability company.

HUD Facility. The HUD Borrowers as of December 4, 2018 consist of Hearthstone SSC LLC, Crestwood SCC LLC, Park Bend SCC LLC, Sagebrook SCC LL, Stonebridge SCC, LLC, Corpus Christi SCC LLC, Round Rock SCC LLC, Brinker SCC LLC, Beltline SCC LLC, Fairpark SCC LLC, HG SCC LLC, Lakepointe SCC LLC, Mullican SCC LLC, Pleasantmanor SCC LLC, RW SCC LLC, Vintage SCC LLC, Whitesboro SCC LLC, PM Management – Fredericksburg NC, LLC, Marlandwood West SCC LLC, Summer Regency SCC LLC, Windcrest SCC LLC, Wurzbach SCC LLC, PM Management – Allen NC, LLC, PM Management – Denison NC, LLC, PM Management – Frisco NC, LLC, PM Management –

Garland NC, LLC, PM Management – Lewisville NC, LLC, and PM Management – Portfolio VI NC, LLC, each a Texas limited liability company.

**Exhibit D**

Schedule of Leases and Landlords

| Landlord[1] | Portfolio | # of Facilities |
|---|---|---|
| Granite. | Momentum | 4 |
| Granite | Valley Grande | 1 |
| Granite | SCC Granite Portfolio #1 | 12 |
| Granite | SCC Granite Portfolio #2 | 6 |
| Granite | SCC Granite Trisun I | 3 |
| Granite | SCC Granite Trisun II | 3 |
| Granite | SCC Granite Trisun IV | 5 |
| Sabra | Hollywood CCP | 12 |
| Sabra | Onion Creek | 1 |
| Sabra | Ranger CCP | 13 |
| Sabra | SCC NHP Portfolio #1 | 5 |
| Sabra | Vegas | 9 |
| LTC | SCC LTC Portfolio #1 | 5 |
| LTC | SCC LTC Portfolio #3 | 2 |
| LTC | Meridian Portfolio #2 | 4 |
| Formation Properties VIII, LP | American Capital | 5 |
| Hidalgo Healthcare Realty, LLC | Hidalgo | 1 |
| Granite Valley Grande LLC | Socorro | 1 |
| Conroe Health Development, LP | Cedar Park | 1 |
| Heatherwilde Assisted Living, LLC | Heatherwilde | 1 |
| Willacy Health Care, Inc. | Willacy | 1 |
| MVI Health Center, LP | MVI | 1 |
| Navarro SNF Development LP | Navarro | 1 |
| Prevarian Senior Living, LP | Prevarian | 1 |
| GLS Hospice Properties, LLC | GLS Hospice | 4 |
| GPDP Development, Ltd. | Hollywood GBP | 2 |
| HC Hill County Associates, Ltd. | House Cross | 5 |
| Saddleback Group, LLC | Saddleback | 2 |

---

[1]  As used herein, "Landlord" refers to an entity or its respective affiliates. References to "Landlord" are to the Debtors' current Landlord, reflecting any subsequent assignments.