Trey A. Monsour
State Bar No. 14277200
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tmonsour@polsinelli.com

Jeremy R. Johnson (Admitted *Pro Hac Vice*)
Polsinelli PC
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com

COUNSEL TO THE DEBTORS AND
DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Senior Care Centers, LLC, *et al.*,[1] | § | Case No. 18-33967 (BJH) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

### MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING FORM OF OPERATIONS TRANSFER AGREEMENT, (II) AUTHORIZING TRANSFER OF THE OPERATIONS AND RELATED ASSETS OF A CERTAIN FACILITY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (III) GRANTING RELATED RELIEF

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON APRIL 12, 2019 AT 9:00 A.M. (PREVAILING CENTRAL TIME) AT THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, 1100 COMMERCE ST., 14TH FLOOR, COURTROOM NO. 2, DALLAS, TEXAS 75242.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE**

---

[1] The Debtors in the Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief* [Docket No. 569] and may also be found on the Debtors' claims agent's website at https://omnimgt.com/SeniorCareCenters. The location of the Debtors' service address is 600 North Pearl Street, Suite 1100, Dallas, Texas 75201.

CLERK OF THE BANKRUPTCY COURT WITHIN AT LEAST 4 DAYS IN ADVANCE OF THE HEARING DATE PROVIDED ABOVE. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE **PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

The above-captioned debtors and debtors in possession (the "**Debtors**") hereby move (the "**Motion**") for entry of an order, substantially in the form attached hereto as Exhibit B (the "**Proposed Order**"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) approving an operations transfer and surrender agreement (the "**OTA**") by and between PM Management – Pflugerville AL, LLC (the "**Transferor**") and PF Senior Living, LLC (the "**New Operator**") the form of which is attached hereto as Exhibit A, (ii) authorizing the transfer of the certain assets and operations of the skilled nursing facility known as "Heatherwilde Assisted Living" located at 401 S. Heatherwilde Blvd, Pflugerville, Texas 78660 (the "**Assets**") from the Transferor to the New Operator pursuant to the OTA, free and clear of all claims and encumbrances except as specified in the OTA, and (iii) granting related relief. In support of the Motion, the Debtors rely upon the *Declaration of Kevin O'Halloran, Chief Restructuring Officer of Senior Care Centers, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 25] (the "**First Day Declaration**"). In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

67906675.1

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). The Debtors consent to entry of a final order under Article III of the United States Constitution.

2.     Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 363, and 365, and Bankruptcy Rules 6004 and 6006.

## BACKGROUND

**A.     General Background**

4.     On December 4, 2018 (the "**December Petition Date**"), certain of the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code, and on January 21, 2019 (the "**January Petition Date**", and together with the December Petition Date, the "**Petition Dates**"), an additional seven affiliated Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").

5.     The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

6.     The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

7.     No trustee or examiner has been requested in the Chapter 11 Cases.

67906675.1

8.    On December 14, 2018, the Office of the United States Trustee for the Northern District of Texas appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "**Committee**").

9.    Transferor is the operator of the skilled nursing facility known as "Heatherwilde Assisted Living" located at 401 S. Heatherwilde Blvd, Pflugerville, Texas 78660 (the "**Facility**"), pursuant to an Amended and Restated Lease Agreement, dated December 31, 2009, as amended (the "**Lease**"), between Transferor and Heatherwilde Assisted Living, LLC ("Landlord").

10.    On January 31, 2019, the Bankruptcy Court approved Transferor's rejection of the Lease.

**B.    Settlement Agreement**

11.    In connection with the transfer of the Assets, the Debtors and Landlord have negotiated a comprehensive agreement ("**Settlement Agreement**") that resolves various disputed issues and obviates the need to engage in costly and protracted litigation, creates a pathway for the Debtors to resolve certain of their financial difficulties, preserves the jobs of a substantial portion of the Debtors' employees by keeping all of the Debtors' operating facilities operational, and, most importantly, allows for the continued care of the Debtors' patients.

12.    In conjunction with this Motion, the Debtors have contemporaneously filed a motion seeking the Court's approval of the Settlement Agreement with Landlord under Bankruptcy Rule 9019.[2] Each motion is contingent on the other motion being approved by the Court. Under the Settlement Agreement, the parties agree that (i) the Debtors will transfer the Assets to the New Operator pursuant to the OTA, and (ii) the Effective Date of the Settlement Agreement shall be the date upon which the later of the following shall occur: (a) the order of the

---

[2] *Motion of Debtors for Entry of an Order (I) Approving Settlement Agreement and (II) Granting Related Relief.*

Bankruptcy Court approving the Settlement Agreement becomes final and non-appealable, or (b) the Closing of the OTA (as defined in the OTA) shall take place or occur.

13. A material term of the Settlement Agreement requires the Debtors to transfer the Assets to the New Operator and; therefore, as required by Bankruptcy Code §§ 363 and 365, the Debtors file this Motion seeking the Court's approval.

**C. Proposed Transfer of assets**

14. The Transferor is the operator of the Facility. The Transferor owns certain assets in connection with the operation of its Facility, and such assets are more particularly defined in the OTA as the "**Assets**". The New Operator desires to purchase from the Transferor the Assets related to the Facility. The New Operator, as of the date hereof, has executed the OTA with respect to the Facility it is purchasing, subject to Bankruptcy Court approval. The New Operator and the Transferor intend to transfer the Facility on the date which the New Operator receives its new operating license (the "**Closing**"). The OTA has an outside date of May 1, 2019.

15. As to the Facility, the Assets to be transferred under the OTA[3] specifically exclude (a) the accounts receivable, which are critical to the Debtors' current operations and are needed to fund other creditor distributions under a proposed plan, and (b) any and all causes of action, claims, or rights of avoidance or recovery of any transfers or liens under chapter 5 of the Bankruptcy Code or applicable state law. Generally, the Assets include:

    a. All inventory, supplies, computers, software (to the extent permitted by applicable licensing agreements), and vehicles;

    b. At the New Operator's option, and subject to subsequent Court approval, any service contracts, licenses, and equipment leases for

---

[3] The description of the transferred Assets in the Motion is for summary purposes only and the terms of the OTA shall govern. To the extent there is any inconsistency between the description of Assets in the Motion and the OTA, the terms of the OTA shall govern.

67906675.1

which Landlord or the New Operator will pay any cure amounts related to prepetition defaults;[4]

c. Subject to applicable regulatory and Court approval, any Medicare/Medicaid provider number and any associated numbers and any and all rights in any other third party payor programs;

d. All charts, personnel records, property manuals, resident/patient charts and records, lists, and similar documents including employee manuals, training materials, policies, procedures and materials related thereto;

e. Subject to subsequent Court approval, all existing agreements with residents, including agreements to hold residents' funds in trust;

f. Subject to applicable regulatory and Court approval, all federal, state, or municipal licenses, certifications, certificates, approvals, permits, variances, waivers, provider agreements, and other authorizations certificates, to the extent assignable;

g. All assignable equipment warranties in favor of the Transferor;

h. All other assignable intangible property not enumerated in the OTA (including trade names) that are used by the Debtors in connection with the operation thereof;

i. All Debtor trade names associated including the name of the facility as then known to the general public, and all goodwill associated therewith; and

j. All telephone numbers used in connection with the operation of the facility, and all goodwill of the Debtor associated with the facilities.

16. On the terms and subject to the conditions contained in the OTA, at the Closing, the New Operator shall assume or otherwise be responsible for all liabilities and obligations under the Assets accruing or arising solely after the Closing (collectively, the "Assumed Liabilities"), and the Debtors shall have no liability for any such liabilities or obligations. Except for the Assumed Liabilities and cure amounts in association with any transferred contracts, the

---

[4] If any contracts are to be assigned to the New Operator, the Debtors will file a separate motion and provide notice and an opportunity to object as to any contract counterparties. A review of such contracts is currently ongoing.

67906675.1

New Operator shall not assume or be liable for any liability, obligation, debt, claim against, or contract of the Facility or the Debtors.

17.     The New Operator will execute new leases with the applicable landlord. As part of the consideration for the Settlement Agreement, the Transferor proposes to transfer the Assets to the New Operator and believe such transfer is in the best interests of the Debtors, their creditors, and the estates.

## RELIEF REQUESTED

18.     Through this Motion, the Debtors seek (a) approval of the OTA, which will be substantially in the form attached hereto as <u>Exhibit A,</u> (b) authorization to transfer the Assets from the Transferor to the New Operator, pursuant to the OTA, and (c) related relief.

## BASIS FOR RELIEF

A.    **The OTA Represents the Exercise of Sound Business Judgment by the Debtors and Should Be Approved**

19.     The transfer of the Assets constitutes a "sale" within the meaning of Bankruptcy Code section 363 (including sections 363(b) and 363(f)) and Bankruptcy Rule 6007. Accordingly, the Transferor's conveyance of its Assets to the New Operator, in exchange for the concessions provided by Landlord under the Settlement Agreement should be deemed "free and clear" of all liens, claims, and other interests in such property as authorized under section 363(b) of the Bankruptcy Code. 11 U.S.C. § 363(f).

20.     Bankruptcy Code section 363 authorizes a debtor to sell assets of the estate other than in the ordinary course of business and provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate ...." 11 U.S.C. § 363(b)(1).

21.    Courts approve proposed sales of property pursuant to Bankruptcy Code section 363 if the transaction represents the reasonable business judgment of the debtor.[5] If a valid business justification exists for the sale, as it does in these Chapter 11 Cases, a debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company."[6] Therefore, any party objecting to this Motion must make a showing of "bad faith, self-interest or gross negligence."[7]

22.    In determining whether a proposed section 363(b)(1) sale satisfies the "business judgment standard," courts consider the following: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested

---

[5] See *Inst. Creditors of Cont'l. Air Lines, Inc. v. Cont'l. Air Lines, Inc. (In re Cont'l. Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty ... there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) ("A sale of assets under § 363 ... is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons."); *In re Delaware & Hudson Rv. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a Chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith"); see also *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986).

[6] *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); see also *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion."); *GBL Holding Co.v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) ("Great judicial deference is given to the [t]rustee's exercise of business judgment" [in approving a proposed sale under section 363].).

[7] *In re Integrated Res., Inc.*, 147 B.R. at 656 (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872-73 (Del. 1985)); see also *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D. N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

parties; (c) whether the price is fair and reasonable; and (d) whether the parties have acted in good faith.[8] The Debtors will show the Court:

a. First, the Debtors have approved the OTA after thorough consideration of all viable alternatives and have concluded that the OTA is supported by a number of sound business reasons. The Debtors submit that the facts described above support an expeditious transfer of the Transferor's Assets to preserve value for the estates and provide a strong business justification for the transfer of such Assets. The Debtors believe that it is in the best interests of their estates to enter into and consummate the transactions provided for in the OTA.

b. Second, the Debtors have provided notice of the Motion as required by the Court, which notice constitutes adequate and reasonable notice to interested parties. Additionally, the Debtors have been in contact with parties who have expressed an interest in the Assets and have informed these parties of the proposed transaction. The Debtors believe that a more extended process would yield no higher or better offers for the operations and the Assets.

c. Third, the Debtors will have provided notice of the proposed cure amounts for any contracts to be assumed and assigned to the parties to those contracts (the "**Cure Parties**") and an opportunity to object to same.

d. Fourth, the consideration to be received by the Debtors for the Assets as a going concern provides the highest possible value and provides significant benefit to the Debtors' estates.

e. Fifth, the Debtors believe that the consideration to be obtained for the Assets and the Settlement Agreement is fair and reasonable. Further, the proposed transfers to the New Operator was negotiated in good faith.

23. For the foregoing reasons, the Debtors submit that the approval of the proposed OTA and the transactions contemplated thereby is appropriate and warranted under Bankruptcy Code section 363.

---

[8] See, e.g., *In re N. Am. Techs. Group, Inc.*, 2010 Bankr. LEXIS 5834, *7 (Bankr. E.D. Tex. Aug. 16, 2010) (citing *In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998)); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). The Debtors will show that the proposed Transfer satisfies all these factors.

B.     The Transfer of the Assets Will Be Free and **Clear of Liens, Claims, Encumbrances, and Interests**

24.     Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances in property of an entity other than the estate if:

a.     applicable nonbankruptcy law permits a sale of such property free and clear of such interest;

b.     such entity consents;

c.     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because Bankruptcy Code section 363(f) is drafted "in the disjunctive," satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests.[9] The Court also may authorize the sale of a debtor's assets free and clear of any liens, claims, or encumbrances pursuant to Bankruptcy Code section 105, even if section 363(f) did not apply.[10]

25.     The Debtors believe that at least one of the tests in Bankruptcy Code section 363(f) will be satisfied with respect to any secured liens asserted against the Transferor's Assets

---

[9] *In re Nature Leisure Times, LLC*, 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007); see also *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D. N.Y. Mar. 6, 1992) ("[S]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D. N.Y. 1986).

[10] See *Matter of Selby Farms*, 15 B.R. 372, 375 (Bankr. S.D. Miss. 1981) ("The power of the Bankruptcy Court to sell property free and clear of liens has long been recognized." (citing *Van Huffel v. Harkelrode*, 284 U.S. 225, 227-28 (1931))); *In re Trans World Airlines, Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("Bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); see also *Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

67906675.1

and other interests that may be alleged by other parties. The Debtors anticipate that any secured creditors will consent to the sale of the Assets pursuant to the OTA and Settlement Agreement. In addition, absent any objection to this Motion, all such secured creditors will be deemed to have consented to the relief requested herein.

26.     Accordingly, the Debtors request that the Assets be transferred free and clear of any liens, claims, encumbrances or other interests, including, without limitation, any claims arising under doctrines of successor liability.

## C.     The New Operator is Entitled to Protection as a Good-Faith Purchaser

27.     This Court has upheld section 363 purchase agreements "negotiated, proposed, and entered into ... in good faith, without collusion ... [resulting from] arm's-length bargaining with ... parties represented by independent counsel."[11] A sale to a good-faith purchaser cannot be avoided under § 363(m), unless the sale authorization was stayed pending appeal.[12] However, "[t]he trustee may avoid a sale ... if the sale price was controlled by an agreement among potential bidders...."[13] Additionally, for the sale to be considered in good-faith, consideration must: (i) be fair and reasonable, (ii) be the highest and best offer for the property, and (iii) constitute reasonably equivalent value, fair value, and fair consideration.[14]

28.     The Debtors negotiated the OTA and Settlement Agreement at arm's length and in good faith to achieve the best results for their estates. The New Operator was represented by counsel and is not an affiliate or insider of the Debtors or otherwise related to the Debtors.

---

[11] *In re TriDimension Energy, L.P.*, 2010 Bankr. LEXIS 4838, *13 (Bankr. N.D. Tex. Nov. 19, 2010).

[12] See 11 U.S.C. § 363(m) ("The reversal or modification of an authorization under subsection (b) of this section of a sale ... does not affect the validity of [the] sale ... to an entity that purchased ... the property in good faith....").

[13] *Id.* § 363(n).

[14] *In re TriDimension Energy, L.P.*, 2010 Bankr. LEXIS 4838, at *13.

Moreover, no equity ownership or future compensation has been offered to the Debtors or any insider of the Debtors. The New Operator is entitled to the protections of a good-faith purchaser under Bankruptcy Code section 363(m), and the OTA does not constitute an avoidable transaction pursuant to Bankruptcy Code section 363(n).

29.     The Debtors submit that the OTA will provide substantial value to the bankruptcy estates because they will facilitate an efficient and orderly transfer of operations, avoid any cessation of operations and displacement of residents, and avoid substantial potential claims of residents and lessors.[15]

## D.     The Debtors May Enter Into the OTA and Other Agreements Related to or Associated With the Transfers

30.     In connection with a sale of substantially all of a debtor's assets, courts routinely approve entry into asset purchase or similar agreements.[16] Such agreements are approved if they are an exercise of the debtor's sound business judgment.[17] The Debtors will show that the OTA has been negotiated at arm's length and that the Debtors utilized their business judgment in an attempt to maximize the recovery and/or minimize claims against their estates. The Court should

---

[15] See *In re TriDimension Energy, L.P.*, 2010 Bankr. LEXIS 4838, at *9 (finding that reasonably equivalent value existed under the Bankruptcy Code); *Mellon Bank, NA. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991) (same), cert. denied, 503 U.S. 937 (1992); see also *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.I., Inc.)*, 92 F.3d 139 (3d Cir. 1996); *Salisbury v. Texas Commerce BankHouston, N.A. (In re WCC Holding Corp.)*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994) (reasonably equivalent value under Texas law) (citing *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1495 (5th Cir.), cert. denied. 510 U.S. 821 (1993) and *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (Bankr. N.D. Tex. 1992)); *In re China Resource Prod. Ltd. v. Favda Intern., Inc.*, 856 F. Supp. 856, 866 (D. Del. 1994) (citing *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 792 (Del. Ch. 1992)).

[16] See, e.g., *In re Tridimension Energy, L.P.*, 2010 WL 5209233, at *2 (Bankr. N.D. Tex. Oct. 29, 2010) (approving the debtor's proposed asset purchase agreement); *In re Enron Corp.*, No. 01-16034, 2002 WL 32154269, at *4 (Bankr. S.D. N.Y. Apr. 24, 2002).

