



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed October 4, 2019

United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **Senior Care Centers, LLC**, *et al.*[1] | § | Case No. 18-33967 (BJH) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## MEMORANDUM OPINION AND ORDER GRANTING DEBTORS' OMNIBUS MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ASSUME UNEXPIRED REAL PROPERTY LEASES, AND (II) ESTABLISHING AND AUTHORIZING THE DEBTORS TO PAY ATTENDANT CURE AMOUNTS [DE # 1479]

## I.    Introduction.

---

[1] The above referenced Chapter 11 debtors ("Debtors"), along with the last four digits of each Debtor's federal tax identification number, are set forth in the Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief [DE # 569] and may also be found on Debtors' claims agent's website at https://omnimgt.com/SeniorCareCenters.

Debtors were once one of the largest operators of skilled nursing facilities in the country. They operated more than 100 facilities in Texas and Louisiana. During the course of their bankruptcy cases, Debtors have trimmed operations substantially, rejecting dozens of leases and transferring the operation of many of these facilities to new operators. After some false starts, Debtors now desire to reorganize around just 22 facilities. To effectuate their business strategy, Debtors filed the Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Unexpired Real Property Leases, and (II) Establishing and Authorizing the Debtors to Pay Attendant Cure Amounts (the "Motion to Assume") that is now before the court.[2]

Two landlords oppose the Motion to Assume at this juncture: TXMS Real Estate Inc. ("TXMS") and Annaly Healthcare Inv. LLC/CHI Javelin ("Annaly" and, collectively with TXMS, the "Landlords"). TXMS leases 11 facilities to Debtors while Annaly is the landlord for five facilities. Fundamentally, the Landlords believe the Motion to Assume should be denied because Debtors: 1) did not meet their evidentiary burden of adequate assurance of future performance; 2) cannot fund their proposed cure payments to the Landlords; and 3) will not promptly cure their defaults, as required by the Bankruptcy Code. The Landlords also object to the cure amounts proposed by Debtors if the court were to grant the Motion to Assume.

The court heard a full day of testimony on September 6, 2019 (the "September 6th Hearing") from seven different witnesses regarding whether Debtors should be allowed to assume the leases as to these 16 facilities and admitted dozens of exhibits into evidence. After considering

---

[2] DE # 1479. For further clarity, the Motion to Assume originally contemplated the additional assumption of ten "Granite leases" (*i.e.,* 32 leases in all), but Debtors later filed the Notice of G-Debtors-10 Rejection of Remaining Granite Leases [DE # 1641], indicating that they had changed their exit strategy, and, thus, were rejecting those Granite leases.

the evidence and the parties' legal argument, for the reasons set forth below, the Motion to Assume is granted.[3]

## II.  Background Facts.

## A.  The Master Leases

In October 2010, TXMS and Debtor Senior Care Centers, LLC ("SCC") entered into a Master Lease Agreement, which the parties amended, including the Second Amended and Restated Master Lease Agreement dated August 27, 2013 (as amended from time to time, the "TXMS Master Lease").[4]  Pursuant to the TXMS Master Lease, SCC leases and operates 11 properties as a single unit with a single monthly minimum rent obligation of approximately $1,187,254.07.[5]

On May 11, 2016, Annaly and PM Management – Portfolio VI NC, LLC entered into a Master Lease Agreement (as subsequently amended, the "Annaly Master Lease" and, collectively with the TXMS Master Lease, the "Master Leases").[6]  Under the terms of the Annaly Master Lease, a different Debtor subtenant operates each of the five properties covered by the Annaly Master Lease.[7]

## B.  Background and Events Precipitating Bankruptcy[8]

---

[3]  Another group of landlords, HC Hill Country Associates, Ltd., H-C Associates, Ltd., J-S Fredericksburg Realty, LP, HC-RW Associates, Ltd., and Hidalgo Healthcare Realty, LLC (collectively, the "HC Landlords") each filed an objection to the Motion to Assume [DE # 1606, 1607, and 1608], relating to six of the 22 facilities.  Debtors and the HC Landlords announced the terms of a settlement to resolve the objections on the record at the September 6th Hearing on the Motion to Assume.  The court will approve the agreement by separate order.

[4]  TXMS Ex. 1, p. 3-5.

[5]  TXMS Ex. 1, p. 3.

[6]  Annaly Ex. 1, 10.  PM Management – Allen NC, LLC; PM Management – Denison NC, LLC; PM Management – Frisco NC, LLC; PM Management – Garland NC, LLC; and PM Management – Lewisville NC, LLC executed the Master Lease as Subtenants and Guarantors, and SCC executed the Master Lease as a Guarantor.

[7]  Annaly Ex. 1, p. 10.

[8]  The events described in this section were presented in the Declaration of Kevin O'Halloran, Chief Restructuring Officer of Senior Care Centers, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [DE # 25].

As noted earlier, Debtors were one of the largest providers of skilled nursing services in the country, providing care on a daily basis to approximately 9,000 patients. Debtors operated 97 skilled nursing facilities, nine assisted living facilities, and six hospice facilities in Texas and Louisiana. In addition, Debtors provide rehabilitation, therapy, and other services. At the time of their bankruptcy, Debtors' work force consisted of approximately 11,300 employees.

