## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| Senior Care Centers, LLC, *et al.*,[1] | § | Case No. 18-33967 (BJH) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## DISCLOSURE STATEMENT FOR THIRD AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**POLSINELLI PC**

Trey A. Monsour
State Bar No. 14277200
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tmonsour@polsinelli.com

Jeremy R. Johnson (Admitted *Pro Hac Vice*)
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com

Stephen J. Astringer (Admitted *Pro Hac Vice*)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
sastringer@polsinelli.com

*Counsel to the Debtors and Debtors in Possession*

Dated: October 15, 2019

**GREENBERG TRAURIG, LLP**

Shari L. Heyen
State Bar No. 09564750
1000 Louisiana St., Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3564
Facsimile: (713) 374-3505
HeyenS@gtlaw.com

Nancy A. Peterman (Admitted *Pro Hac Vice*)
77 West Wacker Dr., Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-8410
Facsimile: (312) 456-8435
PetermanN@gtlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

---

[1] The Debtors in the Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief* [Docket No. 569] and may also be found on the Debtors' claims agent's website at https://omnimgt.com/SeniorCareCenters. The location of the Debtors' service address is 600 North Pearl Street, Suite 1100, Dallas, Texas 75201.

70265001.10

**THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING CENTRAL TIME ON NOVEMBER 22, 2019.**

**TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AND CLAIMS AGENT MUST *ACTUALLY RECEIVE* YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE AS SET FORTH IN THE DISCLOSURE STATEMENT ORDER.**

## TABLE OF CONTENTS

Introduction ............................................................................................................................. 1

I.      Background Information ................................................................................................ 2

        A.      Debtors' Business and History............................................................................ 2

        B.      Organizational Structure and Management of the Debtors................................. 4

        C.      Prepetition Capital Structure.............................................................................. 5

        D.      Other Debt.......................................................................................................... 8

        E.      Events Leading to the Chapter 11 Cases............................................................ 8

II.     The Chapter 11 Cases ................................................................................................. 10

        A.      Commencement of the Chapter 11 Cases and First Day Pleadings.................. 10

        B.      Use of Cash Collateral ..................................................................................... 10

        C.      Retention of Professionals ............................................................................... 11

        D.      Patient Care Ombudsman ................................................................................. 11

        E.      Appointment of the Committee ........................................................................ 11

        F.      Lease Rejections and OTAs.............................................................................. 12

        G.      Other Postpetition Matters ............................................................................... 14

        H.      Schedules and Bar Dates .................................................................................. 16

        I.      Plan Exclusivity................................................................................................ 16

        J.      Sale and Reorganization Process ..................................................................... 16

        K.      Reorganized Debtors......................................................................................... 17

III.    Summary of the Plan .................................................................................................. 18

        A.      Treatment of Unclassified Claims ................................................................... 18

        B.      Classification and Treatment of Claims and Interests ..................................... 20

        C.      Acceptance or Rejection of the Plan................................................................ 27

        D.      Treatment of Executory Contracts and Unexpired Leases .............................. 28

        E.      Means for Implementation ............................................................................... 30

        F.      Provisions Governing Distributions................................................................. 45

        G.      Effect of Plan Confirmation............................................................................. 50

        H.      Conditions Precedent to Confirmation and Effective Date.............................. 54

        I.      Retention of Jurisdiction.................................................................................. 56

        J.      Miscellaneous Provisions ................................................................................ 58

IV.     Confirmation of the Plan ............................................................................................ 63

A. Confirmation Hearing ............................................................................... 63

B. Confirmation Standards .......................................................................... 64

C. Acceptance by Impaired Classes ............................................................ 66

V. Certain Risk Factors to be Considered Before Voting ...................................... 68

A. Bankruptcy Law Considerations............................................................. 68

B. Risks Related to Recoveries Under the Plan........................................... 72

C. Risks Related to the Reorganized Debtors' Businesses........................... 73

D. Risks Associated With Forward Looking Statements ............................. 73

E. Disclosure Statement Disclaimer............................................................ 74

VI. Alternatives to the Plan .................................................................................... 76

A. Chapter 7 Liquidation ............................................................................. 76

B. Alternative Plan ...................................................................................... 77

VII. Certain Securities Law Matters ....................................................................... 77

A. Issuance of New Common Stock............................................................. 77

B. Cancellation of Existing Interests .......................................................... 77

VIII. Certain U.S. Federal Income Tax Consequences to the Plan ......................... 78

A. Consequences to Debtors......................................................................... 79

B. Consequences to Holders of Class 5 General Unsecured Claims........... 80

C. Consequences to Holders of Class 6 Convenience Class Claims ........... 81

IX. Recommendation of the Debtors and the Committee........................................ 81

## EXHIBITS

Exhibit A     List of Debtors and Borrowers
Exhibit B     List of Facilities
Exhibit C     Plan of Reorganization
Exhibit D     Disclosure Statement Order
Exhibit E     Financial Projections
Exhibit F     Liquidation Analysis
Exhibit G     Valuation Analysis
Exhibit H     Sources and Uses

**THE DEBTORS AND THE COMMITTEE HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

**Introduction**

Senior Care Centers, LLC and its wholly-owned affiliates and subsidiaries, which are listed on Exhibit A hereto, as debtors and debtors in possession (each a "**Debtor**" and collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and the Official Committee of Unsecured Creditors (the "**Committee**") submit this disclosure statement (together with all exhibits, schedules, and attachments thereto, as may be amended, supplemented, or otherwise modified from time to time, this "**Disclosure Statement**") pursuant to Bankruptcy Code section 1125 to Holders of Claims against and Interests in the Debtors in connection with the Solicitation of acceptances with respect to the *Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (together with all exhibits, schedules, and attachments thereto, as may be amended supplemented, or otherwise modified from time to time, the "**Plan**"),[1] dated October 15, 2019. A copy of the Plan is attached hereto as Exhibit C. A copy of the Disclosure Statement Order is attached hereto as Exhibit D.

The Disclosure Statement is intended to be a summary of information regarding the Debtors. Information contained herein has been derived from the Debtors' books and records; however, the Disclosure Statement has not been audited. Additional background information about the Debtors and these Chapter 11 Cases, including the Schedules and Statements of Financial Affairs (which contain relevant information about the Debtors' pre-bankruptcy financial condition), may be found at http://omnimgt.com/seniorcarecenters.

The Disclosure Statement includes, without limitation, the following information:

- the Debtors' prepetition operating and financial history;
- the events leading to the commencement of these Chapter 11 Cases;
- significant events which have occurred in these Chapter 11 Cases;
- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan;
- certain effects of Confirmation of the Plan;
- other terms and provisions of the Plan, including risk factors relating to the Debtors and Reorganized Debtors and provisions related to releases, injunctions, and exculpation;
- certain securities law matters with respect to the Plan; and
- certain U.S. federal income tax consequences under the Plan.

Certain Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward, at a reduced size and footprint, which is described in more detail below. The Debtors are not liquidating or going out of business.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

The Plan provides for the reorganization of the Debtors by retiring, cancelling, extinguishing, and/or discharging the Debtor's existing equity interests and issuing new equity to the Unsecured Creditor Trust, subject to dilution by the Management Incentive Plan. Holders of all Claims and Interests except for General Unsecured Claims, Convenience Class Claims, Subordinated Debt Claims, certain Intercompany Claims, certain Intercompany Interests, and Interests are unimpaired under the Plan.

To fund the Debtors' reorganization, the Debtors will use the Debtors' Cash on hand as of the Effective Date and proceeds of the Harden Escrow and the Exit Facility. The Cash and related proceeds will be used to: pay Cures owed pursuant to the Schedule of Assumed Contracts and Unexpired Leases necessary to the proposed reorganization; satisfy Unclassified Claims; and retire the ABL Credit Facility Claims. A Creditor Trust will be formed and funded for the benefit of Holders of General Unsecured Claims, who will receive their pro rata share of the Unsecured Creditor Recovery.

For the reasons set forth herein, the Debtors and the Committee believe that the Plan is fair and equitable, will maximize the value of the Estates, is in the best interest of the Estates and the Debtors' stakeholders, and will enable the Debtors to successfully reorganize and accomplish the objectives of chapter 11 of the Bankruptcy Code. Therefore, the Debtors and the Committee urge Holders of Claims who are entitled to vote to timely return their ballots and to vote to accept the Plan.

## I.     Background Information

### A.     Debtors' Business and History

The Company was formed on November 20, 2008 by Silver Star Investments, LLC ("**Silver Star**"). Silver Star raised $12.5 million in equity capital on behalf of the Company. The Company formally commenced operations on May 1, 2009 as a licensed operator of fourteen (14) skilled nursing facilities ("**SNFs**"). In 2016, Silver Star sponsored an additional equity offering of almost $20 million to provide additional working capital and to assist the Company in its continued growth. As of the Petition Date, Silver Star owns approximately 68.3% of the equity of the Company. Granite Investment Group, LLC (together with its affiliates, "**Granite**") owns approximately 73.5% of Silver Star.

Between 2009 and 2018, the Company expanded operations and became one of the largest providers of skilled nursing services in the country and the largest operator of SNFs in Texas. As of the Petition Date, the Company operated approximately ninety-seven (97) SNFs, nine (9) assisted living facilities ("**ALFs**"), and six (6) hospice facilities (collectively, the "**Facilities**"), as detailed on Exhibit B. As of the Petition Date, the Facilities were located throughout Texas and Louisiana and employed approximately 11,300 individuals. The Debtors also provided rehabilitation, therapy, and other services. As of the Petition Date, the Company provided care on a daily basis to approximately 9,000 patients and had a capacity of approximately 13,000 beds.

To become a patient, the prospective patient must enter into an admission agreement with the Company ("**Admission Agreement**"). The Admission Agreement establishes the terms and

conditions under which a resident will reside in a Facility and receive services. The services provided by the Company to patients include, among other things: transportation, meals, housekeeping, 24-hour monitoring, laundry, daily living assistance, and 24-hour nursing care. In exchange for the services, the Company is reimbursed by a third-party payor and/or the patient. The third-party payors are primarily: (1) Medicare, (2) Medicaid, and (3) other third-party and private payors.

Operators of SNFs are heavily regulated by various state and federal agencies. In particular, nearly every aspect of the operation of the Facilities, including patient services and financial operations are subject to rules and regulations promulgated by: (a) the United States Depart of Health and Human Services' Centers for Medicare & Medicaid Services ("**CMS**"); (b) the Department of Aging, Office of Health Assurance and Licensing, Bureau of Long Term Care, Bureau of Regulatory Enforcement; and (c) the applicable departments of health in Texas and Louisiana.

The Debtors, through Debtor Harden Pharmacy, LLC ("**Harden**"), previously operated a pharmacy business. In February 2018, Harden sold substantially all of its assets to NeighborCare Pharmacy Services, Inc. (the "**Pharmacy Buyer**") for approximately $76 million (the "**Pharmacy Sale**"). The Pharmacy Sale allowed the Debtors to address liquidity needs in early 2018. Specifically, the uses of the proceeds of the Pharmacy Sale were as follows:

| | |
|---|---|
| Harden Vendor Payoff | $1,024,633 |
| ABL Credit Facility Paydown | $2,000,000 |
| Granite I Lease Buy Down[2] | $10,000,000 |
| Gamble Loan (as defined below) Pay Down | $5,000,000 |
| Ranger Loan (as defined below) Pay Off | $7,234,970 |
| Notes Payable – Outside Investors Pay Off[3] | $12,676,513 |
| Operating Working Capital | $29,934,822 |

Additionally, as part of the Pharmacy Sale, an indemnification escrow account was established in the amount of $7.6 million (the "**Harden Escrow**") to cover potential claims from the Pharmacy Buyer related to the Pharmacy Sale. The Pharmacy Buyer did not assert any claims related to the Pharmacy Sale against the Harden Escrow by the required deadline. Postpetition, multiple parties have asserted claims against the Harden Escrow. The Debtors determined that the Pharmacy Sale was necessary because a working capital infusion of cash was needed as the Debtors began to default under certain covenants under various loan documents.

---

[2] In connection with the Pharmacy Sale, Granite and the Company entered into that certain Second Amendment to Master Lease and Security Agreement and Joinder Agreement (the "**Granite Buyout**"). The Granite Buyout purportedly provided, among other things, that Granite would be paid $10 million in exchange for extending the term of its leases to fifteen (15) years and reducing the cost of base rent.

[3] Throughout October 2017 and January 2018, the Company entered into a series of ten (10) short-term high-interest bridge financing loans with certain outside investors (the "**Outside Investors Notes**") introduced through Granite. The total borrowed under the Outside Investors Notes was approximately $15.1 million. All Outside Investor Notes were repaid between January 17, 2018 and February 8, 2018.

3

### B.      Organizational Structure and Management of the Debtors

The Company is comprised of more than 120 wholly owned subsidiaries. These subsidiaries may be classified as (1) holding companies that directly or indirectly hold a portfolio of certain assets (the "**HoldCo Debtors**"); (2) entities that are tenants to master leases with certain landlords (the "**Tenant Debtors**"); and (3) entities which operate Facilities (the "**OpCo Debtors**"). The Company also owns a 38% non-controlling interest in Partners Pharmacy, LLC (the "**Partners Pharmacy**").

Approximately thirty-two (32) Debtors (the "**HUD Debtors**") are parties to operator regulatory agreements ("**Regulatory Agreements**") with the U.S. Department of Housing and Urban Development ("**HUD**"). Typically, the HUD Debtors are parties to leases with property owners who receive financing from certain HUD lenders (the "**HUD Lenders**").

The Debtors are parties to numerous management agreements (the "**Management Agreements**" and, individually, a "**Management Agreement**"). Generally, there was one Management Agreement in place at each Facility as of the Petition Date. Under the Management Agreements, Debtor Senior Care Center Management, LLC ("**SCC Management**") provides certain other Debtors with the following services: (a) provision of care to residents; (b) the general maintenance, repair, and supply, of the Facilities; (c) day-to-day direct supervision of service providers at the Facilities; (d) preparation of annual budgets; (e) preparation and implementation of marketing programs; (f) establishment and maintenance of books and records; (g) preparation of financial reports; (h) preparation of Medicaid, Medicare, and other reimbursement programs; (i) preparation and filing of tax return; (j) purchasing, utilities, and service contract management, (k) maintaining licensing; (l) insurance procurement; and miscellaneous other services. Generally, the Management Agreements provide that the Company's various business segments remit a management fee for such services equal to five percent (5%) of gross revenue.

Pursuant to the Senior Care Centers, LLC Operating Agreement (the "**Operating Agreement**"), the Company is managed by existing management and a board of directors (the "**Board**") at the holding company, Senior Care Centers, LLC ("**SCC Parent**"). Under the Operating Agreement, and at the direction of the Company's management, unit holders of Senior Care Centers, LLC ("**Unit Holders**") are eligible to receive quarterly pro rata distributions of the Company's net profits from operations to assist in paying income tax liabilities along with dividends from time to time. The last tax distribution was made in 2015. The last dividend distribution was made in March 2018.

The Board historically consisted of four Board members (the "**Board Members**"). Prepetition, three of the Board Members were affiliated with Granite and the remaining Board Member was an officer of the Company. In November 2017, an independent Board Member was added to replace the officer member. In response to the Debtors' financial difficulties, the Company formed a special committee of the sole independent Board Member (the "**Independent Committee**") to help review and evaluate their strategic alternatives including a potential sale of some or all of the equity of the Company. On or about November 10, 2018, two additional independent observers were added to the Board and, as of the Petition Date, the three members appointed by Granite resigned from the Board and the independent observers were appointed as

4

additional independent board members. In addition, one additional independent member was added as of the Petition Date. As of the Petition Date, the Board consisted of five (5) independent members.

### C.    Prepetition Capital Structure

### (1)    ABL Credit Facility

Certain Debtors[4] (the "**Non-HUD Borrowers**") are parties to the certain Amended and Restated Credit and Security Agreement dated January 12, 2017 (as amended, restated, modified, or supplemented from time to time, the "**Non-HUD Credit Agreement**") with CIBC Bank USA as Lead Arranger, Administrative Agent, and Lender (the "**Administrative Agent**"),[5] and CIT Finance LLC, Wells Fargo Bank, N.A., MB Financial Bank, N.A., Bankers Trust Company, and Compass Bank as lenders (together with Administrative Agent, the "**ABL Lenders**"). The Non-HUD Credit Agreement provided the Non-HUD Borrowers with access to a term loan up to an aggregate principal amount of $7,395,448.99 (the "**Non-HUD Term Loan**") and a revolving credit loan in the aggregate principal amount of $67,500,000 (the "**Non-HUD Revolver**", and together with the Non-HUD Term Loan, the "**Non-HUD ABL Credit Facility**"). The Non-HUD Term Loan was paid off in early 2017.

Certain Debtors (the "**HUD Borrowers**") are parties to that certain Amended and Restated Credit and Security Agreement dated June 21, 2017 (as amended, restated, modified, or supplemented from time to time, the "**HUD Credit Agreement**", with the Non-HUD Credit Agreement, the "**ABL Credit Facility Documents**") with the Administrative Agent and Lenders. The HUD Credit Agreement provided the HUD Borrowers with a revolving credit loan in the aggregate principal amount of $12,500,000 (the "**HUD Revolver**" or the "**HUD ABL Credit Facility**", together with the Non-HUD Credit Facility, the "**ABL Credit Facility**"). As is common in these types of financings, borrowings under the Credit Facility are limited by a borrowing base calculation (the "**Borrowing Base**").

Additionally, the Debtors and the Administrative Agent are parties to two unsecured letters of Credit in the aggregate principal amount in excess of $2 million (the "**LCs**").

As of the Petition Date, approximately $33.06 million was due and outstanding under the Non-HUD Revolver, and approximately $9.53 million was due and outstanding under the HUD Revolver. As of the Petition Date, the Debtors were obligated to the ABL Lenders in the aggregate principal amount of $45.56 million.

To secure the obligations under the ABL Credit Facility, the Debtors granted the Administrative Agent a first priority perfected security interest in, subject to certain exceptions discussed below: "Goods, Accounts (including Health-Care Insurance Receivables), Equipment, Inventory, contract rights or rights to payment of money (including any escrowed funds, escrow payments or indemnification payments owing to any of the Debtors pursuant to any escrow

---

[4] Attached hereto as *Exhibit A* is a chart which details all Debtors and their status, if any, under the applicable ABL Credit Facility Documents.

[5] The ABL Credit Facility Documents were originally executed by The PrivateBank and Trust Company, predecessor in interest to CIBC Bank USA.

5

agreement, purchase agreement or acquisition agreement), leases, license agreements, franchise agreements, General Intangibles, Intellectual Property, commercial tort claims, documents, Instruments (including any promissory notes), Chattel Paper (whether tangible or electronic), cash, Deposit Accounts, Securities Accounts, Letter-of-Credit Rights (whether or not the letter of credit is evidenced by a writing), Securities, and all other Investment Property, Supporting Obligations, and Financial Assets; all of each Debtor's books and records relating to any of the foregoing; and all and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions, and improvements to and replacements, products, Proceeds and insurance proceeds of any or all of the foregoing (each as defined in the ABL Credit Facility Documents), and every other item of collateral described in the Credit Facility Documents (collectively, all of the above types and descriptions of collateral are referred to herein as the "**Prepetition ABL Collateral**").

