Trey A. Monsour
State Bar No. 14277200
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tmonsour@polsinelli.com

Jeremy R. Johnson (Admitted *Pro Hac Vice*)
Polsinelli PC
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com

COUNSEL TO THE DEBTORS AND
DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Senior Care Centers, LLC, *et al.*,[1] | § | Case No. 18-33967 (BJH) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## DEBTORS' STATUS REPORT REGARDING
## EFFECTIVE DATE STATUS AS OF FEBRUARY 11, 2020

Senior Care Centers, LLC and its affiliated debtors and debtors in possession (the "**Debtors**") hereby file this report (this "**Report**") regarding the progress toward the Effective Date as defined in the *Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 1426] (the "**Plan**").

The Debtors report the following updates with respect to the Effective Date of the Plan:

1.     **Postconfirmation Operations** – The Debtors are pleased to report that, since confirmation, the Debtors have successfully downsized operations to the anticipated levels

---

[1] The Debtors in the Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief* [Docket No. 569] and may also be found on the Debtors' claims agent's website at https://omnimgt.com/SeniorCareCenters. The location of the Debtors' service address is 600 North Pearl Street, Suite 1100, Dallas, Texas 75201.

72290792.5

required by the Reorganized Debtors. In addition, the Debtors have exceeded their projected revenue projections by over $1 million in the aggregate. In addition, the "Frisco Facility" was reopened on or about December 31, 2019 and is performing well, with approximately 43 patients (pre-evacuation, the Frisco Facility had approximately 70-75 patients). The current census is ahead of budget.

2.     **Exit Financing** – One of the principal conditions to the Effective Date of the Plan is closing the Exit Facility Documents. Since the order confirming the Plan was entered on December 13, 2019, the estate professionals have worked diligently and constructively with the various proposed exit financing lenders and other relevant parties-in-interest in order to be in a position to close the exit financing as expeditiously as possible.

a.     Exit Financing Facilities: As of February 10, 2020, there are three (3) contemplated Exit Financing Facilities and the status of each is as follows:

(i)     Financing of Non-HUD Reorganized Debtors – This relates to the financing of 13 of the Reorganized Debtors on a go-forward basis. The collateral for this loan is substantially all assets of each of such Reorganized Debtors and is sized based upon the existing and future accounts receivable related to the 13 facilities. The Debtors believe that the financing documentation for these facilities is substantially complete and the Debtors are prepared to close this financing with MidCap Financial Trust ("**MidCap**") no later than February 28, 2020. This financing does not require approval by HUD.

(ii)     Financing of HUD Reorganized Debtors – This relates to the financing of approximately 9 of the Reorganized Debtors on a go-forward basis. The collateral for this loan is substantially all assets of each of such Reorganized Debtors and is sized based upon the existing and future accounts receivable related to the 9 facilities. This loan requires the approval of HUD and the cooperation of the three FHA lenders (the "**HUD Lenders**"), who are lenders to the Debtors' landlords, and thus will be required to execute intercreditor agreements and other ancillary documentation. The open issues with respect to this loan are:

• Execution of Intercreditor Agreements – The parties-in-interest to the Intercreditor Agreements are the HUD Lenders and MidCap. It is the Debtors' understanding that

2

these are largely form documents provided by HUD, other than the fact-specific cash flow arrangements, which are being negotiated between the HUD Lenders and MidCap. It is also the Debtors' understanding that a form of intercreditor agreement has been substantially agreed upon by the HUD Lenders and MidCap.

- HUD Approval of Exit Financing – This requires the HUD Lenders to obtain HUD's approval of the underlying financial arrangement. It is the Debtors' understanding that, although atypical, the HUD Lenders have been providing drafts of the various documents to HUD on a rolling basis. HUD had previously committed to significantly shortening the typical 3-4 month review to approximately 2 weeks.

(iii) <u>Financing of OldCo Liquidating Debtors</u> – This portion of the exit financing relates to the financing of the receivables generated by the Debtors' discontinued operations that have not yet been collected. This is primarily the receivables generated by 20 legacy Granite facilities transferred to Ensign and CaraDay on October 31, 2019, November 30, 2019, and December 31, 2019. It also includes approximately 3 additional independent facilities. Notably, this OldCo Liquidating facility does not include in its borrowing base any of the receivables related to (a) facilities transferred on April 1, 2019 and May 11, 2019, the so-called "Sabra Facilities" that are subject to an ongoing CHOW vendor hold; or (b) the final 11 Granite facilities which, via equity transfer agreements, were directly transferred to Granite in December, which hired an interim manager to operate such facilities pending a future CHOW, although such receivables are to be pledged as security for such loan as additional collateral. MidCap is the agent for this facility, which will be providing the capital for this facility together with a third-party lender. The open issues with respect to this loan are:

- <u>HUD Lenders' Release of Liens</u> – Certain of the HUD Lenders purport to hold liens second in priority to the liens of CIBC on the accounts receivable related to the HUD Lenders' real estate mortgages on the Granite facilities which allow the HUD Lenders to assert claims against the Debtors to the extent of any claims Granite has against the Debtors. However, pursuant to the terms of the Granite settlement, there are no remaining Granite claims that could properly be asserted by Granite (and by extension HUD), and therefore, the related asserted liens are valueless. Certain of the HUD Lenders assert that questions around these second liens must be resolved before release of any liens and

3

in order for MidCap to hold a first priority lien on the relevant receivables.

- Payment of HUD Lender Legal Fees – Certain HUD Lenders are seeking payment of their legal fees related to negotiations around exit financing.