[17] See, e.g., Tridimension Energy, 2010 WL 5209233, at *2 (finding that "the Debtors have demonstrated a compelling and sound business justification" for approval of the proposed asset purchase agreement); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332377, at *5 (Bankr. D. Del. May 17, 2002); In re Arlco, Inc., 239 B.R. 261, 265 (Bankr. S.D. N.Y, 1999).

approve the OTA and related agreements and all transactions contemplated therein in order to allow the proposed transfer of the Assets to the New Operator to be consummated.

**E.      Cause Exists To Eliminate Any Stay Imposed By the Bankruptcy Rules**

31.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006 provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

32.      The Debtors request that any order approving this Motion be effective immediately, thereby waiving the 14-day stays imposed by Bankruptcy Rules 6004 and 6006. These waivers or eliminations of the 14-day stays are necessary for the transactions to close as expeditiously as possible. The Debtors respectfully submits that it is in the best interest of their estates to close the transactions as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors requests that the Court eliminate the 14-day stays imposed by Bankruptcy Rules 6004 and 6006.

## CONSENT TO JURISDICTION

33.      The Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## NOTICE

34.      Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the Northern District of Texas; (b) the Office of the Attorney General of the states in

67906675.1

which the Debtors operate; (c) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (d) counsel to CIBC Bank USA; (e) counsel to Sabra Texas Holdings, L.P.; (f) the Internal Revenue Service; (g) the Department of Medicaid, Department of Health, and Division of Health Services Regulation in each state in which the Debtors operate; counsel to the Official Unsecured Creditors' Committee and (h) those parties who have requested notice pursuant to Bankruptcy Rule 2002.

35.     The Debtors respectfully submit that such notice is sufficient and that no further notice of this Motion is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order: (i) granting the relief sought herein, and (ii) granting the Debtors such other and further relief as the Court may deem proper.

Dated: April 3, 2019
Dallas, Texas

Respectfully submitted,

**POLSINELLI PC**

*/s/ Trey A. Monsour*
Trey A. Monsour (State Bar No. 14277200)
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tmonsour@polsinelli.com

-and-

Jeremy R. Johnson (Admitted *Pro Hac Vice*)
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com

*Counsel to the Debtors and*
*Debtors in Possession*

## **Exhibit A**

Form of Operations Transfer Agreement

*Execution Version*

## OPERATIONS TRANSFER AND SURRENDER AGREEMENT

THIS OPERATIONS TRANSFER AND SURRENDER AGREEMENT, together with all exhibits and schedules (this "***OTA***" or the "***Agreement***"), dated as of March 29, 2019 (the "***Execution Date***"), is by and between PM Management – Pflugerville AL LLC, a Texas limited liability company ("***Transferor***"), and PF Senior Living, LLC, a Texas limited liability company ("***Transferee***"). Both Transferor and Transferee may be referred to herein as a "***Party***" and collectively as the "***Parties***." A glossary of capitalized terms is set forth in Exhibit A attached hereto.

**WHEREAS**, on December 4, 2018, Transferor commenced a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101-1532 (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Northern District of Texas (the "***Bankruptcy Court***");

**WHEREAS**, Transferor is the operator of that certain licensed assisted living facility known as Heatherwilde Assisted Living located at 401 S. Heatherwilde Blvd, Pflugerville, Texas 78660 (the "***Facility***");

**WHEREAS**, Transferor owns certain Assets used in connection with the operation of the Facility;

**WHEREAS**, Transferee desires to purchase the Assets and assume the Assumed Liabilities from Transferor, and Transferor desires to sell, convey, transfer, and deliver to Transferee the Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this OTA and an Order in a form reasonably satisfactory to Transferee (the "***Sale Order***"), and in accordance with sections 105, 363 and 365 and all other applicable provisions of the Bankruptcy Code; and

**WHEREAS**, the Parties wish to provide for an orderly and lawful transition of the operations of the Facility from Transferor to Transferee in accordance with the terms of this OTA.

**NOW, THEREFORE**, in consideration of the premises, the mutual obligations of the Parties contained in this OTA, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## SURRENDER

1.1     Surrender. Transferor agrees that Transferor's rights and obligations in and to the Facility and all of its rights to occupy or otherwise operate the Facility shall terminate as of the Effective Time, except those rights or obligations which survive or are retained by such Transferor pursuant to this OTA. Transferor agrees to convey, assign and deliver to Transferee the Assets and all of Transferor's right, title and interest in and to the business operations of the Facility, effective as of the Effective Time.

## ARTICLE II
## ASSETS, LIABILITIES AND OTHER MATTERS

2.1     Assets. Upon the terms and subject to the conditions set forth in this OTA, on the Closing Date, and except for the Excluded Assets, to the fullest extent of its interest, Transferor shall (i) transfer to Transferee physical custody (at the Facility) with regard to items in subparagraph "(d)"; and (ii) sell, transfer, convey and/or assign to Transferee, free and clear of all Encumbrances of any nature whatsoever except for Permitted Encumbrances, all of Transferor's right, title and interest in and to the items listed in subparagraphs "a" through " m" (the "***Assets***").

      (a)     Reserved;

(b)     all computers, computer equipment and hardware, office equipment, trucks, vehicles and other transportation equipment, parts, supplies and other tangible personal property owned by and in Transferor's possession as of the date of this OTA or acquired by Transferor prior to the Closing Date which are used exclusively in connection with the operation of its Facility;

(c)     software licenses related exclusively to the operation of the Facility, if applicable and to the extent assignable (and if licensor consent to such assignment is required, to the extent such consent is granted), subject to any license transfer fees which would be the responsibility of Transferee;

(d)     all inventory and supplies located at the Facility at the Closing Date, but not less than a quantity of inventory and supplies that is required by Law including, but not limited to, office, foodstuffs, medical, disposables, prescription medications and pharmaceutical inventories and supplies and other inventories, supplies and articles of personal property of every kind and nature attached to or used in connection with the Facility, but only to the extent such inventory and supplies are owned by Transferor (collectively "*Inventory*");

(e)     the contracts, agreements, leases (excluding real estate leases), purchase orders relating exclusively to the Facility (collectively, the "*Contracts*") which are assumed and cured pursuant to Article VIII.  Transferor has provided Transferee with copies of all of the material Contracts relating to the Facility;

(f)     all menus, operating manuals for equipment at the Facility (but specifically excluding operating policy and procedure manuals), marketing, sales and promotional materials; notwithstanding the foregoing, Transferor shall leave all operating policy and procedure manuals in electronic form (the "Policy and Procedure Manuals") for Transferee to use for a period of one hundred fifty (150) days after the Closing. After one- hundred fifty (150) days (the "*Policy Return Date*"), Transferee shall return all Policy and Procedure Manuals to Transferor; *provided, however*, to the extent that Transferee uses the Policy and Procedure Manuals between the Closing Date and the Policy Return Date, Transferee shall be required to place its name thereon and remove the name of Transferor and its Affiliates; *provided, further* that the Parties acknowledge Transferor makes no representation or warranty as to the compliance of Policy and Procedure Manuals with applicable Law, and Transferor shall not be liable for any use thereof by Transferee;

(g)     to the extent of its interest therein, all rights to telephone and facsimile numbers used by the Facility, any "yellow page" and other advertising rights of such Facility, and all of the rights of Transferor in the name used for the Facility (excluding the marks set forth in Exhibit 2.6),;

(h)     all files, charts, and other information located at the Facility in Transferor's possession or control relating to all (i) current Residents of the Facility as of the Closing Date (ii) Residents who previously occupied the Facility or used the Facility prior to the Effective Time and are not Residents of the Facility as of the Effective Time  for the period between and including the Effective Time and the date that is three (3) years prior to the Effective Time, (iii) employment records for the Transferee Employees (including all medical and health records and all non-medical records including payroll and schedule records, evaluations, etc.), (iv) administrative compliance records including, but not limited to, all state surveys and plans of correction, and (v) correspondence and any other written data which was utilized in connection with the operation of the Facility or the Business (collectively, "*Current Records*");

(i)     licenses, certificates, permits, waivers, consents, authorizations, variances, approvals, accreditations, guaranties, certificates of occupancy, , covenants, commitments, and warranties relating to the Facility and the Assets, if any, issued to or on behalf of Transferor relating to the Assets or the Facility, provided the same are transferable and assumed by Transferee ("*Permits*");

2

(j)     goodwill;

(k)     deleted

(l)     deleted; and

(m)     all other assets, properties, rights, business and tangible personal property of every kind and nature owned by Transferor on the Closing Date, known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, whether or not specifically referred to in this OTA relating exclusively to the Facility and its operations to the extent transferable and not expressly excluded pursuant to <u>Section 2.6</u>

2.2    <u>Assisted Living License</u>.

(a)     Transferee will file, within seven (7) days of the Execution Date, an application for a license to operate the Facility (the "*New License*") with the Texas Health and Human Services (the "*Department*"), and Transferee shall file applications for the Ancillary Permits and Approvals as and when permitted or required under the laws of the applicable issuing authority. Transferee will provide Transferor with a copy of its filed application for the New License within one (1) Business Day after its filing of the application. Transferee shall diligently proceed to secure the New License and the Ancillary Permits and Approvals and shall (i) from time to time, upon reasonable request of Transferor, advise Transferor of the status of Transferee's efforts to secure the New License and the Ancillary Permits and Approvals, (ii) promptly advise Transferor once Transferee has received confirmation of the date on which the New License will be issued, and (iii) promptly upon receipt of a request therefor from Transferor, shall provide Transferor with copies of the document(s) evidencing the New License. For purposes hereof, "*Ancillary Permits and Approvals*" shall mean all ancillary permits or licenses required for the operation of the Facility from and after the Closing Date including, but not limited to, business licenses, food service permits, elevator permits, vending machine permits and beauty shop licenses. Hereinafter, the New License and the Ancillary Permits and Approvals will be collectively referred to as the "*Regulatory Approvals*." The Parties will use reasonable efforts to cooperate by providing such information necessary for Transferee to file the application for the Regulatory Approvals contemplated under this <u>Section 2.2</u>.

2.3    <u>deleted</u>

2.4    <u>Assumption of Liabilities</u>.

(a)     Upon the terms and subject to the conditions set forth in this OTA, at the Effective Time, Transferee agrees to assume the following liabilities relating to the Assets, subject to the provisions of <u>Section 2.4(b)</u>: (i) any Taxes with respect to the operation of the Business at the Facility, (ii) all liabilities under the terms of the Permits, and (iii) all obligations and liabilities (in each case, whether or not accrued, whether fixed, contingent or otherwise, and whether known or unknown) pertaining to the operation of the Facility, but in the case of each of clauses (i), (ii), (iii) only to the extent such liabilities relate to the period after the Effective Time (collectively, "*Assumed Liabilities*").

(b)     Except for the Assumed Liabilities, Transferor shall retain all of its liabilities and obligations of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of and by reason of the ownership or operation of the Assets and the Facility prior to the Effective Time. Except to the extent expressly and unambiguously expressed herein to the contrary, Transferee is not the successor to liability of Transferor and is not herein assuming any liability or detriment from, arising from, out of, or relating to, Transferor's ownership or operation of the Assets, the Facility or any activity of Transferor prior to the Effective Time or

conduct of Transferor after the Effective Time. Transferor shall retain all of its applicable foregoing liabilities and obligations ("***Retained Liabilities***").

2.5 <u>Employees and Employee Benefits</u>. The Parties hereby agree that:

(a) Thirty (30) days prior to the Closing, Transferor shall update the list of employees on <u>Schedule 4.6(a)</u> to reflect new hires and terminations of employment that occurred after the Execution Date. <u>Schedule 2.5(a)</u> sets forth a list of employees to whom Transferee agrees not to make an offer of employment pursuant to <u>Section 2.5(b)</u> below.

(b) Not less than seven (7) days prior to the Closing, Transferee shall (or shall cause one of its Affiliates) to offer in writing employment to substantially all of those employees listed on such revised <u>Schedule 4.6(a)</u> who meet Transferee's employment eligibility requirements (provided that, in any event at least ninety percent of the employees listed on Schedule 4.6(a) are hired by Transferee), effective as of the Effective Time (and subject to such employee's continued employment with Transferor as of immediately prior to the Effective Time), on the terms and conditions set forth in this <u>Section 2.5</u>. Employees who accept Transferee's (or its Affiliate's) offers of employment and commence employment with Transferee are referred to herein as "***Transferee Employees***." The employment of each Transferee Employee shall be effective as of the Effective Time. Nothing contained in this OTA shall constitute a guaranty of employment or continued employment of any kind for any current or former employee of Transferor, whether or not such employee is hired by Transferee.

(c) As of 11:59:59 p.m. on the Closing Date, Transferor shall terminate the employment of all employees at the Facility including, without limitation, Persons temporarily absent from active employment by reason of disability, illness, injury, workers' compensation, approved leave of absence or layoff. Transferee's or its Affiliate's offer of employment to Transferor employees pursuant to <u>Section 2.5(b)</u> above shall commence at the Effective Time, such that those Transferor employees who accept employment with Transferee or its Affiliate shall not experience a period of unemployment in connection with the transactions contemplated herein.

(d) Not less than twenty (20) days prior to the Closing, Transferee shall (i) identify to Transferor all Transferor employees identified on <u>Schedule 4.6(a)</u> to whom Transferee and its Affiliates will not offer employment, and (ii) identify to Transferor all employees of Affiliates of Transferor (such as, without limitation, dieticians, clinicians, division vice-presidents, sales people, and such other similar positions) providing services to the Facility to whom Transferee or its Affiliates would propose to make offers (such individuals under subsection (ii) being "***Affiliated-Service Transferee Employees***"), subject to consent in the sole discretion of the applicable Transferor Affiliate. To the extent that Transferor's applicable Affiliate provides such consent, then the requirements regarding employment and hiring of Affiliated-Service Transferee Employees by Transferee and its Affiliates will be the same for Transferee and its Affiliates as those for Transferee Employees under this <u>Section 2.5</u>.

(e) The Parties shall work together in good faith to coordinate reasonably regarding employee changes that occur between the date of the scheduling updates in this Section and the Effective Time so that each Party can update its schedules and records accordingly.

(f) Except as otherwise required by Law, Transferor shall pay the employees at the Facility in accordance with its standard payroll practice, all earned wages due and payable as of the Closing Date including, but not limited to, any severance, retention bonus or other change in control payment payable to any Transferee Employee or Affiliated Service Transferee Employee, as applicable, that become due or owed as a result of the consummation of the transactions contemplated by this OTA.

(g)     All Transferee Employees hired by Transferee who accept and commence employment with Transferee following the Effective Time shall be employed by Transferee on an "at will" basis. Transferee shall initially employ Transferee Employees on the following terms and conditions in such manner as not to trigger WARN Act liability: (i) comparable base salary or rates of pay as in effect immediately prior to the Closing Date for employees of similar tenure performing comparable services at Transferee's other skilled nursing facilities, and (ii) employee benefits that are comparable in the aggregate to the benefits that are provided by Transferee to its employees under the Plans at its other skilled nursing facility operations. In furtherance and not in limitation of the foregoing, Transferee shall treat prior service with Transferor as service with Transferee for purposes of determining eligibility to receive and participate in all benefits programs maintained by Transferee. It is understood that Transferee shall not be responsible to pay any disability or workers' compensation benefits to or for any Transferor's employee who is receiving such benefits or who experienced a disability or injury covered under Transferor's benefit plans or workers compensation insurance program on or before the Closing, and that Transferor, as applicable, shall continue to be responsible for payment of such benefits until such obligation terminates under the applicable benefit plans or Laws. Transferee, at reasonable times in advance of Closing upon prior written notice to and coordination with Transferor, shall be entitled to meet with the employees of the Facilities and distribute employment applications and benefit enrollment packages. This OTA shall not create and shall not be deemed to create or grant to any Transferee Employee any third party beneficiary rights or claims or any cause of action of any kind or nature.

(h)     Pursuant to Treasury Regulations Section 1.409A-1(h)(4), Transferor and Transferee agree that on the Closing Date, each Transferee Employee shall be treated as having a "separation from service" for purposes of Section 409A of the Code and Treasury Regulations Section 1.409A-1(h).

(i)     Subject to <u>Section 2.5(m)</u>, Transferor shall retain the liability for the claims respecting all employees of Transferor (including the Transferee Employees) that are incurred under any Plan prior to the Effective Time.

(j)     Transferee shall be responsible for any and all liabilities arising out of or with respect to any Transferee Employee arising with respect to employment by Transferee after the Effective Time or attributable to events or circumstances occurring after the Effective Time.

(k)     The Parties acknowledge and agree that all provisions contained in this <u>Section 2.5</u> with respect to employees are included for the sole benefit of the respective Parties and shall not create any right (i) in any other Person, including any employees, former employees, any participant in any Plan or Transferee Plan or any beneficiary thereof, or (ii) to continued employment with any Transferor or Transferee, or particular benefits or coverage in any Plan or Transferee Plan. For the avoidance of doubt, (A) the provisions of this <u>Section 2.5</u> shall not constitute an amendment to any Plan or Transferee Plan, and (B) in no event shall any employee, former employee, any participant in any Plan or Transferee Plan or any beneficiary thereof or any other Person described herein be a third party beneficiary for purposes of this OTA.