Like much of the healthcare sector, Debtors have experienced significant challenges and financial distress in recent years. The challenges faced by Debtors are similar to those experienced by other facility operators and are widespread within the skilled nursing industry. Debtors faced increasing financial pressure in 2017 and 2018 caused by, among other things, declining reimbursement rates, difficulties in collecting accounts receivable, declining census and occupancy rates, increasing lease obligations, tightening terms with various trade creditors, and a significantly reduced working capital loan facility. All of these factors have combined to negatively impact Debtors' operations.

In response to increasing financial pressure, in June 2018, Debtors engaged the firm BDO USA, Inc., to provide interim management and advisory services, while Debtors explored strategic alternatives. Despite Debtors' efforts to resolve their financial issues outside of court, Debtors' metrics continued to decline. Hampered by declining census and revenue and reduced liquidity, due to a significant reduction to Debtors' availability under its working capital loan facility by its lender, Debtors were unable to stay current with their lease obligations to certain landlords. As a result, some landlords declared defaults on underlying leases and one key landlord publicly declared, on an earnings call with investors, that it had purportedly terminated its leases with Debtors. After this earnings call, Debtors began experiencing additional financial pressure from

trade creditors and other landlords. This additional pressure began to overwhelm Debtors' ability to operate and, thus, Debtors sought bankruptcy protection on December 4, 2018.

## C.      Extension of Time and the Motion to Assume

Because Debtors filed their bankruptcy petitions on December 4, 2018, they needed to either decide which leases they would assume or reject by April 3, 2019 (*i.e.*, the date that was 120 days after the date of the order for relief), or obtain an extension.[9]   In light of the complexity of this decision and the sheer number of facilities involved, they opted to seek an extension.[10]   On April 1, 2019, the court signed an order extending the assumption/rejection deadline through July 2, 2019.[11]

On July 2, 2019—the last day of the extended assumption/rejection deadline—Debtors filed the Motion to Assume that is now before the court, seeking to assume the leases on 32 facilities.   Then, on July 29, 2019, Debtors provided notice that they, instead, were rejecting ten of the original 32 leases that they had included in Exhibit 1 of their Motion to Assume.[12]   The first hearing was held in connection with the Motion to Assume on August 8, 2019.   The hearing was converted to a status conference at the request of Debtors.   At the status conference, the parties addressed several issues, including significant disputes regarding cure amounts and a legal "gating issue" questioning whether Debtors were, in fact, even able to assume the then-22 leases they desired to assume (the Landlords argued that the Motion to Assume was far too equivocal to have preserved Debtors' deadline under § 365(d)(4)).

---

[9]  *See* 11 U.S.C. § 365(d)(4)(A) and (B).

[10]  DE # 592.

[11]  DE # 820.

[12]  DE # 1646.

The court continued the hearing on the Motion to Assume to August 27, 2019, ordered face to face meetings and exchanges of information, and set a status conference for the following week to evaluate the parties' progress. On August 27, 2019, the court heard the so-called gating issue, and made an oral ruling that Debtors substantially complied with § 365(d)(4). In other words, the wording of the Motion to Assume was not so "equivocal" to make it ineffective. The court further provided that an evidentiary hearing regarding the Motion to Assume would take place on September 6, 2019, unless the Landlords consented to deferring the Motion to Assume to confirmation.

The court heard a full day of evidence at the September 6th Hearing. Debtors elicited testimony from their CRO, Kevin O'Halloran, and Michael Beal. Nick Adovasio, Karen Moorhead, and Jim Pulliam testified for Annaly. Clint Malin and Kevin Smith served as witnesses for TXMS.

## III.    Legal Analysis.

### A.    The Business Judgment of Debtors in Seeking to Assume the Leases

A debtor-in-possession may assume or reject its unexpired leases, subject to court approval.[13] If a debtor chooses to assume an unexpired lease, it must assume the lease in its entirety.[14] A court evaluates whether a lease should be assumed or rejected employing the business judgment standard.[15] "As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the

---

[13]  11 U.S.C. § 365(a).

[14]  *N.L.R.B. v. Bildisco and Bildisco*, 465 US 513, 531-32 (1984).

[15]  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code."[16]

The court concludes that Debtors have exercised reasonable business judgment in seeking to assume the leases. The preponderance of the evidence showed the leases have a value of approximately $35 million.[17] Debtors conservatively and convincingly project that the leases will yield more than $7 million of EBITDA every year from now through 2023.[18] Debtors also reasonably anticipate earning more revenue at each facility (or at least some facilities) through rehabilitation services that they will provide at the facilities. Finally, while there was some evidence of uncertainty in the market place, including new rules going into effect on October 1, 2019 ("Patient Driven Payment Model" or "PDPM") which will impact revenue flow, there was also compelling testimony that as "baby boomers" continue to come of age, Debtors expect census levels to increase in their facilities. Obviously, there is tremendous difficulty in forecasting something like a "baby boomer" effect in this industry, but the court believes Debtors have been conservative in their projections (appropriately so) and the projections support Debtors' business judgment in seeking to assume the leases on the 22 facilities. Still, given certain equivocal language used in the Motion to Assume, the court recognizes the Landlords' concerns regarding whether Debtors are actually committing to assume their leases. Thus, as part of this court's ruling, the leases shall be deemed assumed effective immediately upon entry of this Memorandum Opinion and Order.

**B.      Debtors' Cure Obligations under § 365(b)(1) of the Bankruptcy Code**

---

[16]  *Id.* (internal quotations omitted).