## (2)    Sabra Loans

In connection with the acquisition of certain Facilities, certain Debtors[6] entered into that certain Loan Agreement dated September 1, 2015 (as amended, restated, modified, or supplemented from time to time, the "**Gamble Loan Agreement**") and Promissory Note (the "**Gamble Note**") with CCP Finance I, LLP.[7] SCC Parent executed that Guaranty of Payment on September 1, 2015 (the "**Gamble Guaranty**", and together with the Gamble Note and Gamble Loan Agreement, the "**Gamble Loan Documents**"). The Gamble Loan Agreement provided the Gamble Debtors with access of up to $20 million (the "**Gamble Loan**").

To provide the Debtors with additional liquidity and to pay off the Non-HUD Term Loan, on April 28, 2017, Sabra and the Debtors entered into that certain Term Loan Agreement and Security Agreement (the "**Ranger Loan Agreement**"). The Ranger Loan Agreement provided the Debtors with a term loan in the amount of $7 million (the "**Ranger Loan**", and together with the Gamble Loan, the "**Sabra Loans**").

To obtain Sabra's consent to the Pharmacy Sale in February 2018,[8] the Debtors paid Sabra approximately $12 million, bringing the outstanding balance of the Gamble Loan down to $5 million, and satisfying the Ranger Loan's balance of approximately $7.23 million. The Debtors also granted Sabra an interest in the Harden Escrow that is disputed by several parties, including the ABL Lenders and the Committee.

As of the Petition Date, approximately $4.33 million was due and outstanding to Sabra on account of the Gamble Loan.

---

[6] Senior Rehab Solutions North Louisiana LLC, SCC Hospice Holdco LLC, Gamble Hospice Care Northwest, LLC, Gamble Hospice Care Cenla, LLC, Gamble Hospice Care Central, LLC and Gamble Hospice Care Northeast, LLC (together, the "**Gamble Debtors**").

[7] In August 2017, CCP Finance I, LLC and its affiliated entities including Care Capital Partners Inc. (collectively, "**CCP**") merged with Sabra Healthcare REIT, Inc. (together with its affiliates, "**Sabra**"). CCP is now a subsidiary of Sabra.

[8] *See* the chart in Section I.A.

As discussed below, Sabra through the Sabra Intercreditor Agreement (as defined below) had a second priority lien on that portion of the Prepetition ABL Collateral related to receivables generated by the Sabra-owned Facilities.

### (3) Excluded Debtors

Certain Debtors are not parties to the ABL Credit Facility (collectively, the "**Excluded Debtors**"). The Excluded Debtors are:

- Harden;
- PM Management - Killeen I NC, LLC, PM Management - Killeen II NC, LLC, PM Management - Killeen III NC, LLC, and PM Management – Portfolio VIII NC, LLC (the "**KeyBank Debtors**");
- PM Management - Park Valley NC, LLC, PM Management–New Braunfels NC, LLC, and PM Management – Portfolio IX NC, LLC (the "**Love Funding Debtors**");
- PM Management – Pflugerville NC, LLC;
- San Antonio SCC LLC;
- SCC Hospice Holdco, LLC;
- Senior Care Center Management II, LLC; and
- The Gamble Debtors

Of the Excluded Debtors, certain are also HUD Debtors. The HUD Lenders assert first priority liens on the assets these Debtors.[9]

### (4) Leasehold Obligations

The Company does not own any real estate, but instead operates the Facilities through a number of leases, subleases, and master leases (collectively, the "**Leases**") among numerous landlords (together, the "**Landlords**"). As of the Petition Date, the Company was party to approximately 113 Leases.

As of the Petition Date, the Company's three largest Landlords were Granite, Sabra, and TXMS Real Estate Investments, Inc. ("**TXMS**" or "**LTC**").

As of the Petition Date, the Company and Granite were parties to a number of Leases (the "**Granite Leases**") covering approximately thirty-four (34) Facilities (the "**Granite Facilities**"). Pursuant to the Granite Leases, Granite was owed approximately $46.6 million per year and held a security deposit in the amount of approximately $1.26 million. As of the Petition Date, Granite was owed approximately $4.49 million in unpaid rent.

As of the Petition Date, the Company and Sabra were parties to a number of Leases (the "**Sabra Leases**") covering approximately thirty-eight (38) Facilities (the "**Sabra Facilities**"). Pursuant to the Sabra Leases, Sabra was owed approximately $58.5 million per year for rent and held a security deposit of approximately $5.76 million and a capital reserve of approximately

---

[9] Love Funding Corporation has a first priority lien on the assets of the Love Debtors. KeyBank, N.A. has a first priority lien on the KeyBank Debtors.

$3.02 million. As of the Petition Date, Sabra was owed approximately $31.78 million in unpaid rent, common area maintenance charges, and taxes.

As of the Petition Date, the Company and TXMS were parties to a number of Leases (the "**TXMS Leases**") covering approximately eleven (11) Facilities (the "**TXMS Facilities**"). Pursuant to the TXMS Leases, TXMS is owed approximately $14 million per year for rent and holds a security deposit in the way of letters of credit of more than $2 million and CAPEX deposits of $2.4 million, and property tax/insurance deposit of $2.2 million. No amounts were due and outstanding to TXMS as of the Petition Date except for the "stub rent" related to December 2018.

As of the Petition Date, the Company was also a party to Leases with approximately fifteen additional Landlords (the "**Additional Landlords**") covering approximately twenty-six Facilities (the "**Additional Leases**").

(5)   **Intercreditor Agreements**

Given the complexity of the Company's operations and capital structure, a number of intercreditor agreements are in place governing the relationships among various parties including the Administrative Agent, Sabra, Landlords, and HUD Lenders. Generally, and as detailed further in the various pleadings in the Chapter 11 Cases and the respective intercreditor agreements and UCC statements, the Administrative Agent has a first priority lien on substantially all of the Debtors' Prepetition Collateral, except for assets owned by the Excluded Debtors.

As of the Petition Date, pursuant to that certain Second Amended and Restated Intercreditor Agreement dated April 28, 2017 (the "**Sabra Intercreditor Agreement**") Sabra had a second priority lien on substantially all of the Debtors' Prepetition Collateral.

Generally, Sabra and certain other Landlords have valid first priority liens in certain landlord collateral (the "**Landlord Liens**").

**D.   Other Debt**

As of the Petition Date, the Company owed an aggregate of approximately $36.7 million in unsecured trade debt.

**E.   Events Leading to the Chapter 11 Cases**

Like much of the healthcare sector, SNF operators have experienced significant challenges and financial distress in recent years. The Company faced similar challenges to those suffered by the skilled nursing industry. In 2017 and 2018, the Company faced additional financial pressure in the form of, among other things, declining reimbursement rates, accounts receivable collection difficulties, declining census and occupancy rates, increasing Lease obligations and "above-market" Leases with various Landlords, tightening trade creditor terms, declining performance with the current portfolio for a variety of industry wide developments, and a significantly reduced working capital facility. Specifically, the Administrative Agent instituted a series of reductions to the ABL Credit Facility's borrowing base, significantly

8

accelerated certain loan obligations, and required paydowns of amounts outstanding under the ABL Credit Facility. In 2017, the Company reported a loss of approximately $92.25 million despite generating approximately $910.42 million in revenue.

Even after the Pharmacy Sale, the Company continued to face liquidity constraints due to a number of factors and began to fall behind on lease payments. In early 2018, the Company hired Alvarez and Marsal Healthcare Industry Group, LLC ("**A&M**") in an attempt to undertake an out-of-court restructuring. A&M recommended refinancing the ABL Credit Facility, renegotiating underperforming leases, and negotiating with vendors on better pricing and terms. In June 2018, the Company engaged BDO USA, LLP ("**BDO**") to provide interim management and advisory services. The Company also formed a special Committee of the Board and engaged Kaufman Hall as financial advisor and S-4 Consulting as a consultant to evaluate strategic alternatives. Between July and November 2018, the Company explored numerous strategic alternatives including: negotiations with Landlords to restructure, reduce, or defer ongoing rent obligations; a sale or spin-off of some or all of the Company's assets; and a refinancing of the ABL Credit Facility to provide additional liquidity. In connection with this process, BDO and the Company held negotiations with lenders, landlords, potential investors, and potential acquirers in an effort to sell, recapitalize or restructure the Company and resolve the increasing financial challenges. Unfortunately, no global resolution to the Company's financial challenges outside of court was successful.

Throughout 2018, the Company was unable to stay current with its obligations under the Leases and certain Landlords declared defaults. These included prepetition notices of default from Sabra and Granite. Between May and October 2018, the Company attempted to negotiate with Sabra and Granite a "tripartite agreement," to, among other things, assist Sabra in the transition of the Sabra Facilities to a new owner, and reduce the rental obligations due under the Sabra Leases and the Granite Leases. These efforts were unsuccessful and Sabra and Granite both sent notices of termination, though the Company continues to dispute the validity and propriety of such terminations.

Despite the Pharmacy Sale and the Company's efforts to resolve its liquidity issues, the Company's finances continued to decline. This problem was further exacerbated by a series of borrowing base reductions. In April 2018, the Administrative Agent sent the Company notices of default under the ABL Credit Facility documents. Pursuant to those notices, the Borrowing Base was further reduced and significant paydowns were required. Additional notices of default were sent in October 2018, continuing to hamper the Company's restructuring efforts.

In mid-November 2018, Newbridge Management, LLC ("**Newbridge**") was retained to provide Kevin O'Halloran ("**Mr. O'Halloran**") as Chief Restructuring Officer ("**CRO**") to the Company. Earlier that month, on a public earnings call, one Landlord publicly announced that it had purportedly terminated its Leases with the Company. After that earnings call, the market began to react, leading to additional financial pressure from other Landlords and trade creditors. Certain vendors demanded modifications to payment terms, restricting or eliminating trade credit. Further, relationships with current and prospective employees and patients were affected by uncertainty.

The Company was unable to stabilize operations and sought relief under the Bankruptcy Code by filing these Chapter 11 Cases in an effort to preserve the value of its remaining assets for the benefit of all creditors.

## II.     The Chapter 11 Cases

### A.     Commencement of the Chapter 11 Cases and First Day Pleadings

The Debtors commenced these Chapter 11 Cases on December 4, 2018 (the "**Petition Date**")[10] by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are debtors in possession pursuant to Bankruptcy Code section 1107(a) and 1108. The Debtors remain in possession of their assets and continue to operate their business without interruption.

When the Debtors filed these Chapter 11 Cases, several goals were critical: (1) to ensure that patients in Facilities continued to receive high-quality care; (2) to use the automatic stay provided by the Bankruptcy Code to obtain a "breathing spell" to permit an orderly restructuring; (3) to transition underperforming Facilities to new operators or restructure the applicable Leases; and (4) to maximize the value of the Debtors' assets through a sale or reorganization.

To that end, contemporaneously with the filing of the petitions, the Debtors filed a number of "first day pleadings" and the Bankruptcy Court entered orders: (1) permitting the joint administration of the Chapter 11 Cases; (2) authorizing the Debtors' to file a consolidated mailing matrix and consolidated list of unsecured creditors; (3) deeming the Chapter 11 Cases as "complex cases" under the Local Rules; (4) approving the Debtors' continued use of their cash management system and business forms; (5) authorizing, but not directing, the Debtors to make certain payroll payments to employees and continue certain employee benefit plans and other practices; (6) approving the maintenance of insurance policies and the payment obligations thereunder; (7) extending their time for filing the Schedules and Statements of Financial Affairs; (8) determining that the Debtors' utility providers have been provided with adequate assurance of payment within the meaning of Bankruptcy Code section 366 and prohibiting such utility providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of a final order; (9) authorizing certain steps to protect confidential patient information in connection with filings in the Chapter 11 Cases; (10) authorizing, but not directing, the Debtors' to pay outstanding prepetition taxes; and (11) permitting the Debtors to maintain their patient refund programs. These first day orders allowed the Debtors to stabilize operations and effectuate procedural efficiencies in the administration of the Chapter 11 Cases.

### B.     Use of Cash Collateral

One critical goal of the Debtors was to ensure sufficient liquidity to operate their businesses during the pendency of the Chapter 11 Cases and ensure there was no impact to, among other things, patient care. On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II), Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V)*

---

[10] Certain additional Debtors filed petitions on the January Petition Date and subsequent dates.

*Granting Related Relief* [Docket No. 24] (the "**Cash Collateral Motion**"). The Court entered a number of interim orders before entering a final order on July 2, 2019. *See* Docket Nos. 74, 75, 431, 673, 962, 1228, 1278, 1370, and 1475 (collectively, the "**Cash Collateral Orders**"). The Cash Collateral Orders provided certain parties with adequate protection including: the Administrative Agent and the Lenders, Sabra, and certain HUD Lenders. Without the consensual use of cash collateral, the Debtors would not have been able to continue business operations in an orderly manner, support working capital needs, and adequately maintain patient care.

The Court also entered an agreed cash collateral order with respect to the Love Funding Debtors and the KeyBank Debtors. *See* Docket Nos. 561, 572, and 1452.

### C.    Retention of Professionals

During the Chapter 11 Cases, the Bankruptcy Court has approved the Debtors' retention and employment of the following Professionals to assist in the administration of the Debtors' Chapter 11 Cases: (1) Polsinelli PC, as counsel to the Debtors; (2) Rochelle McCullough, LLP, as co-counsel to the Debtors; (3) Gray Robinson, P.A., as special counsel to the independent Board; (4) Omni Management Group, as the Voting and Claims Agent; (5) H2C Analytics LLC ("**H2C**"), as investment banker; (6) Newbridge, to provide a CRO; (7) BDO, to provide various officers and financial advisory support; (8) Sitrick and Company, as consultant for corporate communications and public relations; and (9) Stephen Duck, CPA, as accountant to the Debtors.

### D.    Patient Care Ombudsman

On December 31, 2018, the Bankruptcy Court entered an order directing the appointment of a patient care ombudsman (the "**Patient Care Ombudsman**") pursuant to Bankruptcy Code section 333 (the "**PCO Appointment Order**") [Docket No. 233]. The U.S. Trustee appointed Martin I. Kalish, M.D. to serve as Patient Care Ombudsman [Docket No. 261]. The Bankruptcy Court approved the Patient Care Ombudsman's applications to retain Nelson Mullins Riley and Scarborough LLP and Waller Lansden Dortch & Davis, LLP as attorneys by orders dated February 21, 2019 [Docket No. 551] and February 25, 2019 [Docket No. 567]. On May 29, 2019, the Court entered the *Order to Show Cause Regarding the Discharge of the Patient Care Ombudsman* [Docket No. 1206]. Following negotiations between the Debtors, the Committee, the Patient Care Ombudsman, and the Administrative Agent, a resolution was reached regarding the continued role and work plan of the Patient Care Ombudsman. *See Order Resolving Order to Show Cause Regarding the Discharge of Patient Care Ombudsman* [Docket No. 1563].

### E.    Appointment of the Committee

On December 14, 2018, the U.S. Trustee selected the members of the official committee of unsecured creditors (the "**Committee**") pursuant to Bankruptcy Code section 1102. On March 11, 2019, the U.S. Trustee filed an amended notice of appointment [Docket No. 659]. Presently, the Committee is composed of: (1) Shiftkey, LLC; (2) TXMS;[11] (3) Trident USA Health; (4) Performance Food Group, Inc.; (5) Acadian Ambulance Service; (6) Direct Supply, Inc.; (7)

---

[11] TXMS resigned from the Committee in June 2019.

Healthcare Services Group, Inc.; (8) Joerns Healthcare LLC; (9) Medline Industries Inc.; and (10) Omnicare, Inc.

The Committee has retained: (1) Greenberg Traurig, LLP, as counsel; (2) FTI Consulting, Inc., as financial advisor; and (3) Blake E. Rizzo, as conflicts counsel.

### F.     Lease Rejections and OTAs

The Debtors have filed a number of motion to reject various executory contracts and unexpired leases pursuant to Bankruptcy Code section 365. As set forth in <u>Exhibit B</u>, the Debtors have rejected unexpired leases for approximately eighty-five (85) Facilities (collectively, the "**Rejected Facilities**"). Given the nature of the Debtors' business (including the risk to the residents and necessary regulatory approvals), after rejection, the Debtors are unable to simply turn over the properties to the Landlord. Instead, the Debtors are expected to continue to operate the Rejected Facilities for the benefit of the patients and the applicable Landlord. The continued operation of the Rejected Facilities preserves the value of the underlying operations, and therefore, the value of the real estate, and more importantly, protects the patients from the risk of "transfer trauma" involved with moving the patients to alternate Facilities.

After the Landlords have identified new operators ("**New Operators**") for the Rejected Facilities and have reached agreements with the New Operators to operate the Rejected Facilities, the Debtors must: (a) agree to the terms of a settlement agreement ("**Settlement Agreement**") with the Landlord regarding the various claims associated with the applicable Lease and the Rejected Facility; and (b) agree to the terms of an operations transfer agreement ("**OTA**") with the New Operator.

The Settlement Agreements typically resolve various claims between the Landlords and the Debtors, including claims associated with prepetition rent, "stub rent", postpetition rent, fair use and occupancy, rejection damages, and certain post-transition agreements. The OTAs typically include provisions regarding the transfer of operations to the New Operator pending final regulatory approvals, exchange of information and the mechanics of transition, post-closing indemnification, and reconciliation regarding treatment of pre- and post-closing accounts receivable. It is typical in situations involving liquidating debtors who are transitioning operations for the benefit of the underlying landlords without any compensation (as is the case with the Rejected Facilities) for the landlords to provide the new operators with certain financial support. Each OTA and Settlement Agreement is unique given the facts and circumstances of the particular transfer.

As of October 15, 2019, the Debtors have transitioned operations of forty-seven (47) Facilities, including (a) thirty-eight (38) Sabra Facilities (the "**Sabra Facilities**"); and (b) nine (9) independent Facilities (the "**Independent Facilities**"). In addition, there are thirty-three (33) Rejected Facilities (the "**Remaining Rejected Facilities**") that have been rejected (in some cases, as of the Petition Date) but the Landlords have not yet identified New Operators and the Debtors continue to operate such Rejected Facilities for the benefit of the applicable Landlords. Of the thirty-three (33) Remaining Rejected Facilities, thirty-one (31) are Granite Facilities (the "**Granite Rejected Facilities**") and two (2) are independent Facilities (the "**Independent**

**Rejected Facilities**"). The Debtors anticipate that by the Effective Date, no Independent Rejected Facilities will remain.

### (1) Sabra Facilities

Prepetition, Sabra asserted that the leases for the Sabra Facilities had been terminated. On December 27, 2018, the Debtors filed the *Second Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Unexpired Leases* Nunc Pro Tunc *to the Petition Date, and (II) Granting Certain Related Relief* [Docket No. 209] (the "**Second Rejection Motion**"). Among other things, the Second Rejection Motion sought rejection of thirty (30) of the thirty-eight (38) Sabra Facilities. On January 31, 2019, the Court entered an order approving the Second Rejection Motion [Docket No. 465].