- Potential Other Issues – The Debtors are waiting for feedback from MidCap and the third party capital source on two additional substantive issues with respect to this Loan: (i) whether the agreement will be subject to a continuing borrowing base, and (ii) the relationship between this loan and Non-HUD Reorganized Debtor Facility. MidCap has indicated that it expects the Borrowers on that Facility to fully guaranty this loan, and has informed the Debtors that it is discussing with the third party capital source what payments and priority of collateral the Reorganized Debtors will be responsible for if the accounts receivable securing this loan do not fully repay it before the expiration of its term. The Debtors are waiting for additional drafts for this exit financing facility reflecting verbal negotiations on other issues with respect to this loan.

b. Revised Sources and Uses[2] – The Plan provides several conditions necessary to the occurrence of the Effective Date. The principal outstanding requirement is closing the Exit Financing Facilities and paying the Debtors' prepetition secured lender, CIBC and their bank group, in full. As the revised sources and uses will show, to satisfy the payments required at the Effective Date, including payment to CIBC, it requires closing all three of Exit Financing Facilities simultaneously. Alternatively, the Debtors can satisfy the payments required at the Effective Date if CIBC remains the senior lender on the collateral for the OldCo Liquidating Debtors, but to date CIBC has not agreed to do so.

3. **Issues Related to Transition of Granite Facilities** – The remaining 13 Granite facilities were transferred to a new operator as of December 31, 2019. These facilities, like the 7 Granite facilities that were previously transferred, are subject to CHOW vendor holds. On December 4, 2019, the Court approved a settlement agreement ("**Granite Settlement**") by and among the Debtors and Granite regarding the 11 Granite facilities ("**Managed Facilities**").

---

[2] The Debtors will provide an updated sources and uses.

4

Pursuant to the Granite Settlement, the equity of the Managed Facilities was transferred to Granite and Granite was responsible for funding ongoing operations. The Granite Settlement also contemplated the execution of equity transfer agreements ("**ETAs**"), which agreements were executed and the Managed Facilities were transferred over several days in mid-December. Granite hired SAK Texas, LLC ("**SAK Texas**") to manage the facilities on an interim basis. Since the transfer of the Managed Facilities, several issues have arisen:

a.  Accounts Receivable: Pursuant to the terms of the settlement agreement between the Debtors and Granite as well as the related order of the Court, the proceeds from the accounts receivable related to services provided prior to transfer of a particular facility were the property of the Debtors, and the proceeds from the accounts receivable related to the period after the transfer were property of Granite. *Granite Settlement*, Section 12. The ETAs provided additional detail regarding the accounts receivable reconciliation process described in the Granite Settlement Agreement. Certain bank accounts, which receive the majority of payments related to the relevant accounts receivable, were originally contemplated to remain in the Debtors' control for 60 days after closing. *ETA*, Section 1.6. During this 60 day period, the Debtors agreed to reconcile and transfer the payments related to accounts receivable generated after the transfer to Granite on a weekly basis. *ETA*, Section 1.7. After the 60 day period expires and the bank accounts are transferred, Granite is required to do the same reconciliation and transfer the accounts receivable to the Debtors on a weekly basis going forward. The 60 day period expires February 11, 2020.

   (i)   Since the December 11, 2019 transfer date, the Debtors have complied with the terms of the Granite Settlement and ETAs and have diligently remitted the receipts to Granite on a weekly basis.

   (ii)  As of February 11, 2020, the date upon which the transfer of the bank accounts was originally contemplated, there is still over $1 million in pre-transfer accounts receivable outstanding that the Debtors anticipate will be collected in the next 30 days. In addition, the Debtors anticipate that Granite will owe approximately $750,000 in therapy services accounts receivable as of the end of this month. Collection and timely receipt of these accounts receivable are necessary sources of funding for Effective Date payments under the Plan.

   (iii) The Debtors understand that the Managed Facilities are in financial distress and in danger of missing payroll. In addition, the Debtors have had difficulty collecting post-closing therapy services

5

receivables. The Debtors are concerned that Granite has not sufficiently funded post-closing working capital in accordance with the ETA's and the order of the Court. The Debtors are further concerned that this failure of Granite to adequately fund working capital in accordance with its obligations will cause Granite to not timely remit payments related (i) certain equipment leases described in subsection (b) below, (ii) therapy services the Debtors have or will have rendered prior to the Effective Time and (iii) legacy accounts receivable. Any such failure to timely remit payments would breach the Granite Settlement and ETA's, endangering the Debtors ability to go effective. Any delay would significantly prejudice the Debtors.

b.    <u>Transition Services</u>: The Debtors agreed to provide Granite certain transition services related to telephone, internet and related items (the "**Transition Services**") free of charge until January 31, 2020. *Granite Settlement*, Section 13. In every "OTA" transaction approved by this Court except for Granite, such Transition Services were charged to new operators after the transfer. The equipment involved is typically leased from third parties by the Debtors. On or about January 31, 2020, Granite and SAK advised the debtors that they were not turning over the leased equipment and required continued use of the applicable equipment for ongoing operations. The Debtors have allowed Granite and SAK to continue to use such equipment provided lease payments related to such equipment are made by Granite and SAK in a timely fashion.

6

72290792.5

Dated: February 11, 2020
      Dallas, Texas

Respectfully submitted,

**POLSINELLI PC**

*/s/ Trey A. Monsour*

Trey A. Monsour
State Bar No. 14277200
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tmonsour@polsinelli.com

-and-

Jeremy R. Johnson (Admitted *Pro Hac Vice*)
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com

*Counsel to the Debtors and Debtors in Possession*

7