(l)     Immediately following the Closing, Transferee shall provide Transferee Employees who accept employment with Transferee, as well as eligible dependents of such employees (collectively, with the Transferee Employees, "***Affected Participants***") the opportunity to participate in the applicable employee benefit plans, programs or policies maintained or established by Transferee that are comparable to the plans and benefits Transferee provides at its other skilled nursing facility operations (each, a "***Transferee Plan***"), which may include medical, dental, vision, and/or any other applicable group medical plan, program, insurance coverage or arrangement (collectively "***Group Health Plan***"). If elected, the benefits offered to such employees must extinguish Transferor's COBRA insurance coverage obligations. With respect to each Transferee Plan in which Affected Participants become eligible to

participate, subject to the consent of any applicable insurer, Transferee shall: (i) waive any eligibility waiting periods, any evidence of insurability requirements and the application of any pre-existing condition limitations under such Plan, except to the extent that such waiting period, evidence of insurability requirement, or pre-existing condition limitations would not have been satisfied or waived under the comparable Plan in which the Affected Participant participated immediately prior to the Effective Time; and [(ii) provide each Affected Participant credit for copays and deductibles under any Transferee Group Health Plan to place each Affected Participant in the same place that such Affected Participant was in under the Transferor's Group Health Plans immediately prior to the Closing.

2.6     Excluded Assets.  Transferee shall not purchase, and Transferor shall retain, any right, title and interest in the assets listed on Exhibit 2.6 (collectively, "*Excluded Assets*").

## ARTICLE III
## CONSIDERATION AND THE CLOSING

3.1     Transfer Consideration.  The total consideration to be paid to Transferor by Transferee on the Closing Date for the Assets shall be an amount equal to $10.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged (the "*Transfer Consideration*") plus the assumption of the Assumed Liabilities.

3.2     Time and Place of Closing.  Subject to the satisfaction or waiver of all of the conditions precedent set forth in this OTA, the consummation of the transactions contemplated under this OTA (the "*Closing*") shall take place on April 8, 2019, or on such other date as shall be mutually agreed upon by the Parties hereto.  The date on which the Closing occurs is referred to herein as the "*Closing Date.*" Notwithstanding the actual time at which the Closing occurs, the time as of which the Closing shall be deemed to be effective and the risk of loss shall pass from Transferor to Transferee shall be 12:00:01 a.m. (local time where the Facility is located) on the Closing Date (the "*Effective Time*").

3.3     Closing Matters.  Upon the terms and subject to the conditions set forth in this OTA, at the Closing:

(a)     Transferor shall deliver to Transferee a bill of sale in the form attached hereto as Exhibit 3.3 (a) (the "*Bill of Sale*") and such endorsements, assignment instruments, and other instruments of transfer and conveyance as shall be reasonable or necessary to convey, transfer, assign and deliver the Assets to Transferee pursuant to the terms of this OTA;

(b)     Transferor shall deliver an assignment of its interests to the items listed in Article II pursuant to an assignment and assumption agreement in the form attached hereto as Exhibit 3.3 (b) (the "*Assignment and Assumption Agreement*");

(c)     Transferor and Transferee shall execute and deliver to the other a certificate in the form attached hereto as Exhibit 3.3 (c) ("*Bring Down Certificate*");

(d)     Transferor and Transferee shall execute a closing statement with respect to the prorations contemplated by Section 3.4 hereof, and the Party owing pursuant to such statement shall pay the amount due in immediately available funds at Closing;

(e)     Transferee shall deliver to Transferor the Transfer Consideration;

(f)     deleted;

(g) Transferor shall execute and deliver to Transferee an assignment of any and all security deposits or advance deposits from Residents, and Transferee shall deliver to Transferor a written receipt for such funds indicating that Transferee is accepting such funds in trust for the Residents;

(h) Transferor shall deliver to Transferee, to the extent that they are not posted at the Facility, certificates, licenses, permits, authorizations and/or approvals issued for or with respect to such Facility by any Governmental Entity;

(i) Transferor shall deliver to Transferee a current and complete list of the names of each Resident in the Facility;

(j) Not later than ten (10) days after the Closing, Transferor shall deliver a detailed Accounts Receivable aging as of the Effective Time noting all balances owed to Transferor for dates of service prior to the Effective Time as described in Section 6.10 below; and

(k) Transferor shall provide to Transferee an updated Schedule 4.6(a) that lists Transferor's employees as of the Closing Date.

3.4 <u>Closing and Post-Closing Adjustments; Costs and Prorations</u>. In addition to any other items agreed upon by the Parties, the following items are to be apportioned between Transferor and Transferee on a *pro-rata* basis as to ownership as of the Closing Date, in accordance with the general principle that Transferor shall be entitled to the revenue attributable to, and responsible for such expenses and obligations attributable to, the Facility for the period up to the Closing Date, and Transferee shall be entitled to the revenue attributable to, and responsible for such expenses and obligations attributable to, the conduct of the Facility on and after the Closing Date:

(a) Water, gas, electric, telephone and other utility charges, and sewer and waste water charges, shall be prorated, to the extent possible prior to the Closing, as of the applicable Closing Date. For metered service, Transferor shall pay or cause to be paid the utility bills for services rendered prior to the readings, and Transferee shall pay the utility bills for the services rendered after the readings. If any metered utility is read on any day other than the applicable Closing Date, Transferor and Transferee shall prorate such utility charges consistent with the most recent bills, and then reconcile following the Closing as provided in Section 3.4 (i). In furtherance of the foregoing, Transferee shall work to transition the utilities serving the Facility into the name of Transferee effective as of the Effective Time, and Transferor shall reasonably cooperate with Transferee.

(b) Subject to and consistent with Section 6.10, all revenue (including rent and Residents' occupancy fees) attributable to any period ending on or prior to the Closing Date shall belong to Transferor, and all revenue (including rent and Residents' occupancy fees) attributable to any period on and after the Closing Date shall belong to Transferee.

(c) For expenses of the Facility, Transferee shall remit to Transferor any invoices which reflect a service or delivery date before the applicable Closing Date, and Transferee shall assume responsibility for the payment of any invoices which reflect a service or delivery date on or after the Closing Date. Notwithstanding the foregoing, Transferee acknowledges and agrees that it shall have no right, title or interest in and to any retroactive workers compensation insurance program payments whether or not the same are paid prior to or after the Closing Date if and to the extent they relate to any period prior to the Closing Date.

(d) Any and all deposits of Transferor with respect to the Facility including, without limitation, any and all equipment leases, security and/or utility deposits paid to and/or cash or other collateral held by any equipment lessor or by any utility, insurance company or surety, shall remain the sole

and exclusive property of Transferor, and Transferee shall have no right or interest therein or thereto, and to the extent that Transferor does not receive a return of any such deposit on the Closing Date and such security deposit has been assumed by and credited to Transferee, Transferee shall reimburse Transferor on the Closing Date the full amount of any such security deposit assumed by Transferee.

(e)    Any bed Tax or similar provider Taxes or fees shall be pro-rated between Transferor and Transferee based on the period of its operation of the Facility occurring before and after the Closing Date, as the case may be, including, but not limited to, any such assessments made by the State in which the Facility is located and/or paid by Transferor prior to the Closing Date that would apply to operation of the Facility on or after the Closing Date.

(f)    Reserved.

(g)    All such prorations shall be made on the basis of actual days elapsed in the relevant accounting, billing or revenue period and shall be based on the most recent information available to Transferor and Transferee.  Transferor and Transferee shall reasonably cooperate to produce prior to the Closing a schedule of prorations to be made under this Section 3.4 at the Closing that is as complete and accurate as reasonably possible.  All prorations that can be accurately or reasonably estimated as of the Closing shall be made at the Closing.  All other prorations, and adjustments to initial estimated prorations, shall be made by the Parties with due diligence and cooperation within one hundred twenty (120) days following the Closing, or such later time as may be required to obtain necessary information for proration, by payment in immediately available funds by wire transfer to one or more bank accounts designated in writing of the Party yielding a net credit from such prorations from the other Party.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF TRANSFEROR

Except to the extent a representation or warranty speaks as of another date, as of the Execution Date and as of the Closing Date, when read in light of any Schedules that are updated prior to the Closing in accordance with the provisions of this Agreement, Transferor represents and warrants to Transferee the following:

4.1    Corporate.

(a)    Organization.  Transferor is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.

(b)    Power and Authority; Authorization; Enforceability.  Transferor has all necessary corporate, partnership or similar power and authority to own, operate and lease the Assets, and to carry on its business as and where such is now being conducted, including the Business.  Transferor has all necessary corporate, partnership or similar power and authority to enter into the documents and instruments to be executed and delivered by Transferor pursuant hereto and to carry out the transactions contemplated hereby.  The execution and delivery of this OTA and the performance of this OTA by Transferor has been duly and validly authorized.  This OTA constitutes the legal, valid and binding obligation of Transferor, enforceable against Transferor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws and equitable principles relating to or limiting creditors' rights generally.

(c)    Qualification.  With respect to the Business, Transferor is duly qualified or licensed to do business, and is in good standing, in all jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such licensing or qualification.

(d) <u>No Conflicts or Violations</u>. Subject to obtaining the consents, neither the execution and delivery of this OTA, the consummation of the transactions contemplated hereby and thereby, nor the fulfillment of the terms hereof by Transferor shall  (i violate any Order of any Governmental Authority applicable to Transferor, , (ii) constitute a violation by Transferor of any applicable Law, (iii) result in the breach of any of the material terms or conditions of, or constitute a default under, or otherwise cause any impairment of, any permit, license or other governmental authorization held by Transferor, or (iv) conflict with or violate any organizational document of Transferor, except in the case of sub-clauses (i), (ii), (iii), and (iv) , to the extent that any such violation, breach or Encumbrance would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Facility .

4.2 <u>Notices</u>. Except as listed in <u>Schedule 4.2</u>, neither the Facility nor Transferor has received, during the past two years, written notice from any Governmental Entity that results in a Material Adverse Effect to the Facility or identifies that the Facility is in violation of Law which has not been cured, except where such violation would not reasonably be expected to result in a Material Adverse Effect.  Transferor shall disclose any rate reduction or bed count reduction of which it becomes aware and any rate reduction proposal or bed count reduction proposal of which it becomes aware that will affect the Facility.

4.3 <u>Litigation</u>. Except as disclosed on <u>Schedule 4.3</u>, there is no Action pending or, to Transferor's Knowledge, threatened against Transferor with respect to the Assets or the Business. Transferor is not subject to any Order relating to the Assets or the Business.

4.4 Taxes. All Returns required to be filed by or on behalf of Transferor on or before the Closing Date with respect to the Business or the Assets have been duly and timely filed (or subject to proper extensions) with the appropriate taxing authority in all jurisdictions in which such Returns are required to be filed, and all such Returns are true, complete and correct in all material respects.

4.5 <u>Employee Benefit Plans</u>.

(a) <u>Schedule 4.5(a)</u> lists all Employee Benefit Plans including, without limitation, any welfare plan within the meaning of Section 3(1) of ERISA, or any pension plan within the meaning of Section 3(2) of ERISA, that Transferor or Affiliate sponsors, maintains, contributes or is obligated to sponsor, maintain, or contribute to the benefit of any current or former employees or other service provider of the Business (or any dependent or beneficiary thereof), or under which SCC or Transferor has any material liability with respect to any current or former employee or other service provider of the Business (each, a "**Plan**").  Transferor has delivered or otherwise made available in the VDR to Transferee true, accurate and complete copies of each Plan (or, if the Plan has not been reduced to writing, a written summary of all material terms).

(b) Each Plan that is intended to be qualified under Section 401(a) of the Code (each a "**Qualified Plan**") has received a favorable determination, opinion, or advisory letter from the IRS indicating that such Qualified Plan (or the master, prototype, or volume submitter form on which it is established) is so qualified under the Code in form, and no fact or event has occurred since the issuance of the most recent such letter that creates a material risk of revocation of any such letter.  Transferor has made available to Transferee a copy of such determination, opinion, or advisory letter.

(c) Neither Transferor nor any ERISA Affiliate thereof currently sponsors, maintains, or contributes to (or has an obligation to sponsor, maintain or contribute to) or sponsored, maintained or contributed to (or had an obligation to sponsor, maintain or contribute to) any "employee pension benefit plan" (as defined in Section 3(2) of ERISA) for which Transferor or any ERISA Affiliate has any liability covering employees of the Business that is subject to Title IV of ERISA or Code Section 412, including any "multi-employer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA, or any "multiple employer

9

plan" subject to Section 4063 or 4064 of ERISA. "*ERISA Affiliate*" means any Person that is considered a single employer with such Person under Section 414(b), (c), (m) or (o) of the Code, any Transferor, Transferor Affiliate or Joint Venture Interest.

(d)     With respect to each Plan, Transferor, or its Affiliates, as applicable, have funded, administered and maintain each Plan in material compliance with all applicable Laws, including ERISA and the Code, and there is no litigation or proceeding pending (other than routine claims for benefits) or, to the Knowledge of Transferor, threatened or anticipated with respect to any Plan in connection with the Business.

(e)     Except as required under COBRA, no Plan provides or promises benefits, including death or medical or other health-related benefits, with respect to current or former service providers of the Business beyond retirement or other termination of service, and Transferor or its Affiliates have no obligation to provide or contribute toward the cost of any such benefits.

(f)     Neither the execution and delivery of this OTA and any related documents nor the consummation of the transactions contemplated hereby will, either alone or in combination with any other event, (i) increase any benefits payable under any Plan, including acceleration of the payment or vesting of any benefit under any Plan, or (ii) entitle any employee to severance payable by Transferee or any Affiliate thereof; *provided, however,* that benefits due and payable from a Plan may be paid or made available due to a termination of employment from Transferor in the ordinary course of administration of any such Plan.

4.6     Employees.

(a)     Schedule 4.6(a) contains a true and correct list of (i) all of the current employees of the Business as of the Execution Date, including those employees on a leave of absence of any kind, (ii) each such employee's name, title, and location of employment, (iii) each such employee's employment status (i.e., whether employees are actively employed or not actively employed due to illness, short-term disability, sick leave, authorized leave of absence, layoff for lack of work or service in the Armed Forces of the United States or for any other reason), (iv) each such employee's hourly wage rate, salary level or annual rate of compensation, including bonuses and incentive pay, (v) the hours worked by each such employee during the preceding twelve months, the exempt or non-exempt status of each employee (whether or not paid at an hourly or salary rate), (vi) each employee's date of hire or commencement of most recent employment, (vii) a description of any fringe benefits (other than the standard fringe benefits offered by Transferor to all qualifying employees), and (viii) existing contractual arrangement with employees, if any (it being understood that all Parties do not consider any "at-will" arrangements with employees to be Contracts).

(b)     Except as disclosed on Schedule 4.6(b), all salary, wages, commissions, bonuses and other cash compensation due and payable to employees of Transferor on or prior to the Closing Date, shall be paid in full on or promptly following the Closing Date in accordance with Transferor's standard payroll practices.

(c)     All workers directly engaged by Transferor (excluding any engagement through a staffing agency) and classified by Transferor as independent contractors since January 1, 2018, have in good faith satisfied the requirements of applicable Law to be so classified, and Transferor has in good faith fully and accurately reported each such person's compensation on IRS Forms 1099 during such period when required to do so.

(d)     Transferor has complied, in all material respects, with all applicable Laws pertaining to labor or employment practices or relations (including, but not limited to, the terms and conditions of employment, management-labor relations, employee classification, records retention, equal

opportunity employment, non-discrimination, disability accommodation, human rights, statutory and regulatory employer notice requirements (including requirements pursuant to the Fair Credit Reporting Act, the United States Immigration and Nationality Act, as amended, federal, state, provincial and local minimum wage laws, regulations and ordinances, federal and state family, medical and military leave laws and regulations, occupational safety and health laws and regulations, and any other similar applicable Law mandating employer notice of employer and/or employee rights and responsibilities under such Law), statutory and contractual leaves of absence, wage and hour issues, immigration, occupational safety and health, workers' compensation, pay equity and human rights and the employment or termination of employment of their employees, including all such Laws relating to equal employment opportunities, payment of wages (including, but not limited to, payment of hourly wages, overtime, salaries, commissions, bonuses, profit sharing, unemployment compensation, benefits, and vacation, sick or other earned time off benefits due and payable to such employees under any policy, practice, Contract, program or applicable Law) or illegal discrimination).

(e)  Except as set forth in Schedule 4.6(e), there are no outstanding, pending or, to Transferor's Knowledge, threatened, actions, causes of action, claims, complaints, grievances, demands, orders, prosecutions, or suits against Transferor (including its and their respective directors, officers, agents, or employees) claiming that Transferor has violated any applicable employment Laws before any Governmental Authority or labor relations board, including the National Labor Relations Board, the Department of Labor, and the Equal Employment Opportunity Commission regarding any employees of the Business. No written notice has been received by Transferor of the intent of any Governmental Authority responsible for the enforcement of labor or employment Laws to conduct an investigation of Transferor regarding any employees of the Business and no such investigation is in progress.

(f)  Except as set out on Schedule 4.6(f), Transferor is not a party to any collective bargaining agreement relating to the Business.

(g)  Except as set forth in Schedule 4.6(g), since January 1, 2018, Transferor has not experienced any labor disputes, any union organization attempts or any work stoppages, walk outs, strikes, or lock outs due to labor disagreements. There are no unfair labor practice charges or complaints pending or threatened against Transferor. There is no labor strike, dispute, request, petition or pending election for representation, slowdown or stoppage pending, or to Transferor's Knowledge, threatened or anticipated against or affecting Transferor.

(h)  Transferor maintains an Employment Eligibility Form on Form I-9 for each employee currently employed in the United States in accordance with applicable Law.