[17]  Mot. Assume Tr. 23:14-25 Sept. 6, 2019.

[18]  Mot. Assume Tr. 334:23-335:6.

If a debtor chooses to assume an unexpired lease where there has been a default, it must do three things: (1) cure or provide adequate assurance that it will promptly cure all monetary and most non-monetary defaults, (2) compensate, or provide adequate assurance that it will promptly compensate, the non-debtor party to the lease for any actual pecuniary losses related to the default, and (3) provide adequate assurance of future performance under the lease.[19]

*i.     Default*

The threshold question in determining a debtor's obligations when assuming an unexpired lease is whether there has been a default. In this case, Debtors only missed paying monthly rent in the month they filed bankruptcy (December 2018). Accordingly, Debtors contend that their failure to pay the December rent is not a default that is material, so as to trigger an obligation to satisfy the cure and compensation for actual pecuniary losses requirements of § 365(b)(1). The court disagrees with the notion that materiality is a factor here. As explained by Chief Judge Barbara Houser, "If the debtor elects to assume the lease any unpaid rent gets addressed by § 365's mandate that the debtor either cure the payment default or give the landlord adequate assurance that the payment default will be promptly cured."[20] But, even assuming that § 365(b)(1) is only triggered by a "material" default—despite the fact that: (i) this word does not appear in the statute, and (ii) Congress enumerated in § 365(b)(2) specific instances which do not constitute a default under § 365(b)(1)—failure to pay rent should be considered a material breach.[21]

*ii.     Cure/Prompt Cure*

---

[19]  11 U.S.C. § 365(b)(1); *In re Bourbon Saloon, Inc.*, 647 Fed. Appx. 342, 344-45 (5th Cir. 2016).

[20]  *In re Imperial Beverage Group, LLC*, 457 B.R. 490, 497 (Bankr. N.D. Tex. 2011).

[21]  *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1990) (a contractual provision is material when it "goes to the very essence of the contract, *i.e.*, the bargained for exchange.")

Since there has been a default under the Master Leases, the court must next determine the Landlords' cure claims. The purpose of the cure requirement is to restore the lessor/lessee relationship to the status it enjoyed prior to the default.[22] A party may either cure any defaults at the time of assumption or provide adequate assurance that it will promptly cure them.[23] Prompt cure is determined based upon the facts and circumstances of each case.[24] Debtors have proposed to satisfy cure claims (to the extent resolved) on the effective date of Debtors' plan of reorganization. Understandably, the Landlords have balked at this suggestion, considering Debtors' numerous delays thus far in obtaining approval of their disclosure statement. There is no exact certainty regarding when the effective date of the plan will be. In considering the facts and circumstances of this case and, in particular, the delays since the Motion to Assume was filed on July 2, 2019, the court finds that it is appropriate to require Debtors to satisfy the Landlords' cure claims on the earlier of: 1) the effective date of Debtors' plan; or 2) December 16, 2019.

### iii. Ascertaining the Amount of the Landlords' Cure Claims

The Landlords and Debtors agree on how much unpaid rent is owed. Additionally, Debtors and Annaly agree on the pre-petition escrow deficits, and on post-petition "true-ups" of certain tax and insurance escrows that are owed on the Annaly Master Lease. In order to cure these payment defaults, Debtors must pay TXMS $1,187,254.05 and Annaly $658,800.55. From here, the parties diverge. TXMS states, that in order to assume the TXMS Master Lease, Debtors must also pay $1,945,858.80 in deferred maintenance, $69,752.10 in late fees and interest, and $337,667.20 for TXMS' attorney's fees as part of a § 365(b)(1)(A) and (B) claim. Annaly alleges the following additional cure amounts that Debtors must pay: $146,177.98 to satisfy an additional post-petition

---

[22] *ReGen Capital I, Inc. v. Halperin (In re Wireless Data, Inc.)*, 547 F.3d 484, 489 (2d Cir. 2008).

[23] 11 U.S.C. § 365(b)(1)(A).

[24] *In re PRK Enterprises, Inc.*, 235 B.R. 597, 601 (Bankr. E.D. Tex. 1999).

escrow, $264,727.18 for Annaly's attorney's fees, and $146,487.21 to pay the fees of Annaly's lender's counsel.

Debtors challenge these amounts. They further contend that, not only are the Landlords not entitled to attorney's fees, but Debtors themselves are entitled to attorney's fees if they are the prevailing party in this matter, as well as for prior matters in which the Landlords were unsuccessful. The court will evaluate each item to determine whether it is appropriate to include these expenses as part of the Landlords' cure claims.

a.      TXMS' Alleged Necessary Deferred Maintenance

Regarding the TXMS Master Lease, there was a dispute about whether a cure amount was owed to TXMS for accumulated deferred maintenance needed at its 11 properties. The undisputed evidence was that Debtors must fund a minimum escrow for ongoing capital expenditures at the TXMS properties equivalent to $400 per bed, multiplied by 1,444 beds, which equals $577,000, and Debtors' escrow for the TXMS properties is currently at a level of approximately $1,778,879. While TXMS questioned whether Debtors were adequately addressing deferred maintenance and whether the escrowed funds were large enough to cover deferred maintenance in the coming months, the court found the evidence to be more supportive of Debtors on these points. No problematic levels of deferred maintenance were demonstrated. The court did not find the evidence presented by TXMS compelling that there was allegedly approximately $1.9 million of deferred maintenance needed on the TXMS properties. Debtors' witnesses credibly testified that Debtors intend to spend over $1 million for capital expenditures in 2020 and $800,000 per year in subsequent years. The greater weight of evidence suggested that this was reasonable and achievable with the amounts currently in escrow and with what Debtors will continue to set aside.