On February 26, 2019, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving Settlement Agreement, and (II) Granting Related Relief* [Docket No. 574] (the "**Sabra Settlement Motion**") and the [Docket No. 580] (the "**Sabra OTA Motion**"). Together, the Sabra Settlement Motion and Sabra OTA Motion sought the approval of the terms of a settlement agreement (the "**Sabra Settlement Agreement**") and OTAs (the "**Sabra OTAs**") which transferred twenty-eight (28) Sabra Facilities to New Operators on April 1, 2019 (the "**Sabra Initial Transfer Portfolio**"). The Sabra Initial Transfer Portfolio was comprised of twenty (20) Facilities in Texas and eight (8) Facilities in Louisiana.

The Sabra Settlement Agreement contemplated the payment of a $9.5 million from the Debtors to Sabra. In exchange, the Debtors received a waiver of prepetition claims of $30 million in unpaid rent and $4.33 million due under the Gamble Loan. The Debtors and Sabra also agreed to postpetition use and occupancy and stub rent payment schedule. In total, the Debtors believe that Sabra was owed at least $43.7 million, which was settled for approximately $9.5 million. Finally, the Sabra Settlement Agreement provided that the remaining ten (10) Facilities (the "**Sabra Supplemental Transfer Portfolio**") would be transferred as soon as possible and no use and occupancy payment would be due. The Court approved the Sabra Settlement Motion on March 29, 2019 [Docket No. 783] (the "**Sabra Settlement Order**").

The Sabra OTAs provided that the New Operators would assume liability for their respective Facilities as of February 15, 2019 (*i.e.*, the execution date of the Sabra OTAs) on a go-forward basis. This assumed liability included Medicaid and Medicare liability. The Court approved the Sabra OTA Motion on March 29, 2019 [Docket No. 778] (the "**Sabra OTA Order**").

On May 20, 2019, a notice was filed supplementing the Sabra OTA Order [Docket No. 1157] (the "**Sabra Supplemental Notice**"). The Sabra Supplemental Notice provided notice that eight (8) of the remaining ten (10) Facilities comprising the Sabra Supplemental Transfer Portfolio had been transferred to New Operators effective May 20, 2019. The remaining two (2) Facilities were surrendered to Sabra.

### (2) Independent Facilities

In connection with the Second Rejection Motion, several Landlords raised objections regarding the immediate payment of stub rent, payment of rent for January 2019, and post-

70265001.10

rejection fair use and occupancy payments. The Court ruled that the Debtors were not obligated to pay stub rent immediately, but were required to pay contractual rent until such Unexpired Leases were rejected. The Debtors were also obligated to pay fair use and occupancy for the post-rejection period.

Thus far, the Debtors have transitioned nine (9) non-Sabra Facilities as set forth on Exhibit A. While the transition of each Facility was unique, generally, the OTA and Settlement Agreement for each Facility provided that: the Landlords would retain all deposits, escrows, and impounds; the Landlord and the Debtors granted mutual releases; the Landlord waived claims for December stub rent and fair use and occupancy for February, March, and April; the New Operators were required to assume certain liabilities, including Medicare successor liability; the New Operator retained ninety percent (90%) of the Facility's employees; and pre-closing accounts receivable would remain with the Debtors. The OTAs and Settlement Agreements did not provide for the indemnification of New Operators by the Debtors.

### (3)     Remaining Rejected Facilities

There are approximately thirty-three (33) Remaining Rejected Facilities. The following chart summarizes the Remaining Rejecting Facilities:

| Rejected Facilities | Number | Effective Date of Rejection |
|---|---|---|
| OLP Facility | 1 | February 28, 2019 |
| Granite Rejected Facilities[12] | 31 | December 4, 2018 |
| Willacy Facility | 1 | December 4, 2018 |

## G.     Other Postpetition Matters

### (1)     Litigation

During the Chapter 11 Cases, six adversary complaints (the "**Adversary Complaints**") were filed. Of these, two were filed by certain dental providers regarding prepetition Medicaid reimbursements (the "**Dentist Adversaries**"). On July 22, 2019, the Debtors filed a motion seeking to resolve the Dentists Adversaries pursuant to a settlement agreement. *See Motion of Debtors for Entry of an Order (I) Approving Settlement Agreements By and Between the Debtors and Certain Dental Providers, and (II) Granting Related Relief* [Docket No. 1599].

One Adversary Complaint was filed by Sabra, who sought a determination that the Sabra Leases were terminated prepetition. As part of the Settlement Agreement and OTA with Sabra, this matter was dismissed.

One Adversary Complaint was filed by the Committee relating to certain of the collateral pledged to the ABL Lenders. The Committee has also filed a motion for standing to pursue these claims, which has been continued and is pending.

---

[12] The Debtors anticipate three (3) Granite Rejected Facilities will remain on the Effective Date.

14

One Adversary Complaint was filed by the Debtors in connection with the assumption of the Plan Facilities. This Adversary Complaint was mooted by the Courts' order permitting the Debtors to assume the Unexpired Leases for the Plan Facilities. *See* Docket No. 1906.

The final Adversary Complaint was filed by OLP Wyoming Springs, LLC ("**OLP**"), a Landlord for one Facility (the "**OLP Facility**"). The Debtors and OLP have reached settlement.

The Debtors have also been involved in proceedings with a number of prepetition litigation parties who sought relief from the automatic stay imposed by Bankruptcy Code section 362 to continue litigation outside of the Bankruptcy Court.

### (2) Other Rejections

In addition to the Rejected Facilities, the Debtors have also rejected other unexpired leases and executory contracts for, among other things: certain employees, equipment leases, and non-Facility leases.

### (3) D&O Claims

As of the Petition Date, the Debtors had in place insurance policies with approximately $15 million in total limits that cover certain actions against the Debtors' directors and officers (the "**D&O Policies**"). On April 30, 2019, the Committee sent the Debtors a letter demanding $20 million in damages on account of alleged acts, omissions, breaches of fiduciary duties, self-dealing, and other wrongful conduct by the Debtors officers and directors (the "**D&O Claims**"). The Committee further demanded that the Debtors give notice to the issuers of the D&O Policies and take all actions necessary to preserve the D&O Claims and D&O Policies.

Pursuant to the Plan, the D&O Claims, and certain other Causes of Action will be preserved and transferred to the Unsecured Creditors Trust, to be liquidated for the beneficiaries of the Unsecured Creditors Trust.

### (4) Vendor Holds

Texas Medicaid funds represent approximately thirty percent (30%) of the Debtors' revenue and account for $25 million on a monthly basis. Based upon the facts underlying the Dentist Adversaries, on April 4, 2019, the Texas Health and Human Services Commission ("**HHSC**") instituted certain vendor holds (collectively, the "**Vendor Holds**") on Medicaid funds due and owing to the Debtors. On May 30, 2019, the Debtors filed the *Debtors Emergency Motion for an Order to Show Cause* [Docket No. 1213] (the "**Contempt Motion**").

Although this hold was purportedly intended to only apply to Dental Holds of $2.6 million, a full vendor hold was placed on all Texas Medicaid funds due and owing to the Debtors on account of the majority of their operations in Texas. As a result of the Vendor Holds placed on the Debtors' managed care organizations ("**MCOs**") could not process claims submitted by the Debtors.

After the Contempt Motion, the Debtors continued to work with HHSC and the MCOs to reconcile all amounts which were held back due to the vendor hold. This process, however,

caused cash flow issues for the Debtors from April to June 2019. As of the date hereof, the Contempt Motion is still pending.

### H.    Schedules and Bar Dates

Each of the Debtors filed its respective schedules of assets and liabilities, schedules of executory contracts, and statements of financial affairs (collectively, the "**Schedules**") pursuant to Bankruptcy Code section 521 on January 10, 2019 and amended the Schedules on February 14, 2019. A copy of the Schedules may be obtained by (1) calling the Voting and Claims Agent at (844) 378-1143; (2) writing to Senior Care Centers, LLC et al., c/o Omni Management Group, 5955, DeSoto Avenue, Suite 100, Woodland Hills, CA 91367; (3) emailing the Voting and Claims Agent at: seniorcarecenters@omnimgt.com; and/or (4) visiting the Case Website at http://www.omnimgt.com/seniorcarecenters (documents may be downloaded for free). Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.txnb.uscourts.gov.

On March 27, 2019, the Bankruptcy Court entered an order approving, among other things: (1) May 15, 2019 at 4:00 p.m. (prevailing Central Time) as the deadline for all non-Governmental Units to File Claims in the Chapter 11 Cases; (2) July 20, 2019 at 4:00 p.m. (prevailing Central Time) as the deadline for all Governmental Units to File Claims in the Chapter 11 Cases; (3) procedures for filing proofs of Claim; and (4) the form and manner of notice of the applicable bar dates [Docket No. 766] (the "**Bar Date Order**").

Because the resolution process for Claims is ongoing, the Claims figures identified in the Disclosure Statement represent estimates only and, in particular, the estimated recoveries for Holders of General Unsecured Claims could be materially lower if the actual amounts of Allowed General Unsecured Claims are higher than current estimates.

### I.    Plan Exclusivity

Under the Bankruptcy Code, the Debtors had the exclusive right to file a chapter 11 plan through and including April 3, 2019 and the exclusive right to solicit acceptance through and including June 3, 2019. On March 28, 2019, the Bankruptcy Court entered an order [Docket No. 765] extending the time during which the Debtors have the exclusive right to File a chapter 11 plan to July 2, 2019 and a second order extending the time during which the Debtors have the exclusive right to File a chapter 11 plan to September 2, 2019 (the "**Exclusivity Deadline**").

### J.    Sale and Reorganization Process

Prepetition, the Debtors conducted a limited process to evaluate potential strategic alternatives with the various consultants described in Sections I.B and I.E, but did not receive any material offers. Postpetition, the Debtors retained H2C to further evaluate potential strategic alternatives, including exploring a potential 363 process and a plan sponsorship alternative. From January through March 2019, H2C ran a marketing process intended to identify potential 363 purchasers. This process did not yield any actionable offers.

H2C also ran a process to obtain offers from lenders interested in providing exit financing under this Plan. The full details of such exit financing will be included in the Plan Supplement

16

and a description of the expected Exit Financing is set forth in Article III.E(2)(c) of this Disclosure Statement.

### K.    Reorganized Debtors

#### (1)    Reorganized Debtors' Operations

The Debtors intend to assume the Leases for approximately twenty-two Facilities in Texas (the "**Plan Facilities**") made up of both SNFs and ALFs. In addition to operating the Plan Facilities, the Reorganized Debtors will also offer rehabilitation services.

One of the primary causes of the filing of these Chapter 11 Cases was due to above-market leases. As detailed above, the Debtors are in the process of transitioning the majority of their Facilities in order focus exclusively on better performing Facilities. The Debtors and the Committee believe that without a portfolio comprising many above-market leases, the Reorganized Debtors will be able to operate in a more effective manner.

The Reorganized Debtors intend to improve operations in a number of ways. First, the Reorganized Debtors will consist of twenty-two Facilities instead of over one hundred. This will allow for New Management to oversee operations and streamline processes. Certain Facilities were never properly integrated as they were acquired, but the smaller footprint will allow for more consistent operations across the Plan Facilities.

Second, because the portfolio will be smaller, the Reorganized Debtors will be able to implement cost reductions. For example, the Reorganized Debtors intend to reduce corporate overhead by outsourcing certain functions, thus allowing the Reorganized Debtors to focus on delivering high quality of care in a cost efficient manner.

Third, the Debtors have already begun to implement a number of measures to increase accounts receivable collections. As the Company continued to acquire locations and grew to over one hundred Facilities, problems arose as to different medical and billing record systems, which made consolidation more difficult. The Debtors have addressed such problems through a number of initiatives, both internal (*e.g.*, certain review processes across multiple departments including billing, clinical, and reimbursement) and external (*e.g.*, interfacing with MCOs on certain requirements).

#### (2)    Reorganized Debtors' Leadership

The Reorganized Debtors will operate the Plan Facilities under the direction of Michael Beal as Chief Executive Officer. Mr. Beal has over twenty-seven years of experience in the healthcare industry, including as the Debtors Chief Operating Officer. Before joining the Debtors, Mr. Beal served as the President of Nursing Center Divisions for Kindred Healthcare.

New Management will also include: Teri Bonar as Chief Clinical Officer; Michael Templeton as the Senior Vice President of Operations; Anthony Arnaudy as Chief Financial Officer; Michael White as the Vice President of Accounting; and Tonia Bellard as Vice President of Revenue Cycle.

70265001.10

The Reorganized Debtors are also looking to fill positions in New Management for the Chief Sales Marketing Officer and Chief Legal Officer.

Additional individuals or modifications may be included in the Plan Supplement.

## III.    Summary of the Plan

The following summaries certain key information contained in the Plan. This summary refers to, and is qualified in its entirety by, reference to the Plan, a copy of which is attached hereto as Exhibit B. The terms of the Plan will govern in the event any inconsistency arises between this summary and the Plan. The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure Statement. In other words, the terms of the Plan do not yet bind any person or entity. If the Bankruptcy Court does confirm the Plan, it will bind all Holders of Claims or Interests.

The Debtors and the Committee believe that the Plan is in the best interests of the Debtors' creditors, patients, residents, employees, and other parties in interest. In short, the Plan contemplates the following:

- Administrative Claims, Professional Fee Claims, and Priority Tax Claims will be paid in full.

- Holders of ABL Credit Facility Claims will be paid in full.

- Holders of Other Secured Claims, HUD Lender Claims, and Priority Unsecured Claims will be Unimpaired under the Plan.

- Holders of Convenience Class Claims will receive their pro rata share of the Convenience Class Distribution of $1 million.

- An Unsecured Creditor Trust will be established to investigate and pursue the Unsecured Trust Causes of Action. The Unsecured Creditor Trust will also receive 80% of the New Common Stock and, subject to approval by the Exit Facility Lender, the Unsecured Creditor Trust Note in the principal amount of up to $10 million. The Unsecured Creditor Trust will be funded by the Trust Funding of at least $500,000.

- Holders of General Unsecured Claims will receive their pro rata share of the distributions from the Unsecured Creditor Trust.

## A.    Treatment of Unclassified Claims

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes and Interests set forth in B of the Plan.

### (1) Treatment of Administrative Claims

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a less favorable treatment with the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Administrative Claim, an amount of Cash equal to the full unpaid amount of such Allowed Administrative Claim either (1) if the Administrative Expense Claim is Allowed, on the Effective Date or as soon as practicable thereafter, or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by the Debtors and the Holders of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth by an order of the Bankruptcy Court.

No later than five (5) days after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall post on the Case Website the Scheduled Administrative Claims that are based on unpaid liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date. Except for Administrative Claims which are Professional Fee Claims, Priority Tax Claims, or Scheduled Administrative Claims, requests for payment of Administrative Claims must be Filed and served on the Debtors or Reorganized Debtors, as applicable, pursuant to the procedures specified in the Confirmation Order and notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Debtors or Reorganized Debtors, as applicable, and the requesting party no later than sixty (60) days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed.

### (2) Treatment of Professional Fee Claims

All requests for payment of Professional Fee Claims must be Filed no later than thirty (30) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Interim Compensation Order and the Bankruptcy Code. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows following entry of an order by the Bankruptcy Court Allowing such Professional Fee Claims, including from the funds in the Professional Fee Escrow Account.

70265001.10

On the Effective Date, the Reorganized Debtors shall establish the Professional Fee Escrow Account in trust for the Professionals and fund it with Cash equal to the Professional Fee Escrow Amount. Professionals shall estimate in good faith their unpaid Professional Fee Claims through the Effective Date and shall deliver such good faith estimates to the Debtors and the Committee no later than five (5) Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid will be turned over to the Reorganized Debtors.

From and after the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors and the Unsecured Creditor Trustee may employ and pay any professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### (3) Priority Tax Claims

Except to the extent that the Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment with the Debtors or the Reorganized Debtors and the Committee and the Unsecured Creditor Trustee, as applicable, each Holder of an Allowed Priority Tax Claim will receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Priority Tax Claim an amount of Cash equal to the full unpaid amount of such Allowed Tax Claim on (1) the Effective Date, (2) the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable, or (3) over a period ending not later than five (5) years after the applicable petition date.

### (4) U.S. Trustee Fees

All U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtors on or before the Effective Date in accordance with 11 U.S.C. § 1129(a)(12). On and after the Effective Date, until the earliest of a particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code, the Reorganized Debtors shall pay any and all U.S. Trustee Fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.

### B. Classification and Treatment of Claims and Interests

Pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to the Plan, as set forth herein. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest

qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan is premised upon the substantive consolidation of the Debtors solely for the purposes of voting, determining which Classes have accepted the Plan, confirming the Plan, and the resultant treatment of Claims and Interests and Distributions under the Plan.

The Plan contemplates the following Classes:

| Class | Claim or Interest | Status | Voting Rights | Estimated Recovery |
|-------|-------------------|--------|---------------|--------------------|
| 1 | ABL Credit Facility Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 3 | HUD Lender Claims | Unimpaired | Deemed to Accept | 100% |
| 4 | Priority Unsecured Claims | Unimpaired | Deemed to Accept | 100% |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote | 0-40%[13] |
| 6 | Convenience Class Claims | Impaired | Entitled to Vote | 5-40% |
| 7 | Subordinated Debt Claims | Impaired | Deemed to Reject | 0% |
| 8 | Intercompany Claims | Impaired/ Unimpaired | Deemed to Reject/Accept | 0% |
| 9 | Interests in Subsidiary Debtors | Impaired/ Unimpaired | Deemed to Reject/Accept | NA |
| 10 | Interests in SCC | Impaired | Deemed to Reject | 0% |

### (1)    Classification and Treatment of Claims and Interests

Except to the extent that the Debtors or the Reorganized Debtors, as applicable, the Committee or Unsecured Creditor Trustee, as applicable, and a holder of an Allowed Claim or Allowed Interest, as applicable, agree in writing to less favorable treatment for such Allowed Claim or Allowed Interest, as applicable, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon thereafter as reasonably practicable.

### (a)    Class 1 – ABL Credit Facility Claims

*Classification*. Class 1 consists of all ABL Credit Facility Claims.

*Treatment*. Except to the extent that a Holder of an Allowed ABL Credit Facility Claim, the Debtors or the Reorganized Debtors, as applicable, and the Committee or the Unsecured Creditor Trustee, as applicable, agree in writing to less favorable treatment of its Allowed ABL Credit Facility Claim, each Holder of an Allowed ABL Credit Facility Claim shall receive, in

---

[13] *See* Valuation Analysis attached hereto as <u>Exhibit G</u>.

full and complete satisfaction, settlement, discharge, and release of, and in exchange for, its Allowed ABL Credit Facility Claim:

    (a)    payment in full in Cash of the unpaid portion of its Allowed ABL Credit Facility Claim on the Effective Date; or

    (b)    payment at such time and upon other terms as the Debtors or Reorganized Debtors, as applicable, the Committee or Unsecured Creditor Trustee, as applicable, and the Holder of such Allowed ABL Credit Facility Claim may agree.