(i)  Except as set forth in Schedule 4.6(i) or with respect to employees subject to a collective bargaining agreement, all employees of Transferor are employed at-will, may be terminated at any time with or without notice and for any reason or no reason at all, without material cost or penalty to Transferor.

(j)  Except with respect to transactions contemplated by this OTA, Transferor has not implemented any employee layoffs that could implicate the WARN Act or any similar applicable foreign, state or local Law, and no such events are currently planned, anticipated or announced.

4.7  Reserved.

4.8  Certain Licensure Matters; Compliance Generally.

(a)  Government Reimbursement Programs. The Facility currently does not currently participate in any Government Reimbursement Programs.

11
67813572.6

(b)    Licenses. The Facility's assisted living facility license is set forth in the VDR, and all other material Licenses applicable to the Business are located at the Facility. All such Licenses are all of the material Licenses necessary for the ownership and operation of the Facility as currently conducted. Such Licenses are in full force and effect, have not been pledged as collateral security, no proceeding is pending or, to Transferor's Knowledge, threatened, seeking the revocation or limitation of any such License. The Facility is duly licensed as an assisted living facility as required under the Laws in the State where the Facility is located, for at least that number of beds as currently listed on the Licenses. Schedule 4.8(b) (ii) sets forth a true, correct, and complete list of the number and types of licensed beds at the Facility. Except as set forth on Schedule 4.8(b) (iii), there are no proceedings or actions pending or, to Transferor's Knowledge, contemplated to reduce the number of licensed or certified beds of the Facility. Except as set forth on Schedule 4.8(b) (iv), Transferor has not received written notice of any violations of the LSC, fire, building and other applicable codes, ordinances, current zoning requirements, rules, and regulations that have not been cured or for which Transferor has received a waiver under applicable Law. Schedule 4.8(b) (v) sets forth a complete and accurate list of LSC waivers, decertification proceedings, licensure revocations, and termination and suspension proceedings for the past two (2) years.

(c)    Compliance Generally. The Facility has been operated and the Assets have been used by Transferor in compliance in all material respects with all applicable Laws, including all Healthcare Requirements, governing the conduct or operation of the Business, the Facility and the Licenses. Except as set forth on Schedule 4.8(c)(i), Transferor has not received any written notice of any violation of any such Law or License that has not been cured and, to Transferor's Knowledge, no notice of such violation has been threatened, except where any such violation would not have a Material Adverse Effect on the Facility.

4.9    Resident Agreements. A copy of the current standard form of admission agreement used by the Facility has been provided to Transferee or otherwise made available to Transferee in the VDR. To Transferor's Knowledge, there are no agreements with residents of the Facility which materially deviate from the standard form.

4.10    Absence of Changes. Except as otherwise disclosed in Schedule 4.10 or the other Schedules, or as contemplated by this OTA, from December 1, 2018, to the Execution Date, (a) the Business has been conducted in all material respects in the ordinary course consistent with past practice, and (b) to Transferor's Knowledge, there has been no change, event, or loss affecting the Business that has had a Material Adverse Effect on the Facility.

4.11    Inventory. On the Closing Date, Transferor shall maintain its normal inventory of supplies, which will be in sufficient quantities of supplies required by Law in all material respects and consistent with past practices for operation of the Facility.

4.12    Reserved.

4.13    Resident Trust Funds. There are no existing Resident Trust Funds held by the Facility for the benefit of any residents.

4.14    Environmental Laws. Transferor has not received any written notice of alleged, actual or potential responsibility for, or any inquiry or investigation regarding the presence or release of any Hazardous Substance at the Facility in violation of any Environmental Law, which Hazardous Substances were allegedly manufactured, used, generated, processed, treated, stored, disposed or otherwise, handled at, or transported or released from such Facility or regarding compliance with Environmental Laws. Transferor has not received any written notice of any other claim, demand or action by an individual or entity alleging any actual or threatened injury or damage to any Person or entity, property, natural resource or the environment arising from or relating to the presence or release of any Hazardous Substances at, on, under, in, to or from its Facility in connection with any operations or activities of Transferor thereat.

12
67813572.6

4.15    Insurance. Transferor has provided to Transferee or otherwise made available in the VDR, a true and correct list of all general liability, professional liability, fire, casualty, fidelity, workers' compensation and other insurance policies currently held by or on behalf of Transferor relating to the Facility, and a description of any self-insurance arrangements by or affecting the Facility, including any reserves established thereunder. Each of said policies is in full force and effect and shall be maintained by Transferor in full force and effect until the Closing, and all premiums due thereunder have been paid and shall be paid by Transferor until the Closing. Transferor has maintained or caused to be maintained insurance policies that have insured the Facility and the Assets continuously since the date Transferor first operated the Facility.

4.16    Reserved.

4.17    Broker. Except as set forth on Schedule 4.17, Transferor has not engaged, nor is liable to pay any fees, costs or commissions to, any broker, finder, agent or financial advisor (each, a "*Broker*" and collectively, "*Brokers*") in connection with the transactions contemplated hereby.

4.18    Intellectual Property. To Transferor's Knowledge, except as would not reasonably be expected to have a Material Adverse Effect on the Facility, (a) Transferor owns or possesses all licenses or other rights to use all Intellectual Property necessary to conduct the Business as presently conducted, (b) Transferor has not received any written notice from any third party that the Business as currently conducted misappropriates or infringes upon any Intellectual Property rights of others, and (c) Transferor has not received any written notice that any third party is infringing any Intellectual Property owned by Transferor and used exclusively in connection with the Business.

4.19    NO WARRANTY OF CONDITION.    THE ASSETS ARE BEING SOLD, TRANSFERRED, ASSIGNED AND DELIVERED BY TRANSFEROR AND RECEIVED BY TRANSFEREE AS IS WHERE IS, AND WITH ALL FAULTS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WRITTEN OR ORAL, WHETHER STATUTORY, ARISING BY OPERATION OF LAW, ARISING BY CUSTOMS OR USAGES OF TRADE, OR OTHERWISE, EXCEPT SOLELY AS EXPRESSLY SET FORTH IN THIS ARTICLE IV TO THIS OTA AND THE OTHER TRANSACTION DOCUMENTS, AND SUBJECT TO ANY AND ALL LIMITATIONS AND QUALIFICATIONS HEREIN; IT BEING THE INTENTION OF TRANSFEROR AND TRANSFEREE TO EXPRESSLY REVOKE, RELEASE, WAIVE, DISCLAIM, NEGATE AND EXCLUDE ALL EXPRESS AND IMPLIED REPRESENTATIONS AND WARRANTIES (EXCEPT SOLELY AS EXPRESSLY SET FORTH IN THIS ARTICLE IV TO THIS OTA AND SUBJECT TO ANY AND ALL LIMITATIONS AND QUALIFICATIONS HEREIN) INCLUDING, WITHOUT LIMITATION, AS TO (a) THE CONDITION OF THE ASSETS OR ANY ASPECT THEREOF INCLUDING, WITHOUT LIMITATION, ANY AND ALL EXPRESS OR IMPLIED REPRESENTATIONS AND WARRANTIES OF OR RELATED TO MERCHANTABILITY, FITNESS FOR A PARTICULAR USE OR PURPOSE OR NON-INFRINGEMENT; (b) THE NATURE OR QUALITY OF CONSTRUCTION, STRUCTURAL DESIGN, OR ENGINEERING OF THE ASSETS OR ANY OTHER ASSET OR PROPERTY, IF ANY; (c) THE QUALITY OF THE LABOR OR MATERIALS INCLUDED IN THE ASSETS; (d) ANY FEATURES OR CONDITIONS AT OR WHICH AFFECT THE ASSETS WITH RESPECT TO ANY PARTICULAR PURPOSE, USE, POTENTIAL, OR OTHERWISE; (e) THE SIZE, SHAPE, CONFIGURATION, CAPACITY, QUANTITY, QUALITY, CASH FLOW, EXPENSES, VALUE, MAKE, MODEL OR CONDITION OF THE ASSETS; (f) ALL EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE OR BY ANY DESCRIPTION OF THE ASSETS; (g) ANY STRUCTURAL OR CONDITION OR HAZARD OR THE ABSENCE THEREOF HERETOFORE, NOW OR HEREAFTER AFFECTING IN ANY MANNER ANY OF THE ASSETS; AND (h) ALL OTHER EXPRESS OR IMPLIED WARRANTIES AND REPRESENTATIONS BY TRANSFEROR WHATSOEVER, EXCEPT AS

13

EXPRESSLY SET FORTH IN THIS <u>ARTICLE IV</u> AND SUBJECT TO ANY AND ALL LIMITATIONS AND QUALIFICATIONS HEREIN. FURTHERMORE, TRANSFEROR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE FUTURE PROFITABILITY, FUTURE CASH FLOW OR VIABILITY OF THE BUSINESS RELATED TO THE ASSETS, ALL OF WHICH TRANSFEREE MUST DETERMINE FROM ITS INVESTIGATION OF THE RECORDS OF TRANSFEROR AND THE FACILITY AND TRANSFEREE'S OWN BUSINESS ACUMEN.

4.20 <u>Disclosure Updates</u>. Within seven (7) days of the Execution Date, Transferor shall provide all schedules contemplated under this Article IV (the *"Schedules Date"*). Transferee shall have within seven (7) days of the Schedule Date (the *"Schedules Termination Date"*) to terminate this OTA with or without cause. At any time, and from time to time on or prior to the Closing Date, Transferor may supplement or amend the Schedules and/or information in the VDR (collectively, a *"Disclosure Update"*). The representations, warranties, and schedules will be deemed supplemented and amended by any Disclosure Update in order to cause the representations and warranties of Transferor to be true as of the Effective Date and the Closing Date. Notwithstanding the foregoing, in the event that a Disclosure Update reveals a change, event, or loss affecting the Business that has or could reasonably be expected to have a Material Adverse Effect, Transferee shall have the right to terminate this Agreement within five (5) business days after notice of such Disclosure Update was given.

## ARTICLE V
## <u>REPRESENTATIONS AND WARRANTIES OF TRANSFEREE</u>

Except to the extent a representation or warranty speaks as of another date, as of the Execution Date and as of the Closing Date, when read in light of any Schedules that are updated prior to the Closing in accordance with the provisions of this Agreement, Transferee represents and warrants to Transferor the following:

5.1 <u>Corporate</u>.

(a) <u>Organization</u>. Transferee is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.

(b) <u>Power and Authority; Authorization; Enforceability</u>. Transferee has all necessary corporate, partnership or similar power and authority to enter into the documents and instruments to be executed and delivered by Transferee pursuant hereto and to carry out the transactions contemplated hereby. The execution and delivery of this OTA and the performance of this OTA by Transferee has been duly and validly authorized. This OTA constitutes the legal, valid and binding obligation of Transferee, enforceable against Transferee in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws and equitable principles relating to or limiting creditors' rights generally.

(c) <u>Qualification</u>. Transferee is duly qualified or licensed to do business, and is in good standing, in all jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such licensing or qualification.

(d) <u>No Conflicts or Violations</u>. Neither the execution and delivery of this OTA or the other Transaction Documents, the consummation of the transactions contemplated hereby and thereby, nor the fulfillment of the terms hereof by Transferee shall (i) violate or result in a breach of any of the material terms and provisions of, constitute a default under, conflict with, or result in any acceleration of rights,

14
67813572.6

benefits or obligations of any party under any contracts to which Transferee is a party or by which it is bound, (ii) violate any Order of any Governmental Authority applicable to Transferee, or (iii) constitute a violation by Transferee of any applicable Law, or (iv) conflict with or violate any organizational document of Transferee.

5.2    <u>Litigation</u>. There are no proceedings, orders, or determinations by or with any arbitrator, court, or other governmental body, authority or agency, or to Transferee's Knowledge, threatened against or by Transferee or any of its Affiliates that challenge (or could challenge) or seek (or could seek) to prevent, enjoin, or otherwise delay the consummation of the transactions contemplated under this OTA or the execution and delivery of any agreement in connection therewith.

5.3    <u>Broker</u>. Transferee has not engaged, nor is liable to pay any fees, costs or commissions to any Broker(s) in connection with the transactions contemplated hereby.

5.4    <u>Transferee's Reliance</u>.

(a)    In connection with Transferee's investigation of the Business and the Facility, Transferee may have received from Transferor certain projections, forward-looking statements and other forecasts and certain business plan information. Transferee acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Transferee is familiar with such uncertainties, that Transferee is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that (except in the case of fraud) Transferee shall not have or make any claim against any Person with respect thereto. Accordingly, Transferee acknowledges that Transferor or any other Person have not and do not make any direct or indirect representation or warranty with respect to such forward-looking estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

(b)    Transferee acknowledges that neither Transferor nor any other Person have made any representation or warranty, expressed or implied, as to the accuracy or completeness of any information regarding Transferor, the Assets and the Facility furnished or made available to Transferee and its representatives, except as expressly set forth in <u>Article IV</u>, and Transferor or any other Person (including any officer, director, manager, member or partner of any of Transferor) shall not have or been subject to any liability to Transferee (except in the case of fraud), or any other Person, resulting from Transferee's use of any information, documents or material made available to Transferee in any confidential information memoranda, "data rooms," management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby. Transferee acknowledges that except as expressly set forth in <u>Article IV</u>, the Facility and the Assets have been acquired without any representation or warranty as to merchantability or fitness for any particular purpose of their respective assets, in an "as is" condition and on a "where is" basis. For the avoidance of doubt, nothing in this <u>Section 5.4</u> is intended to limit or modify the representations and warranties contained in this <u>Article V</u>. Transferee acknowledges that, except for the representations and warranties contained in <u>Article IV</u>, neither Transferor nor any other Person has made any other express or implied representation or warranty by or on behalf of Transferor.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1    <u>Conduct of Business.</u> From and after the date hereof and pending the Closing, unless Transferee shall otherwise consent in writing, from and after the date hereof until the earlier of the termination of this OTA or the Closing, Transferor shall (a) operate the Assets and Facility only in the ordinary and usual course of business diligently and in good faith, consistent with past practice;  (b) replace

15

inventory, supplies and equipment consistent with past practice; (c) use its commercially reasonable efforts maintain the quality of care to the residents; (d) notify Transferee if Transferor becomes aware of any violation or non-compliance with any Law, except where any such violation or non-compliance would not reasonably be expected to result in a Material Adverse Effect; and (e) actively market the Facility in a manner consistent with past practice.

6.2     Reserved.

6.3     Reserved.

6.4     Access.

(a)     As of the Execution Date, Transferor shall provide Transferee and its employees, accountants, consultants, legal counsel, agents and other authorized representatives, during regular business hours and upon reasonable notice, reasonable access to the Facility, and all other properties, contracts, commitments, and Records of Transferor that relate to the Facility as Transferee may reasonably request for the purpose of transferring the Assets and Facility, and facilitating the smooth transition of operations, and Transferor shall promptly furnish Transferee such information as Transferee may from time to time reasonably require with respect to the Assets and/or the Facility. Transferor shall cause the officers and employees of the Transferor to take commercially reasonable steps to assist Transferee (at Transferee's expense) in preparing to transfer the Assets and shall cause the counsel, accountants, consultants, and other non-employee representatives of Transferor to be reasonably available to Transferee for such purposes. Transferor shall, upon written request by Transferee and reasonable notice, (i) permit Transferee to conduct on-site visits of Transferor's properties and the Assets that comprise the Facility; and (ii) assist Transferee in contacting and arranging meetings with such suppliers of Transferor as consented to by Transferor.

6.5     Disclosure.

(a)     Except as may be necessary to enforce this OTA, or to comply with applicable Laws including securities Laws or bankruptcy laws, for three (3) years after the Closing Date, Transferor shall (i) treat and hold as confidential any proprietary and confidential information of Transferee exclusively related to the Assets or the Assumed Liabilities related to the Facility (collectively, "**_Confidential Information_**"), and (ii) refrain from using any of the Confidential Information except in connection with this OTA. The term "Confidential Information" shall not include information that is or becomes generally available to the public by actions of Persons other than Transferor or that pertains to any of the Excluded Assets or the any Retained Liabilities. If Transferor is required to disclose any Confidential Information in order to comply with, or avoid violating, any applicable Law, Transferor will use commercially reasonable efforts to provide Transferee with prompt notice thereof to the extent legally permissible. To the extent legally permissible and at Transferee's sole expense, Transferor shall provide Transferee, in advance of any such disclosure, with copies of any Confidential Information that Transferor intends to disclose (and, if applicable, the text of the disclosure language itself) and shall reasonably cooperate with Transferee, at Transferee's sole expense, if permitted by applicable Law, to the extent Transferee may reasonably seek to limit such disclosure in a manner consistent with applicable Law.

(b)     Except as may be necessary to enforce this OTA or any other Transaction Document, for three (3) years after the Closing Date, Transferee shall (i) treat and hold as confidential any proprietary and confidential information of Transferor or any of its Affiliates that does not exclusively relate to the Assets or the Assumed Liabilities related to the Facility, including any proprietary and confidential information relating to any of the Excluded Assets or the Retained Liabilities (collectively, "**_Transferor Confidential Information_**"), and (ii) refrain from using any of Transferor Confidential Information except in connection with this OTA. The term "Transferor Confidential Information" shall not include information that is or becomes generally available to the public by actions of Persons other than

Transferee or any of its Affiliates. If Transferee is required to disclose any Transferor Confidential Information in order to avoid violating any applicable Law, Transferee will use commercially reasonable efforts to provide Transferor with prompt notice thereof to the extent legally permissible. To the extent legally permissible and at Transferor's sole expense, Transferee shall provide Transferor, in advance of any such disclosure, with copies of any Transferor Confidential Information that Transferee intends to disclose (and, if applicable, the text of the disclosure language itself) and shall reasonably cooperate with Transferor, at Transferor's sole expense, if permitted by applicable Law, to the extent Transferor may reasonably seek to limit such disclosure in a manner consistent with applicable Law.