b.      TXMS' Late Fees/Interest

TXMS also seeks $69,752.10 in late fees and interest due to Debtors' failure to pay its January rent on time. Whether TXMS is entitled to late fees and interest is a matter of contractual interpretation, as parties in Texas may contract for late fees and interest. Here, the Master Lease provides, in §§ 3.6 and 3.7, that Debtors shall be responsible for a 5% late charge plus interest if the payment default is not cured within 5 days after the due date. The evidence was undisputed that Debtors paid the January rent late (on January 8, 2019). Thus, TXMS appropriately calculated the late charge plus interest and, as such, Debtors must pay TXMS $69,752.10 to compensate it for its actual pecuniary loss.[25]

c.      Annaly's Post-Petition Escrow Deficit 2

While there are no disputes regarding the pre-petition escrow deficits and the post-petition "true-ups" of certain tax and insurance escrows owing to Annaly, Debtors challenge whether they are obligated to cure the $146,177.98 "so-called" Escrow Deficit 2, alleged by Annaly. Debtors explained that Escrow Deficit 2 is an escrow to cover estimated insurance premiums. Debtors contend that they should not have to fund this escrow because they paid the premiums in full on May 1, 2019.[26] Annaly's expert countered that Debtors must fund the insurance escrows and, once it is determined that the insurance premiums were paid, the funds would be released to them.[27] While Debtor may not have followed the escrow protocol with regard to these insurance premiums, Debtors' witness credibly testified under oath that they paid them in full and, therefore, it does not make sense to require Debtors to cure an amount that was already paid. On the record before it, the court disallows the $146,177.98 relating to Escrow Deficit 2.

---

[25] TXMS Ex. 23.

[26] Mot. Assume Tr. 71:18-72:19 Sept. 6, 2019.

[27] Mot. Assume Tr. 216:9-217:13, 238:18-241:7 Sept. 6, 2019.

d.    Annaly's Arguments About Insurance Defaults

Annaly also argues that Debtors have been in default with regard to certain insurance requirements under its Master Lease.  Annaly outlined these defaults in a default notice, dated August 22, 2019, which provided that the defaults must be cured by September 21, 2019, under the terms of the Annaly Master Lease.[28]  While there appears to have clearly been some lapses on exchanges of information, the court was not convinced from the evidence that there is a significant default here that cannot be promptly addressed and cured.

e.    Attorney's Fees – Both Landlords

The court next turns to whether the Landlords should be entitled to recover their attorney's fees pursuant to § 365(b)(1)(B) as an actual pecuniary loss.  The seminal case regarding whether and the extent to which attorney's fees can be recovered under § 365(b)(1)(B) is *In re Shangra-La, Inc.*[29]  In that case, the Fourth Circuit held that:

> attorneys' fees incurred in attempting to collect sums due from debtors following default may be recovered as pecuniary loss under § 365(b)(1)(B) if such monies were expended as the result of a default under the contract or lease between the parties and are recoverable under the contract and applicable state law.

*Id.* at 849.  This approach was adopted by the Supreme Court in *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*,[30] albeit in the context of § 502, resolving a conflict among the circuits regarding whether *Shangra-La* or *In re Fobian*[31] was the correct approach to

---

[28]  Annaly Ex. 18.

[29]  *Three Sisters Partners, L.L.C. v. Harden* (*In re Shangra-La, Inc.*), 167 F.3d 843 (4th Cir. 1999).

[30]  549 U.S. 443, 448-451 (2007).

[31]  *Fobian v. Western Farm Credit Bank* (*In re Fobian*), 951 F.2d 1149 (9th Cir. 1991).

the treatment of post-petition attorney's fee claims. According to the unanimous Court, "An otherwise enforceable contract allocating attorney's fees (*i.e.*, one that is enforceable under substantive, nonbankruptcy law) is allowable in bankruptcy except where the Bankruptcy Code provides otherwise."[32]

Using *Shangra-La* and *Travelers* as talismans, the first step in the analysis is to determine whether there is a provision in the Master Leases that provides for the recovery of attorney's fees. Each of the Master Leases contains such a provision.

§ 32.12 of the Annaly Master Lease provides:

> *Attorney's Fees and Expenses.* Lessee shall pay to Lessor all costs and expenses incurred by Lessor in enforcing or preserving Lessor's rights under this Lease and the security for this Lease, and in all matters of collection, whether or not an Event of Default has actually occurred or has been declared and thereafter cured, including, but not limited to, (a) attorney's and paralegal, consulting and witness fees and disbursements, whether in house or outside counsel; (b) the fees, costs and expenses of any litigation, appellate, administrative, bankruptcy, insolvency, receivership and any other similar proceeding; (c) court costs; (d) the expenses of Lessor, its employees, agents, attorneys and witnesses in preparing for litigation, administrative, bankruptcy, insolvency and other proceedings, including, without limitation, lodging, meals, travel, and attendance at meetings, hearings, depositions, and trials in connection therewith; and (e) consulting and witness fees and expenses incurred by Lessor in connection with any litigation or other proceeding. Notwithstanding the foregoing, in the event litigation is commenced with respect to any alleged default under this Lease, the prevailing party in such litigation shall be entitled to receive, in addition to any award of damages, such sum as the court shall determine as its reasonable attorneys' fees and litigation expenses incurred in connection with such litigation.[33]

Section 16.1 of the TXMS Master Lease provides:

> In the event litigation is commenced with respect to any alleged default under this Lease, the prevailing party in such litigation shall receive, in addition to its damages incurred, such sum as the court shall determine as its reasonable attorneys' fees, and all costs and expenses incurred in connection therewith. Lessor's fees, costs

---

[32] *Travelers*, 549 U.S. at 448.