*Voting*. Class 1 is Unimpaired. Holders of Allowed ABL Credit Facility Claims in Class 1 are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f). Holders of Allowed ABL Credit Facility Claims are not entitled to vote to accept or reject the Plan.

    **(b)**    **Class 2 – Other Secured Claims**

*Classification*. Class 2 consists of all Other Secured Claims.

*Treatment*. Except to the extent that a Holder of an Allowed Other Secured Claim, the Debtors or the Reorganized Debtors, as applicable, and the Committee or Unsecured Creditor Trustee, as applicable, agree in writing to less favorable treatment of its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in full and complete satisfaction, settlement, discharge, and release of, and in exchange for, its Allowed Other Secured Claim:

    (a)    payment in full, in Cash, of the unpaid portion of its Allowed Other Secured Claim on the following: (i) if such Allowed Other Secured Claim is Allowed as of the Effective Date, the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, the date such Allowed Other Secured Claim becomes due and payable, or as soon thereafter as is reasonably practicable); and (ii) if such Allowed Other Secured Claim is not Allowed as of the Effective Date, the date such Other Secured Claim is Allowed or as soon as reasonably thereafter practicable;

    (b)    a distribution of such Collateral securing the Other Secured Claim;

    (c)    a distribution of the proceeds of the sale or disposition of such Collateral securing the Other Secured Claim;

    (d)    Reinstatement of the Other Secured Claim; or

    (e)    such other treatment as the Debtors or Reorganized Debtors, as applicable, the Committee or Unsecured Creditor Trustee, as applicable, and the Holder of such Allowed Other Secured Claim may agree.

*Voting*. Class 2 is Unimpaired. Holders of Allowed Other Secured Claims in Class 2 are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f). Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

### (c) Class 3 – HUD Lender Claims

*Classification*. Class 3 consists of all HUD Lender Claims.

*Treatment*. Except to the extent that a Holder of an Allowed HUD Lender Claim, the Debtors or the Reorganized Debtors, as applicable, and the Committee or Unsecured Creditor Trustee, as applicable, agree in writing to less favorable treatment of its Allowed HUD Lender Claim, each Holder of an Allowed Other Secured Claim shall receive, in full and complete satisfaction, settlement, discharge, and release of, and in exchange for, its Allowed HUD Lender Claim:

(a)     payment in full, in Cash, of the unpaid portion of its Allowed HUD Lender Claim on the following: (i) if such Allowed HUD Lender Claim is Allowed as of the Effective Date, the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, the date such Allowed HUD Lender Claim becomes due and payable, or as soon thereafter as is reasonably practicable); and (ii) if such Allowed HUD Lender Claim is not Allowed as of the Effective Date, the date such HUD Lender Claim is Allowed or as soon as reasonably thereafter practicable;

(b)     a distribution of such Collateral securing the HUD Lender Claim;

(c)     a distribution of the proceeds of the sale or disposition of such Collateral securing the HUD Lender Claim;

(d)     Reinstatement of the HUD Lender Claim;

(e)     such other treatment as the Debtors or Reorganized Debtors, as applicable, the Committee or Unsecured Creditor Trustee, as applicable, and the Holder of such Allowed HUD Lender Claim may agree; or

(f)     Love Funding's first priority lien on the assets of the Love Funding Debtors, including the Cash and Accounts Receivable of the Love Funding Debtors, shall remain in place. If, ninety (90) days after the closing of the transactions transitioning the operations of the Love Funding Debtors, the loans from Love Funding Corporation secured by the assets of the Love Funding Debtors have been assumed by another borrower or borrowers, and those loans are not in default, then, at that time or such later time that any defaults have been cured by another borrower or borrowers, Love Funding's lien on the assets of the Love Funding Debtors shall be released.

*Voting*. Class 3 is Unimpaired. Holders of Allowed HUD Lender Claims in Class 3 are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f). Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

### (d) Class 4 – Priority Unsecured Claims

*Classification*. Class 4 consists of all Priority Unsecured Claims.

*Treatment*. Except to the extent that a Holder of an Allowed Priority Unsecured Claim, the Debtors or the Reorganized Debtors, as applicable, and the Committee or Unsecured Creditor Trustee, as applicable, agree in writing to less favorable treatment of its Allowed Priority Unsecured Claim, each Holder of an Allowed Priority Unsecured Claim shall receive, in full and complete satisfaction, settlement, discharge, and release of, and in exchange for, its Allowed Priority Unsecured Claim:

(a) payment in full, in Cash, on the later of (1) the Effective Date; or (2) the date such Priority Unsecured Claim is Allowed;

(b) payment in the ordinary course of business between the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Unsecured Claim; or

(c) payment at such time and upon other terms as the Debtors or Reorganized Debtors, as applicable, the Committee or Unsecured Creditor Trustee, as applicable, and the Holder of such Allowed Priority Unsecured Claim may agree.

*Voting*. Class 4 is Unimpaired. Holders of Allowed Priority Unsecured Claims in Class 4 are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f). Holders of Priority Unsecured Claims are not entitled to vote to accept or reject the Plan.

### (e) Class 5 – General Unsecured Claims

*Classification*. Class 5 consists of all General Unsecured Claims.

*Treatment*. Except to the extent that a Holder of an Allowed General Unsecured Claim, the Debtors and the Committee or the Unsecured Creditor Trustee, as applicable, agree in writing to less favorable treatment of its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and complete satisfaction, settlement, discharge, and release of, and in exchange for, its Allowed General Unsecured Claim its Pro Rata share of the Unsecured Creditor Recovery.

*Voting*. Class 5 is Impaired. Holders of Allowed General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

### (f) Class 6 – Convenience Class Claims

*Classification*. Class 6 consists of all Convenience Class Claims.

70265001.10

*Treatment*. Except to the extent that a Holder of an Allowed Convenience Class Claim, the Debtors or the Reorganized Debtors, as applicable, and the Committee or Unsecured Creditor Trustee, as applicable, agree in writing to less favorable treatment of its Allowed Convenience Class Claim, each Holder of an Allowed Convenience Class Claim shall receive, in full and complete satisfaction, settlement, discharge, and release of, and in exchange for, its Allowed Convenience Class Claim, its Pro Rata share of the Convenience Claim Distribution.

*Voting*. Class 6 is Impaired. Holders of Allowed Convenience Class Claims in Class 6 are entitled to vote to accept or reject the Plan.

### (g) Class 7 – Subordinated Debt Claims

*Classification*. Class 7 consists of all Subordinated Debt Claims.

*Treatment*. Holders of Subordinated Debt Claims shall not receive any distribution on account of such Subordinated Debt Claims, and such Subordinated Debt Claims shall be discharged, cancelled, releases, and extinguished as of the Effective Date, and shall be of no further force or effect.

*Voting*. Class 7 is Impaired. Holders of Allowed Subordinated Debt Claims in Class 7 are deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g) and are not entitled to vote to accept or reject the Plan.

### (h) Class 8 – Intercompany Claims

*Classification*. Class 8 consists of all Intercompany Claims.

*Treatment*. Each Allowed Intercompany Claim shall be discharged, cancelled, released, and extinguished as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Committee or Unsecured Creditor Trustee, shall be Reinstated or compromised; *provided*, that the treatment of the Allowed Intercompany Claims shall be effectuated in a tax efficient manner. Holders of Intercompany Claims will not receive any distribution on account of such Intercompany Claims.

*Voting*. Class 8 is either (i) Unimpaired, in which case the holders of Allowed Intercompany Claims in Class 8 are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f), or (ii) Impaired, in which case holders of Allowed Intercompany Claims in Class 8 are deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g) and are not entitled to vote to accept or reject the Plan.

### (i) Class 9 – Intercompany Interests

*Classification*. Class 9 consists of all Intercompany Interests.

*Treatment*. Each Allowed Intercompany Interest shall be Reinstated or, with respect to any Debtor that is dissolved pursuant to Article VI.B(8), shall be cancelled to the extent necessary and appropriate to effectuate such dissolution. Holders of Intercompany Interests shall not receive any distribution on account of such Intercompany Interests.

*Voting*. Class 9 is either (i) Unimpaired, in which case the holders of Allowed Intercompany Interest in Class 8 are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f), or (ii) Impaired, in which case holders of Allowed Intercompany Claims in Class 8 are deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g) and are not entitled to vote to accept or reject the Plan.

### (j) Class 10 – Interests in SCC

*Classification*. Class 10 consists of all Interests in SCC.

*Treatment*. Holders of Interests in SCC shall not receive any distribution on account of such Interests, and such Interests in SCC shall be discharged, cancelled, releases, and extinguished as of the Effective Date, and shall be of no further force or effect.

*Voting*. Class 10 is Impaired. Holders of Allowed Interests in SCC, in Class 10, are deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g) and are not entitled to vote to accept or reject the Plan.

### (2) Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such unimpaired Claims.

### (3) Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for the purposes of determining acceptance or rejection of the plan by such Class pursuant to Bankruptcy Code section 1129(a)(8).

### (4) Intercompany Interests and Claims

To the extent Reinstated under the Plan, holders of Allowed Intercompany Interests or Allowed Intercompany Claims are not receiving distributions on account of their Allowed Intercompany Interests or Allowed Intercompany Claims, but rather for the purposes of administrative convenience, for the ultimate benefit of the holders of the New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of the Allowed Claims. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Allowed Interest Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Allowed Intercompany Interests prior to the Effective Date.

70265001.10

C.      **Acceptance or Rejection of the Plan**

(1)      **Deemed Acceptance of the Plan**

ABL Credit Facility Claims (Class 1), Other Secured Claims (Class 2), HUD Lender Claims (Class 3), Priority Unsecured Claims (Class 4), and certain Intercompany Claims (Class 8) and certain Intercompany Interests (Class 9) are Unimpaired by the Plan. Pursuant to Bankruptcy Code section 1126(f), the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan and the votes of such Holders will not be solicited.

(2)      **Deemed Rejection of the Plan**

Subordinated Debt Claims (Class 7), certain Intercompany Claims (Class 8), certain Intercompany Interests (Class 9), and Interests in SCC (Class 10) are Impaired by the Plan and shall receive no distribution under the Plan on account of such Interests. Pursuant to Bankruptcy Code section 1126(g), Holders of Subordinated Debt Claims, certain Intercompany Claims, certain Intercompany Interests, and Interests in SCC are conclusively presumed to have rejected the Plan and the votes of such Holders will not be solicited.

(3)      **Voting Classes**

As a result of the provisions of B, only the votes of Holders of Claims in Classes 5 and 6 will be solicited with respect to the Plan.

(4)      **Acceptance by Impaired Classes**

In accordance with Bankruptcy Code section 1126(c), and except as otherwise provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Holders of at least two-third in dollar amount and more than one-half in number of Claims, who have actually timely and properly cast ballots to vote to accept or reject the Plan, accept the Plan.

(5)      **Confirmation Pursuant to Bankruptcy Code sections 1129(a)(10) and 1129(b)**

The Debtors and the Committee seek Confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to Classes 7, 8, 9, and 10, as the Holders of Claims and Interests in Classes 7 and 10, and certain Claims and Interests in Classes 8 and 10 are presumed to have rejected the Plan. The Debtors and the Committee also seek Confirmation of the Plan pursuant to any other Classes of Claims or Interests which vote to reject the Plan. The Debtors and the Committee reserve the right to modify the Plan to the extent that Confirmation pursuant to Bankruptcy Code section 1129(b) requires modification.

70265001.10

### D. Treatment of Executory Contracts and Unexpired Leases

#### (1) Assumption of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, as of the Effective Date, all Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases will be deemed: (i) assumed by the applicable Debtor in accordance with, and subject to the provisions and requirements of Bankruptcy Code sections 365 and 1123; and (ii) if so indicated on the Schedule of Assumed Executory Contracts and Unexpired Leases, assigned to the other party identified as the assignee for each assumed Executory Contract and Unexpired Lease. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to Bankruptcy Code sections 365 and 1123. The Debtors reserve the right to reject any executory contrary or unexpired lease until the Confirmation Date.

Notwithstanding anything to the contrary in the Plan, all guaranties of a Debtor or non-Debtor (including, without limitation, Senior Care Centers, LLC and Harden Healthcare, LLC) guarantying obligations and liabilities of a Debtor or a Reorganized Debtor under any of the Plan Facilities Leases shall remain and continue after the Effective Date and shall in no way be impacted or diminished by any provision of the Plan.

#### (2) Cure of Defaults

Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default shall be satisfied, pursuant to Bankruptcy Code section 365(b)(1), by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by Bankruptcy Code section 365(b)(1) shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtors unless otherwise ordered by the Bankruptcy Court. The Debtors reserve the right to reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute. The Debtors further reserve the right to reject executory contracts or unexpired leases related to the Rejected Facilities to facilitate transition to new operators not later than ninety (90) days after the Effective Date. Notwithstanding the foregoing, the Debtors shall only be permitted to reject the Plan Facilities Leases until entry of the Confirmation Order.

At least fourteen (14) days before the Confirmation Hearing, the Debtors will provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. Any counterparty to an Executory

70265001.10

Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, may add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption. Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### (3) Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement, or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have rejected each Executory Contract and Unexpired Lease to which it is a party, unless such Executory Contract or Unexpired Lease: (1) was previously assumed or rejected; (2) was previously expired or terminated pursuant to its own terms; (3) is the subject of a motion or notice to assume filed on or before the Confirmation Date; or (4) is designated specifically or by category as an Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases. For the avoidance of doubt, any Executory Contract or Unexpired Lease which does not appear on the Schedule of Rejected Executory Contracts and Unexpired Leases and which is not subject to one of the four conditions for assumption of Executory Contracts and Unexpired Leases listed in this paragraph shall be deemed rejected.

The Confirmation Order shall constitute an order of the Bankruptcy Court under Bankruptcy Code sections 365 and 1123(b) approving the assumptions and assignments or rejections described above as of the Effective Date. Unless otherwise indicated, all assumptions and assignments or rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed and assigned pursuant to the Plan or by Bankruptcy Court order, shall vest in and be fully enforceable by the applicable assignee in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto

to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

### (4)    Rejection Claims

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (i) the Confirmation Date, or (ii) the effective date of rejection of such executory contract or unexpired lease.

### (5)    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

### E.    Means for Implementation

### (1)    Substantive Consolidation; Closing Chapter 11 Cases of Subsidiary Debtors

Except as otherwise expressly provided in the Plan, each Debtor shall continue to maintain its separate corporate existence for all purposes other than the treatment of Claims under the Plan and distributions from the Unsecured Creditor Trust. On the Effective Date, (1) all Unsecured Creditor Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other, (2) subject to Article III.A(7), all Intercompany Claims among the Debtors shall be eliminated and there shall be no distributions on account of such Intercompany Claims, (3) any obligation of a Debtor and any guarantee thereof by any other Debtor shall be deemed to be one obligation, and any such guarantee shall be eliminated, (4) each Claim filed or to be filed against more than one Debtor shall be deemed filed only against one consolidated Debtor and shall be deemed a single Claim against and a single obligation of the Debtors, and (5) any joint or several liability of the Debtors shall be deemed one obligation of the Debtors. On the Effective Date, and in accordance with the terms of the Plan, all Claims based upon guarantees of collection, payment or performance made by one Debtor as to the obligations of another Debtor shall be released and of no further force and effect. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors.

Under applicable law, including *In re ADPT DFW Holdings, LLC*, 574 B.R. 87 (Bankr. N.D. Tex. 2017) ("**Adeptus**"), courts look to a "traditional multi-factor test" and a "harm balancing test". The multi-factor test looks to:

the presence or absence of consolidated financial statements; the unity of interests and ownership between the various corporate entities; the existence of parent and intercorporate guaranties on loans; the degree of difficulty in segregating and ascertaining individual assets and liabilities; the transfer of assets without formal observance of corporate formalities; the commingling of assets and business functions; the profitability of consolidation at a single physical location; the parent corporation owns all or a majority of the capital stock of the subsidiary; the parent and subsidiary have common officers and directors; the parent finances the subsidiary; the parent is responsible for incorporation of the subsidiary; the subsidiary has grossly inadequate capital; the parent pays salaries, expenses, or losses of the subsidiary; the subsidiary has substantially no business except with the parent; the subsidiary has essentially no assets except for those conveyed by the parent; the parent refers to the subsidiary as a department or division of the parent; the directors or officers of the subsidiary do not act in interests of the subsidiary, but take directions from the parent; the formal legal requirements of the subsidiary as a separate and independent corporation are not observed; and the transfer of assets without formal observance of corporate formalities

As set forth by Judge Jernigan in *Adeptus*, the multi-factor test may be distilled into two factors: (1) whether creditors dealt with entities as single economic unit and did not rely on their separate identity in extending credit; and (2) whether the affairs of the Debtors are so entangled that consolidation will benefit all creditors. The harm-balancing test ultimately asks whether the substantive consolidation under the aforementioned factors will cause more harm than benefit.

At the Confirmation Hearing, the Debtors intend to demonstrate that substantive consolidation is appropriate. The Chapter 11 Cases are the jointly administered cases of approximately 130 Debtors. Looking to the factors outlined in *Adeptus*:

(a)     Each of the Debtors are wholly owned subsidiaries of SCC.

(b)     The Debtors utilize consolidated financial statements and file a consolidated tax returns.

(c)     The Debtors' "nerve center" is SCC's corporate office in Dallas, which controls policy and management decisions at all Facilities. Thus, all of the Debtors are controlled by common officers and directors.

(d)     The Debtors utilize a centralized cash management system which sweeps cash from Facilities to centralized concentration accounts. The cash management system has a non-HUD and HUD component which commingles assets between non-HUD and HUD Facilities. As set forth in the Schedules, this has resulted in large intercompany claims amongst the Debtors. For example, SCC funded losses at subsidiary operating Facilities.

(e)     With certain exceptions, nearly all Debtors are liable under the ABL Credit Facility. SCC has also executed guarantees on certain leases.

(f)     Creditors viewed the Debtors as a single entity. For example, certain vendors would arrange for single payments from SCC but deliver good

31

and/or services across the Facilities. Certain vendors also have national contracts with the Debtors that were entered into by SCC and which covered multiple facilities. This is further evidenced by the multitude of identical and duplicate Claims filed against multiple Debtors.

(g)     The D&O Claims which are a significant asset of the Unsecured Creditor Trust Assets are owned jointly by the Debtors and would be difficult, if not impossible, to allocate between the Debtors.

(h)     Because the landlords to Rejected Facilities typically waive claims against the Debtors in connection with the transfer of operations, the vast majority of Unsecured Claims are trade creditors who dealt with the Debtors on an aggregate basis.

In short, the Debtors and the Committee believe that substantive consolidation is appropriate as it will maximize recoveries for all creditors. Because the liabilities of the Debtors are so intertwined that to untangle would be impossible and impracticable, the Debtors and the Committee believe that creditors would be harmed if substantive consolidation did not occur. However, the Debtors will not substantively consolidate Accounts Receivable between non-HUD and HUD Facilities. Further, the Cash and Accounts Receivable of the Love Funding Debtors, including the Love Funding Net Unencumbered Cash, shall remain segregated from, and will not be substantively consolidated with the assets of any other Debtors or Reorganized Debtors, and shall remain pledged to Love Funding, unless and until Love Funding's lien is released as provided in Section III(A)(3) of the Plan. At such time as Love Funding releases its lien on the Love Funding Net Unencumbered Cash and other assets of the Love Funding Debtors, such assets will be transferred to the concentration account of the HUD Debtors.