6.6     Appropriate Action; Consents; Filings. From and after the Execution Date, each of the Parties shall use commercially reasonable efforts to obtain from any Governmental Entities or third parties any consents, licenses, permits, waivers, approvals, authorizations or orders required to be obtained, or made, by such Party in connection with the authorization, execution and delivery of this OTA and the consummation of the transactions contemplated hereby and shall provide such notices, and Transferee shall post such escrows, as required by the applicable Governmental Entities and Laws, and each Party shall comply with any written agreements with third parties to consummate the transaction. The Parties shall cooperate with each other in connection with the making of all such filings, including the timing of such filings and providing copies of all such documents to the non-filing Parties and their advisors prior to filing and, if requested, to accept all reasonable additions, deletions or changes to such filings suggested in connection therewith.

6.7     Access to Records. From and after the Closing Date, Transferee shall allow Transferor and its Affiliates, agents and representatives to have reasonable access to (upon reasonable notice and during normal business hours), and to make copies of the Records (at Transferor's expense), to the extent reasonably necessary to enable Transferor to, among other things, investigate and defend litigation, malpractice, employee or other claims, to file or defend Tax returns, and to enable Transferor to complete, in accordance with Transferor's policies and procedures, any and all post-Closing Date accounting, reconciliation and closing procedures including, but not limited to, a month end close out of all accounts including, but not limited to, accounts payable and Medicare and Medicaid billing. Transferor agrees not to use or disclose any of the information obtained from Transferee except solely for the purposes described herein, and further agrees to maintain this information as confidential. Likewise, from and after the Closing Date, Transferor shall allow Transferee and its agents reasonable access to the Records including, without limitation, the Prior Records, to the extent Transferee reasonably requires such access in connection with, without limitation, accounting, billing, Tax filings or securities filings. Transferor shall use its commercially reasonable efforts to provide such items which require expedited handling to Transferee within ten (10) Business Days of Transferee's request. Transferee agrees not to use or disclose any of the information obtained from Transferor except solely for the purposes described herein, and further agrees to maintain this information as confidential. Transferee shall assure that any successor operator of the Facility is legally obligated to provide Transferor access to the Records in the manner required by this Section 6.7.

6.8     Further Assurances. From time to time after the Closing, Transferor shall, at the reasonable request of Transferee and at Transferee's expense but without further consideration, execute and deliver any further deeds, bills of sale, endorsements, assignments, and other instruments of conveyance and transfer, and take such other actions as Transferee may reasonably request and consistent with this OTA in order to (a) more effectively transfer, convey, assign and deliver to Transferee, and to place Transferee in actual possession and operating control of, and to vest, perfect or confirm, of record or otherwise, in Transferee all right, title and interest in, to and under the Assets or the Facility, (b) assist in the collection or reduction to possession of any and all of the Assets or the Facility or to enable Transferee to exercise and enjoy all rights and benefits with respect thereto, (c) with respect to any payor agreement that is non-transferrable, reasonably cooperate with Transferee to assist Transferee in securing a new agreement, or (d) otherwise carry out the intents and purposes of this OTA. In the case of rights (including, without limitation, under any Contract) which cannot be transferred effectively without the consent of third

parties, Transferor shall use its commercially reasonable efforts (within commercially reasonable limits) to obtain such consent and to assure to Transferee the benefits thereof during the terms thereof.

      6.9     <u>Reserved</u>.

      6.10    <u>Accounts Receivable</u>.

          (a)    <u>Accounts Receivable</u>.  Transferor shall retain whatever right, title and interest it may have in and to all outstanding Accounts Receivable with respect to the Facility which relate to periods ending before the Effective Time (collectively, "***Transferor's A/Rs***").  Transferor acknowledges that Transferee owns all Accounts Receivable arising from services provided by or at the Facility after the Effective Time ("***Transferee's A/Rs***").

          (b)    <u>Receipts by Transferee</u>.  payments received by Transferee after the Effective Time from third party payors including, but not limited to, managed care and health insurance, shall be handled as follows:

          (i)    If such payments either specifically indicate on the accompanying remittance advice, or if Transferor and Transferee agree that such payments relate to the period ending before the Effective Time, they shall be forwarded by Transferee to Transferor, along with the applicable remittance advice, within thirty (30) days after receipt thereof; and

          (ii)    If such payments indicate on the accompanying remittance advice, or if Transferor and Transferee agree that such payments relate to the period after the Effective Time, they shall be retained by Transferee.

          (c)    <u>Receipts by Transferor</u>.  Payments received by Transferor after the Effective Time from third party payors including, but not limited to, managed care and health insurance, shall be handled as follows:

          (i)    If such payments either specifically indicate on the accompanying remittance advice, or if Transferor and Transferee agree that such payments relate to the period after the Effective Time, they shall be forwarded by Transferor to Transferee, along with the applicable remittance advice, within thirty (30) days after receipt thereof; and

          (ii)    If such payments indicate on the accompanying remittance advice, or if Transferor and Transferee agree that they relate to the period ending on or before the Effective Time, they shall be retained by Transferor.

          (d)    <u>Other Receipts</u>.  If the remittance advice indicates or the Parties agree that any payment relates to periods both prior to or on and after the Effective Time, the Party receiving the payment shall forward the amount relating to the other Party's operation of the Business, along with the applicable remittance advice, within thirty (30) days after receipt thereof.  If the remittance advice does not indicate the period to which a payment relates or whether it is for Transferor or Transferee, or if there is no accompanying remittance advice, or the payment is not otherwise identifiable using commercially reasonable efforts, and if the Parties do not otherwise agree as to how to apply such payment, then 100% of such payments received within the first one hundred twenty (120) days after the Effective Time shall be deemed to have been collected in respect of Transferor's A/Rs due from the payee in respect of services provided on or prior to the Effective Time.  All such payments received in excess of the amount of Transferor's A/Rs due from said payee and all such payments received one hundred twenty (120) days after the Effective Time shall be deemed to have been collected in respect of Transferee's A/Rs from said payee.  All such payments received by Transferee but which are deemed to be due Transferor under this <u>Section</u>

6.10 shall be forwarded by Transferee to Transferor within twenty (20) days after receipt thereof, and all such payments received by Transferor but which are deemed to be due Transferee under this Section 6.10 shall be forwarded by Transferor to Transferee within twenty (20) days after receipt thereof. All such payments received by Transferor which are deemed to have been collected in respect to Transferor's A/Rs shall be retained by Transferor and all such payments received by Transferee which are deemed to have been collected in respect to Transferee's A/Rs shall be retained by Transferee.

      (e)    Medicaid Applications. deleted.

      (f)    Accounting for Accounts Receivable.

      (i)    Attached hereto as Schedule 6.10(f)(i) is a schedule of Transferor's A/Rs listing by Resident the amount due as of five (5) days prior to the Closing Date. As soon as reasonably possible but not later than fifteen (15) Business Days after the Closing Date, Transferor shall provide Transferee with a schedule of Transferor's A/ Rs listing by Resident the amounts due as of the Effective Time.

For a period of six (6) months following the Effective Time or until Transferor receives payment of all Transferor's A/Rs attributable to the operation of the Facility prior to the Effective Time, whichever is sooner, Transferee shall provide Transferor (no less frequently than monthly) with (A) an accounting setting forth all amounts received by Transferee during the preceding month with respect to Transferee's A/Rs and Transferor's A/Rs using the same format of schedule as that provided by Transferor pursuant to Section 6.10(b), and (B) copies of all remittance advices relating to such amounts received and any other reasonable supporting documentation as may be required for Transferor to determine that Transferee's A/Rs and Transferor's A/Rs have been paid. Transferee shall deliver such accounting to Transferor at the following physical and email addresses: 600 Pearl Street, Suite 1100 Dallas, Texas 75201 Attention: Greg Flynn (gflynn@seniorcarecentersltc.com) and Tonia Bellard (tbellard@seniorcarecentersltc.com).

      (ii)    For a period of six (6) months following the Effective Time or until Transferor receives payment of all Accounts Receivable attributed to the operation of the Facility prior to the Closing Date, whichever is sooner, Transferor shall provide Transferee (no less frequently than monthly) with (A) an accounting setting forth all amounts received by Transferor with respect to Transferee's A/Rs and Transferor's A/Rs using the same type of schedule as that provided by Transferor pursuant to Section 6.10(b), and (B) copies of all remittance advices relating to such amounts received and any other reasonable supporting documentation as may be required for Transferee to determine Transferee's A/Rs and Transferor's A/Rs that have been paid. Transferor shall deliver such accounting to Transferee at the following address: 117 West Main, Allen, Texas 75013 Attention: Scott Lundy (scott@rensl.com).

      (iii)    On two (2) occasions during the period of six (6) months following the Effective Time, Transferor and Transferee shall, upon reasonable notice and during normal business hours, have the right to inspect all cash receipts of the other Party in order to confirm the other Party's compliance with the obligations imposed on it under Sections 6.10 and 6.11. Notwithstanding the foregoing, if such information can be transmitted through electronic mail, then Transferor and Transferee may satisfy their obligations under this Section 6.10 in that manner.

      (iv)    To enable Transferor to close its books with respect to the period ending on the Closing Date, Transferee will permit duly authorized representatives of Transferor reasonable access to the Facility during regular daily business hours, in a manner that does not materially interfere with the operation of the Facility, for a period of no more than one-hundred eighty (180) days after the Closing Date. During that period, Transferee will permit individuals employed by SCC or its Affiliate immediately before the Closing Date to provide reasonably necessary assistance to SCC in its closing of the books.

(v) Any amounts to be paid by one Party to the other Party under this Article VI shall be made by electronic transfer using the wire instructions set forth on Exhibit 6.10(f).

(g) Transferor Collection Activities. After the Closing Date, SCC and Transferor shall have the right, and any agent or representative retained by the foregoing shall have the right on behalf of SCC and Transferor, to engage in commercially reasonable collection activities with respect to unpaid Transferor's A/R's, including private pay amounts.

(h) Delivery of Mail. To the extent that Transferee or any of its Affiliates receives any mail or packages addressed to SCC, Transferor or any of their Affiliates not relating to the Assets or the Assumed Liabilities, Transferee shall promptly deliver such mail or packages to Transferor. After the Closing Date, Transferee shall deliver to Transferor any checks or drafts made payable to Transferor or its Affiliates that constitutes an Asset, and Transferor shall promptly deposit or cause to be deposited such checks or drafts and, upon receipt of funds, reimburse Transferee within ten (10) Business Days for the amounts of all such checks or drafts, or, if so requested by Transferee, endorse such checks or drafts to Transferee for collection. To the extent Transferor or its Affiliates receives any mail or packages addressed to Transferor or its Affiliates but relating to the Assets or the Assumed Liabilities relating to the Facility, Transferor shall promptly deliver such mail or packages to Transferee. After the Closing Date, to the extent that Transferee receives any cash or checks or drafts made payable to Transferee that constitutes an Excluded Asset, Transferee shall promptly use such cash to, or deposit such checks or drafts and upon receipt of funds from such checks or drafts, reimburse Transferor within ten (10) Business Days for such amount received, or, if so requested by Transferor, endorse such checks or drafts to Transferor for collection. The Parties may not assert any set off, hold back, escrow or other restriction against any payment described in this Section 6.10(h).

6.11   Reserved.

6.12   Assistance in Proceedings. Transferee shall reasonably cooperate with Transferor and its counsel in the contest or defense of, and (at Transferor's expense) make available its personnel and provide any testimony and access to its Records in connection with, any proceeding involving or relating to any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction on or before the Closing Date involving Transferor, the Facility or its Business.

6.13   Overhead and Shared Services; National Contracts. Transferee acknowledges that the Facility currently benefits from the National Contracts and receives Overhead and Shared Services from Transferor and its Affiliates. Transferee further acknowledges that, as it relates to the operation of the Facility, all such benefits from the National Contracts and provision of Overhead and Shared Services shall cease, and any agreement by the Facility with Transferor or any of its Affiliates in respect to benefiting from the National Contracts or the provision of Overhead and Shared Services shall terminate, as of the Closing Date for the Facility. No Overhead and Shared Services shall be provided by Transferor or any of its Affiliates to the Facility after the Effective Time.

6.14   Information Systems, Records in Electronic Form, Software and Data. Transferor shall use reasonable efforts to cause the transfer of current data in fully operational form for use in Transferee's computer applications. Transferor further agrees that in order to assist Transferee in ensuring the continued operation of the Facility after the Closing Date in compliance with applicable Law and in a manner which does not jeopardize the health and welfare of the Residents of the Facility, Transferor shall cooperate with Transferee regarding the delivery of all such Records to Transferee, in electronic form in order to enable Transferee to obtain the necessary copies of such medical records and physician orders.

## ARTICLE VII
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF PARTIES

7.1 <u>Conditions to Obligations of Transferee</u>. The obligations of Transferee hereunder are subject to the fulfillment of all of the following conditions precedent unless such fulfillment is waived in writing by Transferee, subject to the limitations contained herein, as the case may be:

(a) <u>Representations and Warranties</u>. The representations and warranties of Transferor set forth in <u>Article IV</u> shall be true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) on and as of the Closing Date as if made on and as of the Closing Date, except to the extent (i) any such representation or warranty expressly is made as of an earlier date or with respect to a particular period, in which case such representation or warranty shall have been true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) as of such date or with respect to such period, and (ii) a breach of any such representations and warranties would not reasonably result in a Material Adverse Effect.

(b) <u>No Litigation</u>. Without limiting the generality of any representation, no injunction, temporary restraining order, judgment or other order of any court or governmental agency or instrumentality shall have issued or have been entered which would be violated by the consummation of the transactions contemplated hereby; and no suit, action or other proceeding brought by the United States, the State of Texas or any political subdivision, which any Facility is located or any agency or instrumentality thereof shall be pending in which it is sought to restrain or prohibit this OTA or the consummation of the transactions contemplated hereby.

(c) <u>Compliance with Covenants</u>. Transferor shall have performed and complied, in all material respects, with all terms, agreements, covenants and conditions of this OTA to be performed or complied with by it at or prior to the Closing, except to the extent a breach of any such terms, agreements, covenants and conditions would not reasonably result in a Material Adverse Effect

(d) <u>No Material Adverse Effect</u>. Since the date of execution of this OTA, there shall have been no Material Adverse Effect.

(e) <u>Termination of Management Agreements</u>. Any management agreements between Transferor and SCC and/or its Affiliates shall have been terminated and any existing Leases related to the Facility between Transferor and SCC and/or its Affiliates shall have been terminated to the extent not otherwise rejected pursuant to the Bankruptcy Code.

(f) <u>New License</u>. Transferee shall have received the New License as of the Closing Date (or shall have obtained reasonable assurances from the Department that the New License has been or will be issued by the Department effective as of the Effective Time or promptly thereafter).

(g) <u>Closing Certificate</u>. Transferor shall have delivered to Transferee a certificate of a duly authorized officer of Transferor dated as of the Closing Date stating that the conditions specified in <u>Sections 7.1(a) and 7.1(c)</u> have been satisfied.

(h) <u>Bankruptcy Court Order; Consents</u>. The receipt of all consents, orders and approvals of the Bankruptcy Court, including certified copies of the Sale Order and the Designated Contracts Order, and (i) no order staying, reversing, modifying or amending such orders shall be in effect on the Closing Date, and (ii) the Sale Order shall not be subject to any challenge of Transferee's good faith under Section 363(m) of the Bankruptcy Code.

(i)     Assignment and Assumption Agreement.  Transferor shall have executed and delivered any Assignment and Assumption Agreements related to the Facility.

(j)     Resident Trust Deposits.  Transferor acknowledges there are no resident trust deposits.

(k)     deleted

7.2     Conditions to Obligations of Transferor.  The obligations of Transferor hereunder are subject to the fulfillment of all of the following conditions precedent unless such fulfillment is waived in writing by Transferor, subject to the limitations contained herein, as the case may be:

(a)     Representations and Warranties.  The representations and warranties of Transferee set forth in Article V shall be true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) on and as of the Closing Date as if made on and as of the Closing Date, except to the extent any such representation or warranty expressly is made as of an earlier date or with respect to a particular period, in which case such representation or warranty shall have been true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) as of such date or with respect to such period.

(b)     No Litigation.  Without limiting the generality of any representation, no injunction, temporary restraining order, judgment or other order of any court or governmental agency or instrumentality shall have issued or have been entered which would be violated by the consummation of the transactions contemplated hereby; and no suit, action or other proceeding brought by the United States, the State of Texas, any political subdivision, which any Facility is located or any agency or instrumentality thereof shall be pending in which it is sought to restrain or prohibit this OTA or the consummation of the transactions contemplated hereby.

(c)     Compliance with Covenants.  Transferee shall have performed and complied, in all material respects, with all terms, agreements, covenants and conditions of this OTA to be performed or complied with by it at or prior to the Closing.

(d)     Authorization.  Transferee shall have approved and authorized the transactions contemplated by this OTA.