[33] Annaly Ex. 1, p. 64.

and expenses, including those related to any insolvency proceedings filed by Lessee, shall constitute Additional Charges hereunder.[34]

The phrase "Additional Charges" is defined in § 3.3 of the TXMS Master Lease:

> In addition to Minimum Rent, (1) Lessee . . . will also pay and discharge as and when due and payable all other amounts, liabilities, obligations and Impositions which Lessee assumes or agrees to pay under this Lease . . ., and (2) in the event of any failure on the part of Lessee to pay any of those items referred to in clause (1) above, Lessee will also promptly pay and discharge every fine, penalty, interest and cost which may be added for non-payment or late payment of such items (the items referred to in clauses (1) and (2) above being referred to herein collectively as the **"Additional Charges"**).[35]

Debtors contend these provisions are "prevailing party" clauses, which entitle the Landlords to attorney's fees only in matters that the Landlords litigated successfully. The Landlords counter that there is distinct "prevailing party" language relating to litigation and, separately, specific provisions that allow for recovery of attorney's fees in any other proceeding. The court agrees with the Landlords on this point. A plain reading of the provisions reveals that they distinguish between insolvency proceedings (and, in the case of Annaly, administrative, bankruptcy, and other proceedings) where most fees, costs, and expenses are allowable, as opposed to litigation where fees are only available to the prevailing party. This is a logical distinction, since bankruptcy courts are essentially courts of equity, which adjudicate disputes over property and "also deal in a summary way with matters of an administrative character, including questions between the bankrupt and his creditors, which are presented in the ordinary course of the administration of the bankrupt's estate."[36]

Since the attorney's fees are permitted under the applicable sections of the Master Leases, we next turn to substantive state law. Each Master Lease provides that Texas substantive state law

---

[34] TXMS Ex. 3, p. 34.

[35] TXMS Ex. 3, p. 9.

[36] *Katchen v. Landy*, 382 U.S. 323, 327 (1966) (internal quotations omitted).

shall apply.[37]  In Texas, "[p]arties are free to contract for a fee-recovery standard either looser or stricter than the fee-recovery standards provided by statute, and courts are bound by the parties' choice."[38]  Thus, the attorney's fees are allowable both pursuant to the Master Leases and Texas law.

In making its ruling that attorney's fees should be awarded to the Landlords in accordance with § 365(b)(1)(B), the court finds the case *In re America the Beautiful Dreamer*[39] to be instructive.  In *America*, the debtor was the lessee of a single space in a shopping center.  At the time of filing, the debtor owed about five months of pre-petition rent, including interest.  The debtor filed a motion to assume the lease and the lessor moved to compel rejection.  The lease provided, in relevant part, that:

> If, in the context of Tenant's bankruptcy case, Landlord is compelled at any time to incur any expense, including attorneys' fees, in enforcing or attempting to enforce the terms of this Lease or to enforce or attempt to enforce any actions required under the Bankruptcy Code to be taken by the Trustee or by the Tenant, as Debtor-In-Possession then the sum so paid by Landlord . . . shall be immediately due and payable by the Trustee of by the Tenant's bankruptcy estate.[40]

The court found that this provision, in combination with a separate lease provision that defined "Additional Rent" as "all sums of money required to be paid by Tenant under this Lease," entitled the landlord to recover its reasonable post-petition fees because the default created a pecuniary loss under § 365(b)(1)(B) for which the landlord had to be compensated in order for Debtor to assume the Lease.[41]  In their post-trial briefing, the Landlords accurately summarize that,

---

[37]  Annaly Master Lease, § 32.6 (Annaly Ex. 1, p. 63), TXMS Master Lease, § 32.6 (TXMS Ex. 3, p. 47).

[38]  *Mohican Oil & Gas, LLC v. Scorpion Expl. & Prod., Inc.*, 337 S.W.3d 310, 321 (Tex. App.—Corpus Christi—Edinburg 2011, pet. denied).

[39]  No. 05-47435, 2006 WL 2038646 (Bankr. W.D. Wash. May 18, 2006).

[40]  *Id.* at *4.

[41]  *Id.* at *5.

in *America*, the court awarded landlord its *reasonable* fees and expenses associated with (1) landlord's unsuccessful motion for relief from stay, (2) landlord's motion to compel payment of post-petition lease charges, (3) landlord's unsuccessful objection to the debtor's motion to assume, (4) landlord's unsuccessful motion to compel rejection, and (5) landlord's objection to the debtor's disclosure statement.[42] Noteworthy to the case bar, the court in *America* ruled that incurring fees to ensure that a debtor complies with the assumption/rejection deadlines prescribed by § 365(d) and other requirements for assumption are compensable.[43] The court concludes that the logic in the *America* applies equally to this case.