If the Bankruptcy Court does not approve the substantive consolidation of all of the Estates for the purposes set forth herein: (1) the Plan shall be treated as a separate plan of reorganization for each Debtor not substantively consolidated, and (2) the Debtors shall not be required to resolicit votes with respect to the Plan.

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases for the limited purposes set forth herein. If no objection to substantive consolidation is timely filed and served by any Holder of an Impaired Claim on or before the deadline to object to the confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court and the Debtors meet their burden of introducing evidence to establish that substantive consolidation is merited under the standards of applicable bankruptcy law, the Confirmation Order, which shall be deemed to substantively consolidate the Debtors for the limited purposes set forth herein, may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing shall coincide with the Confirmation Hearing.

In addition, if the Bankruptcy Court approves the substantive consolidation, the Plan shall serve as, and shall be deemed to be, a motion, pursuant to Bankruptcy Code sections 105(a) and 350(a) and Bankruptcy Rule 3022, for entry of a Final Decree closing, as of the later of (i) the

Effective Date and (ii) the date that the Confirmation Order becomes final and non-appealable, the Chapter 11 Cases of each of the Subsidiary Debtors. If no objection to entry of such a Final Decree is timely filed and served on or before the deadline to object to the confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, and the Debtors meet their burden of introducing evidence to establish that the Final Decree is merited under the standards of applicable bankruptcy law, the Confirmation Order, which shall be deemed to be a Final Decree with respect to the Subsidiary Debtors, may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the Final Decree and closing of the Chapter 11 Cases of the Subsidiary Debtors, and the objections thereto, shall be scheduled by the Bankruptcy Court, which hearing shall coincide with the Confirmation Hearing.

### (2) Financing and Restructuring Transactions

On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Debtors shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution, delivery, and filing, as applicable, of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation, each containing terms that are consistent in all material respects with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution, delivery, and filing, as applicable, of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation, each on terms consistent in all material respects with the terms of the Plan; (3) the execution, delivery, and filing, as applicable, of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) such other transactions that are required to effectuate the Restructuring Transactions in the most tax efficient manner, as determined by the Debtors; and (5) the execution, delivery, and filing, if applicable, of the New Corporate Governance Documents, and any documentation related to the New Common Stock or the Restructuring Transactions.

### (a) Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, the Debtors will assume the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases pursuant to Bankruptcy Code section 1123(b)(2). Such Schedule of Assumed Executory Contracts and Unexpired Leases shall include, among other things, Unexpired Leases for Facilities. In conjunction with the assumption of Executory Contracts and Unexpired Leases for any Plan Facilities subject to HUD Regulatory Agreements, the Debtors will continue to comply with all HUD statutes, regulations, rules, procedures, and policies, including, without limitation, all HUD handbooks, HUD Regulatory Agreements, and any HUD addenda to any Executory Contract or Unexpired Lease; *provided, however*, the Debtors reserve the right to rejected Executory Contracts or Unexpired Leases which impinge upon the Debtors' ability to operate.

On the Effective Date, the Debtors will assume the Medicare provider agreements for the Plan Facilities, and will continue to comply with all Medicare statutes, regulations, rules, procedures, and policies, including, without limitation, the payment of overpayments, civil money penalties, or other liabilities owed to CMS, if any exist.

70265001.10

#### (b)  Sources and Uses of Consideration for Plan Distributions

On the Effective Date, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded with Cash on hand, including Cash from operations and the proceeds of the Exit Facility and the Harden Escrow. Any Cash payments to be made pursuant to the Plan after the Effective Date will be made by the Reorganized Debtors, the Unsecured Creditors Trustee or a Distribution Agent. The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan; *provided, however*, that the funds belonging to the Love Funding Debtors shall remain segregated and shall not be used to satisfy other debts unless and until Love Funding's liens are released as provided in Section III(A)(3) of the Plan.

#### (c)  Exit Facility

The Exit Facility is expected be a $21 million senior credit facility provided by MidCap Financial Services, LLC (the "**Exit Facility Lender**") on the terms described herein.[14] Specifically, the Exit Facility is expected to consist of up to a $20 million revolving line of credit and a $1 million term loan. The revolving line of credit is expected to contain an accordion provision to increase the total commitment amount to $35 million. The Exit Facility likely will have availability in an amount up to 85% of eligible receivables. Like the ABL Credit Facility, the Exit Facility will finance HUD and non-HUD Facilities separately. The Exit Facility will comply with HUD statutes, regulations, rules, procedures, policies, and handbooks. Generally, the revolver for the non-HUD Facilities will be approximately $12 million and the revolver for the HUD Facilities will be approximately $8 million.

Interest on the outstanding balance of the revolving line of credit will be payable monthly in arrears at an expected annual rate of reserve-adjusted, 30-day LIBOR (subject to a 1.0% floor) plus 475 basis points, reset monthly. Additionally, the Debtors will pay the Exit Facility lender a collateral management fee expected to be 0.1% per month on the outstanding balance of the revolving line of credit. The revolving line of credit will also contain an unused line item fee expected to be 0.5% per annum and an expected 1% origination fee. Interest on the term loan will be calculated at an annual rate expected to be 30-day, reserve-adjusted LIBOR (subject to a 1.0% floor) plus 800 basis points. The term loan also has is expected to have 1.0% origination fee.

The Exit Facility will also likely contain the following terms and conditions, each of which are consistent with industry standard asset based lending:

(a)  Security. The Exit Facility shall be secured by a perfected first priority security interest in all of the Debtors' existing and future Accounts Receivable and Accounts Receivable-related items, along with all securities evidencing ownership interest in SCC and its subsidiaries, joint

---

[14] The following is a summary of the term sheet (the "**Exit Facility Term Sheet**") attached to the *Debtors' Expedited Motion for Entry of An Order (I) Approving Entry into Exit Financing Term Sheet, (II) Authorizing Payment of Related Exit Facility Fees, and (III) Granting Related Relief* [Docket No. 1921].

ventures, and all other assets of SCC including the existing rehabilitation division.

(b) <u>Financial Covenants</u>. SCC shall maintain a minimum fixed charge coverage ratio of 1.1 to 1.0. Fixed charge coverage ratio shall be calculated as follows:

EBITDA - unfinanced capital expenditures / (principal payments + cash interest + cash taxes)

(c) <u>Other Terms</u>. SCC shall maintain and pay for a depository account (or a lock box account) subject to a control agreement satisfactory to the Exit Facility Lender, into which the Debtors' cash collections shall be remitted and swept to the Exit Facility Lender on a daily basis for application to the revolving line of credit balance. The Exit Facility Lender shall perform periodic field audits on the Debtors' books and records and collateral information.

(d) <u>Loan Information</u>. The Debtors shall execute and deliver to the Exit Facility Lender such loan and security agreements, instruments, documents, certificates, and assurances as are reasonable and customary for similar loans, and as the Exit Facility Lender may reasonably require in connection with the closing of the Exit Facility. Such loan document shall provide, among other things, that the Exit Facility Lender shall have the right to assign the Exit Facility in whole or in part, at its discretion. The Exit Facility Lender shall receive an opinion from the Debtors' counsel satisfactory to the Exit Facility Lender.

Because the foregoing description of the Exit Facility is based upon the Exit Facility Term Sheet, the terms may change prior to the Effective Date. The Exit Facility Documents and any related motion will have the final terms of the Exit Facility and related fees.

The Reorganized Debtors will enter into the Exit Facility on the Effective Date. The Confirmation Order shall include approval of the Exit Facility and authorization for the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded to the lenders under the Exit Facility pursuant to the Exit Facility Documents. The Reorganized Debtors may use the Exit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

On the Confirmation Date, (1) the Reorganized Debtors are authorized to execute and deliver the Exit Facility Documents and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, and (2) subject to the occurrence of the Effective Date the Exit Facility Documents shall constitute the legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

70265001.10

### (d)  Rejected Facilities

The Debtors will continue to manage the Rejected Facilities. If such Rejected Facilities are not transitioned to new operators by the Effective Date the Debtors will: (a) execute an Interim Management Agreement until operations are transferred; (b) proceed with closing the Rejected Facility under applicable state law and the procedures set forth in the Closure Motion; (c) seek the appointment of a receiver; (d) seek emergency closure if necessary; or (e) continue to operate such Rejected Facility utilizing the OldCo Facility.

### (e)  Unsecured Creditor Trust Note

The Confirmation Order shall include approval of the Unsecured Creditor Trust Note and authorization for the Reorganized Debtors to enter into and execute the Unsecured Creditor Trust Note and such other documents as may be required to effectuate the treatment afforded to the Unsecured Creditor Trust under the Unsecured Creditor Trust Note and related documents.

On the Confirmation Date, (1) the Reorganized Debtors are authorized to execute and deliver the Unsecured Creditor Trust Note and related documents and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities; and (2) subject to the occurrence of the Effective Date the Unsecured Creditor Trust Note and related documents shall constitute the legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

**THE UNSECURED CREDITOR TRUST NOTE IS SUBJECT TO THE APPROVAL OF THE EXIT FACILITY LENDER. THEREFORE, THE UNSECURED CREDITOR TRUST NOTE MAY NOT BE ISSUED AND THE RECOVERY FOR THE UNSECURED CREDITOR TRUST BENEFICIARIES MAY BE LIMITED TO THE TRUST FUNDING, UNSECURED CREDITOR TRUST CAUSES OF ACTION AND 80% OF THE NEW COMMON STOCK.**

### (f)  Issuance of New Common Stock

On the Effective Date, the Reorganized Debtors shall be authorized to and shall issue the New Common Stock in accordance with the terms of the Plan without the need for any further corporate action. Each share of New Common Stock issued and distributed pursuant to the Plan shall be duly authorized, validly issued, and fully paid and non-assessable. Each distribution and issuance shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### (g)  Retained Causes of Action

In accordance with Bankruptcy Code section 1123(b), the Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the

occurrence of the Effective Date. The Reorganized Debtors may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Retained Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including, pursuant to Article VIII hereof, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with Bankruptcy Code section 1123 and except as otherwise provided herein, any Retained Causes of Action which a Debtor may hold against any entity shall vest in the applicable Reorganized Debtor. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Retained Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

### (h) Dissolution of Certain Entities

The Debtors and the Committee shall identify, in the Plan Supplement, Debtor entities that will be Reorganized Debtors. All other Debtors that are not Reorganized Debtors shall be dissolved; *provided, however*, that the Debtors and the Committee may supplement such list before the Effective Date consistent with the list of Rejected Facilities.

### (3) Corporate Action

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions as may be necessary or appropriate to effect any transactions described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the adoption, execution, delivery and/or filing of the New Corporate Governance Documents; (2) the selection of the directors, managers, and officers of the Reorganized Debtors; (3) the authorization, issuance, delivery, and distribution of the New Common Stock; (4) rejection, assumption, or assumption and assignment, as applicable, of the Executory Contracts and Unexpired Leases; (5) the entry into the Exit Facility Documents; (6) the adoption of the Management Incentive Plan; (7) the entry into the Unsecured Creditor Trust Agreement, Unsecured Creditor Note, and related documents; and (8) all other actions that may be required under applicable law.

70265001.10

On the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the officers or directors of the Debtors or Reorganized Debtors.

On or before the Effective Date (as applicable), the appropriate officers of the Debtors or Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name and on behalf of the Reorganized Debtors.

### (4)    Continued Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of Entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended or amended and restated by the Plan, the New Corporate Governance Documents, or otherwise, and to the extent such documents are amended or amended and restated, such documents are deemed to be amended or amended and restated pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### (5)    Vesting of Assets

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and any other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Causes of Action of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan, other than the Unsecured Creditor Trust Assets, shall automatically, without the notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, rule or any requirement of further action, vote or other approval or authorization of the security holders, equity owners, members, managers, officers or directors of the Debtors, the Reorganized Debtors or the other applicable Entity or by any other person (except for those expressly required pursuant hereto or by the Plan Documents), vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens, if any, which survive the occurrence of the Effective Date as described in this Plan. On and after the Effective Date, the Reorganized Debtors may operate their respective businesses and use, acquire, and dispose of their respective property, without notice to, supervision of or approval by the Bankruptcy Court

and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.

On the Effective Date, except as otherwise provided in the Plan and Confirmation Order, the Unsecured Creditor Trust Assets shall automatically vest in the Unsecured Creditor Trust, free and clear of all Claims, Liens, and other encumbrances. Confirmation of this Plan effects no settlement, compromise, waiver, or release of any Unsecured Creditor Trust Assets, including, without limitation, the Unsecured Creditor Trust Causes of Action. The non-disclosure or non-discussion of any particular Unsecured Creditor Trust Cause of Action is not and shall not be construed as a settlement, compromise, waiver, or release of any such Unsecured Creditor Trust Cause of Action. The Unsecured Creditor Trust and the Unsecured Creditor Trustee reserve any and all Unsecured Creditor Trust Causes of Action, whether such Unsecured Creditor Trust Causes of Action arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, the Record Date and/or any Distribution Date, including, without limitation, those Unsecured Creditor Trust Causes of Action that the Debtors, the Unsecured Creditor Trustee, or the Unsecured Creditor Trust may have against (a) any D&O Liability Insurance Policies; (b) the Debtors' prepetition officers and directors,[15] including, without limitation, Andrew Kerr, Michael Brandley and the officers and directors identified in the Disclosure Statement or the Plan Supplement; (c) payments to the Debtors' officers, directors, and senior management and the relatives of the Debtors' officers, directors and senior management prior to the Petition Date, including, without limitation, those persons and payments identified in the Debtors' schedules of assets and liabilities, the Disclosure Statement, or the Plan Supplement; (d) Granite, (e) Silver Star, (f) PharMerica and/or the PharMerica Funds; (g) any Insiders; (h) those persons repaid for "bridge loans" or "payday loans" prior to the Petition Date, including, without limitation, those persons identified in the Debtors' schedules of assets and liabilities, the Disclosure Statement or the Plan Supplement; (i) the Debtors' prepetition Professionals,[16] including, without limitation, BDO and the Debtors' accounting firm BKD; and (j) any contempt claims relating to or arising under the Contempt Motion. The entry of the Confirmation Order shall not constitute *res judicata* or otherwise bar, estop or inhibit any actions by the Debtors, the Unsecured Creditor Trust or the Unsecured Creditor Trustee relating to any Unsecured Creditor Trust Causes of Action referred to in this Article VI.E, the Plan Supplement, the Disclosure Statement or otherwise. Except as specifically set forth herein, the Unsecured Creditor Trustee shall constitute the representative of the Estates for purposes of retaining, asserting and/or enforcing the Unsecured Creditor Trust Causes of Action under Bankruptcy Code section 1123(b)(3)(B). On the Effective Date, the Unsecured Creditor Trustee shall be substituted as a party of record in all pending litigation brought by, on behalf of, or against the Debtors without need for further order of the Bankruptcy Court to the extent such litigation constitutes an Unsecured Creditor Trust Cause of Action. For the avoidance of doubt, the Unsecured Creditor Trustee shall be substituted for the Committee with respect to all pending litigation and/or discovery to which the Committee is a party, including, but not limited, the discovery described in or related to the Motion of the Official Committee of Unsecured Creditors of Senior Care Centers, LLC, *et al.* for Entry of an Order Authorizing the Examination of Granite Investment Group, LLC, Silver Star Investments, LLC, the Granite Board Appointees and the Granite Landlords Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure filed in the Chapter 11 Cases at docket number 644, and

---

[15] Except for those who are Released Parties.
[16] Except for those who are Released Parties.

the Unsecured Creditor Trustee shall be authorized to commence and/or continue any discovery related to Unsecured Creditor Trust Causes of Action, including pursuant to Bankruptcy Rule 2004.

### (6) Charter, Bylaws, and New Corporate Governance Documents

On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors' respective certificates of incorporation and bylaws (and other formation and constituent documents relating to limited liability companies) shall be amended or amended and restated as may be required to be consistent with the provisions of the Plan, the New Corporate Governance Documents and the Exit Facility Documents. The New Corporate Governance Documents shall, among other things: (1) authorize the issuance of the New Common Stock; and (2) be modified or deemed to be modified to include a provision pursuant to and only to the extent required by Bankruptcy Code section 1123(a)(6), prohibiting the issuance of non-voting equity Securities. After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

### (7) Directors and Officers

On the Effective Date, all managers, directors, and other members of the existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the applicable New Board.

*Management*. Michael Beal shall be the Chief Executive Officer of the Reorganized Debtors and shall designate individuals to serve in such other officer capacities, as necessary, as of the Effective Date, which additional officers, if any, shall be disclosed in the Plan Supplement or Disclosure Statement. All officers of the Reorganized Debtors shall be subject to the ordinary rights and powers of the applicable New Board to remove or replace them in accordance with the New Corporate Governance Documents.

*New Board*. The initial composition of the New Board shall be Michael Wyse, a current member of the Debtors' Board of Directors, and two other members selected by the Committee, and thereafter shall be determined in accordance with the New Corporate Governance Documents. Pursuant to Bankruptcy Code section 1129(a)(5), the identity of the members of the initial New Board will be disclosed in the Plan Supplement.

### (8) Management Incentive Plan

On or as soon as practicable following the Effective Date, the New Board shall adopt the Management Incentive Plan. As part of this Management Incentive Plan, twenty percent (20%) of the New Common Stock in the Reorganized Debtors shall be reserved for the Reorganized Debtors' management team, including, but not limited to New Management. The Management Incentive Plan will include a vesting schedule with respect to the New Common Stock, non-compete provisions and non-solicitation provisions. On or as soon as reasonably practicable following the Effective Date, the Reorganized Debtors also expect to enter into employment agreements with the members of senior management, which agreements will set forth salary,

40

benefits, severance and other provisions. The members of Reorganized Debtors' senior management may be entitled to bonuses, as part of their compensation package, in the discretion of the Reorganized Debtors' New Board.

The material terms of the Management Incentive Plan shall be disclosed in the Plan Supplement and shall be reasonably acceptable to the Debtors and the Committee. For the avoidance of doubt, the Management Incentive Plan and any employment agreements will be implemented after the Effective Date and the Debtors are not seeking the Bankruptcy Court's approval of any of these items in connection with confirmation of the Plan. The Management Incentive Plan and employment agreements will be left to the review and approval of the New Board following the Effective Date.

### (9) Exemption from Registration Requirements

The offering, issuance, and distribution of all shares of New Common Stock under the Plan will be exempt from, among other things, the registration and prospectus delivery requirements under the Securities Act or any similar federal, state, or local laws in reliance upon Bankruptcy Code section 1145 to the maximum extent permitted and applicable and, to the extent that reliance on such section is either not permitted or not applicable, the exemption set forth in section 4(a)(2) of the Securities Act.