(e)     No Material Adverse Effect.  Since the date of execution of this OTA, there shall have occurred, no event, circumstance or other change in Transferee or its assets that, alone or in the aggregate, has had or, reasonably could be expected to have, a Material Adverse Effect with regard to Transferee.

(f)     New License.  Transferee shall have received the New License as of the Closing Date (or shall have obtained reasonable assurances from the Department that the New License has been or will be issued by the Department effective as of the Effective Time or promptly thereafter).

(g)     Bankruptcy Court Order; Consents.  The receipt of all consents, orders and approvals of the Bankruptcy Court, including certified copies of the Sale Order, the 9019 Order and the Designated Contracts Order, and (i) no order staying, reversing, modifying or amending such orders shall be in effect on the Closing Date, and (ii) the Sale Order shall not be subject to any challenge of Transferor's good faith under Section 363(m) of the Bankruptcy Code.

(h)     Release.  Transferor shall have received an executed release from Landlord in substantially the form attached hereto as Exhibit _7.2(h).

(i)    Closing Certificate. Transferee shall have delivered to Transferor a certificate of a duly authorized officer of Transferee dated as of the Closing Date stating that the conditions specified in Sections 7.2(a) and 7.2(c) have been satisfied.

(j)    Assignment and Assumption Agreement. Transferee shall have executed and delivered any Assignment and Assumption Agreements related to the Facility.

## ARTICLE VIII
## BANKRUPTCY MATTERS

8.1 Assumption of Contracts and Cure.

The parties do not contemplate that Transferee shall assume and cure any Contracts of Transferor pursuant to Section 365 of the Bankruptcy Code. 8.3 Bankruptcy Court Approval.

(a) Transferor and Transferee acknowledge that this OTA and the sale of the Assets and the assumption and assignment of the Noticed Contracts are subject to Bankruptcy Court approval. Transferor and Transferee acknowledge that (i) to obtain such approval, Transferor must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the transaction contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Transferee must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Noticed Contract. The terms and conditions and form of Sale Order approving this OTA, the sale of assets, and assumption and assignment of Noticed Contracts is subject to the satisfaction and approval of Transferee which approval shall not to be unreasonably withheld.

8.4 In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Transferor shall promptly notify Transferee of such appeal or stay request and shall promptly provide to Transferee a copy of the related notice of appeal or order of stay. Transferor shall also provide Transferee with written notice of any motion or application filed in connection with any appeal from either of such orders.

8.5 If the Bankruptcy Court orders that it is necessary to conduct a bidding process and auction of the Assets, Transferee shall have the sole discretion to terminate this OTA. However, in such an event, Transferee may, in its sole discretion, elect to become a "stalking horse bidder" with respect to any auction process and bidding procedure and set forth such terms and conditions of the bidding procedure and auction process, including certain bid protections that may be approved by the Bankruptcy Court.

## ARTICLE IX
## TERMINATION

9.1    Termination. This OTA may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by either Transferor or Transferee if the Closing has not occurred by the Outside Date;

(b)    by either Transferor or Transferee if an application for a change of ownership has not been filed with the state of Texas by March 1, 2019.

(c)    by the mutual written consent of Transferor Representative and Transferee;

23
67813572.6

(d)     by Transferee, by reason of the breach, inaccuracy or non-fulfillment of any representation, covenant, condition, obligation or agreement by Transferor under this OTA that (A) (i) has a Material Adverse Effect, and (ii) is incapable of being cured prior to the Outside Date, or (B) has not been cured by Transferor within one hundred twenty (120) days after written notice from Transferee; or

(e)     by Transferor, by reason of the breach, inaccuracy or non-fulfillment of any representation, covenant, condition, obligation or agreement by Transferee under this OTA that (i) is incapable of being cured prior to the Outside Date, or (ii) has not been cured by Transferee within forty-five (45) days after written notice thereof from Transferor Representative, except in the case of a breach of the covenants set forth in Section 2.2(a), in which case Transferee shall have ten (10) days after written notice thereof from Transferor Representative to file for the applicable New Licenses and/or to notify Transferor that the necessary filings have been made in accordance with Section 2.2(a).

(f) by Transferee, if a bidding procedure and auction is ordered by the Bankruptcy Court, and Transferee elects to participate in such bidding procedure and auction process, and New Operator is not the successful bidder or authorized as a back-up bidder.

9.2     Procedure and Effect of Termination. In the event of termination of this OTA pursuant to this Article IX, the terminating Party shall give written notice thereof to the other Parties and this OTA shall terminate, and the transactions contemplated hereby shall be abandoned, without further action by any of the Parties.

## ARTICLE X
## SURVIVAL AND REMEDIES

10.1     Survival and Remedies. The representations and warranties of parties set forth herein shall not survive the Closing. From and after the Closing, the parties hereto shall have no liability with respect to any inaccuracy or breach of any of the representations or warranties contained in this Agreement and such representation and warranties shall terminate as of Closing. The sole remedy for the breach of any representations and warranties and covenants in this Agreement shall be the termination of this Agreement provided that a party may seek enforcement of this Agreement by means of specific performance in the event of a breach of the covenants contained in Sections 2.3, 6.7, 6.8, 6.10 and 6.11.

## ARTICLE XI
## ASSIGNMENT

11.1     Assignment. Neither this OTA, nor any rights, interests or obligations hereunder, may be assigned or transferred, in whole or in part, by operation of law or otherwise by Transferor or Transferee without the prior written consent of the other Party which shall not be unreasonably withheld, conditioned or delayed, and any such assignment that is not consented to shall be null and void. Notwithstanding the foregoing, upon prior written notice to Transferor Representative, Transferee may assign all, but not less than all, of its rights, duties and obligations under this OTA to a wholly-owned subsidiary of Transferee or to a municipal hospital in order to participate in a quality incentive payment program, provided that no such assignment shall relieve Transferee from its obligations under this OTA.

## ARTICLE XII
## MISCELLANEOUS

24
67813572.6

12.1   <u>Disclosure Schedules</u>. The information contained in the Disclosure Schedules shall be deemed to qualify to the specific Section (or subsection, as appropriate) of this OTA to which it corresponds, and shall be cumulative so that if the existence of the fact or item or its contents disclosed in any particular schedule is relevant to any other schedule, then such fact or item shall be deemed to be disclosed with respect to the other schedule to the extent such relevance is reasonably apparent whether or not a specific cross-reference appears. The headings contained in the Disclosure Schedules are included for convenience only, and are not intended to limit the effect of the disclosures contained in such schedule or to expand the scope of the information required to be disclosed in such schedule. Descriptions of documents in the Schedules are summaries only and are qualified in their entirety by the specific terms of such documents. Matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this OTA to be reflected herein; additional matters are set forth for informational purposes and the fact that any item of information is disclosed in the Disclosure Schedules shall not be construed to mean that such information is required to be disclosed by this OTA. Any information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the term "material" or other similar terms in this OTA or constitute an admission that such items are required to be disclosed under this OTA.

12.2   <u>Payment of Expenses</u>. Except as otherwise provided in this OTA, each of the Parties shall bear its own expenses in connection with the negotiation and the consummation of the transactions contemplated by this OTA. Subject to the foregoing, no expenses of Transferor relating in any way to the purchase and sale of the Assets hereunder and the transactions contemplated hereby, including broker, legal, accounting or other professional expenses of Transferor shall be charged to or paid by Transferee or included in any of the Assumed Liabilities. No expenses of Transferee relating in any way to the purchase and sale of the Assets hereunder and the transactions contemplated hereby, including broker, legal, accounting or other professional expenses of Transferee shall be charged to or paid by any Transferor or included in any of the Retained Liabilities. The foregoing shall not limit, however, any Party's right to include such expenses in any claim for damages against any other Party who breaches any legally binding provision of this OTA to the extent provided in this OTA.

12.3   <u>Entire Agreement; Assignment; Etc</u>. This OTA (including the preamble, recitals, Disclosure Schedules and all other schedules and exhibits hereto which are incorporated into and are a part of this OTA), together with any certificates and other instruments delivered hereunder, state the entire agreement of the Parties, merge all prior negotiations, agreements and understandings, if any, whether written or oral, and state in full all representations, warranties, covenants and agreements that have induced this OTA. Each Party agrees that in dealing with third parties no contrary representations will be made. This OTA shall not be assignable by operation of Law or otherwise.

12.4   <u>Captions</u>. The Article, Section and paragraph captions in this OTA are for convenience of reference only, do not constitute part of this OTA and shall not be deemed to limit or otherwise affect any of the provisions hereof.

12.5   <u>Severability</u>. The invalidity or unenforceability of any provision of this OTA shall not affect the validity or enforceability of any other provision of this OTA.

12.6   Reserved.

12.7   <u>Modification or Amendment</u>. The Parties may modify or amend this OTA at any time, only by a written instrument duly executed and delivered by Transferee and Transferor Representative which modification or amendment shall be subject to the approval of the Bankruptcy Court.

12.8   <u>Construction of Agreement</u>. If an ambiguity or question of intent or interpretation arises under this OTA, this OTA shall be construed as if drafted jointly by the Parties, and no presumption or

burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this OTA.

12.9    Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made as of the date delivered if delivered (a) personally, (b) by electronic means with acknowledgement of receipt or (c) by a nationally recognized overnight courier service to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice, except that notices of changes of address shall be effective upon receipt):

If to Transferor, addressed to:

PM Management – Pflugerville AL LLC
c/o Senior Care Centers, Inc.
600 Pearl Street, Suite 1100
Dallas, Texas 75201
Phone: (214) 271-9036
Email: kmorrison@seniorcarecentersltc.com
Attn: Kelly Morrison, General Counsel
Attn: Kevin O'Halloran, CRO

With a copy to (which shall not constitute notice):

Polsinelli PC
401 Commerce Street, Suite 900
Nashville, TN 37219
Attn: Bobby Guy, Esq.
Phone: (615) 259-1511
Email: bguy@polsinelli.com

If to Transferee, addressed to:

PF Senior Living, LLC
Attn: Scott Lundy
117 West Main
Allen, Texas 75013
Phone: 817-789-6157
Email: scott@rensl.com

With a copy to (which shall not constitute notice):

Broude Smith Jennings & McGlinchey PC
Attn: Kathryn McGlinchey
309 West 7th Street, Suite 1100
Fort Worth, Texas 76102
Phone: 817-335-1615
Email: kdm@bsjpc.com

or to such other address or to such other Person as either Party shall have last designated by such notice to the other Party.

67813572.6

12.10   Remedies Cumulative. Except as otherwise provided herein, the remedies provided for or permitted by this OTA shall be cumulative and the exercise by any Party of any remedy provided for herein shall not preclude the assertion or exercise by such Party of any other right or remedy provided for herein.

12.11   Governing Law; Consent to Jurisdiction. This OTA shall be construed, performed, and enforced in accordance with, and governed by, the Laws of the State of Texas (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.   For so long as Transferor is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court, except to the extent (a) jurisdiction and venue are unavailable in the Bankruptcy Court, in which case each of the Parties irrevocably and unconditionally consents and submits to exclusive jurisdiction and venue in the state and federal courts for the State of Texas, and (b) submission to the jurisdiction of a court in another state is necessary for enforcement or an order of the appropriate foregoing court. The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens.

12.12   Waiver of Jury Trial. **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS OTA OR THE TRANSACTIONS OR EVENTS CONTEMPLATED HEREBY OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY.   THE PARTIES EACH AGREE THAT ANY AND ALL SUCH CLAIMS AND CAUSES OF ACTION SHALL BE TRIED BY THE COURT WITHOUT A JURY.   EACH OF THE PARTIES HERETO FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY SUCH LEGAL PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.**

12.13   Time of Essence. With regard to all dates and time periods set forth or referred to in this OTA, time is of the essence unless such delay is caused by factors outside the control of the Party in which case a reasonable delay shall be granted to the requesting Party.

12.14   Counterparts. This OTA may be executed in the original or by facsimile or electronic .pdf in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.  The exchange of copies of this OTA and of signature pages by facsimile transmission or e-mail shall constitute effective execution and delivery of this OTA as to the Parties and may be used in lieu of the original OTA for all purposes.  Signatures of the Parties transmitted by facsimile or e-mail shall be deemed to be their original signatures for all purposes.

12.15   Representation Waiver. Each of the Parties hereto acknowledges and agrees, on its own behalf and on behalf of its members, partners, officers, employees and Affiliates, that Transferor is a client of Polsinelli PC (the "*Firm*") in the preparation, negotiation and execution of this OTA and the other Transaction Documents. After the Closing, it is possible that the Firm will represent Transferor and/or its Affiliates in the future in connection with issues that may arise under this OTA and the other Transaction Documents or any claims that may be made thereunder. The Firm (or any successor) may serve as counsel to Transferor and/or its Affiliates or any member, partner, manager, officer, employee, representative or Affiliate of such Persons in connection with any claim arising out of or relating to this OTA or the other Transaction Documents. Each of the Parties hereto consents thereto, and waives any conflict of interest

arising therefrom, and each such Party shall cause any Affiliate thereof to consent to waive any conflict of interest arising from such representation. Each of the Parties hereto acknowledges that such consent and waiver is voluntary, that it has been carefully considered, and that the Parties have consulted with counsel or have been advised they should do so in connection therewith.

12.16 <u>Transferor Representative</u>.

(a) Transferor hereby irrevocably constitutes and appoints SCC as its representative ("***Transferor Representative***") and its true and lawful attorney-in-fact, with full power and authority to act on behalf of Transferor in the absolute discretion of Transferor Representative for purposes of this OTA, and the transactions to be carried out pursuant hereto, and the execution of this OTA, by Transferor will constitute ratification and approval of such designation on the terms set forth herein. All decisions, actions, consents and instructions by Transferor Representative with respect to this OTA will be binding upon Transferor, and Transferor will not have the right to object to, dissent from, protest or otherwise contest the same. Transferee will be entitled to rely on any decision, action, consent or instruction of Transferor Representative as being the decision, action, consent or instruction of Transferor. By way of example and not limitation, Transferor Representative will be authorized and empowered, as agent of and on behalf of Transferor to (i) execute and deliver and take all actions under the OTA on behalf of Transferor; (ii) give and receive notices and communications as provided herein; (iii) agree to, negotiate, enter into settlements and compromises of, and comply with orders of courts and awards of arbitrators with respect to, such claims or losses; (v) waive after the Closing Date any breach or default of Transferee of any obligation to be performed by it under this OTA; (vi) receive service of process on behalf of Transferor in connection with any claims against Transferor arising under or in connection with this OTA; and (iv) take all other actions that are either (A) necessary or appropriate in the judgment of Transferor Representative for the accomplishment of the foregoing, or (B) specifically mandated by the terms of this OTA. Notices or communications to or from Transferor Representative will constitute notice to or from Transferor.

(b) The grant of authority provided for in this <u>Section 12.16</u> is coupled with an interest and is being granted, in part, as an inducement to Transferee to enter into this OTA, and will be irrevocable and survive the dissolution, liquidation or bankruptcy of any Transferor, and will be binding on any successor thereto.

12.17 <u>Attorney-Client Privilege</u>. Neither of Transferor or Transferee is waiving, and each will not be deemed to have waived or diminished, any of its attorney work product protections, attorney-client privileges or similar protections and privileges as a result of disclosing its Confidential Information (including Confidential Information related to pending or threatened litigation) to the others, regardless of whether such Party has asserted, or is or may be entitled to assert, such privileges and protections. The Parties (a) share a common legal and commercial interest in all of the Confidential Information that is subject to such privileges and protections; (b) are or may become joint defendants in proceedings to which such Party's Confidential Information covered by such protections and privileges relates; (c) intend that such privileges and protections remain intact should any Party become subject to any actual or threatened proceeding to which the Confidential Information covered by such protections and privileges relates; and (d) intend that after the Closing the proprietary Party whose Confidential Information is at issue shall have the right to assert such protections and privileges. No Party shall admit, claim or contend, in proceedings involving any Party or otherwise, that any Party waived any of its attorney work-product protections, attorney-client privileges or similar protections and privileges with respect to any information, documents or other material not disclosed to a Party due to any Party disclosing its Confidential Information (including Confidential Information related to pending or threatened litigation) to another Party.

[The Next Page is the Signature Page]

**IN WITNESS WHEREOF**, each of the undersigned in the capacity indicated below has executed this OTA as of the Execution Date.

**TRANSFEROR:**
**PM MANAGEMENT – PFLUGERVILE AL LLC,**
a Texas limited liability company

By: _____
Name: _____
Title: _____


**TRANSFEREE:**

**PF SENIOR LIVING, LLC,**
a Texas limited liability company
_____


By: _____
Name: _____
Title: _____

**IN WITNESS WHEREOF**, each of the undersigned in the capacity indicated below has executed this OTA as of the Execution Date.

**TRANSFEROR:**
**PM MANAGEMENT – PFLUGERVILE AL LLC,**
a Texas limited liability company

By:_____
Name:_____
Title:_____

**TRANSFEREE:**

**PF SENIOR LIVING, LLC,**
a Texas limited liability company

_____

By:_____
Name:_____
Title:_____

## Exhibit A

### Definitions

Definitions. In addition to the terms otherwise defined herein, the following terms shall have the following meaning:

"*9019 Order*" means a final and non-appealable order of the Bankruptcy Court settling, releasing and discharging any and all Claims (as defined in the Bankruptcy Code) of Landlord under, and in any way relating to, the real property lease covering the Facility (as well as all other facilities leased by Landlord, the form and substance of which is satisfactory to Transferor in all respects.