Assuming, *arguendo*, that TXMS' and Annaly's attorney's fees clauses are prevailing party clauses, the Landlords would nevertheless be entitled to their reasonable attorney's fees. Judge Christopher Mott analyzed Texas law regarding prevailing party clauses and surmised, "to determine if a party is a 'prevailing party', Texas law requires a court to examine whether the party successfully prosecutes or defends the 'main issue' in the proceeding, and the remedy actually obtained by that party."[44] According to the Texas Supreme Court, a party may qualify as a prevailing party if it obtains at least some relief on its claim: "[A] judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay."[45]

In the bankruptcy context, success is relative and can be difficult, and sometimes impossible, to measure. While this court determined that Debtors were ultimately able to assume

---

[42] *Id*. (emphasis added).

[43] *Id*.

[44] *In re WBH Energy, LP*, No. 15-10003-HCM, 2016 WL 3049666, at *12 (Bankr. W.D. Tex. May 20, 2016), *aff'd sub nom. In re: WBH Energy, LP U.S. Energy Dev. Corp. v. CL III Funding Holding Co., LLC*, No. 1: 16-CV-884-LY, 2017 WL 663561 (W.D. Tex. Feb. 17, 2017), *aff'd sub nom. Matter of WBH Energy, L.P.*, 708 F. Appx 210 (5th Cir. 2018) (per curiam).

[45] *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.,* 295 S.W.3d 650, 654 (Tex. 2009).

the Master Leases, the Landlords were instrumental in the following: compelling Debtors to decide whether to assume the Master Leases, raising significant issues with regard to Debtors' ability to promptly cure defaults—in connection with both the Motion to Assume and Debtors' disclosure statement—and generally ensuring that their interests were adequately protected if Debtors were to assume the Master Leases. The court doubts whether the Landlords would be in the same position at this stage in the case, absent their collective efforts. They also obtained damages and other relief that Debtors were otherwise unwilling to provide. Overall, the Landlords were successful in defending the main issue as it relates to them, ensuring that their rights under the Master Leases were protected during the course of Debtors' bankruptcy cases.

The final hurdle to recovery of attorney's fees under § 365(b)(1)(B) is that the fees must be reasonable. "[A] bankruptcy court has the power to arrive at a reasonable attorneys' fee even if the contractual attorneys' fee provision is valid under state law."[46] Here, the Landlords have presented evidence of the following attorney's fees and expenses:

| | Fees | Expenses | Total |
|---|---|---|---|
| *TXMS*[47] | | | |
| Wick Phillips Gould & Martin, LLP | $286,608.00 | $0.00 | $286,608.00 |
| Sherry Meyerhoff Hanson & Crance LLP | $52,252.00 | $259.20 | $52,511.20 |
| TXMS Total | $338,860.00 | $259.20 | **$339,119.20** |
| *Annaly*[48] | | | |
| Winstead PC | $264,085.50 | $1,745.08 | **$265,830.58** |
| *Berkadia*[49] | | | |
| Kilpatrick Townsend & Stockton LLP | $138,497.00 | $231.40 | **$138,728.40** |

---

[46] *Wells Fargo Bank NA v. 804 Cong. LLC* (*In re 804 Cong., L.L.C.*), 756 F.3d 368, 376 (5th Cir. 2014) (internal citations and quotations omitted).

[47] TXMS Exs. 18 and 19. TXMS requested $337,667.20 in attorney's fees as of the time of the hearing. The court will use the total submitted as evidence as the amount requested pursuant to § 365(b)(1)(B).

[48] Annaly Ex. 14. Annaly requested $264,727.18 in attorney's fees as of the time of the hearing. The court will use the total submitted as evidence as the amount requested pursuant to § 365(b)(1)(B).

[49] Annaly Ex. 15.

TXMS has urged that its attorney's fees and expenses should be recovered as reasonable, actual pecuniary losses it suffered in connection with Debtors' default. At first blush, this overall amount—$339,119.20—seems rather steep for a landlord's fees and expenses. However, TXMS is not just any landlord. It is party to a master lease encompassing 11 properties which yield (or contractually should yield) $1,187,254.07 of minimum rent per month. And, of course, the tenant is not just any tenant—it is a regulated entity operating skilled nursing facilities for elderly or infirm residents. A rejection of the leases by the tenant/Debtors would not result in simply locking the doors and handing TXMS the keys. Obviously, there would be a collective concern for finding a new operator, ensuring the welfare of the residents, and making sure all involved are complying with a multitude of federal and state laws and regulations. Careful monitoring of the case by TXMS was reasonable—even if Debtors missed only one rent payment (the rent for December 2018, the month that Debtors filed their bankruptcy cases) and were only late one other month (January 2019).

TXMS' positions or posturing may have seemed aggressive at times, but certainly not overly aggressive, given the stakes. When one divides the $338,860.00 in aggregate fees over the 11 month time period the invoices span (Sherry Meyerhoff's first invoice is for fees incurred in October 2018 and its last invoice is for fees incurred in May 2019; Wick Phillips's first invoice is for fees incurred as early as November 30, 2018 and the last invoice is for August 2019), this amounts to an average of $30,805.45 in monthly fees. Again, while steep, this is not unreasonable given the overall size and complexity of the case. Moreover, Wick Phillips's blended rate of $448.25 per hour and Sherry Meyerhoff's rate of $428.65 per hour both seem reasonable.