### (10) Cancellation of Notes, Instruments, Certificates, and Other Documents

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, or in any Plan Document, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or Interest and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan; *provided, however*, that first priority liens of Love Funding shall remain in place and effective unless and until Love Funding's liens are released as provided in Section III(A)(3) of the Plan.

### (11) General Settlement of Claims and Interests

Unless otherwise set forth in the Plan, pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved by the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and within the range of reasonableness.

70265001.10

### (12)    Section 1146(a) Exemption

To the fullest extent permitted by Bankruptcy Code section 1146(a), any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; (4) the grant of collateral as security for any or all of the Exit Facility; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of Bankruptcy Code section 1146(c), shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### (13)    Unsecured Creditor Trust

### (a)    Creation of Unsecured Creditor Trust

On the Effective Date, the Reorganized Debtors (solely in their capacity as successors to Debtors) and the Unsecured Creditor Trustee shall execute the Unsecured Creditor Trust Agreement, and shall take all steps necessary to establish the Unsecured Creditor Trust in accordance with the Plan, which shall be for the benefit of the Holders of Claims that receive beneficial interests in the Unsecured Creditor Trust. Additionally, on the Effective Date the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to the Unsecured Creditor Trust all of their rights, title and interest in and to all of the Unsecured Creditor Trust Assets, and in accordance with Bankruptcy Code section 1141, the Unsecured Creditor Trust Assets shall automatically vest in the Unsecured Creditor Trust free and clear of all Claims and Liens, subject only to (a) the beneficial interests in the Unsecured Creditor Trust, and (b) the expenses of the Unsecured Creditor Trust as provided for in the Unsecured Creditor Trust Agreement. On the Effective Date, the Trust Funding shall be paid from a source other than cash in the bank account of any Debtor that is party to a HUD Regulatory Agreement.

The Unsecured Creditor Trust shall be governed by the Unsecured Creditor Trust Agreement and administered by the Unsecured Creditor Trustee and the Unsecured Creditor Trust Advisory Board. The powers, rights, responsibilities and compensation of Unsecured

Creditor Trustee and Unsecured Creditor Trust Advisory Board shall be specified in the Unsecured Creditor Trust Agreement. The Unsecured Creditor Trustee shall hold and distribute the Unsecured Creditor Trust Assets in accordance with the Plan and the Unsecured Creditor Trust Agreement. Other rights and duties of the Unsecured Creditor Trustee, the Unsecured Creditor Trust Advisory Board and the Holders of Claims that receive beneficial interests in Unsecured Creditor Trust shall be as set forth in the Unsecured Creditor Trust Agreement.

After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the Unsecured Creditor Trust Assets. To the extent that any Unsecured Creditor Trust Assets cannot be transferred to the Unsecured Creditor Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Bankruptcy Code section 1123 or any other provision of the Bankruptcy Code, such Unsecured Creditor Trust Assets shall be deemed to have been retained by the Reorganized Debtors and the Unsecured Creditor Trust shall be deemed to have been designated as a representative of the Reorganized Debtors pursuant to Bankruptcy Code section 1123(b)(3)(B) to enforce and pursue such Unsecured Creditor Trust Assets on behalf of the Reorganized Debtors for the benefit of the Holders of Claims that receive beneficial interests in Unsecured Creditor Trust. Notwithstanding the foregoing, all net proceeds of such Unsecured Creditor Trust Assets shall be transferred to the Unsecured Creditor Trust to be distributed in accordance with this Plan.

### (b) Transfer of Assets and Causes of Action to Unsecured Creditor Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Unsecured Creditor Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and the Unsecured Creditor Trustee will take this position on the Unsecured Creditor Trust's tax return accordingly. The beneficiaries of the Unsecured Creditor Trust shall be treated as the grantors of the Unsecured Creditor Trust and as the deemed owners of the Unsecured Creditor Trust Assets. For U.S. federal income tax purposes, the transfer of assets to the Unsecured Creditor Trust will be deemed to occur as (a) a first-step transfer of the Unsecured Creditor Trust Assets to the holders of Class 5 Claims and, to the extent the Unsecured Creditor Trust Assets are allocable to disputed Claims, to the disputed claims reserve described in the subsequent paragraph, and (b) a second-step transfer by such holders and, to the extent relevant with respect to the disputed claims reserve, to the Unsecured Creditor Trust. As a result, the transfer of the Unsecured Creditor Trust Assets to the Unsecured Creditor Trust should be a taxable transaction, and the Debtors should recognize gain or loss equal to the difference between the tax basis and fair value of such assets. As soon as possible after the transfer of the Unsecured Creditor Trust Assets to the Unsecured Creditor Trust, the Unsecured Creditor Trustee shall make a good faith valuation of the Unsecured Creditor Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, Unsecured Creditor Trustee, and the holders of Claims receiving beneficial interests in the Unsecured Creditor Trust shall take consistent positions with respect to the valuation of the Unsecured Creditor Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Unsecured Creditor Trust shall in no event be dissolved later than 5 years from the creation of such Unsecured Creditor Trust unless the Bankruptcy Court, upon motion within the 6-month period prior to the 5th anniversary (or within the 6-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 5 years with a private letter

ruling from the IRS or an opinion of counsel satisfactory to the Unsecured Creditor Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Unsecured Creditor Trust Assets.

If the Unsecured Creditor Trust were not to qualify as a "liquidating trust", as described above, the Unsecured Creditor Trustee will take the position that it is a partnership for U.S. federal income tax purposes. In either case, each Unsecured Creditor Trust Beneficiary will include its distributive share of income, as reported to it by the Unsecured Creditor Trustee, and may not receive sufficient cash to satisfy its tax liability. The Internal Revenue Service may take the position that the Unsecured Creditor Trust should be taxed as a corporation for U.S. federal income tax purposes. If the Internal Revenue Service were to prevail in that position, the Unsecured Creditor Trust would be subject to U.S. federal income tax which would reduce the return to an Unsecured Creditor Trust Beneficiary. Each Unsecured Creditor Trust Beneficiary is urged to consult with its own tax advisor.

With respect to amounts, if any, in a reserve for disputed claims, it is expected that such account will be treated as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for such disputed claims reserve and will be subject to tax annually on a separate entity basis. Any taxes (including with respect to interest, if any, earned in the account, or any recovery on the portion of assets allocable to such account in excess of the disputed claims reserve's basis in such assets) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). Holders of Claims receiving beneficial interests in the Unsecured Creditor Trust will be bound by such election, if made by the Unsecured Creditor Trustee, and, as such, will, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

### (c) The Administration of the Unsecured Creditor Trust and Powers of the Unsecured Creditor Trustee

The Unsecured Creditor Trust shall be administered by the Unsecured Creditor Trustee with oversight by the Unsecured Creditor Trust Advisory Board pursuant to the Unsecured Creditor Trust Agreement. In the event of any inconsistency solely between this Article VI.M of the Plan, the Unsecured Creditor Trust Agreement shall control, with the Plan controlling in all other cases. All compensation for the Unsecured Creditor Trustee and other costs of administration for the Unsecured Creditor Trust shall be paid by the Unsecured Creditor Trust in accordance with this Plan and the Unsecured Creditor Trust Agreement. The Unsecured Creditor Trust Agreement generally will provide for, among other things: (a) the payment of the expenses of the Unsecured Creditor Trust, including the cost of pursuing the Unsecured Creditor Trust Causes of Action; (b) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; (c) the investment of Cash by the Unsecured Creditor Trustee within certain limitations, including those specified in the Plan; (d) the orderly liquidation of the Unsecured Creditor Trust Assets; and (e) litigation of any

Unsecured Creditor Trust Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Unsecure Creditor Trust Causes of Action.

The Unsecured Creditor Trustee, on behalf of the Unsecured Creditor Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of those professionals without further order of the Bankruptcy Court from the Unsecured Creditor Trust Assets in accordance with the Plan and the Unsecured Creditor Trust Agreement.

The Unsecured Creditor Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Unsecured Creditor Trust. Any such indemnification shall be the sole responsibility of the Unsecured Creditor Trust and payable solely from the Unsecured Creditor Trust Assets, and the Debtors or the Reorganized Debtors shall have no obligations related to such indemnification.

In furtherance of and consistent with the purpose of the Unsecured Creditor Trust and the Plan, the Unsecured Creditor Trustee, for the benefit of the Unsecured Creditor Trust, shall (a) hold the Unsecured Creditor Trust Assets for the benefit of the Unsecured Creditor Trust Beneficiaries, (b) make distributions of proceeds of the Unsecured Creditor Trust Assets as provided in the Unsecured Creditor Trust Agreement, and (c) have the power and authority to prosecute and resolve any Unsecured Creditor Trust Causes of Action. The Unsecured Creditor Trustee shall be responsible for all decisions and duties with respect to the Unsecured Creditor Trust and the Unsecured Creditor Trust Assets, except as otherwise provided in the Unsecured Creditor Trust Agreement. In all circumstances, the Unsecured Creditor Trustee shall act in the best interests of the Unsecured Creditor Trust Beneficiaries.

Subject to the provisions of the Unsecured Creditor Trust Agreement, the Unsecured Creditor Trustee may settle, compromise, abandon, or withdraw any Unsecured Creditor Trust Cause of Action on any grounds or terms it deems reasonable, without further order of the Bankruptcy Court. The Unsecured Creditor Trustee may also settle or compromise any Disputed Claim, or withdraw any objection thereto, on any grounds or terms it deems reasonable, without further order of the Bankruptcy Court.

### (d)     Waived Avoidance Actions

Notwithstanding anything in the Plan to the contrary, on the Effective Date, all Waived Avoidance Actions shall be waived and released by the Debtors and the Reorganized Debtors and their Estates.

### F.     Provisions Governing Distributions

### (1)     Distributions for Claims and Interests Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Bankruptcy Court, the Reorganized Debtors, Distribution Agent, or the Unsecured Creditor Trustee shall make distributions under the Plan on account of Allowed Claims and Allowed Interests on the Effective Date, *provided, however*, that (1) Allowed Administrative Claims with respect to

liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims and Allowed Other Secured Claims shall be paid in accordance with A(3) and B(1)(b) respectively.

### (2)     Delivery of Distributions

### (a)     Record Date

The Reorganized Debtors, Distribution Agent, and Unsecured Creditor Trustee will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Reorganized Debtors, Distribution Agent, and Unsecured Creditor Trustee shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the Claims Register as of the close of business on the Distribution Record Date.

### (b)     Distribution Agent

All distributions made under the Plan that are to be made on the Effective Date shall be made by the Debtors or Unsecured Creditor Trustee as Distribution Agent or any other duly appointed Distribution Agent, unless otherwise specified herein.

### (c)     Distribution Process

Unless the Holder of an Allowed Claim, the Debtors or the Reorganized Debtors, as applicable, and the Committee or Unsecured Creditor Trustee, as applicable, agrees to a different distribution date or except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed as of the Effective Date shall be made on the Effective Date or as soon as thereafter practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

### (d)     Fractional, Undeliverable, and Unclaimed Distributions

*Fractional Distributions.* Whenever any distribution of fractional shares of New Common Stock would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction to the nearest share (up or down), with half shares or less being rounded down. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

*Undeliverable and Unclaimed Distributions.* If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors, Distribution Agent, or Unsecured Creditor Trustee as undeliverable or is otherwise unclaimed, no further distributions shall be

46

made to such Holder unless and until the Reorganized Debtors, the Distribution Agent, or Unsecured Creditor Trustee is notified in writing of such Holder's then current address. Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their property or the Unsecured Creditors Trustee or Unsecured Creditors Trust. In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates, the Reorganized Debtors or the Unsecured Creditors Trust, as applicable, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Nothing contained in this Plan shall require any Distribution Agent, including, but not limited to, the Reorganized Debtors or the Unsecured Creditor Trustee, to attempt to locate any Holder of an Allowed Claim.

### (e) Minimum Distributions

The Reorganized Debtors, Distribution Agent, or Unsecured Creditor Trustee shall not be required to make distributions valued at less than $50.00.

### (3) Interest on Claims

Unless otherwise explicitly provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

### (4) Claims and Interests Paid or Payable by Third Parties

### (a) Claims and Interests Paid by Third Parties

A Claim or Interest shall be reduced in full, and such Claim or Interest shall be Disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim or Interest receives payment in full on account of such Claim or Interest from a party that is not a Debtor, a Reorganized Debtor or the Unsecured Creditor Trust. To the extent a holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor, a Reorganized Debtor or the Unsecured Creditor Trust on account of such Claim or Interest, such holder shall repay, return, or deliver any distribution held by or transferred to such holder to the applicable Reorganized Debtor or the Unsecured Creditor Trust, as applicable, to the extent such holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.

### (b) Claims and Interests Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim or Allowed Interest that is payable pursuant to one of the Debtors' insurance policies until the

holder of such Allowed Claim or Allowed Interest has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim or Interest, then immediately upon such insurers' agreement, such Claim or Interest may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Notice and Claims Agent without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### (5) Setoffs

Except as otherwise expressly provided for herein, each Debtor, Reorganized Debtor or the Unsecured Creditor Trustee, as applicable, pursuant to the Bankruptcy Code (including section 553), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may, but shall not be required to, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature whatsoever that such Debtor, Reorganized Debtor or the Unsecured Creditor Trustee, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effectuate such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor or the Unsecured Creditor Trustee of any such Claims, rights, and Causes of Action that such Reorganized Debtor or the Unsecured Creditor Trust may possess against such holder. In no event shall any holder of Claims be entitled to setoff any such Claim against any Claim, right, or Cause of Action of any Debtor, Reorganized Debtor or the Unsecured Creditor Trust (as applicable) unless such holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to Bankruptcy Code section 553 or otherwise.

### (6) Allocation Between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to interest, if any, on such Allowed Claim accrued and unpaid through the Effective Date.

### (7) Provisions for Resolving Disputed Claims

### (a) Disputed Claims Process

Subject to the next two paragraphs, only the Debtors, the Reorganized Debtors, or the Unsecured Creditor Trustee may object to the allowance of any Claim or Administrative Claim. Such objections shall be served and filed on or before the later of (a) one hundred eighty (180) days after the Effective Date, or (b) such later date as may be fixed by the Bankruptcy Court, without any limitation of the Debtors, the Reorganized Debtors, or the Unsecured Creditor Trustee to seek additional extensions of time.

The Unsecured Creditor Trustee, and only the Unsecured Creditor Trustee, shall be responsible for all aspects of the Claims resolution process related to Claims to be satisfied from the Unsecured Creditor Trust, including the objection to the allowance of any General Unsecured Claim. The Reorganized Debtors shall cooperate with the Unsecured Creditor Trustee and provide access to and preserve all books and records which shall be necessary for the reconciliation of such Claims at no cost to the Unsecured Creditor Trust.

After the Effective Date, (i) the Reorganized Debtors, with the consent of the Unsecured Creditor Trustee, shall be accorded the power and authority to allow or to settle and compromise any Claim (other than a General Unsecured Claim) without notice to any other party, or approval of, or notice to the Bankruptcy Court, and (ii) the Unsecured Creditor Trustee shall be accorded the power and authority to allow or to settle and compromise any General Unsecured Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court. For the avoidance of doubt, if the Reorganized Debtors object to a Claim on the grounds that such Claims should be re-classified as a General Unsecured Claim, the Reorganized Debtors shall not be permitted to settle such claim objection without the consent of the Unsecured Creditor Trustee.

### (b) Estimation of Claims

Subject to subsection (1) of this Article VII.G, the Debtors, the Reorganized Debtors, or the Unsecured Creditor Trustee may at any time request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to Bankruptcy Code section 502(c), regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors or the Unsecured Creditor Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. The aforementioned objection, estimation, and resolution procedures are intended to be cumulative and rather than procedures that are exclusive of the others.

### (c) Amendments to Claims

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and the Reorganized Debtors or Unsecured Creditor Trustee, as applicable, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

### (d) Distributions for Disputed Claims

If an objection, motion to estimate or other challenge to a claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors, Distribution Agent, or Unsecured Creditor Trustee, as applicable, shall provide the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### G. Effect of Plan Confirmation

### (1) Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims and Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.

### (2) Plan Injunction

**Except as otherwise provided herein or in the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been satisfied or released pursuant to the Plan shall be permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, the Unsecured Creditor Trust, or the Exculpated Parties, or any of their respective properties or Estates: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering in any manner or by any means any judgment, award, decree, or order on account of, in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind on account of, in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of, in connection with or with respect to any such Claims or Interests, unless such Entity has Filed, on or before the Confirmation Date, a motion with the Bankruptcy Court requesting the right to perform such setoff, notwithstanding any indication that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing**

or continuing in any manner any action or other proceeding of any kind on account of, in connection with or with respect to any such Claims or Interests discharged, released, exculpated, or settled pursuant to the Plan or that is otherwise inconsistent with the provisions of the Plan.

  (3)  **Protected Party Injunction**

    The Bankruptcy Court shall retain exclusive jurisdiction over any suit brought on account of any claim or Cause of Action against a Protected Party in connection with or arising out of the administration of, or otherwise related to, the Chapter 11 Cases; the negotiation and pursuit of the Plan, the Disclosure Statement, the Exit Financing, the Restructuring Transactions, and all related agreements, instruments, and other documents (including the Plan Supplement and other Plan Documents); the solicitation of votes for, or confirmation of, this Plan; the funding of this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of New Common Stock under or in connection with the Plan; or the transactions in furtherance of any of the foregoing, and any Entity bringing such suit shall do so in the Bankruptcy Court or such other court as the Bankruptcy Court may direct. The other protections provided by this Section shall be in addition to, and shall not limit, any other releases, indemnifications, injunctions, exculpations, any and all other applicable law or rules protecting the Protected Parties from liability. For the avoidance of doubt, nothing in the Plan or Confirmation Order is intended to affect the police or regulatory activities of Governmental Units.

    The Protected Parties, who are receiving the benefit of the Protected Party Injunction, are limited to the following persons in their capacities as such during the Chapter 11 Cases: (a) the Debtors and the Reorganized Debtors; (b) the following Debtors' Professionals: Gray Robinson, P.A.; H2C Analytics, LLC; Newbridge Management, LLC; Omni Management Group, Inc.; Sitrick and Company; Polsinelli PC; and Rochelle McCullough, LLP; (c) the Exit Facility Lender; (d) the individual members of New Management; (e) the following members of the Debtors' Board: David Stewart, Gideon Argov, Timothy J. Hughes, and Michael Wyse; (f) the Committee and the members thereof; (g) the Committee's Professionals: Greenberg Traurig, LLP and FTI Consulting; (h) the Patient Care Ombudsman; (i) the Distribution Agent; (j) the Unsecured Creditor Trust Advisory Board, including its members and professionals; (k) the Unsecured Creditors Trustee and its professionals; (l) Harden Healthcare; and (m) the Harden Investors.