"*Accounts Receivable*" means all accounts receivable and incentive payments of the Business.

"*Action*" means any claim, action, cause of action or suit (whether in contract or tort), litigation (whether at Law or in equity, whether civil or criminal), or any written controversy, assessment, arbitration, investigation, hearing, charge, complaint, demand, settlement, notice or proceeding to, from, by or before any Governmental Authority of which the Parties thereto have received written notice..

"*Affected Participants*" has the meaning set forth in Section 2.5(l).

"*Affiliate*" means, with respect to any Person, at the time of determination, any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person directly or indirectly, whether through ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. .

"*Affiliated-Service Transferee Employees*" has the meaning set forth in Section 2.5(d).

"*Ancillary Permits and Approvals*" has the meaning set forth in Section 2.2(a).

"*Approved Cure Cost*" has the meaning set forth in Section 8.1(a).

"*Assets*" has the meaning set forth in Section 2.1.

"*Assigned Contract Order*" has the meaning set forth in Section 8.1(a).

"*Assignment and Assumption Agreement*" has the meaning set forth in Section 3.3(b).

"*Assumed Liabilities*" has the meaning set forth in Section 2.4(a).

"*Bankruptcy Code*" has the meaning set forth in the Recitals.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Bill of Sale*" has the meaning set forth in Section 3.3(a).

"*Bring Down Certificate*" has the meaning set forth in Section 3.3(c).

"*Broker(s)*" has the meaning set forth in Section 4.17.

"***Business***" means the business conducted by Transferor exclusively at or exclusively related to the Facility.

"***Business Days***" means any day that is not a Saturday or Sunday or a legal holiday on which banks are authorized or required by Law to be closed in Dallas, Texas.

"***Closing***" has the meaning set forth in Section 3.2.

"***Closing Date***" has the meaning set forth in Section 3.2.

"***CMS***" means the Centers for Medicare and Medicare Services.

"***COBRA***" means the Consolidated Omnibus Budget Reconciliation Act or similar state law.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Confidential Information***" has the meaning set forth in Section 6.5(a).

"***Contracts***" has the meaning set forth in Section 2.1(e).

"***Current Records***" has the meaning set forth in Section 2.1(h).

"***Department***" has the meaning set forth in Section 2.2(a).

"***Designated Contract***" has the meaning set forth in Section 8.1(b).

"***Disclosure Update***" has the meaning set forth in Section 4.20.

"***Effective Time***" has the meaning set forth in Section 3.2.

"***Employee Benefit Plan***" means any plan, program, agreement or policy for the benefit of any current or former employee, director, independent contractor, or owner (or any dependent or beneficiary thereof) that is (a) a welfare plan within the meaning of Section 3(1) of ERISA, (b) a pension plan within the meaning of Section 3(2) of ERISA, (c) a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right or similar equity-based plan, or (d) any other compensation, deferred-compensation, retirement, welfare-benefit, bonus, incentive, retention, severance pay, sick leave, vacation pay, salary continuation, disability, dental, vision, medical, life insurance or fringe-benefit plan, program, agreement or policy.

"***Encumbrance***" means any charge, claim, condition, equitable interest, lien, encumbrance, license, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement and any other restriction or covenant with respect to, or condition governing the use, construction, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership.

"***Environmental Law***" means all Laws that relate to or govern the regulation, quality, protection or improvement of human health, pollution, or the environment, including (a) emissions, discharges, releases, or threatened releases of or exposures to Hazardous Substances, (b) protection of public health, the environment or worker health and safety, (c) the manufacture, generation, processing, distribution, handling, transport, use, treatment, storage or disposal of Hazardous Substances, or (d) recordkeeping, notification, warning, disclosure and reporting requirements respecting Hazardous Substances. .

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" has the meaning set forth in Section 4.5(c).

"***Excluded Assets***" shall mean the Assets which are not being transferred to Transferee from Transferor as described in Section 2.6.

"***Execution Date***" has the meaning set forth in the Preamble.

"***Facility***" has the meaning set forth in the Recitals.

"***Financial Statements***" means the unaudited balance sheets and profit and loss statements relating to the operations of the Business for the 2017 fiscal year.

"***Firm***" has the meaning set forth in Section 12.15.

"***GAAP***" means U.S. generally accepted accounting principles, as in effect on the Execution Date, consistently applied.

"***Government Reimbursement Program***" means the Medicare program, any relevant state Medicaid program and any other similar or successor federal, state or local health care payment programs with or sponsored by any Governmental Authority (excluding the TRICARE Program).

"***Governmental Authority***" or "***Governmental Entity***" means any federal, state, or local government or any court of competent jurisdiction, administrative agency or commission or other domestic governmental or quasi-governmental authority or instrumentality.

"***Group Health Plan***" has the meaning set forth in Section 2.5(l).

"***Hazardous Substances***" means any chemicals, materials, compounds or substances defined, regulated, listed or otherwise classified under any applicable Law as a "hazardous substance," "extremely hazardous substance," "hazardous material," "hazardous waste," "universal waste," "mixed waste," "bio-hazardous waste," "medical waste," "radioactive waste," "pharmaceutical waste," "commingled waste," "mold," "toxic substance," "toxin," "pollutant" or "contaminant," including petroleum (including petroleum products, constituents, additives, or derivatives thereof), asbestos, asbestos-containing materials, and polychlorinated biphenyls.

"***Healthcare Requirements***" means the requirements of or with respect to Government Reimbursement Programs, Referral Laws, Patient Privacy Requirements, the False Claims Act, 31, U.S.C. Section 3729 et seq. as amended, and 42 USC Section 1320a-7k(d), 42 U.S.C. 1320a-7a(a).

"***HIPAA***" means the Health Insurance Portability and Accountability Act of 1996, as amended.

"***Intellectual Property***" means any right, title and interest in and to all intellectual property rights throughout the world, including all (a) patents and patent applications, (b) trademarks, (c) copyrights (including rights in software), (d) trade secrets, know-how and rights to proprietary information and data, (e) domain names and websites, and (f) any registrations or applications for any of the foregoing. (in all instances, excluding such intellectual property listed as an Excluded Asset).

"***Inventory***" has the meaning set forth in Section 2.1(d).

"***Knowledge***" means, when used with respect to Transferor, the actual awareness after due inquiry of a particular fact or matter of any of the following: Michael Beal and Kelly Morrison.

"***Landlord***" has the meaning set forth in Section 7.1(k).

3
67813572.6

"***Law***" means any statute, law, rule or regulation or ordinance of any Governmental Authority.

"***LSC***" means Life Safety Code.

"***Material Adverse Effect***" means any event, change, development or occurrence that has had or would reasonably be expected to have a material and adverse effect on the operations, condition (financial or otherwise) or results of operations of the Facility, taken as a whole, but excluding any such event, change, development or occurrence attributable to or resulting from (i) any change in applicable Law or the interpretation thereof, (ii) any change in GAAP or the interpretation thereof, (iii) any events, changes, developments or occurrences generally affecting the industries in which the Business operates, (iv) general economic, political or market conditions, (v) any disasters, calamities, emergencies, acts of war, sabotage or terrorism (or an escalation or worsening of any of the foregoing), (vi) the entry into or announcement of this OTA and the transactions contemplated hereby, (vii) any action taken or omitted to be taken by Transferor or its Affiliates pursuant to this OTA or at the written request or with the prior written consent of Transferee, (viii) any loss of, or change in, the relationship of the Business with its customers, employees or suppliers (but not any breach of Contract by Transferor or its Affiliate) that is a direct result of the execution, delivery or performance (in accordance with its terms) of this OTA, the consummation of the transactions contemplated by this OTA or the announcement of any of the foregoing, (ix) the failure of the Business to achieve internal or external financial forecasts or projections, provided that the events, changes, developments or occurrences underlying such failure shall not be excluded as a result of this clause (ix), or (x) any breach by Transferee of this OTA.

"***National Contracts***" means all Contracts between SCC, Transferor, or any of their respective Affiliates, on the one hand, and any third party, on the other hand, that have been entered into on a national or regional basis including, without limitation, any Contract pursuant to which any services are provided by or to any nursing facility or other facility of SCC or any of its Affiliates that is not the Facility.

"***New License***" shall have the meaning set forth in Section 2.2(a).

"***Noticed Contracts***" has the meaning set forth in Section 8.1.

"***Order***" means any writ, order, judgment, injunction, ruling, legally binding agreement, stipulation or decree (including a consent decree) of any Governmental Authority.

"***OTA***" has the meaning set forth in the Preamble.

"***Outside Date***" means May 1, 2019.

"***Overhead and Shared Services***" means ancillary corporate or shared services provided to or in support of any Facility that are general corporate, overhead or other services or provided to both (a) the Facility, and (b) any other business or facility of SCC and its Affiliates that is not a Facility including, without limitation, access to hardware and software related to financial and clinical operations, use of intellectual property, travel and entertainment services, temporary labor services, purchasing and supply services, personal telecommunications services, computer hardware and software services, energy/utilities services, treasury services, public relations, legal and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, internal audit services, executive management services, investor relations services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services, training, federal and state reimbursement services, state licensing and Medicare and Medicaid certification and maintenance support, in each case

including services relating to the provision of access to information, operating and reporting systems and databases and all hardware and software or other intellectual property used in connection therewith.

"*Party*" and "*Parties*" have the meaning set forth in the Preamble.

"*Patient Privacy Requirements*" means the applicable requirements of the Administrative Simplification Provisions of the HIPAA as amended by the American Recovery and Reinvestment Act of 2009 and the implementing regulations thereunder governing the privacy of individually identifiable health information and the security of such information maintained in electronic form or of any similar state Laws.

"*Permits*" has the meaning set forth in Section 2.1(i).

"*Permitted Encumbrance*" means (i) Encumbrances for Taxes (ii) statutory Encumbrances of landlords and Encumbrances of carriers, warehousemen, mechanics, materialmen and other Encumbrances imposed by Law, , (iii) zoning, entitlement, building and land use regulations, customary covenants, easements, rights-of-way, restrictions and other similar charges or encumbrances which do not, in each of the foregoing cases, individually or in the aggregate, materially and adversely interfere with the current use or occupancy of or diminish the value of the portfolio materially and adversely, in each case in the ordinary conduct of the Business thereon, (iv) Encumbrances that will be released by Transferor prior to or as of the Closing Date, (v) matters that would be disclosed by an accurate survey provided such matters do not, individually or in the aggregate, materially and adversely interfere with the current use or occupancy of or diminish the value of the portfolio materially and adversely, in each case in the ordinary course of Business; (vi) Encumbrances arising under this Agreement or any of the Transaction Documents; (vii) residency agreements of residents and (viii) any Encumbrance set forth in the Sale Order that will not be released prior to or as the Closing Date and shall survive Closing pursuant to the terms of the Sale Order

"*Person*" means an individual, partnership, venture, unincorporated association, organization, syndicate, corporation, limited liability company, or other entity, trust, trustee, executor, administrator or other legal or personal representative or any government or any agency or political subdivision thereof.

"*Plan*" has the meaning set forth in Section 4.5(a).

"*Policy and Procedure Manuals*" has the meaning set forth in Section 2.1(f).

"*Policy Return Date*" has the meaning set forth in Section 2.1(f).

"*Prior Records*" has the meaning set forth in Exhibit 2.6.

"*Proposed Cure Cost*" has the meaning set forth in Section 8.1.

"*Qualified Plan*" has the meaning set forth in Section 4.5(b).

"*Referral Laws*" means Section 1128B(b) of the Social Security Act, as amended, 42 USC Section 1320a 7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute," Section 1877 of the Social Security Act, as amended, 42 USC Section 1395nn and related regulations (Prohibition Against Certain Referrals), commonly referred to as "Stark Law," 42 USC Section 1320a-7a(a)(5).

"*Regulatory Approvals*" shall have the meaning set forth in Section 2.2(a).

"*Resident*" means a resident of the Facility.

"*Resident Trust Funds*" has the meaning set forth in Section 2.1(k).

"***Retained Liabilities***" has the meaning set forth in <u>Section 2.4(b)</u>.

"***Return***" and "***Returns***" means any and all returns, reports, information statements and certifications with respect to any and all Taxes that are required to be filed with the IRS or any other federal, state or local taxing authority, including consolidated, combined and unitary tax returns, and any and all returns, reports and information statements required to be so filed in connection with any Employee Benefit Plan.

"***Sale Order***" has the meaning set forth in the Recitals.

"***SCC***" means Senior Care Centers, LLC, a Delaware limited liability company.

"***Schedules Date***" has the meaning set forth in Section 4.20.

"***Schedules Termination Date***" has the meaning set forth in Section 4.20.

"***Tax***" and "***Taxes***" means taxes, fees, levies, duties, tariffs, imposts and governmental impositions or charges of any kind imposed by any federal, state or local taxing authority, including (a) income, franchise, profits, gross receipts, ad valorem, net worth, value added, sales, use, service, real or personal property, special assessments, capital stock, license, payroll, withholding, employment, estimated, social security, workers' compensation, unemployment compensation or insurance contributions, utility, severance, production, excise, stamp, occupation, premiums, windfall profits, transfer, gains, business and occupation, disability, quality assurance fee, bed tax, provider tax or other tax, duty or charge of any kind whatsoever, however denominated; and (b) interest, penalties, additional taxes and additions to tax imposed by a taxing authority with respect thereto.

"***Transaction Documents***" means (a) this OTA, (b) the Bills of Sale and Assignment and Assumption Agreements, and (c) such other documents and certificates contemplated by this OTA.

"***Transfer Consideration***" has the meaning set forth in <u>Section 3.1</u>.

"***Transferee***" has the meaning set forth in the Preamble.

"***Transferee Employees***" has the meaning set forth in <u>Section 2.5(b)</u>.

"***Transferee Plan***" has the meaning set forth in <u>Section 2.5(l)</u>.

"***Transferee's A/Rs***" has the meaning set forth in <u>Section 6.10(a)</u>.

"***Transferor***" has the meaning set forth in the Preamble.

"***Transferor Bad Debt***" has the meaning set forth in <u>Section 6.10 (d)</u>.

"***Transferor Confidential Information***" has the meaning set forth in <u>Section 6.5(b)</u>.

"***Transferor Representative***" has the meaning set forth in <u>Section 12.16(a)</u>.

"***Transferor's A/Rs***" has the meaning set forth in <u>Section 6.10(a)</u>.

"***Transition Period***" has the meaning set forth in <u>Section 2.2(b)(iii)</u>.

"***VDR***" means the "_____" ownCloud virtual data room, including all documents and materials posted thereto as of the Closing Date for the Facility and Business.

"***WARN Act***" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

**Exhibit 2.6**

**Excluded Assets**

(a)    Any cash, cash equivalents, or bank accounts;

(b)    All Accounts Receivable, prepaid expenses, security deposits and other current assets of the Facility (excluding deferred tax assets);

(c)    All Contracts not expressly assumed by Transferee pursuant to this OTA, all managed care contracts and all National Contracts;

(d)    All Overhead and Shared Services, including any Contracts for or assets related to Overhead and Shared Services;

(e)    Licenses and permits that are not assignable or transferable, whether with or without third party consent, to Transferee;

(f)    Assets of Transferor disposed of in the ordinary course of business prior to the Effective Time; provided that Transferor shall not dispose of any material Assets without the prior written consent of Transferee (other than Inventory used at the Facility in the ordinary course of business, which may be used and disposed of provided that it shall also be replenished to a quantity that is required by Law);

(g)    Any management agreement between Transferor and SCC or its Affiliates, as the case may be;

(h)    All insurance policies and any claims and rights to proceeds thereunder;

(i)    The minute books and ownership records of Transferor, including all organizational documents, stock registers and such other Records of Transferor as they pertain to the ownership, organization, or existence of Transferor and duplicate copies of such records;

(j)    Any claims for refunds of Taxes and other governmental charges imposed on Transferor of whatever nature including, but not limited to, those with respect to the Facility or the business attributable to periods ending on or prior to the Closing Date;

(k)    All shares of any capital stock, membership interests or partner interests in any partnership, of Transferor;

(l)    All of Transferor's email accounts;

(m)    All rights of Transferor under this OTA or the other Transaction Document;

(n)    All insurance policies of Transferor or any of its Affiliates and all rights of every nature and description under or arising out of such insurance policies, including the right to make claims thereunder, to the proceeds thereof and to any insurance refunds relating thereto;

(o)    Transferor's Returns for periods up to and including the Closing Date and all rights of Transferor to any recoveries or refunds in respect of Taxes for periods up to and including the Closing Date, whether or not any refund of or credit for claims have been filed prior to the Closing Date;

(p)    Transferor's attorney-client privilege;

(q)     All Employee Benefit Plans (including Plans) and all assets related thereto;

(r)     Transferor's information technology systems, emails, software licenses, corporate minute books, records, marketing materials, policies and procedures, and all assets that are used at the corporate level and do not solely relate to the operations of the Business;

(s)     All claims or rights of Transferor with and among any other Transferor or amounts due from related parties;

(t)     All of SCC's or any of its Affiliate's proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, and all data and studies or analyses generated for the benefit of the Facility;

(u)     All funds and accounts of all employee retirement, deferred compensation, health, welfare or benefit plans and programs, including assets representing a surplus or overfunding of any Employee Benefit Plan;

(v)     All unclaimed property of any third party as of the Closing, including, without limitation, property which is subject to applicable escheat Laws;

(w)     All assets of Transferor not used in connection with or held in whole or in part for use in connection with the Business;

(x)     Owned or leased vehicles or trucks unless otherwise agreed to by the parties;

(y)     The items of personal property brought to the Facility by employees of Transferor or its Affiliates that are not used or held for use with the Business and the operation of any of the Facility;

(z)     All tradenames, trademarks, service marks, domain names (URLs) and websites owned by SCC or its Affiliates including, without limitation, any use of the names "Senior Care Centers" in whole or in part, or any derivation thereof, and all references to any of the foregoing on social media channels (including, without limitation, Facebook, Twitter and YouTube) associated with any or all of the Facility or SCC or its Affiliates;

(aa)     All files, charts, and other information relating to all Residents who previously occupied the Facility or used the Facility prior to the Effective Time and are not Residents of the Facility as of the Effective Time) for all periods prior to the date that is three (3) years before the Effective Time (collectively, "Prior Records" and together with the Current Records, "Records");

(bb)     all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by Transferor to any third party with respect to periods prior to the Closing (e.g., such overpaid amounts may be determined by billing audits undertaken by Transferor or Transferor's consultants) to the extent not offset against any underpayments by any applicable third party payor in respect of services rendered prior to the Closing;

**<u>Exhibit 3.2(a)</u>**

**Bill of Sale**

**Exhibit 3.2 (b)**

**Assignment and Assumption Agreement**

**Exhibit 3.2 (c)**

**Bring Down Certificate**

**Exhibit 6.10(f)**

**Wire Instructions**

to be provided by the **parties within thirty (30) days** following the Execution Date]

**Exhibit 7.2(h)**

**Landlord Release**

**Exhibit B**

Proposed Order

IN THE **UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| Senior Care Centers, LLC, *et al.*,[1] | § § | Case No. 18-33967 (BJH) |
| Debtors. | § § § | (Jointly Administered) |

**ORDER (I) APPROVING FORM OF OPERATIONS TRANSFER AGREEMENT, (II) AUTHORIZING TRANSFER OF THE OPERATIONS AND RELATED ASSETS OF A CERTAIN FACILITY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**") of the debtors and debtors in possession (the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") for entry of an order (this "**Order**") (i) approving the form of the Operations Transfer Agreement, (ii) authorizing the transfer of the Assets of the skilled nursing facility known as "Heatherwilde Assisted Living" located at 401 S. Heatherwilde Blvd, Pflugerville, Texas 78660 (the "**Facility**")

---

[1] The Debtors in the Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief* [Docket No. 569] and may also be found on the Debtors' claims agent's website at https://omnimgt.com/SeniorCareCenters. The location of the Debtors' service address is 600 North Pearl Street, Suite 1100, Dallas, Texas 75201.