Annaly has requested that both its attorney's fees and expenses and those of its *lender*, Berkadia Commercial Mortgage LLC ("Berkadia") should be recovered as reasonable, actual

pecuniary losses it suffered in connection with Debtors' default. Annaly contends that Berkadia's attorney's fees, which it incurred monitoring the bankruptcy case—and which are passed along to Annaly—are a form of "actual pecuniary loss" to the landlord that must be cured pursuant to § 365(b)(1)(B). The court does not find contractual or legal support for the notion of reimbursing the attorney's fees and costs of Annaly's secured lender, Berkadia, as a § 365(b) "cure" cost.

Preliminarily, § 32.12 of the Annaly Master Lease provides that "Lessee shall pay to Lessor all costs and expenses incurred by Lessor **in enforcing or preserving Lessor's rights under this Lease and the security for this Lease**, and in all matters of collection . . .[.]"[50] The clause, when read in its entirety, relates to reimbursement for actions taken to enforce or preserve Annaly's rights—not the rights of Annaly's lender. Additionally, the phrase "security for this Lease" is not a reference to some instrument creating a security interest, but rather a general reference to Annaly's security for the Master Lease. In any event, the clause is in no way specific enough to place Debtors on notice that they would be obligated to pay the attorney's fees and expenses of a third-party. Under Texas law, "[t]he intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written."[51] Since this provision, as it relates to Berkadia's fees and costs, would not be enforceable under state law, it cannot be recovered as an actual pecuniary loss under § 365(b)(1)(B). While Berkadia may have a direct claim against Debtors, that matter does not need to be adjudicated in connection with this Motion to Assume.[52]

---

[50] Annaly Ex. 1, p. 64 (emphasis added).

[51] *Pegasus Energy Grp., Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 121 (Tex. App.—Corpus Christi—Edinburgh 1999, pet. denied).

[52] *See* Berkadia's proofs of claim and Annaly Ex. 16.

Turning to the fees and expenses of Annaly's own attorney, the overall amount again seems rather steep for a landlord's fees without some context. The context, of course, it that Annaly is party to a master lease encompassing five properties and has approximately $37 million of secured debt associated with these properties that happens to be insured by HUD. And, as mentioned earlier, the tenant is not just any tenant—it is a regulated entity operating skilled nursing facilities for elderly or infirm residents. Careful monitoring of the case by Annaly was reasonable—even if Debtors only missed one rent payment (the rent for December 2018, the month that Debtors filed their Chapter 11 cases).

Annaly has had some unique reasons to be concerned during this case and to closely monitor it. One of its properties was significantly damaged in June 2019 by a storm, resulting in the need to move residents to different properties and close the facility for a while. There is concern about whether and how much insurance coverage will be available to cover the losses, when the repairs will be completed, and when the property will be operational. Moreover, another one of the Annaly properties has sustained significant declines in census over the past several months. Annaly has rightfully been concerned about Debtors' intentions regarding these two properties in particular. When one divides the $264,085.50 of aggregate fees of the Winstead firm over the nine-month time period they span, this amounts to $29,342.83 of average monthly fees— not too different from the amount incurred by TXMS. Again, while steep, this is not unreasonable given the overall size and complexity of the case. Moreover, Winstead's blended rate of $564.04 per hour seems reasonable.

(iv)    *Adequate Assurance of Future Performance—Both Landlords*

In determining whether a debtor has offered adequate assurance of future performance, a court should consider whether "the debtor's financial data indicated its ability to generate an

income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee."[53] A debtor does not need to show that it will thrive, make a profit or provide a guarantee of performance.[54] Rather, a debtor must show that it can meet its rental and other lease obligations.[55] Courts have also considered a number of other factors including: "1) the debtor's payment history; (2) presence of a security deposit; (3) evidence of profitability; (4) plan that would earmark money exclusively for the landlord; and (5) whether the unexpired lease is at, or below, the prevailing rate."[56]

Weighing these factors and the evidence before it, the court believes that Debtors have provided adequate assurance of future performance. Significantly, Debtors' payment history on the leases involved is good. Debtors made all payments under the leases except the December 2018 payment (Debtors filed bankruptcy December 4, 2018) and have made all post-petition payments to these landlords up to the date of the hearing (through September 2019). TXMS has made much of Debtors' recent decline in EBITDAR and its perceived likely risk that Debtors will not be able to meet certain financial covenants in the TXMS Master Lease—namely the rent coverage ratio, which requires the ratio of 1.2 on a consolidated basis (trailing 12-months) for the TXMS properties. If Debtors fail to meet this coverage ratio for two consecutive quarters, Debtors will be required to pay a greatly increased security deposit (an amount equal to six times the then-current rent) and could eventually go into an incurable default. The court is not convinced that this is so great a risk that the court cannot find "adequate assurance of future performance," and the court certainly does not believe that it is reasonable for TXMS to ask for an enhanced security

---

[53] *Richmond Leasing Co.*, 762 F.2d at 1310.

[54] *In re Patriot Place, Ltd.*, 486 B.R. 773, 801 (Bankr. W.D. Tex. 2013).

[55] *Id.*

[56] *Id.*

deposit anywhere close to this level in connection with being provided "adequate assurance of future performance."