  (4)  **Exculpation**

    Notwithstanding anything to the contrary in the Plan or Confirmation Order, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any cause of action, claim or other assertion of liability for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, administration, implementation or Filing of, as

applicable, Plan, the Plan Supplement, the Disclosure Statement, the Exit Facility, the Exit Facility Documents, the New Corporate Governance Documents, the Unsecured Creditor Trust Agreement, the Unsecured Creditor Trust Note, or any other contract, instrument, release or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of Confirmation, the pursuit of Consummation, the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct. Notwithstanding anything to the contrary herein, the Exculpated Parties shall, in all respects, be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the Solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the Solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. With respect to any Exculpated Party that is not also an Estate fiduciary, such exculpation shall be as provided for by Bankruptcy Code section 1125(e). Notwithstanding anything contained herein, no exculpation shall be given in contravention of *Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

The Exculpated Parties who are receiving the above exculpation are the following parties solely in their capacity as such during the Chapter 11 Cases: (a) the Debtors and Reorganized Debtors; (b) the Committee and the members thereof; (c) the Patient Care Ombudsman; and (d) with respect to each of the foregoing Entities, each of their directors, officers, attorneys, investment bankers, accounts, consultants, and other Professionals.

(5)     **Releases by the Debtors**

Pursuant to Bankruptcy Code section 1123(b), and notwithstanding anything to the contrary in the Plan or Confirmation Order, on the Confirmation Date and effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, and to the fullest extent permitted by applicable law, in exchange for their cooperation, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates (the "Debtor Releasing Parties") from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivate claim asserted on behalf of any Debtor and/or Reorganized Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or

52

Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, preparation, implementation or administration of the Plan, the Plan Supplement, the Disclosure Statement, the Exit Facility, the Exit Facility Documents, the New Corporate Governance Documents, or any other Plan Documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (the "Debtor Release"). Notwithstanding anything contained herein, no release shall be given in contravention of *Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any claim, cause of action or other assertion of liability released pursuant to the Debtor Release.

For the avoidance of doubt, the Debtor Release shall not operate to waive, release, or otherwise impair: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by a Final Order of the Court or any other court of competent jurisdiction, including, without limitation, the Unsecured Creditor Trust Causes of Action; and/or (ii) the Rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Court.

The Released Parties, who are receiving the benefit of the above release from the Debtors, the Reorganized Debtors and their Estates, are limited to the following persons in their capacities as such during the Chapter 11 Cases: (a) the Debtors and the Reorganized Debtors; (b) the following Debtors' Professionals: Gray Robinson, P.A.; H2C Analytics, LLC; Newbridge Management, LLC; Omni Management Group, Inc.; Sitrick and Company; Polsinelli PC; and Rochelle McCullough, LLP; (c) the Exit Facility Lender; (d) the individual members of New Management (Michael Beal, Teri Bonar, Michael Templeton, Anthony Arnaudy, Michael White, Tonia Bellard, and such other individuals designated to serve in such other officer capacities, as of the Effective Date as disclosed in the Plan Supplement); (e) the following members of the Debtors' Board: David Stewart, Gideon Argov, Timothy J. Hughes, and Michael Wyse; (f) the Committee; and (g) the Committee's Professionals: Greenberg Traurig, LLP and FTI Consulting.

70265001.10

### (6) Release and Exculpation Injunction

**The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, fines, penalties, or liabilities released or exculpated pursuant to the Plan**

### (7) Discharge of Claims and Termination of Interests

Pursuant to Bankruptcy Code section 1141(d), and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section Bankruptcy Code 501; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to Bankruptcy Code section 502; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

## H. Conditions Precedent to Confirmation and Effective Date

### (1) Conditions Precedent to Confirmation

The following is the list of conditions precedent to Confirmation of the Plan:

(1) the Bankruptcy Court shall have entered an order approving the Disclosure Statement as containing adequate information and such order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

(2) a form of Unsecured Creditor Trust Agreement and the New Corporate Governance Documents shall be agreed upon by the Debtors and the Committee;

(3) the proposed Unsecured Creditor Trustee, the members of the Unsecured Creditor Trust Advisory Board and the members of the New Board are identified and disclosed;

70265001.10

(4)     the Plan Supplement is filed; and

(5)     the Confirmation Order shall have been entered by the Bankruptcy Court confirming the Plan in form and substance acceptable to the Debtors and the Committee, and such order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

### (2)     Conditions Precedent to Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section IX.D of this Plan:

(1)     the Conditions precedent to Confirmation contained in Section IX.A are met;

(2)     the Unsecured Creditor Trust Agreement and Unsecured Creditor Trust Note shall each be executed and the Unsecured Creditor Trustee shall have been appointed and accepted such appointment;

(3)     the Exit Facility Documents shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facilities shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Facilities shall occur concurrently with the occurrence of the Effective Date;

(4)     all conditions precedent to the issuance of the New Common Stock, other than any conditions related to the occurrence of the Effective Date shall have occurred;

(5)     the New Corporate Governance Documents shall have been duly filed with the applicable authorities in the relevant jurisdiction;

(6)     all governmental and material third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall be in full force and effect (which, in the case of an order of judgment of any Court, shall mean a Final Order), and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

(7)     all documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery, and (b) been effected or executed by all Entities party thereto, or will be deemed executed and delivered by virtue of the effectiveness of the Plan as expressly set forth herein, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

### (3)     Waiver of Conditions Precedent

The conditions to Confirmation and Effective Date set forth in this H may be waived only by consent of the Debtors and the Committee without any notice to other parties in interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan. The failure to satisfy any condition before the Confirmation Date or the Effective Date may be asserted by the Debtors or the Committee as a reason not to seek Confirmation or declare an Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or the Committee, in their respective sole discretion). The failure of the Debtors or the Committee, in their respective sole discretion, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each such right shall be deemed an ongoing right, which may be asserted at any time.

### (4)     Effect of Nonoccurrence of Conditions

If the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Committee, or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Committee, or any other Person or Entity.

## I.     Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of and related to the Chapter 11 Cases for, among other things, the following purposes:

(1)     to hear and determine all matters relating to the assumption or rejection of executory contracts or unexpired leases and the allowance of Cure amounts and Claims resulting therefrom;

(2)     to hear and determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(3)     to Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim against or Interest in a Debtor, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims and Interests

(4)     to ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(5)     to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 330 or 503;

(6)     to hear and determine any application to modify the Plan in accordance with Bankruptcy Code section 1127, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(7)     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing;

(8)     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court, except as otherwise provided herein;

(9)     to issue orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan;

(10)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(11)     to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(12)     to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan, the Disclosure Statement or the Plan Supplement;

(13)     to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(14)     to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in

connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

(15)     to hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(16)     to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(17)     to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases with respect to any Person;

(18)     to take any action and issue such orders as may be necessary to construe, enforce, or implement the Exit Facility;

(19)     to hear any other matter related to the Plan and not inconsistent with the Bankruptcy Code; and

(20)     to enter a Final Decree closing the Chapter 11 Cases.

## J.     Miscellaneous Provisions

### (1)     Amendment or Modification of the Plan

Alterations, amendments, or modifications of the Plan may be proposed in writing jointly by the Debtors and the Committee at any time before the Confirmation Date; provided that the Plan, as altered, amended, or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123 and the Debtors and the Committee shall have complied with Bankruptcy Code section 1125. The Debtors and the Committee may jointly modify the Plan at any time after Confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123 and the circumstances warrant such modifications. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### (2)     Plan Supplement

Draft forms of certain documents, agreements, instruments, schedules and exhibits specified in the Plan shall, where expressly so provided for in the Plan, be contained in the Plan Supplement filed from time to time. Unless otherwise expressly provided in the Plan, the Debtors and the Committee may file any Plan Supplement until ten (10) days prior to the Voting Deadline and may alter, modify or amend any Plan Supplement in accordance the Plan. Holders of Claims or Interests may obtain a copy of the Plan Supplement on the Case Website or the Bankruptcy Court's Website.

70265001.10

### (3) Additional Documents

On or before the Effective Date, the Debtors and the Committee may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### (4) Governing Law

Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent the Plan, an exhibit or a schedule hereto, a Plan Document or any settlement incorporated herein provide otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof.

### (5) Time

To the extent that any time for the occurrence or happening of an event as set forth in the Plan falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

### (6) Severability

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### (7) Revocation

The Debtors and the Committee reserve the right to jointly revoke and withdraw the Plan prior to the entry of the Confirmation Order. If the Debtors and the Committee jointly revoke or withdraw the Plan, the Plan shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors.

70265001.10

### (8) Dissolution of the Committee

On the Effective Date, the Committee shall dissolve automatically and all members thereof (solely in their capacities as such) shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases; provided, however, that the Committee shall continue to exist and its Professionals shall continue to be retained and entitled to reasonable and documented compensation, without further order of the Bankruptcy Court, with respect to: (a) the preparation and prosecution of any final fee applications of the Committee's Professionals and requests for reimbursement of the Committee members, and (b) prosecuting or participating in any appeal of the Confirmation Order or any request for consideration thereof. Upon the resolution of (a) and (b), the Committee shall be immediately dissolved, released and discharged.

### (9) Termination and Discharge of the Patient Care Ombudsman.

As of the Effective Date, the Patient Care Ombudsman appointed in the Chapter 11 Cases shall be discharged and relieved from his duties and responsibilities as Patient Care Ombudsman in the Chapter 11 Cases. The Patient Care Ombudsman and the Patient Care Ombudsman's Professionals are authorized to dispose of or destroy any documents provided by the Debtors or any third parties to the Patient Care Ombudsman, if any, in the course of their evaluation, in accordance with their respective document retention policies or applicable law.

### (10) Reservation of Rights

The Plan shall have no force or effect unless and until entry by the Bankruptcy Court of the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or the Committee with respect to the holders of Claims or Interests prior to the Effective Date.

### (11) Reservation of Rights in Favor of Governmental Units

Notwithstanding anything in the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any other plan document:

(1) nothing shall discharge, release, preclude, or enjoin (a) any liability of the Debtors to any Governmental Unit that is not a Claim; (b) any Claim of a Governmental Unit arising on or after the Effective Date; (c) any police or regulatory liability of any entity to a Governmental Unit , including, without limitation, any police or regulatory liability that such entity would be subject to as the post-Effective Date owner or operator of property; (d) any Claim of or liability to a Governmental Unit on the part of any Person or Entity other than the Debtors; or (e) any obligations preserved or established in any order entered by the Bankruptcy Court in any Debtor's case;

(2)     nothing shall enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Bankruptcy Court, any liability described in the preceding clause; and

(3)     nothing shall authorize the transfer of any representative payee applications, representative payee status, Social Security beneficiary trust accounts, NPIs, provider agreements, licenses, permits, registrations, or other governmental authorizations or approvals without compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

Notwithstanding anything in the Plan, Disclosure Statement, Confirmation Order, Plan Supplement, or any other plan document, for the avoidance of doubt, the United States of America and HHSC shall not grant any exculpation as provided in Article VIII.C, and the United States of America's and HHSC's rights, claims, and defenses of setoff or recoupment, if any, are expressly preserved, as are the Debtors' defenses and rights thereto.

Notwithstanding anything in the Plan, Disclosure Statement, Confirmation Order, Plan Supplement, or any other plan document, the Debtors and Reorganized Debtors shall abide by and comply with all: (a) U.S. Department of Health and Human Services' and the Centers for Medicare & Medicaid Services' statutes, regulations, rules, procedures, and policies, including, without limitation, the Debtors' Medicare provider agreements; (b) U.S. Social Security Administration's statutes, regulations, rules, procedures, and policies, including, without limitation, the Debtors' representative payee applications; (c) U.S. Department of Housing and Urban Development's statutes, regulations, rules, procedures, and policies, including, without limitation, all HUD handbooks, the Debtors' HUD Regulatory Agreements, the HUD addenda to all leases executed by the Debtors, and the intercreditor agreements executed by the Debtors, certain HUD Lenders and the ABL Lenders; (d) all other applicable Federal statutes, regulations, rules, procedures, and policies; and (e) HHSC's statutes, regulations, rules, procedures, and policies, including, without limitation, the Debtors' Medicaid provider agreements.

## (12)     Voting and Claims Agent

The Voting and Claims Agent shall be relieved of such duties on the date of the entry of the Final Decree or upon written notice by the Reorganized Debtors or Unsecured Creditor Trustee.

## (13)     Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## (14)     Service of Documents

Any pleading, notice, or other document shall be in writing and, unless otherwise provided herein, shall be served on:

70265001.10

| | |
|---|---|
| Debtors/Reorganized Debtors | Senior Care Centers, LLC<br>600 North Pearl Street, Suite 1100<br>Dallas, Texas 75201<br>Attention: Kevin O'Halloran |
| Counsel to Debtors | Polsinelli PC<br>600 3rd Avenue, 42nd Floor<br>New York, New York 10016<br>Attention: Jeremy R. Johnson |
| | Polsinelli PC<br>2950 N. Harwood, Suite 2100<br>Dallas, Texas 75201<br>Attention: Trey A. Monsour |
| Counsel to the Committee | Greenberg Traurig, LLP<br>77 West Wacker Drive, Suite 3100<br>Chicago, Illinois 60601<br>Attention: Nancy A. Peterman |
| | Greenberg Traurig, LLP<br>1000 Louisiana Street, Suite 1700<br>Houston, Texas 77002<br>Attention: Shari L. Heyen |
| United States Trustee | Office of the United States Trustee<br>1100 Commerce Street, Room 976<br>Dallas, Texas 75242<br>Attention: Meredyth A. Kippes |

### (15)  Entire Agreement

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan on the Effective Date.

### (16)  Inconsistency

To the extent the Confirmation Order and/or the Plan is inconsistent with the Disclosure Statement or any other agreement entered into between the Debtors and any third party, the Plan shall control the Disclosure Statement and any previous agreements and the Confirmation Order shall control the Plan.

70265001.10

### (17)     Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors and the Committee will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code sections 1125 and 1126, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation. Accordingly, the Debtors, the Reorganized Debtors, the Committee and each of their respective Related Parties shall be entitled to, and upon the Confirmation Date will be granted, the protections of Bankruptcy Code section 1125(e).

## IV.     Confirmation of the Plan

### A.     Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to conduct a hearing to consider confirmation of the Plan. The Bankruptcy Court has scheduled the Confirmation Hearing for September 27, 2019 at 9:30 a.m. (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned confirmation Hearing.

Pursuant to the Bankruptcy Code, any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Northern District of Texas, and any orders of the Bankruptcy Court; (3) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (4) be Filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

| | |
|---|---|
| **Debtors** | **Senior Care Centers, LLC**<br>600 North Pearl Street, Suite 1100<br>Dallas, Texas 75201<br>Attention: Kevin O'Halloran |
| **Counsel to Debtors** | **Polsinelli PC**<br>600 3rd Avenue, 42nd Floor<br>New York, New York 10016<br>Attention: Jeremy R. Johnson |
| | **Polsinelli PC**<br>2950 N. Harwood, Suite 2100<br>Dallas, Texas 75201<br>Attention: Trey A. Monsour |

| | |
|---|---|
| **Counsel to the Committee** | **Greenberg Traurig, LLP**<br>77 West Wacker Drive, Suite 3100<br>Chicago, Illinois 60601<br>Attention: Nancy A. Peterman |
| | **Greenberg Traurig, LLP**<br>1000 Louisiana Street, Suite 1700<br>Houston, Texas 77002<br>Attention: Shari L. Heyen |
| **United States Trustee** | **Office of the United States Trustee**<br>1100 Commerce Street, Room 976<br>Dallas, Texas 75242<br>Attention: Meredyth A. Kippes |

Unless an objection to the Plan is timely served and Filed, it may not be considered by the Bankruptcy Court.

### B. Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Debtors and the Committee believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors and Committee have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtors and the Committee believe that the Plan satisfies or will satisfy the applicable confirmation requirements of Bankruptcy Code section 1129 set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors and the Committee, as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- The Debtors and the Committee will disclose, in the Plan Supplement, the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the

70265001.10

Plan. The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors and the Committee will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider.

- Either each Holder of an Impaired Claim will have accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such Voting Class pursuant to Bankruptcy Code section 1129(b).

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, and that Priority Tax Claims will be paid in accordance with Bankruptcy Code section 1129(a)(9)(C).

- At least one Class of Impaired Claims or Interests will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by Bankruptcy Code section 101(31), holding a Claim or Interest in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

### (1) Best Interests Test

Bankruptcy Code section 1129(a)(7) or the "best interests" test requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provide, with respect to each class, that each holder of a claim or an equity interest in such class either (1) has accepted the plan, or (2) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor or debtors are liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (1) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the chapter 11 cases were converted to a chapter 7 case and the assets of the particular debtors' estate were liquidated; (2) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the

priority scheme dictated in chapter 7; and (3) compare such holder's liquidation distribution to the distribution under the chapter 11 plan that such holder would receive if the chapter 11 plan were confirmed.

As shown in the Debtors' Liquidation Analysis (attached hereto as <u>Exhibit F</u>), Holders of General Unsecured Claims may not be entitled to any recovery if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interest in each Class with a recovery greater than or equal to the value of any distributions if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. In addition, distributions in a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors.

The liquidation valuations in the Liquidation Analysis have been prepared solely for use in this Disclosure Statement and do not represent values that are appropriate for any other purpose. Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession by or admission of the Plan proponents for any purpose.

### (2) Feasibility

Bankruptcy Code section 1129(a)(11) requires that a debtor demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared certain financial projections, which projections and the assumptions upon which they are based are attached to the Disclosure Statement as <u>Exhibit E</u> (the "**Financial Projections**"). Based on these Financial Projections, the Debtors and the Committee believe the feasibility standard has been met. Additionally, the Debtors and the Committee believe that sufficient funds will exist to make all payments required by the Plan, including on the Effective Date as set forth on <u>Exhibit H</u> (Sources and Uses of Cash on the Effective Date). The Debtors and the Committee believe that confirmation and consummation is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

### C. Acceptance by Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if each class of claims or interests that is impaired under a plan does not vote to accept the plan so long as one impaired class of claims has voted to accept the plan. Pursuant to Bankruptcy Code section 1129(b) , notwithstanding an impaired Class's rejection of the Plan, the Plan will be

confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

### (1)  No Unfair Discrimination

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). The Debtors and the Committee believe the Plan does not discriminate unfairly against any impaired class of Claims or Interests.

### (2)  Fair and Equitable

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The Plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class ("**Dissenting Class**"), *i.e.*, a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

- Secured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- Unsecured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property

- Interests. The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (1) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, and any fixed redemption price to which such holder is entitled; (b) the value of such interest; or (iii) if the class does not

67

receive the amount as required under clause (i) above, no class of interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors and the Committee believe the Plan is fair and equitable and shall seek confirmation of the Plan under Bankruptcy Code section 1129(b) to the extent applicable.

## V.     Certain Risk Factors to be Considered Before Voting

### A.     Bankruptcy Law Considerations

#### (1)     Parties May Object to the Plan's Classification of Claims and Interests

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors and the Committee believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### (2)     The Conditions Precedent to the Effective Date May Not Occur

As set forth more fully in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

#### (3)     The Debtors and the Committee May Not Obtain Sufficient Votes

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors and the Committee intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors and/or the Committee may seek to accomplish an alternative chapter 11 plan of reorganization. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

#### (4)     The Debtors and the Committee May Not be Able to Obtain Confirmation of the Plan

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.