67906675.1

from PM Management – Pflugerville AL, LLC (the "**Transferor**") to PF Senior Living, LLC (the "**New Operator**"), and (iii) granting related relief, all as more fully set forth in the Motion; and upon the record of the hearing on the Motion, if any; the Court having reviewed the Motion and the *Declaration of Kevin O'Halloran, Chief Restructuring Officer of Senior Care Centers, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 25] (the "**First Day Declaration**"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. 157 and §§ 1334(b); and the Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that the Debtors consent to entry of a final order under Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given, under the circumstances, and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motion is granted as set forth herein.

2. All objections not resolved by the terms of this Order are hereby overruled.

3. The Operations Transfer Agreement (the "**OTA**"), any other ancillary documentation (the "**Transaction Documents**"), and the transactions contemplated by the foregoing, are approved.

4. The transfer of its Assets by the Transferor to the New Operator pursuant to the Transaction Documents and the transactions contemplated by the foregoing are approved.

5.    The Debtors are prohibited from paying any obligations to their employees pursuant to the Transaction Documents, including but not limited to, any severance, retention bonus, or other change in control payment, unless this Court enters an order authorizing such payment. Any severance, retention bonus, or other change in control payment contemplated by the OTA that is payable because of any sale is limited to the extent required by applicable Bankruptcy law.

6.    The transferred Assets exclude (i) any and all causes of action, claims, or rights of avoidance or recovery of any transfers or liens under chapter 5 of the Bankruptcy Code or applicable state law; and (ii) all D&O policies of Transferor or any of its affiliates and all rights of every nature and description under or arising out of such insurance policies, including the right to make claims thereunder, to the proceeds thereof.

7.    The Debtors and the New Operator are authorized and empowered to enter into, and to perform all of their obligations under the Transaction Documents and take any acts, and to execute and perform such documents, including but not limited to any ancillary agreements, and take such other actions as are necessary, desirable, or reasonably required to effectuate the terms thereof.

8.    Subject to paragraphs 9-13 of this Order, the Assets are transferred free and clear of all liens, claims, interests, or encumbrances, including but not limited to successor liability claims (the "**Encumbrances**"), provided, however, that for any party holding a secured interest in the Assets senior to any interest held by Heatherwilde Assisted Living, LLC (the "**Landlord**") (or an ownership interest, if any third party owns any goods or equipment located at the Facility), the New Operator will receive such Assets subject to such interest unless such interest is satisfied in a manner agreed to by the holder thereof or as otherwise determined by this Court. All persons

and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to transfer the Assets to the New Operator in accordance with the terms of the OTA and this Order; provided, however, the Committee and any subsequently appointed liquidating trustee shall have reasonable access to records and information transferred by the Transferor.

9.     Certain of the Debtors are parties to Medicare provider agreements (the "**Provider Agreements**") with the Secretary of the United States Department of Health and Human Services ("**HHS**"), acting through its designated component, the Centers for Medicare & Medicaid Services ("**CMS**"), to receive payment for services provided to Medicare beneficiaries pursuant to the provisions of, and regulations promulgated under, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll. Notwithstanding anything in this Order, the Motion, the OTA, or the Transaction Documents,

(a) the Provider Agreements shall be governed exclusively and solely by the Medicare statutes, regulations, rules, policies, and procedures, including, but not limited to, the adjustment of any payments to the New Operators;

(b) the Provider Agreements shall be automatically assigned to the New Operators upon a change in ownership pursuant to 42 C.F.R. § 489.18(c), and upon assignment, the Provider Agreements shall be subject to all applicable Medicare statutes, regulations, rules, policies, and procedures, and shall be subject to the terms and conditions under which the Provider Agreements were originally issued, including, but not limited to, the repayment of all pre-assignment Medicare overpayments and all other monetary liabilities, regardless of whether yet determined by CMS;

(c) the New Operators and the Provider Agreements shall be subject to compliance with applicable health and safety standards pursuant to all Medicare statutes, regulations, rules, policies, and procedures;

(d) nothing shall affect or impair the United States' defenses, claims, rights, or ability to recoup, setoff, or otherwise recover Medicare overpayments and any other monetary liabilities from the Debtors and/or any New Operator under the Provider Agreements in accordance with the Medicare statutes, regulations, rules, policies, and procedures;

(e) nothing shall relieve or be construed to relieve the Debtors or any New Operator from complying with all Medicare statutes, regulations, rules, policies, and procedures, including, but not limited to, the requirement that the Debtors and any New Operator apply for and obtain CMS approval of a change of ownership by the filing of Form CMS-855A; and

(f) the Debtors and/or New Operators shall retain their respective right to appeal CMS' overpayment determination in accordance with the applicable statutes and regulations.

10. Notwithstanding anything herein to the contrary, the transfer of the Assets pursuant to this Order shall not be free and clear of claims related to executory contracts or unexpired leases that may be assumed and assigned to the New Operators, unless (i) the Debtors provide notice of an intention to assume and assign such executory contract to a New Operator, (ii) the New Operator cures any defaults, to the extent that any exist, relating to such contract, and (iii) the New Operator provides adequate assurance of the future performance of such contract. For the avoidance of doubt, all parties' rights are reserved regarding (i) whether a contract is assumable and/or assumable and assignable, (ii) the cure amount related to any executory contract, and (iii) the ability of the applicable New Operator to provide adequate assurance of future performance.

11. Notwithstanding anything in this Order, the Motion, the OTA, or the Transaction Documents, (1) the Debtors and New Operators shall abide by all Social Security Administration ("**SSA**") statutes, regulations, rules, policies, and procedures, including, but not limited to, (a) the transfer of any account holding Social Security benefits, or (b) any New Operator's actions as any beneficiary's representative payee; (2) nothing shall impair or affect SSA's authority, rights, claims or defenses under SSA statutes, regulations, rules, policies, and procedures; and (3) to the extent the Debtors may need to disclose information they possess solely by virtue of being organizational representative payees, the Debtors shall seek a protective order or request the information be sealed.

12.     Notwithstanding anything in this Order, the Motion, the OTA, or the Transaction Documents, nothing releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit arising from or related to the enforcement of any applicable police or regulatory law or regulation (including but not limited to those of the Texas Health and Human Services Commission, "**HHSC**") to which any entity would be subject to as the owner, operator or licensee of property from and after the date of the closing of the Sale. Nothing in this Order authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police and regulatory law. Further, nothing herein shall impair HHSC's rights to place a vendor hold on Medicaid receivables as part of any Change of Ownership process.

13.     Certain of the Debtors are parties to Medicaid provider agreements (the "**Medicaid Agreements**") with the Texas Health and Human Services Commission ("HHSC"). Notwithstanding anything in this Order, the Motion, the OTA, or the Transaction Documents:

a. The Medicaid Agreements shall be governed exclusively and solely by applicable Medicaid statutes, regulations, rules, policies, and procedures, including, but not limited to, the adjustment of any payments to the New Operators;

b. The New Operators and the Medicaid Agreements shall be subject to compliance with applicable health and safety standards pursuant to all Medicaid statutes, regulates, rules, policies, and procedures;

c. Nothing shall affect or impair HHSC's defenses, claims, rights, or ability to recoup, setoff, or otherwise recover Medicaid overpayments and any other monetary liabilities from the Debtors and/or any New Operator under the Medicaid Agreements in accordance with all applicable Medicaid statutes;

d. Nothing shall relieve or be construed to relieve the Debtors or any New Operator from complying with all applicable Medicaid statutes, regulations, rules, policies, and procedures; and

      e. The Debtors and/or New Operators shall retain their respective right to an administrative appeal of any overpayment determination in accordance with the applicable statutes and regulations.

14.     This Order shall be binding upon and govern the acts of all persons and entities that received notice of the Motion, including but not limited to all creditors and stakeholders, any parties in interest, the Debtors and the New Operator, and their respective successors and assigns, and may be relied upon by all filing agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law to accept, file, register, or otherwise record or release any documents or instruments.

15.     Upon the closing of the transactions contemplated by the OTA and associated Transaction Documents (the "**Closing**"), such transactions shall constitute a legal, valid, and effective transfer of the Assets and shall vest the New Operator with all right, title, and interest of the Debtors in and to the Assets, free and clear of all Encumbrances except as expressly set forth herein.

16.     No release or indemnification shall be granted in contravention of *Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.), 584 F.3d 229 (5th Cir. 2009)* or Bankruptcy Code section 524(e).

17.     Certain equipment and/or vehicles ("**Wells Fargo Equipment**") that are subject to leases between certain of the Debtors and Wells Fargo Equipment Finance, Inc., Wells Fargo Bank dba Wells Fargo Equipment Finance, and/or Wells Fargo Financial Leasing, Inc. (collectively, "**Wells Fargo**") are, or may be, located at the Facility. Notwithstanding any other term or provision of this Order, subsequent to the transfer of the Assets to the New Operator, Wells Fargo shall retain its liens and interests in the Wells Fargo Equipment, which shall be transferred to the New Operator subject to such liens and interests, and any rights or interests of

the Debtors therein shall be deemed to be terminated following the effective date of the transfer to the New Operator. Wells Fargo and the New Operator may enter into such new equipment lease, lease assumption, or other transaction regarding the Wells Fargo Equipment to which such parties may mutually agree and, in the absence of such agreement, Wells Fargo shall be permitted to exercise its legal or contractual in rem rights and remedies with respect to the Wells Fargo Equipment, as to which the automatic stay shall be terminated upon Closing. With Wells Fargo's consent, the Debtors shall file a motion to formally assume or reject any contracts or leases pertaining to the Wells Fargo Equipment, in consultation with the New Operator, within ninety (90) days of the Closing.

18. The OTA Transfers and any Purchased Assets assigned to each New Operator, and the sale process conducted by the Debtors and each New Operator was non-collusive, fair and reasonable. All facets of the transactions completed under each OTA Transfer, including the purchase of the Purchased Assets, were proposed, conducted, adequately disclosed, negotiated, and agreed to at arm's length and in good faith within the meaning of, and pursuant to, Bankruptcy Code Section 363(m). Each new Operator and/or its assignee (if applicable), as transferee of the Purchased Assets, is a good faith purchaser under Bankruptcy Code Section 363(m) and, as such, is entitled to the full protection of Bankruptcy Code Section 363(m). The Sale of the Purchased Assets to each New Operator was not controlled by an agreement among potential bidders and no cause of action against any New Operator (or their officers, directors, employees, agents, independent contractors and/or retained professionals) with respect to the Purchased Assets transferred to each New Operator under Bankruptcy Code Section 363(n), and any such claims under Bankruptcy Code Section 363(n) are hereby released, waived and discharged. In the absence of a stay pending appeal, each New Operator will be acting in good

faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the transactions contemplated in this Sale Order.

19. Neither the New Operator, Landlord, nor their respective affiliates, successors, or assigns shall be deemed, as a result of any action taken in connection with the transaction to: (i) be a successor to the Debtors; (ii) have, *de facto* or otherwise, merged with or into the Debtors; (iii) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors; (iv) be acquiring or assuming or liable for any liability, warranty, or other obligation of the Debtors, except to the extent expressly assumed in the OTA, or as set forth in paragraphs 9-13 of this Order. Except as expressly provided in the OTA or as set forth in paragraphs 9-13 of this Order, neither the New Operator nor Landlord are assuming nor shall they in any way be liable or responsible, as successor or otherwise, for any claims, taxes, liabilities, debts, obligations, or Encumbrances of the Debtors or their estates of any kind or character in any way whatsoever relating to or arising from the Assets or the Debtors' operation or use of the Assets prior to the Closing, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent. Further, other than as set forth in paragraphs 9-13 of this Order, all persons and entities are enjoined from (i) taking any action against the New Operator or Landlord to recover any claim which such person or entity had solely against any of the Debtors or any of the Debtors' subsidiaries, affiliates, directors, officers, agents, representatives, employees, investors, owners, shareholders, partners, or joint venturers, and (ii) pursuing Encumbrances against the Assets.

20. To the extent that the New Operator has not received the necessary licenses, evidence of licenses, and/or other regulatory approvals (including but not limited to, Medicare provider agreements to the extent required by applicable law or regulation) to operate the Facility

prior to Closing, the Debtors and the New Operator, after consent of the Committee or any subsequently appointed liquidating trustee, are hereby authorized to enter into any management or other agreement necessary for continuity of resident care, and this shall not create or effectuate any liability for prior obligations of Debtors, whether successor liability or otherwise.

21.     The terms of the OTA and any ancillary Transaction Documents may be waived, modified, amended, or supplemented by the written and signed agreement of the Debtors and the New Operator without further action of the Court; *provided, however*, that, in the Debtors' business judgment any such waiver, modification, amendment, or supplement is not material or is not adverse to the Debtors' estates, and the Committee or subsequently appointed liquidating trustee has consented, and provided further that any such waiver, modification, amendment, or supplement must be shared with the affected Objecting Parties prior to its entry or effectiveness, and the Debtors, the New Operator, and Landlord are directed to engage in good faith with such affected Objecting Parties to address any concerns they may have. To the extent the Debtors, the New Operator, Landlord, and the affected Objecting Parties are unable to resolve any issues or differences as to the terms of any waiver, modification, amendment, or supplement to the OTA and any ancillary Transaction Documents, the Debtors shall seek appropriate supplemental relief or adjudication by this Court, and/or the approval of any such revised terms.

22.     This Court retains jurisdiction to enforce the provisions of this Order and the Transaction Documents, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, to resolve any dispute concerning this Order, the Transaction Documents, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Transaction Documents, and any related agreements and this Order.

23.     Notwithstanding any applicable Bankruptcy Rule or Local Bankruptcy Rule to the contrary, this Order is effective and enforceable immediately upon entry, no stay applies, and the Debtors may complete the transactions contemplated hereby immediately. This Order is intended to be, and in respects shall be, a final order regarding the relief granted herein, and shall not be an interim order.

24.     To the extent any provisions of this Order conflict with the terms and conditions set forth in the Motion or the Transaction Documents, this Order shall govern and control.

25.     Except as otherwise expressly provided for herein, the provisions of this Order shall not be affected by, and shall continue to be binding in, any subsequent chapter 7 proceeding, dismissal, appointment of a trustee or examiner, or chapter 11 plan, and the Debtors or their successors and assigns shall continue to carry out any further assurances and obligations under the Transaction Documents. Further, any chapter 7 trustee or other fiduciary (including but not limited to any party appointed pursuant to any chapter 11 plan) shall not interfere with, and shall cooperate with the New Operator, in effectuating the terms of the OTA and related Transaction Documents.

### END OF ORDER ###

Order submitted by:

POLSINELLI PC

/s/      Trey A. Monsour
Trey A. Monsour
State Bar No. 14277200
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tmonsour@polsinelli.com

-and-

Jeremy R. Johnson (Admitted *Pro Hac Vice*)
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com

*Counsel to the Debtors and Debtors in Possession*