For one thing, Debtors' witnesses credibly testified that revenue is somewhat seasonal—census numbers do not tend to increase and, in fact, are more likely to decrease during summer months. Second, Debtors have been hampered with regard to marketing the properties during the overhang of the bankruptcy. Third, Debtors have been in a slow process of reducing expenses during the case (in other words, they have not completely right-sized expenses for a 22-facility enterprise—affecting current EBITDAR to some extent). Fourth, Debtors anticipate having "rehab revenue" to enhance the overall profitability of the facilities. There was some dispute as to whether "rehab revenue" could be "counted" for calculating the rent coverage ratio. The court believes that rehabilitation services can be included in calculating whether the lease coverage ratios will be satisfied. Both Master Leases contain a provision that pertains to the "primary intended use" of the Leased Property. In this provision, the Landlords permit Debtors to use the premises as skilled nursing facilities and for ancillary services related thereto.

"Ancillary services" appears to be a term of art in the skilled nursing industry. The court takes judicial notice that, according to a DHHS Report by the Office of Inspector General, ancillary services include laboratory, radiology, drugs, therapy, and other items and services for which charges are customarily made in addition to a routine per diem charge.[57] In the same report, the OIG states that rehabilitation therapy services are the largest ancillary costs to Medicare in connection with skilled nursing facilities.

---

[57] OFFICE OF INSPECTOR GENERAL, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OEI-06-92-00863, MEDICARE SERVICES PROVIDED TO RESIDENTS OF SKILLED NURSING FACILITIES 3 (1994), *available at* https://oig.hhs.gov/oei/reports/oei-06-92-00863.pdf.

In addition, there is nothing contained in the lease coverage ratio formula that would exclude this type of revenue. In substance, the formula is 12-month trailing EBITDAR/12-month trailing rent with EBITDAR being calculated employing generally accepted accounting procedures ("GAAP").[58] Applying GAAP, it appears that one should include all income from wherever derived, which would include income from providing rehabilitation services.

Regarding Annaly in particular, the court notes that the evidence shows it really has only two problematic facilities—from a revenue standpoint. One is a facility in Frisco, which sustained storm damage in June 2019, resulting in the need to close the facility temporarily and move patients to different facilities. The court believes Debtors will diligently pursue insurance coverage for this facility. The other problematic facility, Winters Park, has sustained lower census rates, at least partially attributable to the closure of a nearby hospital in recent months, which had been a source of incoming patients.

Finally, it seems noteworthy that both TXMS and Annaly had handsome security deposits (actually, letters of credit) in connection with their leases. Annaly had a $750,000 letter of credit that it drew during the case (and the issuing bank, CIBC Bank USA ("CIBC")—Debtors' secured lender—then later used Debtors' funds to eventually repay the resulting obligation owed by Debtors as arranger under the letter of credit). Debtors indicate that they fully intend to replenish this $750,000 security deposit with Annaly—and the court believes Debtors can and will have the financial wherewithal to do so. TXMS has a $2 million letter of credit issued by CIBC that expires in December 2019, and apparently CIBC has indicated that it will not renew it. Debtors have assumed that TXMS will draw on this letter of credit, before it expires, in Debtors' computations

---

[58] The formula described in the TXMS Master Lease is actually the 12-month trailing EBITDARM, the "M" being the actual management fee charged by manager to relevant Debtor, minus a 5% management fee divided by the 12-month trailing rent. As Debtors use a 5% management fee in their projections, the "M" is cancelled out of the equation.

of the CIBC indebtedness that will have to be addressed under Debtors' plan.  Obviously, the court cannot address this situation with certainty right now—if the letter of credit is drawn, it will both impact the out-of-pocket amount Debtors must pay to cure defaults with TXMS and, at the same time, Debtors will have to present evidence as to what new security deposit it intends to provide to TXMS and the court will determine if it is adequate.

Based on the foregoing,

   **IT IS ORDERED** that the Motion to Assume is **GRANTED**.

   **IT IS FURTHER ORDERED** that Debtors' assumption of the leases shall be effective immediately upon entry of this Memorandum Opinion and Order.

   **IT IS FURTHER ORDERED** that, on the earlier of the Effective Date of the plan or December 16, 2019, Debtors shall pay the cure amounts aggregating: (1) $1,596,125.35 to TXMS, consisting of (a) $1,187,254.05 in pre-petition rent, (b) $69,752.10 in interest and late fees, and (c) $339,119.20 in attorney's fees for TXMS' counsel; and (2) $924,631.13 to Annaly, consisting of (a) $596,097.23 in pre-petition rent, (b) $62,703.32 in post-petition tax and insurance escrow true-ups, (c) $265,830.58 in attorney's fees for Annaly's counsel, and (d) $750,000.00 to replenish the escrow it drew post-petition, *less* (e) the $750,000 retainer it drew post-petition.[59]

   **IT IS FURTHER ORDERED** that, in the event Debtors choose to subsequently reject either of the Master Leases, TXMS and/or Annaly shall have an administrative expense claim for the full cure amount specified in this Memorandum Opinion and Order.

   **#### END OF MEMORANDUM OPINION AND ORDER####**

---

[59] As the court stated in a previous footnote, the court will approve Debtors' and the HC Landlords' settlement of the HC Landlords' cure claim by separate order of this court.