If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against or Allowed Interests in them would ultimately receive on account of such Allowed Claims or Allowed Interests.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests would receive with respect to their Allowed Claims or Interests.

The Debtors and the Committee, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### (5) Nonconsensual Confirmation May be Necessary

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under Bankruptcy Code section 1124) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors and the Committee believe that the Plan satisfies these requirements, and the Debtors and the Committee may request such nonconsensual Confirmation in accordance with Bankruptcy Code section 1129(b). Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### (6) The Debtors and/or the Committee May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtors and the Committee reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### (7) The Chapter 11 Cases May be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of the Debtors' creditors, any or all of the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be

appointed or elected to liquidate assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors and the Committee believe that liquidation under chapter 7 would result in no distributions being made to unsecured creditors and Debtors' equity security holders and smaller distributions being made to the Debtors' secured lenders than those provided for in the Plan because of (1) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than the Debtors' businesses being reorganized as a going concern; (2) additional administrative expenses involved in the appointment of a trustee; and (3) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation, and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

### (8) The Effective Date May Not Occur

Although the Debtors and the Committee believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### (9) Contingencies Could Affect Votes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### (10) Releases, Injunctions, and Exculpation Provisions May Not be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, Exculpated Parties, and Protected Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and injunctions are not approved, certain parties may not be considered Released Parties, Releasing Parties, Exculpated Parties, or Protected Parties, and certain Released Parties, Exculpated Parties, or Protected Parties may withdraw their support for the Plan.

### (11) The Exit Facility May Not Close

If the Effective Date is significantly delayed, the Debtors may exhaust their available financing or their obligations under the ABL Credit Facility may mature. There is no assurance that the Exit Facility will close before the Effective Date or that the Debtors may obtain continued used of cash collateral. If either event were to occur, the liquidity necessary to maintain operations may be materially impaired.

### (12)     The OldCo Facility May Not Close

The OldCo Facility is expected to finance the accounts receivable relating to the Remaining Rejected Facilities. As of the Effective Date, the Debtors expect that all Remaining Rejected Facilities will be transitioned to new operators and that a vendor hold will be placed on all accounts receivable relating to the Remaining Rejected Facilities. If the OldCo Facility, which is expected to monetize those accounts receivable relating to the Remaining Rejected Facilities and subject to a vendor, does not close, the Debtors may not be able to consummate this Plan given that they may lack sufficient cash to pay all amounts due and owing on the Effective Date, unless certain creditors agree to defer payment over time.

Furthermore, if the Landlords for the Remaining Rejected Facilities are unable to locate New Operators, the Debtors may need to utilize the OldCo Facility to continue to sustain the operations of the Remaining Rejected Facilities until New Operators are located. However, because the Remaining Rejected Facilities do not generate sufficient revenue to sustain operations, if the OldCo Facility does not close, the Debtors will be forced to incur the significant administrative cost of closing the Remaining Rejected Facilities pursuant to the Closure Motion and the Debtors may not have sufficient cash available to cover such closure costs.

### (13)     The Debtors May Not Obtain Necessary Governmental Approvals

The Plan provides for an Exit Facility, the transition of operations of certain facilities to new operators, and potentially, the financing of the Remaining Rejected Facilities under the OldCo Facility. These actions will require the approval of several government agencies, including, without limitation, the U.S. Department of Health and Human Services and its Centers for Medicare & Medicaid Services ("**CMS**"), the U.S. Social Security Administration ("**SSA**"), and the U.S. Department of Housing and Urban Development ("**HUD**").

Pursuant to Medicare statutes, regulations, rules, policies, and procedures, SSA statutes, regulations, rules, policies, and procedures, and Texas law, various approvals are necessary for a new operator to take control of the Debtors' operations, including licenses, provider agreements, and representative payee status with respect to Social Security beneficiary trust accounts.

Pursuant to HUD statutes, regulations, rules, policies, and procedures, the HUD Debtors' Regulatory Agreements, the Intercreditor Agreements, and Section 15.3 (J) of the Healthcare Insurance Program Handbook, the written approval of HUD and the HUD Lenders is necessary prior to the Debtors' entry into any new AR financing where the AR lender takes a pledge of any HUD Debtor's accounts receivable, or the AR lender takes control of any HUD Debtor pursuant to a pledge of membership interests.

Further, pursuant to HUD statutes, regulations, rules, policies, and procedures, and the HUD Debtors' Regulatory Agreements, the written approval of HUD and the HUD Lenders is necessary prior to the transfer of operations of any HUD Debtor facility to a new operator.

The Debtors may not receive such government approvals, and the Plan, as a result, may not be feasible.

### B. Risks Related to Recoveries Under the Plan

#### (1) The Debtors May Not be Able to Achieve Their Project Financial Results

The Financial Projections represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Debtors' operations. The Financial Projections also depend on the Debtors' ability to retain key personnel, including the implementation of the Management Incentive Plan. While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized and are subject to known and unknown risks and uncertainties, many of which are beyond their control. If the Debtors do not achieve these projected financial results, (1) the value of the New Common Stock may be negatively affected, (2) the Reorganized Debtors may lack sufficient liquidity to maintain operations after the Effective Date, and (3) the Reorganized Debtors may be unable to pay postpetition obligations, including repaying the Exit Facility and/or the Unsecured Creditor Trust Note. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

#### (2) The Unsecured Creditor Trust Note May Not be Acceptable to the Exit Lenders

Under the terms of the Plan, the terms of the Unsecured Creditor Trust Note must be acceptable to the Exit Lenders. There can be no assurance of such acceptance. Without such acceptance, the Reorganized Debtors would not issue the Unsecured Creditor Trust Note, and the Unsecured Creditor Trust Note would not be included in the Unsecured Creditor Trust Assets.

**THE UNSECURED CREDITOR TRUST NOTE IS SUBJECT TO THE APPROVAL OF THE EXIT FACILITY LENDER. THEREFORE, THE UNSECURED CREDITOR TRUST NOT MAY NOT BE ISSUED AND THE RECOVERY FOR THE UNSECURED CREDITOR TRUST BENEFICIARIES MAY BE LIMITED TO THE UNSECURED CREDITOR TRUST CAUSES OF ACTION AND 80% OF THE NEW COMMON STOCK.**

#### (3) The New Common Stock Will Not Be Publicly Traded

There can be no assurance that an active market for the New Common Stock will develop, nor can any assurance be given to the prices at which such securities may be traded. The New Common Stock to be issued under the Plan will not be listed or traded on any nationally recognized market or exchange. Further, the New Common Stock has not been registered under the Securities Act or the Exchange Act, or any state securities law, or the laws of any other jurisdiction. Absent such registration, the New Common Stock may be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and other applicable securities laws. To the extent that the issuance and distribution of the New Common Stock are covered by Bankruptcy Code section 1145, such securities may be resold without registration under the Securities Act or other federal

securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. Certain recipients of the New Common Stock will be able to resell such securities without registration pursuant to the exemption provided by Rule 144 of the Securities Act, subject to any restrictions set forth in the New Organizational Documents of the Reorganized Debtors.

### (4)     Estimated Recoveries for Holders of General Unsecured Claims

The estimated recovery for Holders of General Unsecured Claims is speculative and based upon the estimated recoveries of the Unsecured Creditor Trust Causes of Action and the liquidation of the New Common Stock held by the Unsecured Creditor Trust, each of which may result in no recovery, or recovery several years from the Effective Date.

### C.     Risks Related to the Reorganized Debtors' Businesses

### (1)     Competition

The healthcare industry is competitive. The Reorganized Debtors will compete with other companies who provided skilled nursing, assisted living, rehabilitation, and similar services. There is no assurance that the Reorganized Debtors will be able to successfully compete and their reputation will develop and continue. Accordingly, the Debtors cannot predict what effect competitive pressures will have on the business going forward.

### (2)     Government Regulation

The healthcare industry is heavily regulated by state and federal authorities. Each state in which the Debtors has different regulations. The Debtors are required to satisfy the regulations of each state where its facilities are located. Additionally, the Debtors and the Reorganized Debtors are required to comply with certain regulatory requirements to implement the transactions contemplated by the Plan and such transactions may require certain regulatory approval. Regulation of the healthcare industry is constantly evolving. State regulations may in the future adopt new laws, regulations, and/or policies regarding a wide variety of matters related to the healthcare industry, which could directly or indirectly affect the operation, management, and/or ownership of the Facilities. The Debtors are unable to predict the content of any new regulations that may affect the business or what impact new regulations may have on the Business, including future financial performance.

### D.     Risks Associated With Forward Looking Statements

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in the Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

73

The Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward-looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Reorganized Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) anticipated future commodity prices.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in the Disclosure statement should not be considered assurances or guarantees of the amount of funds or the amount of claims that may be allowed in the various classes. While the Debtors believe that the Financial Projections contained in the Disclosure Statement are reasonable, there can be no assurance that they will be realized.

E.      **Disclosure Statement Disclaimer**

(1)     **The Information Contained in this Disclosure Statement is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

(2)     **The Disclosure Statement Was Not Approved by the SEC**

This Disclosure Statement has not and will not be filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has approved or disapproved of the securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

(3)     **Forward Looking Statements**

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to

in such forward- looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### (4) No Legal or Tax Advice is Provided to you by the Disclosure Statement

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### (5) No Admissions Made

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any Entity (including, without limitation, any Debtor or the Committee) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, the Committee, the Unsecured Creditor Trust, the Unsecured Trustee, or Holders of Allowed Claims or Interests or any other parties in interest.

### (6) No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors of the Committee (or any other Entity, as the case may be) to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

### (7) Information Was Provided by the Debtors and Relied Upon by the Debtors' Advisors

The Debtors' and the Committee's advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' and the Committee's advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

### (8) Potential for Inaccuracies and No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors and the Committee as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the

information set forth herein since that date. While the Debtors and the Committee have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors and the Committee nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors and the Committee may subsequently update the information in this Disclosure Statement, the Debtors and the Committee have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### (9)  No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors, the Committee, and the United States Trustee.

### (10)  Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or Reorganized Debtors, as applicable, and/or the Committee or Unsecured Creditor Trustee, as applicable, may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

## VI.  Alternatives to the Plan

### A.  Chapter 7 Liquidation

If the Plan or an alternative chapter 11 plan of reorganization cannot be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets. A discussion of the effect a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Section IV.B herein, titled "Confirmation Standards." The Debtors and the Committee believe that liquidation under chapter 7 would result in (1) smaller or equal distributions being made to creditors entitled to a recovery than those provided for in the Plan based on the liquidation value of the Debtors' assets and because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (2) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (3) the failure to realize the greater, going-concern value of all of the Debtors' assets.

70265001.10

## B.        Alternative Plan

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets.

The Debtors and the Committee believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserving their businesses and allowing their creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors and the Committee believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

The prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' businesses and operations. Among other things, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' vendors and service providers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships. Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. In addition, the Debtors may no longer be permitted to use cash collateral on a consensual basis. Under these circumstances, it is unlikely the Debtors could successfully reorganize without damage to their business operations and material decreases in recoveries for creditors.

## VII.    Certain Securities Law Matters

### A.        Issuance of New Common Stock

On the Effective Date, the Reorganized Debtors shall be authorized to and shall issue the New Common Stock in accordance with the terms of the Plan. The New Common Stock shall be distributed to the Unsecured Creditor Trustee for the benefit of the Unsecured Creditor Trust Beneficiaries.

In reliance upon Bankruptcy Code section 1145, the offer and/or issuance of the New Common Stock by the Reorganized Debtors is exempt from registration under the Securities Act of 1933 (as amended, the "**Securities Act**.") and any equivalent securities law provisions under state law.

### B.        Cancellation of Existing Interests

Except for purposes of evidencing a right to distributions under the Plan, on the Effective Date, all agreements and other documents evidencing Claims or rights of any Holder of a Claim against the Debtors and any options or warrants to purchase Interests, or obligating the Debtors to issue, transfer, or sell Interests or any other capital stock of the Debtors, shall be cancelled and

discharged. The Plan and Confirmation Order will extinguish all issued and outstanding shares of stock and other Interests of the Debtors.

## VIII. Certain U.S. Federal Income Tax Consequences to the Plan

Substantial uncertainty exists with respect to many of the tax issues discussed below. Therefore, each holder of a Claim is urged to consult its own tax advisor regarding the federal, state, and other tax consequences of the Plan. No rulings have been or are expected to be requested from the Internal Revenue Service with respect to any tax aspects of the Plan.

A summary description of certain United States ("**U.S.**") federal income tax consequences of the Plan is provided below. The description of tax consequences below is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Plan as discussed herein. Only the potential material U.S. federal income tax consequences of the Plan to the Debtors and to a hypothetical holder of Claims who are entitled to vote to confirm or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement. No rulings or determinations of the Internal Revenue Service (the "**IRS**") or any other tax authorities have been obtained or sought with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the holders of Claims. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED HEREIN.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY SPECIFIC HOLDER OF CLAIMS. EACH HOLDER OF CLAIMS IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

### A. Consequences to Debtors

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("**COD**") income recognized during the taxable year. COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the debtor in satisfaction of such discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Although Section 108(a) of the Tax Code provides exceptions to this rule, when dealing with an entity taxed as a partnership for federal income tax purposes, these exceptions apply only at the partner level. Since the Debtor SCC is an entity taxed as a partnership for federal income tax purposes (and the other Debtor entities are wholly owned (directly or indirectly) subsidiaries of SCC), the exceptions under Section 108(a) of the Tax Code will not apply to the Debtors. Thus, the Debtors may realize COD income as a result of the Plan. The ultimate amount of any COD income realized by the Debtors is uncertain because, among other things, it will depend on the fair market value of all assets, including debt and equity securities, issued to holders of claims issued on the Effective Date.

In addition, if a debtor conveys appreciated (or depreciated) property (*i.e.*, property having an adjusted tax basis less (or greater) than its fair market value) to a creditor in cancellation of debt, the debtor must recognize taxable income or loss (which may be ordinary income or loss, capital gain or loss, or a combination of each) equal to the excess or shortfall, respectively, of such fair market value over the debtor's adjusted tax basis in such property. Further, to the extent that the amount of the debt to be satisfied or discharged exceeds the fair market value of any property transferred to creditors in cancellation of that debt, this amount will result in COD income.

Based on all of the above, the Debtors will likely realize both taxable income or loss as well as COD income as a result of the implementation of the Plan. The ultimate amount of any COD income realized by the Debtors is uncertain because, among other things, it will depend on the fair market value of all assets, including debt and equity securities, issued to holders of claims (including the Unsecured Creditor Trust Assets transferred to the Unsecured Creditor Trust in satisfaction of all Allowed General Unsecured Claims that do not participate in the Convenience Claim Distribution) issued on the Effective Date. Any amount of income or loss from the transfer of appreciated or depreciated property as well as COD income due to implementation of the Plan should, pursuant to Section 108(e)(8) of the Tax Code, be allocated to the owners of Interests in the Debtor prior to the Effective Date.

70265001.10

### B. Consequences to Holders of Class 5 General Unsecured Claims

Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim will receive in satisfaction of its Claim a *pro rata* beneficial interest in the Unsecured Creditor Trust which will include all of the Unsecured Creditor Trust Assets. The U.S. federal income tax treatment to Holders of Allowed General Unsecured Claims may depend in part on the tax basis a Holder has in its Claim and, in some circumstances, what gave rise to or the nature of the Holder's Claim.

As set forth in Section (E)(13)(b) of Article III above, for federal income tax purposes, the Class 5 General Unsecured Claims will be satisfied by the deemed transfer to them of the Unsecured Creditor Trust Assets followed by a deemed contribution of said assets to the Unsecured Creditor Trust in exchange for their *pro rata* beneficial interest in said Unsecured Creditor Trust. It is intended that the Unsecured Creditor Trust be treated as a liquidating trust for federal income tax purposes, and if it does not so qualify, as a partnership for federal income tax purposes.

Because of the nature of the Unsecured Creditor Trust Assets, the deemed transfer by the Debtor of the Unsecured Creditor Trust Assets could cause a Holder to recognize gain, but not loss, due to said transfer. The Unsecured Creditor Trust Assets that will be deemed transferred to Holders of General Unsecured Claims consist of various assets including 80% of the equity interests in SCC, which is taxed as a partnership for federal income tax purposes. When a creditor exchanges its claim against a partnership for an equity interest in such partnership, under Section 721 of the Tax Code, the creditor normally (with some exceptions) will recognize no gain or loss on such exchange and will have a carryover tax basis from the claim to the partnership interest received. Although the above mentioned rule should apply in this case, the assets being deemed received by the General Unsecured Claimants other than the partnership equity interest in SCC must first be taken into account. To the extent that the (i) fair market value of the *pro rata* beneficial interest in the Unsecured Creditor Trust Assets other than the equity interest in SCC that a Holder of a General Unsecured Claim receives, exceeds (ii) the Holder's tax basis in such Claim, the Holder should recognize gain on such deemed transfer equal to such excess. Such gain could be capital or ordinary in nature depending on the genesis and nature of the Claim being satisfied. Pursuant to Section 721 of the Tax Code, the remainder of a Holder's Claim will be considered to be contributed to SCC in exchange for an equity interest in SCC in a transaction where no gain or loss is recognized. The non-recognition characterization of the exchange will not apply to the extent that the equity interest in SCC is deemed to be received in exchange for accrued but untaxed interest, unpaid rent or royalties and certain other types of claims. To the extent that a Holder's tax basis in its claim exceeds the fair market value of its *pro rata* beneficial interest in the Unsecured Creditor Trust Assets other than the equity interest in SCC received in the deemed exchange, it should receive a tax basis in the equity interest in SCC it receives equal to such excess.

**For the tax aspects and consequences of the creation and operation of the Unsecured Creditor Trust, refer to Section H(12) of Article III above.**

### C. Consequences to Holders of Class 6 Convenience Class Claims

Pursuant to the Plan, each Holder of a Convenience Class Claim will receive cash distributions in satisfaction of its Claim, and should be treated as exchanging such Convenience Class Claim for cash in a fully taxable exchange. The Holder of a Convenience Class Claim should recognize gain or loss equal to the difference between (a) the amount of cash received that is not allocable to accrued interest and (b) the Holder's tax basis in the Convenience Class Claim surrendered therefor by the holder. If the Holder of a Convenience Class Claim held such claim as a capital asset, such gain or loss will constitute a capital gain or loss (long term if held for more than one year), otherwise, such gain or loss will be ordinary in nature. To the extent that a portion of the cash received in exchange for the Convenience Class Claims is allocable to accrued but untaxed interest, the Holder may recognize ordinary income.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR GENERAL UNSECURED OR CONVENIENCE CLASS CLAIMS.**

### IX. Recommendation of the Debtors and the Committee

The Debtors and the Committee believe the Plan is in the best interests of all creditors, equity interest holders, and the Estates and urge the holders of Impaired Claims and Interests entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated: October 15, 2019
       Dallas, Texas

/s/ _____

Kevin O'Halloran
Chief Restructuring Officer
Senior Care Centers, LLC

/s/ _____

● 
Chairperson
Official Committee of Unsecured Creditors

81